1
2
3
4

Anerio V. Altman, Esq. #228445
Lake Forest Bankruptcy
PO Box 515381
Los Angeles, CA 90051
Phone and Fax:  (949) 218-2002
avaesq@lakeforestbkoffice.com
**ATTORNEY FOR DEBTOR**
**SUSAN JO WHITE**

5
6
7

8

UNITED STATES BANKRUPTCY COURT

9

CENTRAL DISTRICT OF CALIFORNIA –SANTA ANA DIVISION

10

11       In re:  SUSAN JO WHITE                     )   **Case No.:** 8:24-bk-10187-SC
                                                    )
         Debtor                                     )   **Chapter:** 7
12                                                  )
                                                    )   **REQUEST FOR JUDICIAL NOTICE OF**
13                                                  )   **OUT OF CIRCUIT CASES CITED BY**
                                                    )   **THE DEBTOR IN SUPPORT OF HER**
                                                    )   **OPPOSITION TO CREDITOR'S**
14                                                  )   **MOTION TO DISMISS FILED AS**
                                                    )   **DOCKET #30**
15                                                  )
                                                    )   **JUDGE**
                                                    )   Hon. Scott Clarkson
16                                                  )
                                                    )   **HEARING**
17                                                  )   Date:  July 16th, 2024
                                                    )   Time:  11:00 A.M.
                                                    )   Place:  411 West Fourth Street #5C, Santa Ana,
18                                                  )   CA 92701
                                                    )
19                                                  )
                                                    )
20                                                  )

21

         ///

22

23

24

- 1 -

1

2

3

   DEBTOR SUSAN WHITE ("Debtor") provides notice of, and copies of, cases cited by the

Debtor from outside of this circuit in conformity with the Federal and Local Rules of Bankruptcy

Procedure.

| Case Name and Cite | Circuit and Year | District/BAP/Circuit |
|---|---|---|
| *In Re Gandy* 2014 WL 1374050 (Unpublished) | E.D. Tenn, 2014<br>6th Circuit | District |
| *Mitrano v. Consiglio (In re Consiglio)* Case No.: 15-31915 (AMN)) (Unpublished) | Bankr. D. Conn., Mar. 2, 2018<br>2nd Circuit | Bankruptcy Court |
| *Hiller v. Hiller (In re Hiller)* 482 B.R. 462, 469 | Bankr. D. Mass. 2012<br>2nd Circuit | Bankruptcy Court |
| *In re Longo* 364 B.R. 161 | Bankr. D. Conn. 2007<br>2nd Circuit | Bankruptcy Court |
| *Cousin v. Westbrook (In re Westbrook)* Case No.: 13-35191)(Unpublished) | Bankr. N.D. Ohio<br>6th Circuit | Bankruptcy Court |
| *In re Ellringer* 370 B.R. 905 | Bankr. D. Minn. 2007<br>8th Circuit | Bankruptcy Court |
| *In re Augugliaro* (Bankr. E.D. Mich., Sep. 24, 2021, No. 20-32000-JDA)(Unpublished) | Bankr. E.D. Mich. Sep. 24, 2021<br>6th Circuit | Bankruptcy Court |

REQUESTS FOR JUDICIAL NOTICE

| | | |
|---|---|---|
| _In re Ajunwa_ No. 11-11363 (ALG)(Unpublished) | Bankr. S.D.N.Y., Sep. 4, 2012 2nd Circuit | Bankruptcy Court |
| _Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse)_ 438 B.R. 631 | Bankr. W.D. Wis. 2010 7th Circuit | District Court |
| _Desiderio v. Parikh (In re Parikh)_ 508 B.R. 572, 594 | Bankr. E.D.N.Y. 2014 2nd Circuit | Bankruptcy Court |
| _In re Henebury_, 361 B.R. 595 | Bankr. 14 S.D. FL 2007 11th Circuit | Bankruptcy Court |
| _In re Pennington_, 348 B.R. 647 | Bankr. D. DE 15 2006 3rd Circuit | Bankruptcy Court |
| _In re Mundy_, 363 B.R. 407 | Bankr. M.D. PA 2007 3rd Circuit | Bankruptcy Court |

Dated:  July 2nd, 2024

Signed:/s/ ANERIO V. ALTMAN, ESQ.
ANERIO V. ALTMAN, ESQ.
ATTORNEY FOR DEBTOR
SUSAN WHITE

No. 15-5831
UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

# Gandy v. Schuchardt (In re Gandy)

645 F. App'x 348
Decided Apr 7, 2016

No. 15-5831 No. 15-5832

04-07-2016

In re: KEVIN BRIAN GANDY, Debtor KEVIN
BRIAN GANDY, Appellant/Cross-Appellee, v.
ELLIOTT J. SCHUCHARDT, Appellee/Cross-
Appellant.

JULIA SMITH GIBBONS, Circuit Judge.

**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 16a0197n.06** ON APPEAL FROM
THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
OPINION **BEFORE: MERRITT**, **GIBBONS**,
**and SUTTON**, **Circuit Judges.**

**JULIA SMITH GIBBONS**, **Circuit Judge.**
Creditor Elliott Schuchardt filed an adversary
proceeding for a determination that Chapter 7
debtor Kevin Gandy should be denied discharge
based upon 11 U.S.C. §§ 727(a)(2), (3), and (4).
The bankruptcy court denied Gandy's discharge
after finding that Gandy knowingly and
fraudulently made false statements under oath that
materially related to his bankruptcy case in
violation of 11 U.S.C. § 727(a)(4)(A), and Gandy
appealed. The district court affirmed, and Gandy
again appealed. We affirm.

## I.

On February 3, 2011, Gandy filed a voluntary
petition under Chapter 13 of the Bankruptcy Code.
Along with his petition, Gandy filed his Schedule
I—Current Income of Individual Debtor(s)
("Original Chapter 13 Schedule I"), which stated

2    that he was single and had *2 two dependents: a
48 year-old "Live-In Wife/Girlfriend" and a
disabled 27-year-old son. Gandy's Original
Schedule I also stated that he was employed as the
business and finance manager of West Side Honda
in Knoxville, Tennessee, that his gross monthly
income was $3,962, and that his "Combined
Average Monthly Income" was $2,801. Gandy
further noted that he is paid based on commission
and that his income fluctuates. Gandy signed a
declaration under penalty of perjury that he "read
the foregoing summary and schedules, . . . and that
they are true and correct to the best of [his]
knowledge, information, and belief." On June 21,
2011, Gandy filed an Amended Chapter 13
Schedule I, which revised his marital status to
"Married" and stated that his spouse was
unemployed.

In his Chapter 13 Statement of Current Monthly
Income and Calculation of Commitment Period
and Disposable Income ("Original Chapter 13
Means Test"), which was also filed on February 3,
2011, Gandy again represented that he was
unmarried. He further represented that his monthly
income totaled $4,333, which made his annualized
income $51,996, which is less than the applicable
median family income in Tennessee of $52,368.[1]
As with his Schedule I, Gandy signed a
declaration under penalty of perjury.

---

[1] Because Gandy represented that his
annualized income was less than that of the
applicable median family income in
Tennessee, he did not have to complete the
remainder of the Means Test, including



information regarding deductions from income, disposable income, and additional expenses.

Gandy also filed an Original Statement of Financial Affairs, in which he represented that he had not closed, sold, or otherwise transferred any financial accounts or instruments in the preceding year. As with his other filings, Gandy declared under penalty of perjury that his answers were true and correct. When Gandy filed an Amended Statement of Financial Affairs on June 21, 2011, he did not change his answer regarding whether he had closed any financial accounts in the preceding year, but in fact he had closed a bank account with Branch Banking *3 & Trust ("BB&T") on September 28, 2010, just four months before he initiated his Chapter 13 bankruptcy proceedings.

After a trial in August 2011, the bankruptcy court confirmed Gandy's Chapter 13 Plan, which required him to make semi-monthly payments of $141 for sixty months. The bankruptcy court overruled the objections of Schuchardt, who had challenged the accuracy of Gandy's schedules. As a condition of confirmation, the bankruptcy court required Gandy to file a declaration under penalty of perjury setting forth all income earned for each subsequent 90-day period and to pay any excess disposable income to the Chapter 13 Trustee. On February 5, 2013, the Chapter 13 Trustee filed a motion to dismiss Gandy's Chapter 13 case because Gandy had failed to pay $6,110 in excess disposable income. Before the bankruptcy court ruled on the Chapter 13 Trustee's motion to dismiss, however, Gandy converted his case to Chapter 7, pursuant to 11 U.S.C. § 1307.

Upon conversion to Chapter 7, Gandy filed under penalty of perjury a Chapter 7 Statement of Current Monthly Income and Means-Test Calculation ("Original Chapter 7 Means Test"), which again classified him as unmarried and listed a total current monthly income of $4,333 and an annualized income of $51,996. Because Gandy's reported annualized income was less than the

applicable median family income of $52,368, a presumption of abuse did not arise under 11 U.S.C. § 707(b)(2).[2]

> [2] If a debtor's annualized income exceeds the applicable median family income, then a presumption of abuse of bankruptcy law's protections arises under § 707(b), which requires the debtor to provide additional information to the court to ensure that the debtor is eligible for the total relief promised a Chapter 7 debtor. *See Schultz v. United States*, 529 F.3d 343, 347-48 (6th Cir. 2008). --------

Shortly thereafter, Schuchardt filed a motion to dismiss Gandy's Chapter 7 case, arguing that Gandy's Original Chapter 7 Means Test was false and constituted abuse under 11 U.S.C. § 707(b). The bankruptcy court denied Schuchardt's motion to dismiss because Gandy's income *4 as stated in his Means Test was low enough that only the court and the United States Trustee had standing to seek dismissal of Gandy's case under § 707(b)(6).

In response, Schuchardt filed the instant adversary proceeding, claiming that Gandy should be denied discharge for knowingly and fraudulently filing false documents in violation of 11 U.S.C. §§ 727(a)(4)(A), (a)(2), and (a)(3). Before Gandy responded to the Complaint, he filed a notice to withdraw his Original Chapter 7 Means Test, which he asserted had been filed "in error." On that same date, Gandy filed an Amended Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income ("Amended Chapter 13 Means Test"), in which he certified that he was unmarried and which updated his monthly income to $4,689, with an annualized income of $56,268—more than the applicable median family income of $52,368. Likewise, Gandy filed an Amended Chapter 7 Statement of Current Monthly Income and Means-Test Calculation ("Amended Chapter 7 Means Test"), in which he certified that he was unmarried and which updated his monthly income to $4,689, with an annualized income of $56,268.

The bankruptcy court found that Gandy had made material false oaths with fraudulent intent in his Original/Amended Chapter 13 Means Test, his Original/Amended Chapter 7 Means Test, his Original/Amended Chapter 13 Schedule I, and his Original/Amended Statement of Financial Affairs, which warranted denial of discharge under 11 U.S.C. § 727(a)(4)(A). However, the bankruptcy court declined to find that Gandy had violated 11 U.S.C. §§ 727(a)(2) or (a)(3). The district court affirmed the ruling of the bankruptcy court.

## II.

"On appeal following the district court's review of the bankruptcy court's decisions, we review the bankruptcy court's orders directly rather than the intermediate decision of the district *5 court." *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 411 (6th Cir. 2013) (citation omitted). We therefore review the bankruptcy court's legal conclusions *de novo* and its findings of fact for clear error. *Id*. A factual finding is clearly erroneous only if, based on the whole record, we are left with a definite and firm conviction that a mistake has been made. *See, e.g.*, *United States v. McGee*, 494 F.3d 551, 554 (6th Cir. 2007). Although "[t]he Bankruptcy Code should be construed liberally in favor of the debtor," discharge is a privilege and not a right, as a debtor who has engaged in certain types of misconduct is not entitled to a discharge. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *see* 11 U.S.C. § 727.

The bankruptcy court denied discharge on the sole ground that Gandy made false oaths. Schuchardt contends that the bankruptcy court erred in not additionally finding that Gandy violated §§ 727(a)(2) and 727(a)(3). However, "[i]f any one of these grounds justifies the denial of discharge, we need not decide the propriety of the others." *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177 (5th Cir. 1992). Because we affirm the bankruptcy

court's denial of discharge pursuant to § 727(a)(4), we do not address the merits of Schuchardt's §§ 727(a)(2) and 727(a)(3) claims.

11 U.S.C. § 727(a)(4)(A) provides as follows: "The court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." In order to merit denial of Gandy's discharge, Schuchardt must prove five elements by a preponderance of the evidence: "1) [Gandy] made a statement under oath; 2) the statement was false; 3) [Gandy] knew the statement was false; 4) [Gandy] made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *In re Keeney*, 227 F.3d at 685 (citing *In re Beaubouef*, 966 F.2d at 178). "Whether a debtor has *6 made a false oath under section 727(a)(4)(A) is a question of fact," which we review for clear error. *Eifler v. Wilson & Muir Bank & Trust Co.*, 588 F. App'x 473, 477 (6th Cir. 2014) (quoting *In re Keeney*, 227 F.3d at 685). False statements in the debtor's schedules are sufficient to justify the denial of discharge. *In re Beaubouef*, 966 F.2d at 178.

We previously considered fraudulent intent and materiality under 11 U.S.C. § 727(a)(4)(A) as follows:



Gandy v. Schuchardt, 64 F. App'x ... (6th Cir. 2016)

[I]ntent to defraud "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998). A reckless disregard as to whether a representation is true will also satisfy the intent requirement. *See id.* "[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case." *Williamson* [*v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987)] (citation omitted). However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence. *See* [*Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997)]. The subject of a false oath is material if it "'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Beaubouef*, 966 F.2d at 178 (citation omitted).

*In re Keeney*, 227 F.3d at 685-86. Further, materiality does not turn solely on an asset's value, but also depends on "whether the omission was detrimental to creditors." *Pratt v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (quoting *In re Beaubouef*, 966 F.2d at 178). "It makes no difference that he does not intend to injure his creditors when he makes a false statement." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).

The bankruptcy court found that Gandy made material false oaths in his Original/Amended Chapter 13 Means Test, his Original/Amended Chapter 7 Means Test, his Original/Amended Chapter 13 Schedule I, and his Original/Amended Statement of Financial Affairs. The bankruptcy court reasoned that "based upon the Defendant's own pay advices, the *7 $4,333.00 reflected in the Chapter 13 Means Test and again in the Chapter 7 Means Test is not an accurate figure, and the

Defendant's testimony that the three day delay in filing his bankruptcy schedules caused a mathematical error is not plausible and is clearly incorrect." *In re Gandy*, No. 11-30369, Adversary No. 13-3061, 2014 WL 1374050, at *6 (Bankr. E.D. Tenn. Apr. 8, 2014). Gandy's "testimony at trial that he had not remembered when the [BB&T] account had been closed did not satisfy the court that the failure to list the account was a mere oversight." *Id.* at *7. Further, Schuchardt's "objections and motions put [Gandy] on notice that he should recheck his numbers, which were sworn to under penalty of perjury." *Id.* at *8.

On appeal, Gandy argues that the false oaths were mere mistakes and that he lacked the intent required by the statute. He further asserts that the false oaths were not material, as required by *In re Keeney*. According to Gandy, because the false statements in the Chapter 13 and Chapter 7 Means Test would not affect his eligibility to file a Chapter 7 petition, he should not be denied discharge. As for his failure to disclose the BB&T account, Gandy claims that he "stated several times at trial that the omission was caused by sheer inadvertence." First Br. at 22.

As early as February 22, 2011, the same month in which Gandy filed his original Chapter 13 petition, Schuchardt's objections to the accuracy of Gandy's filings should have put Gandy on notice that his stated income was false. Although the bankruptcy court ultimately confirmed Gandy's Chapter 13 plan, and overruled Schuchardt's objections, the court ordered Gandy to file his payroll stubs with the court and to pay additional earned income to the Chapter 13 Trustee—which further should have put Gandy on notice regarding the accuracy of his filings. Gandy again filed under penalty of perjury the incorrect income amount when he converted his case to Chapter 13 more than two years later. Gandy did not finally correct the mistakes in his Original Chapter 13 Means Test until July 31, 2013, and in his Original Chapter 7 Means Test until *8 September 11, 2013. Gandy's reliance on inaccurate schedules for

more than two years, despite repeated objections from Schuchardt, certainly gave the bankruptcy court reason to find that Gandy had acted with the requisite fraudulent intent. *See Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) ("Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.").

Despite signing declarations under the penalty of perjury, Gandy relied upon false income numbers for years, and he continued to rely upon these numbers as Schuchardt repeatedly challenged their veracity. *See* Fed. R. Bankr. P. 1008. He has never explained why some of his documents and his testimony at trial indicate that he is married, while others list him as unmarried, nor has he explained how he could spend $147 per month on educational expenses for a minor child when his only stated dependents are a wife/girlfriend and twenty-seven year old son. Contrary to the "fundamental purpose of § 727(a)(4)(A) . . . to insure that the trustee and creditors have accurate information without having to do costly investigations," Gandy presented confusing and dishonest information to the bankruptcy court on multiple occasions. *See United States Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (quoting *Jahn v. Flemings (In re Flemings)*, 433 B.R. 230, 237 (Bankr. E.D. Tenn. 2010)). When considered together, the numerous and repeated false oaths in the Original/Amended Chapter 13 Means Test, his Original/Amended Chapter 7 Means Test, his Original/Amended Chapter 13 Schedule I, and his Original/Amended Statement of Financial Affairs, prove a clear example of "a pattern of reckless and cavalier disregard for the truth." *Stevenson v. Taylor (In re Taylor)*, 461 B.R. 420, 423 (E.D. Mich. 2011) (citation omitted).

Gandy's argument that none of the false oaths in his Original/Amended Chapter 13 Means Test, his Original/Amended Chapter 7 Means Test, his Original/Amended Chapter 13 *9 Schedule I, and his Original/Amended Statement of Financial

Affairs, are material, is unavailing. The test for determining whether a false oath is material is not so narrow as Gandy suggests when he contends that materiality requires that a false oath "would have changed [something] with respect to the case or produced an asset or other benefit to the estate." *See* First Br. at 26. Rather, a false oath is material if it "bears a relationship to the bankrupt's business transactions." *In re Beaubouef*, 966 F.2d at 178 (citation omitted). "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Id.* (citation omitted).

In this case, the false oaths regarding Gandy's income were detrimental to creditors. Gandy's misstated income potentially affected the rights of Schuchardt and other creditors to file a motion to dismiss, as well as whether a presumption of abuse arose in the case and whether Gandy was required to complete additional paperwork. Although the instant case related to Gandy's Chapter 7 bankruptcy, his inaccurate income in his Original Chapter 13 Means Test directly related to the confirmation of his Chapter 13 plan and how much he owed to the Chapter 13 Trustee each month and was in place for more than a year before he converted to Chapter 7. Gandy's false oaths regarding his monthly income are plainly material. So too is the false oath in the Original/Amended Statement of Financial Affairs, in which Gandy failed to disclose the closure of the BB&T account. The bankruptcy court found that Gandy's testimony at trial that his failure to disclose this account was a mere oversight was not convincing, and Gandy presented no compelling argument for why this court should overturn this factual finding by the bankruptcy court.

For the reasons stated previously, we affirm.



Gandy v. Schuchardt Inc., 64 F. App'x 315 (6th Cir. 2016)



Case No.: 15-31915 (AMN)

UNITED STATES BANKRUPTCY COURT DISTRICT OF CONNECTICUT NEW HAVEN DIVISION

# Mitrano v. Consiglio (In re Consiglio)

Decided Mar 2, 2018

Case No.: 15-31915 (AMN) AP No.: 16-3013

03-02-2018

In re: CAROL M. CONSIGLIO, Debtor JOHN G. MITRANO, Plaintiff v. CAROL M. CONSIGLIO, Defendant

Parties John G. Mitrano Plaintiff Pro se 934 Temple Street Duxbury, MA 02332 Carol M. Consiglio Defendant Brian E. Kaligian 74 Cherry Street Milford, CT 06460

---

Ann M. Nevins United States Bankruptcy Judge District of Connecticut

Chapter 7 Re: ECF No. 8, 9 Re: AP-ECF No. 1 **MEMORANDUM OF DECISION AFTER TRIAL** *Parties* John G. Mitrano

*Plaintiff Pro se*
934 Temple Street
Duxbury, MA 02332 Carol M. Consiglio

*Defendant* Brian E. Kaligian
74 Cherry Street
Milford, CT 06460

I. Introduction

Carol M. Consiglio ("Ms. Consiglio," or the "Defendant") filed a chapter 7 bankruptcy case, (the "Main Case"), on November 20, 2015 (the "Petition Date"). John G. Mitrano ("Mr. Mitrano"), *pro se*, filed several motions in the Main Case, and commenced an adversary proceeding, *Mitrano v. Consiglio*, AP No. 16-3013, against Ms. Consiglio. Mr. Mitrano's motions in the Main Case, as well as his complaint in the adversary proceeding, are based on a common set of facts

2 and, with the consent of the *2 parties, they were tried on the same day. Having considered the evidence, argument and testimony of the parties, the court issues this memorandum of decision.

II. Procedural History

Ms. Consiglio, represented by counsel, filed the Main Case on November 20, 2015.[1] ECF No. 1. On Schedule J, Ms. Consiglio listed two dependents, her eighty-five (85) year old mother, and her twenty-five (25) year old daughter, both of whom resided with the Debtor. ECF No. 1. The Debtor listed her current monthly income as $5,915.70, for an annual income of $70,988.40. ECF No. 2. While Ms. Consiglio listed three people in her household, she did not indicate that she received any income from either her daughter or her mother.[2] ECF No. 2. Relevant to the instant dispute, the Debtor listed an unsecured claim of $20,000.00 owed to Mr. Mitrano. ECF No. 1.

---

[1] Citations to the docket in Case No. 15-31519 are noted by "ECF No." Citations to the docket of Adversary proceeding No. 16-3013, are noted by "AP-ECF No."

[2] Specifically, on Official Form 22A-1 "Statement of Your Current Monthly Income," the Debtor listed "$0.00" in response to both Question 4; "All amounts from any source which are regularly paid for household expenses of you or your dependents, including child support. Include regular contributions from an unmarried partner, members of your household, your dependents, parents and roommates;" and Question 10 "Income from all other sources."



Mr. Mitrano appeared at the meeting of creditors on December 18, 2015, and briefly examined Ms. Consiglio.[3] Pl. Ex. 2 ("341 Transcript"). On February 5, 2016, Mr. Mitrano filed three pleadings in the Main Case: a motion seeking further examination of Ms. Consiglio, ECF No. 7; an objection to Ms. Consiglio's Exemptions, ECF No. 8;[4] and a motion to dismiss (the "Motion to Dismiss"), ECF No. 9. *3

3

> [3] The Chapter 7 Trustee adjourned the meeting of creditors, and filed a report stating there were no assets of the estate to be administered. Docket Entries dated 12/21/2015, 12/29/2015. The Chapter 7 Trustee has not taken a position in the dispute between the parties.

> [4] ECF No. 8 is described on the docket as "Creditor's Objection to Debtor's Claim of Exemptions Filed by John Mitrano Creditor." However, ECF No. 8 is identical to ECF No. 7, a document entitled "Creditor's Motion for Permission for Creditor to Conduct Extract [sic] Further Testimony From Debtor." While it appears ECF No. 8 was entered in error, Mr. Mitrano did press his objection at the evidentiary hearing in this case.

On February 16, 2016, Mr. Mitrano filed an adversary complaint (the "Adversary Complaint"), objecting to the Ms. Consiglio's discharge, commencing case number 16-3013. AP-ECF No. 1. Mr. Mitrano also examined the Debtor pursuant to Fed.R.Bankr.P. 2004, and a transcript of the examination was admitted into evidence at the October 27, 2016 hearing. Pl. Ex. 1 (the "2004 Exam Transcript").

Both the Motion to Dismiss the Main Case and the Adversary Complaint contain several common allegations, specifically, that Ms. Consiglio understated the value of several assets, including furniture, clothing, her home, and a vehicle. ECF No. 9, ¶¶ 4, 5, 6; AP-ECF No. 1, ¶¶ 4, 5, 6, 7. Additionally, the Adversary Complaint alleged Ms. Consiglio committed bankruptcy fraud in a

prior case.[5] AP-ECF No. 1, ¶¶ 1, 2. Finally, Mr. Mitrano's Motion to Dismiss alleged, generally, that Ms. Consiglio's household income created a presumption of abuse under 11 U.S.C. § 707(b).[6] ECF No. 9.

> [5] Ms. Consiglio previously received a chapter 7 discharge in 1996. Case No. 96-30414-ASD. Mr. Mitrano did not present any evidence or argument in support of these allegations. Accordingly, the court deems the claim relating to the 1996 case waived.

> [6] Unless otherwise noted, all statutory citations refer to the Bankruptcy Code, Title 11 of the United States Code.

Given the obvious overlap between the Motion to Dismiss, the Adversary Complaint, and Mr. Mitrano's other objections, the parties consented to adjudicating all causes of action against the debtor in one proceeding. ECF No. 33, 00:12:30 - 00:14:30.

An evidentiary hearing and trial was held on October 27, 2016, at which time the Debtor, and the Debtor's daughter, Christina Consiglio, testified. ECF No. 33. Mr. Mitrano represented to the court that he had subpoenaed Lindy Perrelli, Ms. Consiglio's mother, for her testimony and her "financials." ECF No. 34, 00:01:30 - 00:03:30. *4 However, Ms. Perrelli did not appear at the October 27, 2016, and the court granted her motion to quash Mr. Mitrano's subpoena. ECF No. 60, 61.

4

The court held closing argument in the matter on July, 27, 2017, at which time the matter was taken under advisement. AP-ECF No. 26.

III. Discussion

As the objecting party in the Main Case, and the plaintiff in the adversary proceeding, Mr. Mitrano had the burden of proof. In his challenge to Ms. Consiglio's exemptions, Mr. Mitrano also had the burden to prove Ms. Consiglio's exemptions "are



Mitrano v. Consiglio (In re Consiglio), Case No. 15-21085 (AMN) (Bankr. D. Conn. Mar. 2, 2018)

not properly claimed," by a preponderance of the evidence. Fed.R.Bankr.P. 4003(c); *In re Woerner*, 483 B.R. 106, 112 (Bankr. W.D. Tex. 2012). Likewise, as the party moving to dismiss the Main Case, Mr. Mitrano had the burden to demonstrate the extent to which income received by Lindy Perrelli or Christina Consiglio should be considered part of the Debtor's current monthly income. *In re Justice*, 404 B.R. 506, 519 (Bankr. W.D. Ark. 2009).

The heart of this dispute concerns a personal loan Mr. Mitrano gave to Ms. Consiglio in the summer of 2010. 2004 Exam Transcript, pgs. 6-7. While Mr. Mitrano did not filed a proof of claim in the case, Ms. Consiglio scheduled an unsecured $20,000.00 debt to Mr. Mitrano on Schedule F of her petition.[7] ECF No. 1. Although Ms. Consiglio testified at the 2004 examination that she made one payment to Mr. *5 Mitrano, Mr. Mitrano did not contest the amount of the debt as scheduled. 2004 Exam Transcript, pg. 8.

> [7] Mr. Mitrano's failure to file a proof of claim does not deny him standing to challenge the Debtor's discharge. Section 707(b) permits a "party in interest" to object to a debtor's discharge. 11 U.S.C. § 707(b). As a creditor, Mr. Mitrano is a party in interest to the Debtor's case. A creditor need not file a proof of claim to establish standing to object to discharge. *Carto v. Oakley (In re Oakley)*, 503 B.R. 407, 422-23 (Bankr. E.D. Pa. 2013).

Several facts were not in dispute. Mr. Mitrano conceded that Ms. Consiglio's household consisted of three people, including her mother, Lindy Perrelli, and her daughter Christina Consiglio. AP-ECF No. 26, 00:10:15 - 00:10:50; 00:24:20 - 00:26:00. Rather, Mr. Mitrano's principal challenge was that the sum total of the income of all three persons constituting the debtor's household, exceeded the median income for a household of three, and "forms a presumption of

abuse" warranting dismissal of the Main Case pursuant to § 707(b). AP-ECF No. 26, 00:05:00 - 00:06:20.

Section 707(b) provides that a debtor's chapter 7 case may be dismissed if it presents an "abuse" of the chapter 7 process.[8] 11 U.S.C. § 707(b)(1); *In re Paret*, 347 B.R. 12, 14 (Bankr. D. Del. 2006). "'Abuse, in turn, may be determined pursuant to either § 707(b)(2) or § 707(b)(3).' Section 707(b)(2) 'sets forth a detailed mathematical formula for determining whether a presumption of abuse has arisen,' and the formula is commonly referred to as the Means Test. It 'creates a presumption of abuse under certain circumstances when a debtor's disposable income exceeds fixed amounts.'" *In re Curcio*, 387 B.R. 278, 281 (Bankr. N.D.Fla. 2008) (*first quoting In re Hayes*, 376 B.R. 55, 58 (Bankr. D. Mass. 2007); *and then quoting In re Singletary*, 354 B.R. 455, 460 *6 (Bankr. S.D.Tex. 2006)). Generally speaking, the "means test" requires taking a debtor's "current monthly income," subtracting applicable expenses as provided by statute, to determine, in essence, whether a debtor has sufficient monthly income to repay a portion of her debts. 11 U.S.C. § 707(b)(2); *see generally In re Addison*, 2018 Bankr. LEXIS 62, *5-8 (Bankr. E.D.N.Y. January 11, 2018); *see also In re Montalto*, 537 B.R. 147, 150 (Bankr. E.D.N.Y. 2015) (Noting that "many of the statutory changes made by Congress through BAPCPA were intended to urge debtors into repayment plans and away from no-asset liquidations where the mathematical formula created by BAPCPA shows an ability to repay").

> [8] Section 707 was significantly revised by the 2005 amendments to the Bankruptcy Code, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, known as BAPCPA. "Prior to the 2005 amendments to the Code, section 707(b) provided for dismissal of a case involving primarily consumer debts if the granting of relief under chapter 7 would have been a substantial abuse of that chapter. The 2005

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 13 of 154

Mitrano v. Consiglio (In re Consiglio), Case No. 15-21015 (AMN) (Bankr. D. Conn. Mar. 2, 2018)

amendments very significantly amended section 707(b) to establish new and detailed provisions relating to dismissal "of a case filed under [chapter 7].'" Collier on Bankruptcy ¶ 707.04[1] (16th ed.). Although pre-BAPCPA, a court could dismiss a chapter 7 case "for cause," or for "abuse," "[t]he major objective of Congress in adding the means test in § 707(b)(2) was to limit judicial discretion from the process of determining abuse by providing an objective standard for establishing a presumption of abuse." *In re Hartwick*, 359 B.R. 16, 21 (Bankr. D.N.H. 2007).

The Means Test functions as a "switching device" to steer cases either into Section 707(b)(2)(B) (where the debtor bears the burden of proving "special circumstances" to avoid dismissal (or conversion to a reorganization chapter on consent)) or (at the non-debtor movant's option) into Section 707(b)(3) (where the movant bears the burden of showing "abuse" either because of a bad faith filing or under the "totality of the circumstances" test).

*In re Longo*, 364 B.R. 161, 164 (Bankr. D. Conn. 2007). But though the means test is one way to determine whether a debtor's cases constitutes an "abuse" of chapter 7, § 707(b)(7) provides a "safe harbor."

Under § 707(b)(7), if a debtor's current monthly income is less than the "highest median family income," of the debtor's state of residence, then no presumption of abuse exists under § 707(b)(2).[9] *See Paret*, 347 B.R. at 14. Furthermore, if a debtor

7    meets *7 the income qualifications of § 707(b)(7), none of the United States Trustee, a chapter 7 trustee, a creditor, any party in interest, or the court may file a motion seeking to dismiss the case under subsection (b)(2). *Paret*, 347 B.R. at 14.

⁹ Section 707(b)(6) provides a further safe harbor, though one that is not directly applicable here. That section limits

provides "[o]nly the judge or United States trustee . . . may file a motion under section 707(b)" where the debtor's household income is less than the median family income of the debtor's home state. Though subsection (b)(6) would seem superfluous, in light of subsection (b)(7), the former prevents the judge, or United States trustee, from seeking a dismissal under *any* subsection of § 707(b), not just § 707(b)(2), if the Debtor meets the applicable income threshold. *Paret*, 347 B.R. at 14; *Curcio*, 387 B.R. at 281-82. However, neither of the safe harbors of subsections (b)(6) or (b)(7) relieve the court from making the independent inquiry required of § 707(b)(3). *Paret*, 347 B.R. at 14. To determine whether the debtor's case is an "abuse" as required under (b)(1), the court must make an independent inquiry to determine whether the petition was filed in bad faith, or the "totality of the circumstances . . . . demonstrates abuse." 11 U.S.C. § 707(b)(3); *Paret* 347 B.R. at 14 ("Even where no presumption of abuse arises under section 707(b)(2), however, the Court must still determine under paragraph (b)(1) whether the granting of relief under chapter 7 would constitute an abuse. Dismissal under paragraph (b)(1) depends on the guidelines established by Congress in paragraph (b)(3), namely fraud or the totality of the circumstances."). No evidence or circumstances have been presented that the court could conclude the Debtor filed this case in bath faith, or that, this case would constitute abuse of the provisions of chapter 7, as contemplated by § 707(b)(3).

Mr. Mitrano's assertion that Ms. Consiglio's total household income did not "pass the means test," and that the case must therefore be dismissed, conflates the means test of § 707(b)(2), and the application of the safe harbor of § 707(b)(7). ECF No. 34, 00:08:45 - 00:09:15. The means test of § 707(b)(2) is one method by which the Code determines whether a case constitutes an "abuse"

of chapter 7. In contrast, if a debtor qualifies for the § 707(b)(7) safe harbor, no presumption of abuse exists. The two are independent. In essence, Mr. Mitrano's argument is that Ms. Consiglio's household income exceeds the amount permitted under the (b)(7) safe harbor, and that Ms. Consiglio's case is therefore is abusive, warranting dismissal.[10]

> [10]  The court notes that the Debtor was not required to undergo the means test, as her answers on Official Form 22A-1 indicated there was "no presumption of abuse," because she qualified for the safe harbor of § 707(b)(7). ECF No. 2. "The means test is applied only if the debtor's [current monthly income] is above the safe harbor amount set forth in § 707(b)(7)." *Blauset v. United States Tr.*, 552 F.3d 1124, 1132 (9th Cir. 2009). Thus, even if the court determined that the Debtor did not qualify for the § 707(b)(7) safe harbor, the debtor could still "pass" the means test on § 707(b)(2).

The question therefore is not whether Ms. Consiglio's case constituted "abuse," but whether Mr. Mitrano had standing to bring the Motion to Dismiss in the first place. *"If the Debtor's annualized [current monthly income] falls below the applicable median income, [a] Creditor[] [is] not eligible to bring a motion under § 707(b) ."* *Curcio*, 387 B.R. *8 at 282. The court must determine whether the "current monthly income" of the Debtor's household of three, (on the Petition Date) was "equal to or less than" "the highest median family income" of Connecticut, which, as of the Petition Date, was $91,131.00.[11] 11 U.S.C. § 707(b)(7); U.S. Trustee Program, Census Bureau Median Family Income By Family Size (Cases Filed Between November 1, 2015 and March 31, 2016,                        Inclusive), https://www.justice.gov/ust/eo/bapcpa/20151101/bci_data/median_income_table.htm.

> [11]  While the § 707(b) refers to "current monthly income," which is defined as "the average monthly income," the safe harbor of § 707(b)(7) annualizes that number, by multiplying it by 12. 11 U.S.C. §§ 707(b)(7); 101(10A). Because the median family income tables, as well as Official Form 22A, use an annual income figure, as opposed to a monthly figure, this opinion does the same.

"Current monthly income includes, inter alia, 'any amount paid by any entity other than the debtor...on a regular basis for the household expenses of the debtor or the debtor's dependents.'" *In re Persaud*, 486 B.R. 251, 262 (Bankr. E.D.N.Y 2013) (*quoting* § 101(10A)(B)). But, [c]urrent monthly income is defined to include any amount paid by any entity toward the household expenses of the debtor or the debtor's dependents on a regular basis. Thus, it clearly does not include all income of nondebtor household members. Amounts not used for household expenses of the debtor or debtor's dependents, or not received on a regular basis [by] the debtor or debtor's dependents, are not included. Collier on Bankruptcy ¶ 101.10A (Alan Resnick & Henry J. Sommer, eds. 16th ed., 2013). With respect to Lindy Perreli or Christina Consiglio, only their contributions to the Debtor's household expenses are counted towards determining the Debtor's current monthly income. *In re Ellringer*, 370 B.R. 905, 911-12 (Bankr. D. Minn. 2007); *Fraleigh*, 474 B.R. at 102 ("[§ 101(10A)(B)] plainly limits third-party income, when computing 'current monthly income,' to amounts paid 'on a regular basis for the household expense of the debtor or the debtor's dependents...'"). While this case is somewhat unique, it is *9 analogous to cases where only spouse files for bankruptcy. In such cases, only the non-filing spouses' income that contributes to household expenses is counted towards the debtor-spouses' current monthly income. *Persaud*, 486 B.R. at 262 ("Income of a

Mitrano v. Consiglio (In re Consiglio), Case No. 15-51826 (JAM) (Bankr. D. Conn. Mar. 2, 2018)

non-filing spouse can therefore be excluded only to the extent it is not regularly contributed to household expenses.")

It is not disputed that Ms. Consiglio's current monthly income, as of the Petition Date, annualized, totaled at least $70,988.40. Mr. Mitrano also conceded that Ms. Consiglio's household consisted of three people.[12] AP-ECF No. 26, 00:10:15 - 00:10:50 (Mr. Mitrano: "By including the income and or economic contributions of Ms. Consiglio's adult daughter, AND Ms. Consiglio's mother, [Ms. Consiglio] exceeds the cutoof for the presumption of abuse."); AP-ECF No. 26, 00:24:20 - 00:26:00 (Mr. Mitrano: "With [Ms. Consiglio's] income and the daughter's income, it comes to $105,987.80 for the household. And that's only for two people. That already exceeds the cutoff limit for three people.").

> [12]  The court is mindful of the varying approaches courts have used to determine the size of debtors' households. *In re Skiles*, 504 B.R. 871, 876 (Bankr. N.D. Ohio 2014) ("Courts, when applying the above rules of statutory construction, have reached three different definitions of 'household:' (1) 'heads-on-beds;' (2) 'IRS dependent;' and (3) 'economic unit.'). As Mr. Mitrano conceded that the Defendant's household consisted of three people, the court need go no further. Parenthetically, the court notes that another court within the Second Circuit has adopted the "economic unit" test, which defines a household to "include individuals who are financially dependent on a debtor, individuals who financially support a debtor, and individuals whose income or expenses are intermingled or interdependent with a debtor." *In re Fraleigh*, 474 B.R. 96, 101 (Bankr. S.D.N.Y. 2012) (*quoting In re Morrison*, 443 B.R. 378, 396 (Bankr. M.D.N.C. 2011)). In the alternative, unrebutted testimony of the Defendant and Christina Consiglio established that the

Defendant, Lindy Perrelli and Christina Consiglio function as an "economic unit," and therefore, the Defendant's household consists of three people for the purposes § 707(b). *Fraleigh*, 474 B.R. at 101.

However, Mr. Mitrano is incorrect is asserting that every penny of income received by Lindy Perrelli and Christina Consiglio must be counted towards Ms. Consiglio's current monthly income. *Ellringer*, 370 B.R. at 911-12. Although Lindy *10 Perrelli and Christina Consiglio were members of Ms. Consiglio's household on the Petition Date, not all of their income was included in Ms. Consiglio's current monthly income for the § 707(b)(7) purposes. "[O]nly the amount of such third-party income to the extent it is used to support the debtor or the debtor's dependents" is included in "current monthly income." *In re Fraleigh*, 474 B.R. 96, 106 (Bankr. S.D.N.Y. 2012); *see Montalto*, 537 B.R. at 151-52 (noting that only income from the non-filing spouse "contributed on a regular basis for household expenses is included in the debtor's 'current monthly income.'").

Mr. Mitrano, as the party seeking dismissal, bears the burden to demonstrate income from other members of Ms. Consiglio's household should be attributed to her current monthly income. *Justice*, 404 B.R. at 519 ("As the objecting party [creditor] had the burden of proving that a portion of the amounts [the debtor] received were paid on a regular basis and paid for the household expenses of the debtor and his dependents."); *Montalto*, 537 B.R. at 153 ("The general rule is that the [United States Trustee] bears [the] burden of proof in demonstrating that there is a presumption of abuse under § 707(b)(2)"). Likewise, Mr. Mitrano bears the burden of proof on his § 727 objection to discharge, which he must prove by a preponderance of the evidence. *Fraleigh*, 474 B.R. at 105.

## The Defendant's Daughter's Income and

Mitrano v. Consiglio (In re Consiglio), Case No. 15-21015 (AMN) (Bankr. D. Conn. Mar. 2, 2018)

*Contributions towards Household Expenses.*

Christina Consiglio's contributions to the household were the subject of conflicting evidence. At the meeting of creditors, the Defendant testified that her daughter made $19,000.00 per year. 341 Transcript, pg 25; Testimony of Carol Consiglio, ECF No. 33, 03:07:00 - 03:08:00. However, at the October 27, 2016 *11 hearing, Christina Consiglio herself testified she made "about" $30,000.00 "last year." Testimony of Christina Consiglio, ECF No. 33, 03:18:00 - 03:19:00. But it is not clear to what time frame Christina Consiglio's estimate of $30,000.00 in annual income applied, as she later clarified that, as of the petition date, "it would be less." Testimony of Christina Consiglio, ECF No. 33, 03:20:45 - 03:21:45.

Christina testified she did not contribute any of her own income towards the Defendant's household expenses. Testimony of Christina Consiglio, ECF No. 33, 03:21:30 - 03:22:00. The Defendant testified that she provided "75%" support of Christina Consiglio, and received, at most $300.00 per year from her daughter, towards the Defendant's cell phone bill. Testimony of Carol Consiglio, ECF No. 33, 03:08:15 - 03:08:45; 03:09:50 - 03:10:15. Christina Consiglio corroborated the testimony regarding the payments towards the cell phone bill. Testimony of Christina Consiglio, ECF No. 33, 03:23:30 - 03:24:15. When asked by Mr. Mitrano "Do you pay rent [to the Defendant] or contribute to the household in any way," Christina Consiglio answered, "No." Testimony of Christina Consiglio, ECF No. 33, 03:21:30 - 03:22:15. The uncontroverted evidence further shows Christina Consiglio did not pay rent or contribute to the mortgage on the Defendant's residence. Testimony of Carol Consiglio, ECF No. 33, 03:11:30 - 03:12:00. While the evidence regarding Christina Consiglio's salary and income was imprecise, there was no evidence that she contributed any more than the $300.00 per year towards the

Defendant's household. While Christina Consiglio did testify that she uses a vehicle that is registered in her name and the Defendant's name, (but for which the Defendant pays the insurance), there was no testimony that Christina's contributions towards the vehicle contribute to the household expenses of *12 the Defendant. Testimony of Christina Consiglio, ECF No. 33, 03:21:45 - 03:22:45. Therefore, on an annual basis, Christina Consiglio's $300.00 contribution to the Defendant's household is attributable to the Defendant's current monthly income.

*The Defendant's Mother's Income and Contributions towards Household Expenses.*

Lindy Perrelli did not testify at the hearing, and all of the evidence regarding her contributions to the Defendant's household was provided by Ms. Consiglio's own testimony. The uncontroverted evidence was that Lindy Perrelli is substantially dependent on the Defendant for support. Testimony of Carol Consiglio, ECF No. 33, 03:06:00 - 03:07:25. The Defendant acknowledged Lindy Perrelli received some income, half of which was from social security payments, and the other half from a pension, but could not identify how much she received each month. Testimony of Carol Consiglio, ECF No. 33, 03:07:00 - 03:08:00. Lindy Perrelli used that income to pay for her own medical bills and personal expenses. Testimony of Carol Consiglio, ECF No. 33, 03:12:00 - 03:12:45. Lindy Perrilli did not pay rent of contribute to the mortgage on the Defendant's residence. Testimony of Carol Consiglio, ECF No. 33, 03:11:30 - 03:12:00. However, the Defendant conceded that Lindy Perreli contributed $540 per month towards groceries for the household. ECF No. 34, 00:11:00 - 00:11:45. Therefore, on an annual basis, Ms. Perreli's $6,480.00 contribution to the Defendant's household is included the Defendant's current monthly income.[13] *13

13  The court notes § 101(10A)(B) specifically excludes from current monthly income any "benefits received under the Social Security Act." To the extent Lindy Perrelli's contributions to the Defendant's household may be traceable to her social security benefits, they may have been excludable from the calculation of the Defendant's household's current monthly income. However, the court views the concession by the Defendant that Ms. Perrelli contributes $540.00 per month toward groceries for the household as waiving an argument that the origin of such funds renders them excludable under § 101(10A)(B). --------

Christina Consiglio's $300.00 annual contribution to the Defendant's household, plus Lindy Perrelli's $6,480.00 annual contribution to the Defendant's household, increases the Defendant's annualized current monthly income to $77,778.40. This amount is substantially less than the highest median income for a household of three, $91,131.00, for the state of Connecticut as of the petition date. Because the Defendant's household income is less than $91,131.00, she qualifies for the safe harbor of § 707(b)(7), and as such, there is no presumption of abuse. *Paret*, 347 B.R. at 14. Accordingly, § 707(b)(7) deprives Mr. Mitrano of standing to seek dismissal pursuant to § 707(b)(2). *Curcio*, 387 B.R. at 282, 285.

Additionally, Mitrano's remaining objections to the Ms. Consiglio's exemptions are overruled. ECF No. 9, ¶¶ 4, 5, 6; AP-ECF No. 1, ¶¶ 4, 5, 6, 7. As the party bearing the burden, Mr, Mitrano was required to establish, by a preponderance of the evidence, which exemptions were not property claimed. Fed. R. Bankr. P. 4003(c); *Woerner*, 483 B.R. at 112. "'To deny a debtor an exemption which is based upon a dollar limitation, the objecting party cannot carry its burden of proof by merely impeaching the Debtors' valuation. Competent evidence, which affirmatively demonstrates a higher valuation by a preponderance of the evidence, is required.'"

*Woerner*, 483 B.R. at 112 (*quoting In re Shurley*, 163 B.R. 286, 291 (Bankr. W.D. Tex. 1993)). Because Mr. Mitrano simply challenged the valuation of Ms. Consiglio's exemptions, without providing any alternative valuation of the exempted property, Mr. Mitrano failed to carry his burden of proof, and his objections must therefore be denied.

Mr. Mitrano's challenge to Ms. Consiglio's "expenses," which the court interprets as an objection to the expenses listed on Schedule J, is overruled. AP-ECF No. 26, *14 00:16:00 - 00:17:15. To the extent Mr. Mitrano seeks to object to Ms. Consiglio's discharge under § 707(b)(3), that she filed her bankruptcy petition in bad faith, or that the totality of the circumstances demonstrates abuse, the objection is barred by § 707(b)(6). Section 707(b)(6) provides that "only the judge or United States trustee" may make such a motion, where, as here, Ms. Consiglio's current monthly income is less than the highest median family income of her home state. 11 U.S.C. § 707(b)(6).

Finally, the court notes Mr. Mitrano did not present specific evidence or argument in pursuit of his objection to Ms. Consiglio's discharge under § 727, the cause of action in the adversary proceeding. Therefore, the court concludes Mr. Mitrano failed to carry his burden on that claim. *Fraleigh*, 474 B.R. at 105

IV. Conclusion.

For the reasons stated, Mr. Mitrano's objections, ECF No. 8 are OVERRULED, the Motion to Dismiss, ECF No. 9, is DENIED, and judgment shall be entered in FAVOR of the Defendant in Adversary Proceeding No. 16-2013.

Dated on March 2, 2018, at New Haven, Connecticut.

*Ann M. Nevins*

*United States Bankruptcy Judge*

*District of Connecticut*



Mitrano v. Consiglio (In re Consiglio), Case No. 15-51215 (JAM) (Bankr. D. Conn. Mar. 2, 2018)



Case No. 11-12756-FJB

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

# Hiller v. Hiller (In re Hiller)

482 B.R. 462 (Bankr. D. Mass. 2012)

Decided Nov 13, 2012

Bankruptcy No. 11–12756–FJB. Adversary No. 11–1208.

2012-11-13

In re Phyllis M. HILLER, Debtor. Judith Hiller, Plaintiff v. Phyllis Hiller and Andrew Hiller, Defendants.

Evans Huber, Frieze Cramer Rosen & Huber, Wellesley, MA, for Plaintiff. Gary M. Hogan, Gilmore, Rees & Carlson, P.C., Franklin, MA, for Defendants.

FRANK J. BAILEY

463   *463

Evans Huber, Frieze Cramer Rosen & Huber, Wellesley, MA, for Plaintiff. Gary M. Hogan, Gilmore, Rees & Carlson, P.C., Franklin, MA, for Defendants.

464   *464

## *MEMORANDUM OF DECISION ON DEFENDANTS′ MOTION TO DISMISS*

**FRANK J. BAILEY, Bankruptcy Judge.**

## Procedural History

Judith Hiller, daughter of 91–year old Phyllis Hiller, sued Phyllis in state court in 2006 because Phyllis, by exercise of a special power of appointment, appointed a remainder interest in her home to Andrew Hiller. Andrew is Judith's bother and Phyllis's son. Judith believes the remainder interest is owed to her and her alone; she also contends that she is in any event entitled to recompense from Phyllis for monies she invested to improve the house. Her three-count complaint was dismissed; on appeal, the order of dismissal was affirmed as to two counts, for breach of contract and promissory estoppel, but vacated as to the third, for unjust enrichment, and remanded for further proceedings. Phyllis then filed a petition for relief under chapter 7 of the Bankruptcy Code. Judith, on the strength of her still-unadjudicated claim, is her only possible creditor; Phyllis listed no other creditor in her schedules. Judith then filed the present adversary complaint against Phyllis,

[1] also in three counts. Count I seeks dismissal of the bankruptcy case under 11 U.S.C. § 707(b)(1) as a bad faith filing. Count II is an objection to discharge under 11 U.S.C. § 727(a)(2)(A), the factual basis of which is unclear. And Count III is an objection to discharge under 11 U.S.C. § 727(a)(5) for failure to explain satisfactorily a loss of assets, specifically, of the funds that Phyllis used to pay for her and Andrew's defense of the state court action. The adversary proceeding is now before the Court on a motion by Phyllis and Andrew under Fed. R. Civ. P. 12(b)(6) to dismiss each of the three counts for failure to state a claim on which relief can be granted. Judith opposes the motion.

[1] Andrew, too, is named as a defendant, but the complaint seeks no relief against him.

## Standard of Review



Hiller v. Hiller (In re Hiller), 482 B.R. 758 (Bankr. D. Mass. 2012)

When presented with a Rule 12(b)(6) motion, the Court must "accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Artuso v. Vertex Pharmaceuticals, Inc.,* 637 F.3d 1, 5 (1st Cir.2011). Subject to certain exceptions, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.,* citing Fed.R.Civ.P. 8(a)(2).

Although there is no need for "detailed factual allegations," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v.*

662 *Iqbal* *662 , 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). Accordingly, a complaint must include more than a rote recital of the elements of a cause of action; it must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." [ *S.E.C. v.*] *Tambone,* 597 F.3d [436] at 442 [ (1st Cir.2010) ] (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).
*Artuso,* 637 F.3d at 5. The First Circuit's approach to the plausibility standard has been usefully distilled as follows:

465 *465

[T]o determine whether the factual allegations in the complaint are sufficient to survive a motion to dismiss, the Court "employ[s] a two-pronged approach." "The first prong is to identify the factual allegation and to identify statements in the complaint that merely offer legal conclusions couched as facts or are threadbare or conclusory." "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." The second

prong is to assess whether the factual allegations "allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." If they do, "the claim has facial plausibility." "The make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief."
*Juarez v. U.S. Bank Nat. Ass'n, Trustee,* 2011 WL 5330465, *2 (D.Mass.2011) (internal citations omitted).

## Facts

The complaint alleges as follows.

Judith Hiller is the daughter of the defendant and debtor, Phyllis Hiller. Phyllis resides at 211 School Street, Westford, Massachusetts ("the Property"). In late 2000 and early 2001, Phyllis and Judith retained the services of an attorney to prepare certain estate planning documents. One of these, which they executed, was an irrevocable trust ("the Trust") of which Judith was trustee and Judith and Andrew were equal beneficiaries. At that time, Phyllis transferred the School Street Property to the Trust but retained for herself a life estate.

[2] She also retained a power to appoint the Property to a limited class of persons, including Judith and Andrew but not herself. She also retained the right to pay for all repairs and maintenance of the Property or to have the trustee, Judith, do so on her behalf.

> [2] The irrevocable trust and the deed were not attached to the complaint. For the time being, I simply reproduce, and make no determination of the validity of, the subsidiary conclusions of law—whether drawn from these documents or otherwise —in Judith's factual allegations.

In the years immediately after the Property was transferred to the Trust, Judith spent approximately $150,000 of her own money and

Hiller v. Hiller (In re Hiller), 478 B.R. 463 (Bankr. D. Mass. 2012)

countless hours of her time on substantial renovations to the Property. Judith's expectation and understanding at the time was that the Property had been transferred to her—that is, she believed herself to be the only beneficiary of the Trust—in exchange for the time and money she was spending renovating the Property. Judith did not understand at the time that, under the terms of the Trust, her brother was an equal beneficiary of the trust, even though he was contributing neither time nor money to the renovation. Judith also did not understand that the Trust gave Phyllis the power to "appoint" the property of the Trust to someone other than Judith: that is, to Andrew.

The relationship between Judith and Phyllis deteriorated in 2004, and in 2006 Judith moved out of the Property.

[3] In 2006, Judith commenced the state court action against both Phyllis and Andrew, seeking to enforce what Judith contended was her agreement with Phyllis that the Property would be conveyed to Judith, subject to Phyllis's life estate, in exchange for (among other things) Judith's remaining in the property with Phyllis and 466 supervising *466 and paying for the renovation of the Property. Judith also asserted an alternative claim on a theory of quantum meruit/unjust enrichment to recover the value of the time and money Judith had put into the Property.

> [3] Though the complaint does not say so, Judith had been living at the Property with Phyllis for some time.

At that time, Phyllis had more than $100,000 in her bank account, as well as some valuable gold coins. These were available to Phyllis for living expenses, to supplement her income.

A sensible resolution of the lawsuit, and one which would have cost Phyllis almost nothing, would have been for Phyllis to exercise her power under the Trust to appoint the Property to Judith, so that the Property would pass entirely to Judith

upon Phyllis's death. This would have had no adverse effect on Phyllis, would not have affected Phyllis's life estate in the Property, would have given Judith what Judith contended Judith was entitled to, and would have preserved Phyllis's limited assets so that they were available to Phyllis for living expenses. However, Andrew saw an opportunity in the dispute between Phyllis and Judith. He manipulated the emotions of his elderly mother, Phyllis, and persuaded her to react to the lawsuit by appointing the entire Property to him.

Even though, as a result of the Property being appointed to him, Andrew was now the only person who stood to benefit from defending the lawsuit—as opposed to settling it in the manner described above—Andrew also persuaded Phyllis to spend her own limited resources vigorously defending the lawsuit. One law firm was retained to represent both Phyllis and Andrew. On behalf of Phyllis and Andrew, that law firm managed to get dismissed, on summary judgment (which dismissal was affirmed on appeal), the claim that, had Judith prevailed, would have required Phyllis to appoint the Property to Judith. This outcome, achieved at great expense, was of absolutely no benefit to Phyllis but of substantial benefit to Andrew.

Phyllis has paid at least half, and perhaps all, of the legal fees to defend the state court action. Given who stood to benefit from a successful defense of that action, Andrew should have paid all of the legal fees to defend that lawsuit.

Judith's other claim, for recovery under the theory of quantum meruit/unjust enrichment, was also dismissed on summary judgment, but that dismissal was reversed on appeal. Trial of that matter was scheduled for April 27, 2011. On March 30, 2011, Phyllis filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Judith is the only creditor listed on Phyllis's schedule. Judith's claim in the state court action is the only debt that Phyllis seeks to discharge.

casetext
Part of Thomson Reuters

Hiller v. Hiller, 482 B.R. 460 (Bankr. D. Mass. 2012)

One important reason for Phyllis's bankruptcy filing was that she was concerned that if she lost the state court action, Judith might seek to enforce the judgment against Phyllis's interest in the Property and throw her out of the Property, leaving her with no place to live. However, even if Judith obtained a judgment against Phyllis in the state court action, it would be unenforceable against her life estate in the property. That interest is protected by the automatic homestead exemption afforded by MASS. GEN. LAWS ch. 188, § 4, up to $125,000, which amount exceeds the actuarial value of Phyllis's life estate. Therefore, one of the primary reasons for Phyllis to file the bankruptcy petition—to retain the ability to live in her house should she lose the state court action—was baseless. Phyllis has virtually no assets other than her life estate in the Property and her ability to appoint the remainder interest in the property to Judith. Therefore, she can gain nothing by filing her bankruptcy petition.

467  *467

The real reason that Phyllis's bankruptcy petition was filed is that, once again, Andrew manipulated his elderly mother into believing that the bankruptcy filing was the only way she could be sure of being able to remain in the Property for the remainder of her life. This bankruptcy process, which will be of no practical benefit to Phyllis even if she obtains a discharge, but which is nevertheless being paid for by Phyllis, was filed at Andrew's urging and primarily, if not solely, for his benefit.

The schedules that Phyllis filed in connection with her bankruptcy petition contain a number of material misstatements and omissions. These include the following:

a. On Schedule A, the schedule of real property, Phyllis listed only the actuarial value of her life estate in the property. In fact she also has a power of appointment which she can exercise in favor of

Judith, her only creditor. It should be considered an asset and should have been listed on Schedule A.

b. On her Statement of Financial Affairs at question 14, Phyllis was required but failed to list certain property "owned by another person that the debtor holds or controls": specifically, the property whose legal title is held by Judith, as trustee, and whose beneficial interest is held by Andrew. Phyllis controls this property. She has the power to appoint it to Judith or Andrew, the power to use Trust assets for maintenance and repair of the Property, and the power to authorize the trustee to mortgage the Property.

c. On Schedule B, the schedule of personal property, Phyllis failed to list the value of certain gold coins, which she owned at least as late as December 2007 and still owns.

d. Also on Schedule B, Phyllis failed to list a debt owed to her by Andrew. Phyllis has been paying all or a portion of the legal fees to defend the state court action, even though all or most of those fees should be the responsibility of Andrew, the only person who stands to benefit from a successful defense of that action.

These are the facts as Judith has alleged them.

## Count I: For Dismissal of the Bankruptcy Case Pursuant to § 707(b)(1)

In Count I, which incorporates all the foregoing allegations of fact, Judith contends simply that the bankruptcy petition was not filed in good faith and therefore, pursuant to 11 U.S.C. § 707(b)(1), should be dismissed. Although Fed. R. Bankr.P. 1017(e)(1) requires a party moving to dismiss under § 707(b)(1) to state with particularity the circumstances alleged to constitute abuse, nowhere in Count I or in the complaint more generally has Judith indicated precisely how the alleged facts show bad faith or where the bad faith lies. In her Rule 12(b)(6) Motion, Phyllis argues that the complaint does not allege bad faith on the



Hiller v. Hiller, 482 B.R. 460 (Bankr. D. Mass. 2012)

part of Phyllis, only that Andrew manipulated Phyllis into filing for his own benefit; undue influence on the part of Andrew is not bad faith on the part of Phyllis.

[4] In response to the motion to dismiss, Judith
468 argues that § 707(b)(1) requires *468 dismissal of an individual's chapter 7 case where the granting of relief would be an abuse of the provisions of chapter 7, that in determining whether the granting of relief would be such an abuse, the court must consider (i) whether the debtor filed the petition in bad faith or (ii) whether the totality of the circumstances of the debtor's financial situation demonstrates abuse, 11 U.S.C. § 707(b)(3), that the filing was in bad faith because its purpose was to protect Phyllis's right to dispose of her property according to her current estate plan, and that the totality of the circumstances demonstrates abuse because it shows that Phyllis has the ability to pay the judgment that Judith seeks against her. She may pay the debt, Judith alleges, by reappointing the Property to Judith or by authorizing Judith, as trustee of the Trust, to mortgage the Property to pay off the debt to her. Recognizing that the totality of the circumstances theory was not pleaded in the complaint, Judith moved, both in her response to the Rule 12(b)(6) hearing and orally at the hearing on that motion, for leave to amend her complaint accordingly. She contends that, where no responsive pleading has been filed, she has an absolute right to amend. Phyllis has voiced no objection to amendment.

> [4] Phyllis also argues that, for various reasons, the alleged omissions from Phyllis's schedule do not state a basis on which the court could find bad faith. However, at the hearing on the Rule 12(b)(6) Motion, Judith, in articulating the basis of Count I, did not mention the omissions. The omissions are therefore irrelevant to Count I, and Phyllis's arguments about them are moot.

## a. Adversary Complaint as Vehicle for Request to Dismiss for Abuse under § 707(b)

A request to dismiss a case under § 707(b) is generally made by a motion filed in the bankruptcy case.

[5] The use of an adversary complaint instead of a motion raises two concerns. First, it is procedurally more cumbersome than a simple motion, and unnecessarily so. Second, where the parties to the adversary proceeding are limited to the creditor and the debtor, other parties with an interest in the matter—the chapter 7 trustee, other creditors, and the United States trustee—may be inappropriately excluded. Neither of these concerns warrants requiring Judith to start over with a motion. If anything, her choice of an adversary complaint merely affords Phyllis perhaps more process than would otherwise be required. As for other parties, there are no other creditors in this case; and the chapter 7 trustee and United States trustee, though not named as parties, were at least served with the complaint when it was filed, as Fed. R. Bankr.P. 1017(e) requires, and neither has responded with a request to intervene or be heard. In addition, the subject matter of this count is related to the objections to discharge in Counts II and III, and therefore there is efficiency in joining all three counts in one proceeding. Phyllis has not objected to the process employed. For these reasons, I will not strike Count I as procedurally inappropriate.

> [5] See Fed. R. Bankr.P. 9014(a) ("In a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion[.]"), 1017(e) ("The court may dismiss ... an individual debtor's case for abuse under § 707(b) only on motion") and 1017(f)(1) (subject to certain exceptions not applicable here, "Rule 9014 [specifying procedure for contested matters] governs a proceeding to dismiss ... a case").



Hiller v. Hiller, 478 B.R. 233 (Bankr. D. Mass. 2012)

## b. The Merits

I begin with the relevant statute and rules. Under § 707(b)(1), the court "may dismiss a case filed by an individual debtor under this chapter [chapter 7 of title 11] whose debts are primarily consumer debts ... if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). In certain cases, a presumption of abuse arises. See 11 U.S.C. § 707(b)(2). The parties agree that no presumption of abuse arises in this case. When a presumption of abuse does not arise, the court, in considering whether the granting of relief would be an abuse of the provisions of chapter 7, "shall consider (A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances ... of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3). Recourse to § 707(b) is limited. One such limitation is that when the debtor is a so-called "below-median debtor," only the judge or the United States trustee may file a motion to dismiss under § 707(b). 11 U.S.C. § 707(b)(6) ("Only the judge or United States trustee ... may file a motion under section 707(b), if the current monthly income of the debtor ... as of the date of the order for relief, when multiplied by 12, is equal to or less than—in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner.").

Phyllis's Rule 12(b)(6) motion focuses on the ultimate question of whether the granting of relief would be an abuse of the provisions of chapter 7. To establish that abuse, Judith alleges that Phyllis filed the petition in bad faith and that the totality of the circumstances, especially Phyllis's ability to pay, establishes abuse. Neither the concept of bad faith nor the totality of the circumstances test has clearly-defined parameters, which makes them ungainly in the context of a Rule 12(b)(6) motion. Even without reaching the issue of abuse, however, it appears for two reasons that Judith does not have a claim on which relief can be granted.

First, it appears to be undisputed that Phyllis's current monthly income as of the date of the order for relief, when multiplied by 12, is equal to or less than the Massachusetts median family income for a single earner.

[6] If so, then under § 707(b)(6), only a judge or the United States trustee, but not a creditor, may file a motion to dismiss under § 707(b). In short, Judith, a creditor, appears to be statutorily precluded from moving for dismissal under § 707(b). However, this particular deficiency in Count I is not apparent from the complaint itself and was not raised as cause for dismissal in Phyllis's Rule 12(b)(6) motion. Judith is entitled to be heard on this basis for dismissal, which the Court is raising now for the first time.

> [6] This fact is not alleged in the complaint, but at the hearing on this motion, Phyllis's counsel stated that Phyllis passed the so-called "means test" with flying colors, such that no presumption of abuse arose in her case. Judith did not contest this statement and likely would have done so had it enabled her to take advantage of the presumption of abuse in § 707(b)(2). Phyllis's uncontested Chapter 7 Statement of Current Monthly Income and Means–Test Calculation bears out her attorney's contention that her income is dramatically below the Massachusetts median.

Second, § 707(b) applies only to the chapter 7 cases of individual debtors "whose debts are primarily consumer debts." 11 U.S.C. § 707(b)(1). "Consumer debt" means "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8) (defining consumer debt for purposes of the Bankruptcy Code). Phyllis's only debt is her alleged liability to Judith in the state court action on a theory of quantum meruit/unjust enrichment to recover the value of the time and money Judith invested to improve the Property. It is doubtful that the alleged liability to Judith is "consumer debt"



Hiller v. Hiller (In re Hiller), 462 B.R. 69 (Bankr. D. Mass. 2012)

within the meaning of the statute. Judith has not expressly so alleged and has not addressed the "consumer debt" requirement in her response to the Rule 12(b)(6) motion, but neither has Phyllis invoked that requirement as a basis for her Rule 12(b)(6) motion. The parties simply have not addressed the issue. *470

470

Therefore, instead of addressing the poorly-defined parameters of bad faith and totality of the circumstances as they apply to the unusual circumstances of this case, the Court will issue an order to show cause why Count I should not be dismissed for each of the two reasons articulated above: (i) under § 707(b)(6), Judith may not file a motion under § 707(b); and (ii) Phyllis's debts are not primarily consumer debts.

## Count II: For Denial of Discharge under § 727(a)(2)(A)

In Count II, Judith simply states that, "based on the foregoing facts"—that is, the allegations recapitulated above—"Phyllis has failed to disclose all of the assets which she owned or over which she had control as of March 30, 2011," the date of her bankruptcy filing. "Accordingly, [Phyllis's] discharge should be denied pursuant to § 727(a)(2)(A)." Phyllis argues that this count should be dismissed for two reasons. First, an objection to discharge under § 727(a)(2)(A) sounds in fraud and therefore requires pleading with particularity, but Judith has not plead this count with particularity; her complaint does not give adequate notice of Judith's basis or bases for nondischargeability. Second, Phyllis argues that Judith has not alleged that Phyllis had actual intent to hinder, delay, or defraud her, which § 727(a)(2)(A) requires. Judith responds that the gravamen of this count is Phyllis's failure to disclose a number of significant assets to the Bankruptcy Court: (i) the power of appointment over the Property; (ii) the powers reserved to Phyllis in the Trust, "including the power to mortgage the property to pay for debts related to maintenance and upkeep of the property, inasmuch as the property was

placed in trust by Phyllis and is thus in a so-called "self-settled" trust; and (iii) "the debt owed to Phyllis by Andrew, to the extent Phyllis has been paying the legal fees for the state court action." Judith adds that though this count is pleaded under subsection 727(a)(2)(A), it may more properly be asserted under subsection 727(a)(4)(A) (denial of discharge for knowing and fraudulent making of a false oath in the bankruptcy case); to the extent that the Court concludes that this count should have been asserted under § 727(a)(4)(A), she asks for leave to amend the complaint. Judith does not attempt to show that the above-cited incidents of nondisclosure do in fact state a claim under § 727(a)(2)(A), but she does state that § 727(a)(2)(A) "may be applicable to the extent Phyllis has paid the legal fees for Andrew in the state court action."

I begin by considering this count under the subsection invoked in the complaint, § 727(a)(2)(A). It requires denial of discharge where

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed,

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A). To state a claim under this subsection, a complaint must (i) allege that the debtor committed one of the predicate acts and specify which of the predicate acts was committed (transfer, destruction, concealment, etc.), (ii) specify the property in issue and indicate whether it was property of the estate or property of the debtor, (iii) specify that the transfer occurred in the applicable time period, and (iv) allege that the debtor committed the predicate act with the necessary specific intent. Because this subsection sounds in *471 fraud, the requirements must be

471



pleaded with particularity. The complaint must put the debtor on clear notice of the charge of fraud against which she must defend.

Count II fails to satisfy these requirements in a number of ways. First, it does not specify the acts or assets in question. The complaint elsewhere does allege acts that might constitute concealment as to specified assets, but Count II does not indicate whether those, or some or all of them, are the basis of this count. Judith's response to the motion to dismiss partially rectifies this deficiency by identifying three incidents of nondisclosure on which Count II is based; but her response still does not indicate that this nondisclosure constituted "concealment" or one of the other predicate acts listed in § 727(a)(2)(A). Second, neither in Count II nor elsewhere in the complaint does Judith allege that Phyllis's failures of disclosure were committed with the necessary specific intent: intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title. Nor is an allegation of fraudulent intent implicit in the allegation of failure to disclose. The alleged falsity of each of the alleged nondisclosures is dependent on a conclusion of law that is hardly self-evident, even to an attorney but all the more to a lay person: that after exercise of the power of appointment, Phyllis continued to have a power of appointment over the remainder interest; that after exercise of the power of appointment, the trust had a res to which the retained powers might apply; that a voluntary payment of the fees of another, without more, gives the donor an enforceable right to obtain repayment of those fees—that a gift is not a gift. Moreover, in her response to the Motion to Dismiss, Judith still has not made an allegation of intent to hinder, delay, or defraud. In fact, she has made no attempt at all to show that three cited incidents of nondisclosure do in fact state a claim under subsection 727(a)(2)(A). For these reasons, I conclude that Count II fails to state a claim under § 727(a)(2)(A).

Next Phyllis states that § 727(a)(2)(A) "may be applicable to the extent Phyllis has paid the legal fees for Andrew in the state court action." Phyllis payment of the legal fees is not one of the grounds pleaded as a basis for Count II; as currently stated, Count II is based only on failures to disclose, and she has not moved to amend the complaint. In addition, Judith nowhere makes two allegations that would be necessary for the payment of the legal fees to constitute a basis for nondischargeability under § 727(a)(2)(A): that Judith's payment of fees occurred in a relevant time period, and that they were made with intent to hinder, delay, or defraud. For lack of these allegations, the complaint does not, in Count II or elsewhere, state a claim under § 727(a)(2)(A) on the basis of the payment of fees.

In the alternative, Judith asks that the Court consider her allegations of nondisclosure as stating a claim under subsection 727(a)(4)(A), under which a debtor will be denied a discharge where "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." 11 U.S.C. § 727(a)(4)(A). In order for Judith's allegations of nondisclosure to state a cause of action under this subsection, they would need to include allegations that the debtor's failures of disclosure were made knowingly and fraudulently. The complaint includes no such allegations, and Judith does not now contend that the omission was an oversight or seek leave to amend the complaint. Therefore, Count II does not state a claim *472 under § 727(a)(4)(A) and must be dismissed.

## Count III: For Denial of Discharge under § 727(a)(5)

In Count III, Judith alleges (in addition to the facts recited above) that "Phyllis Hiller has failed to explain a loss of assets.... Phyllis's cash and cash-equivalents have been used to fund the defense of a lawsuit primarily, in not entirely, for the benefit of Andrew. Accordingly, [Phyllis's] discharge should be denied pursuant to 11 U.S.C. § 727(a)



Hiller v. Hiller (In re Hiller), 482 B.R. 480 (Bankr. D. Mass. 2012)

(5)." Phyllis contends that this count should be dismissed for two reasons: first, it is premature because no one has asked her to explain any loss of assets; and second, the allegation itself explains what happened to the assets: they were used to defend a lawsuit. In response, Judith does not answer either of the reasons offered for dismissal. Instead she says that she has not had an opportunity to conduct discovery on this count. Notably, she adds:

[I]f discovery reveals (as appears likely) that Phyllis has exhausted her assets paying for a lawsuit to benefit only Andrew, this would certainly constitute a failure to *satisfactorily* explain the loss of those assets; "I spent virtually all my money defending a lawsuit for the benefit of my son" is not, in this context, an acceptable explanation.

Section 727(a)(5) states: "The court shall grant the debtor a discharge, unless ... (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). In relevant part, it requires a failure to explain satisfactorily a loss of assets. That is not what Judith complains of. Rather, what she alleges, the gravamen of the count as pleaded, is a failure or inability to *justify* the loss. As Phyllis points out, Judith knows what happened to the assets. In fact she identifies the assets in question by the manner in which they were lost: those cash and cash equivalents *that were used to defend the lawsuit for the benefit of Andrew.* What she contends is that the use of the funds for this purpose was not justified; that is, the funds were not used for a valid or appropriate purpose. Justification is beyond the scope of subsection (a)(5). An explanation must be satisfactory, but in subsection (a)(5), satisfactory modifies explanation, not loss. Provided the debtor knows what happened to the assets and her explanation is

convincing, it will be satisfactory. A debtor need only account for the loss, tell how it happened. She need not also defend the manner of loss. Even if the manner of loss were wholly reprehensible—such as a fraudulent transfer, or utter and spiteful waste—a truthful and convincing explanation would suffice and would obviate cause for denial of discharge under this subsection. In contrast, subsection (a)(2) does permit denial of discharge for certain losses of assets—by the debtor's transfer, removal, or destruction of an asset with intent to hinder, delay, or defraud; it expressly does inquire into the manner of disposition.

[7] 11 U.S.C. § 727(a)(2)(A). In short, what Judith alleges is not within the scope of subsection (a)(5) and therefore fails to state a claim on which relief can be granted.

[7] Judith has not suggested that, in the alternative, the facts on which Count III is based would support an objection to discharge under § 727(a)(2)(A). Nor has she alleged that Judith's payment for defense of the state court action was done with intent to hinder, delay, or defraud a creditor, which subsection (a)(2)(A) would require.

473 [8] *473

[8] Having so concluded, I need not address Phyllis's argument that this count is premature.

## Conclusion

For the reasons set forth above, the Court will allow the Rule 12(b)(6) motion as to Counts II and III and, as to Count I, issue an order to show cause why they should not be dismissed because (i) under § 707(b)(6), Judith may not file a motion under § 707(b) and (ii) Phyllis's debts are not primarily consumer debts.



Hiller v. Hiller, 478 B.R. 460 (Bankr. D. Mass. 2012)



CASE NO. 06-30781 (LMW), DOC. I.D. NOS. 26, 30
United States Bankruptcy Court, D. Connecticut

# In re Longo

364 B.R. 161 (Bankr. D. Conn. 2007)
Decided Mar 19, 2007

CASE NO. 06-30781 (LMW), DOC. I.D. NOS. 26, 30.

March 19, 2007.

B. Amon James, Esq., Holley L. Claiborn, Esq., Office of the United States Trustee, New Haven, CT, for the Movant United States Trustee. *162

F. Woodward Lewis, Jr., Esq., Law Offices of F. Woodward Lewis, Jr., Yalesville, CT, for the Debtor.

## MEMORANDUM AND ORDER RE: UNITED STATES TRUSTEE'S MOTION TO DISMISS THE DEBTOR'S CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 707(b)(2)

LORRAINE MURPHY WEIL, United States Bankruptcy Judge.

This case presents the question of whether payments on secured debt are proper deductions under the "means test" of Bankruptcy Code § 707(b)(2)(A) when the debtor has filed a statement of his intent to surrender the collateral securing that debt. Before the court are: (1) United States Trustee's (the "UST") Motion To Dismiss the Debtor's Chapter 7 Case Pursuant to 11 U.S.C. § 707(b)(2) (Doc. I.D. No. 26, the "Motion");[1] and (2) the above-referenced debtor's (the "Debtor") objection thereto *2 (Doc. I.D. No. 30, the "Objection"). This court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C.

§§ 157 and 1334 and that certain Order dated September 21, 1984 of the District Court (Daly, C.J.).[2]

[1] References herein to the docket of this case appear in the following form: "Doc. I.D. No. ___."

[2] That order referred to the "Bankruptcy Judges for this District" "all cases under Title 11, U.S.C., and all proceedings arising under Title 11, U.S.C., or arising in or related to a case under Title 11, U.S.C. . . ."

# I. BACKGROUND

The Debtor commenced this case by a chapter 7 petition (the "Petition") filed on June 1, 2006 (the "Petition Date"). Bankruptcy schedules and statements were filed with the Petition. ( See Doc. I.D. No. 1.) Those schedules disclose the following secured debt (the "Secured Debt"): (a) first and second mortgages (joint with codebtor) on the Debtor's residence (the "Residence"); (b) a mortgage (joint with codebtor) on a Tempus Resorts Timeshare interest (the "Timeshare"); and (c) a secured loan with respect to a 2005 Ford Taurus. ( See id.) The Motion states that the Debtor's Statement of Intention proposes to surrender both the Residence and the Timeshare.[3] On July 27, 2006, the Debtor filed a (Second) Amended Statement of Current Monthly Income and Means Test Calculation (Doc. I.D. No. 25). In line 42 of that document, the Debtor claimed a deduction (the "Proposed Deduction") under Bankruptcy Code § 707(b)(2)(A)(iii) with respect to all the Secured Debt.



3  That statement appears to be contrary to the record in that the only Statement of Intention on file proposes to surrender the Residence only. ( *See* Doc. I.D. No. 1.) However, the Debtor does not dispute the referenced statement. Accordingly, because it makes no difference to the result, the court will proceed as if the referenced statement were accurate and as if a conforming Statement of Intention had been filed with the Petition.

The UST filed the Motion on July 31, 2006. The Motion asserts that, because the Residence and the Timeshare were proposed to be surrendered, the Proposed Deduction is improper to the extent that it relates to Secured Debt with respect to those properties. Accordingly, the UST argues, a *3 "presum[ption of] abuse" exists under Section 707(b)(2)(A) and such presumption not having been rebutted by the Debtor ( *see* 11 U.S.C. § 707(b)(2)(B)), this case must be dismissed (or converted to a chapter 13 case with the Debtor's consent). In the Objection, the Debtor argues that the Proposed Deduction is proper notwithstanding the proposed surrender of the Residence and the Timeshare. *163

A non-evidentiary hearing on the Motion and the Objection was held on August 30, 2006. At that hearing the parties agreed that, if the Proposed Deduction is proper, the Motion must be denied (and the Objection sustained) and if the Deduction is improper, the Motion must be granted (and the Objection overruled). It is undisputed that the contracts relating to the Secured Debt all were extant as of the Petition Date and that the Debtor had not "surrendered" any of the collateral prepetition.

## II. ANALYSIS

Section 707(b) provides in relevant part as follows:

(b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. . . .

(2)(A)(i) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of —

(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or

(II) $10,000 [the "Means Test"].

. . .

(iii)  The debtor's average monthly payments on account of secured debts shall be calculated as the sum of —

*4

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;



In re Lawrence, 251 B.R. 51 (Bankr. D. Conn. 2007)

divided by 60 [the "Deduction"].

. . .

(B)(i) In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

. . .

(iv) The presumption of abuse may only be rebutted if the additional expenses or adjustments to income referred to in clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of —

(I) 25 percent of the debtor's nonpriority unsecured claims, or $6,000, whichever is greater; or

(II) $10,000.

*164

(C) As part of the schedule of current income and expenditures required under section 521, the debtor shall include a statement of the debtor's current monthly income, and the calculations that determine whether a presumption arises under subparagraph (A)(i), that show how each such amount is calculated.

(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider —

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

*5

11 U.S.C.A. § 707(b) (West 2007).[4] The Means Test functions as a "switching device" to steer cases either into Section 707(b)(2)(B) (where the debtor bears the burden of proving "special circumstances" to avoid dismissal (or conversion to a reorganization chapter on consent)) or (at the non-debtor movant's option) into Section 707(b)(3) (where the movant bears the burden of showing "abuse" either because of a bad faith filing or under the "totality of the circumstances" test). *See, e.g., In re Hartwick*, No. 06-10749-JMD, 2007 WL 518617 (Bankr. D.N.H. Feb. 12, 2007)[5]; *In re Walker*, No. 05-15010-WHD, 2006 WL 1314125 (Bankr. N.D. Ga. May 1, 2006).[6] *6

> [4] Section 707(b)(3) is subject to the so-called "safe harbor" of Section 707(b)(6) which limits the persons who may file a Section 707(b)(3) motion when the debtor has "median income" below a certain level. *See* 11 U.S.C. § 707(b)(6).

5



The major objective of Congress in adding the [M]eans [T]est in § 707(b)(2) was to limit judicial discretion from the process of determining abuse by providing an objective standard for establishing a presumption of abuse. However, Congress did not remove the ability of bankruptcy courts to consider circumstances, including postpetition developments, in determining abuse. On the contrary, Congress expressly incorporated the formerly judicially created totality of the circumstances test which permits consideration of circumstances both preceding and following the filing of the petition.

*Id.* at *4 (citation omitted).

6

[T]he Court also notes that, whether the debtor passes or fails the [M]eans [T]est is relevant only to the question of whether the U.S. Trustee will benefit from a presumption of abuse. In cases in which the presumption of abuse does not arise or is rebutted, the U.S. Trustee may pursue dismissal of a debtor's case under Section 707(b)(3), which provides that the court may consider whether the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

*Id.* at *8 (alteration in original; internal quotation marks omitted). In this case the UST has kept her options open by (from time to time) obtaining orders continuing

the date by which a Section 707(b)(3) objection may be filed.

Some courts hold that, if the relevant contractual secured debt is extant on the petition date, the Deduction properly is taken to the extent that the schedule of payments annexed to (or provided for by) the relevant contract provides for payments during the statutory 60-month period even if the debtor proposes to surrender the collateral postpetition (or even already has surrendered it postpetition). *See, e.g., Hartwick, supra*; *In re Sorrell,* No. 06-31720, 2007 WL 211276 (Bankr. S.D. Ohio Jan. 26, 2007); *In re Randle,* No. 06 B 05929, 2006 WL 3734351 (Bankr. N.D. Ill. Dec. 19, 2006); *Walker, supra.* Other courts allow the Deduction only if it appears that the debtor actually will be making the "scheduled" *165 payments postpetition. *See, e.g., In re Harris,* 353 B.R. 304 (Bankr. E.D. Okla. 2006); *In re Skaggs,* 349 B.R. 594 (Bankr. E.D. Mo. 2006).

This court agrees with those courts that interpret the term "scheduled" in Section 707(b)(2)(A)(iii) to mean something substantially equivalent to "scheduled under" or "provided for by" the referenced contract. Those courts reject the contrary interpretation that the statutory term "scheduled" is an allusion to the debtor's bankruptcy schedules. *See, e.g., Randle*, 2006 WL 3734351, at *5 ("[T]he context of this provision . . . clearly requires the debtor to list payments `scheduled' under secured debt instruments, virtually all of which call for installment payments that are scheduled to be paid on a monthly basis."); *Sorrell,* 2007 WL 211276, at *15 ("[T]he words `scheduled as' . . . do not refer to the bankruptcy schedules."); *Walker,* 2006 WL 1314125, at *3.[7] *See also In re Mundy*, No. 1-06-BK-00875MDF, *7 2007 WL 620971, at *4 (Bankr. M.D. Pa. March 1, 2007) ("To interpret the common verb `scheduled' as a reference to the proper noun `Schedule' as used in the Bankruptcy Code is a grammatical exercise too complex and strenuous to be considered `plain.'").

7

> Webster's Dictionary defines the word "schedule" as "to plan for a certain date." The common meaning of "as contractually due" is that the debtor is legally obligated under the contract . . . to make a payment in a certain amount . . . for a set number of months into the future. Accordingly, payments that are "scheduled as contractually due" are those payments that the debtor will be required to make on certain dates in the future under the contract. These payments are limited by additional statutory language to only those payments required in each of the sixty months after the petition is filed. For example, the debtor may have a car loan with a remaining payment term of only two years, or a mortgage with a remaining payment term of twenty years. The debtor would include only the remaining twenty-four months of the car loan payments, but would add all sixty months of the mortgage payments in order to calculate the average monthly payment on secured debt.

> *Id.* (citation omitted).

This court also agrees with those courts that hold that the Section 707(b)(2)(A)(iii) calculation is (in all relevant senses) intended to be a "snapshot" of the state of matters as of the petition date. *See, e.g., In re Haar,* No. 06-31270, 2007 WL 521221 (Bankr. N.D. Ohio Feb. 20, 2007);[8] *Hartwick,* 2007 WL 518617, at *4 ("[C]onsideration of postpetition developments in the application of the [M]eans [T]est would be contrary to Congressional intent. . . ."); *Sorrell,* 2007 WL 211276, at *16 ("Section 707(b)(2)(A)(iii)(I) does

not reference any post-petition eventuality, which would alter the expense amount for purposes of the § 707(b)(2) formula, to adjust that calculation, including an intention to surrender secured property."); *Randle,* 2006 WL 3734351, at *5 ("This provision calls for a snapshot of the debtor's obligations on the date of the petition."); *Walker,* 2006 WL 1314125, at *6 ("Congress *8 intended for the [M]eans [T]est to be applied based on the facts in existence at the time of the filing, without reference to what the debtor will do in the future.").

8

> Such a reading conforms to the general tenet in bankruptcy that circumstances are to be gauged from the petition date, with the Bankruptcy Code replete with examples where any deviation therefrom is made explicit. *See, e.g.,* 11 U.S.C. § 541(a)(5) (allowing a limited class of postpetition interests in property acquired by the debtor to become property of the estate); 11 U.S.C. § 503 (allowing an administrative expense against the estate for certain services that are performed postpetition).

> *Id.* at *7.

Here the Debtor proposes the postpetition surrender of the relevant collateral. A surrender of collateral proposed in a Statement of Intention filed with the petition *166 does not change the fact that the relevant contractual secured debt still was extant as of the petition date. That is because a Statement of Intention is not a self-effectuating document. It is merely what it purports to be: a statement of intent to surrender in the future, not an actual surrender. *Cf.* 11 U.S.C. § 362(h) (termination of the automatic stay when, *inter alia,* the debtor has failed timely to effectuate his stated intent to surrender personal property

collateral).[9] Thus, the Petition Date "snapshot" here properly includes all of the Secured Debt.[10]

[9]

*9

[9] For the purposes of this opinion, the court assumes (but does not decide) that a "surrender" of collateral satisfies the relevant secured debt.

[10] The court has considered the remaining arguments of the UST and finds them to be unpersuasive.

## III. <u>CONCLUSION</u>

The Proposed Deduction is proper. Accordingly, the Motion is denied and the Objection is sustained (both without prejudice to the UST's right timely to file a motion under Bankruptcy Code § 707(b)(3)). It is **SO ORDERED.**



Case No.: 13-35191

UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF OHIO WESTERN DIVISION

# Cousin v. Westbrook (In re Westbrook)

Decided Nov 5, 2014

Case No.: 13-35191 Adv. Pro. No. 14-3047

11-05-2014

In Re: Kathryn B. Westbrook, Debtor. Fred L. Cousin, Plaintiff, v. Kathryn B. Westbrook, Defendant.

Judge John P. Gustafson

Chapter 7 **MEMORANDUM OF DECISION AND ORDER**

This case came before the court for an evidentiary hearing on October 20, 2014 upon what the court construes as *pro se* Plaintiff-Creditor Fred L. Cousin's ("Plaintiff") Amended Complaint to Determine the Dischargeability of Debt ("Complaint") [Doc. # 13], what Plaintiff refers to as a Motion to Dismiss ("Motion") [Doc. #15], Defendant Kathryn B. Westbrook's ("Defendant" or "Debtor") Answer to the Complaint ("Answer") [Doc. #16], and Defendant's Response to Plaintiff's Motion fo Dismiss ("Response") [Doc. #17]. Attorney for Defendant, Defendant, and *pro se* *2 Plaintiff appeared at the hearing in person. After considering Plaintiff's Complaint and Motion, the Defendant's Answer to the Complaint and Response to Debtor's Motion, and the arguments of counsel for the Defendant and the *pro se* Plaintiff on his own behalf at the hearing held on the matter, for the following reasons, the court will deny what *pro se* Plaintiff refers to as his Motion to Dismiss Debtor's underlying Chapter 7 case and will grant judgment on the Complaint in favor of the Defendant.

2

The underlying Chapter 7 bankruptcy case of Kathryn B. Westbrook was filed on December 27, 2013. Initially, the Debtor did not list the claim[1] of Fred L. Cousin. An Amended Schedule F was filed on April 4, 2014. [Case No. 13-35191, Doc. #11]. The last day to oppose the discharge or dischargeability (or to seek dismissal of the case under §707(b)) was April 21, 2014. *See,* Form ohnb 9A, "Notice of Chapter 7 341(a) Meeting of Creditors & Deadlines", Case Number 13-35191, Doc. #5. Plaintiff Cousin had obtained a state court judgment against the Debtor. The existence of the debt was known[2], and it should have been listed in the initial Schedules.

> [1] The law in the Sixth Circuit related to notice in a "no asset" Chapter 7 case is set forth in *In re Madaj*, 149 F.3d 467 (6th Cir. 1998) and *In re Rosinski*, 759 F.2d 539 (6th Cir. 1985). The Chapter 7 Trustee filed a "no asset" report in the Chapter 7, Case No. 13-35191. [Case No. 13-35191, Doc. #9].

> [2] To understand why the underlying loan was made, and why the debt was known, Plaintiff is Debtor's father.

On April 21, 2014, Plaintiff filed a one page handwritten complaint, stating that he was "objecti[ng] to the dischar[ge] of [his] debt" in Defendant's underlying Chapter 7 case. [Doc. #1]. In Defendant's Answer to Plaintiff's initial complaint, Defendant asserted that Plaintiff had failed to state a claim upon which relief could be granted. [Doc. #7]. On May 27, 2014, Plaintiff filed a document titled "Supplement Motion Denying Defendants Bankruptcy Debt to Plaintiff." In his Supplement Motion, Plaintiff



Cousin v. Westbrook (In re Westbrook), Court No. 14-3515 (Bankr. N.D. Ohio Nov. 5, 2014)

clarified that he "Was Not Included in The File" and did not receive notice of Defendant's bankruptcy filing. The court construed this as Plaintiff referencing the fact that he was not initially listed as a creditor in Defendant's bankruptcy petition. [Doc. #8].

On June 2, 2014, the court held a pretrial on Plaintiff's Complaint. At that time, the court instructed Plaintiff that neither his initial Complaint nor his Supplement Motion made mention of any facts or any section of the Bankruptcy Code which would support his claim that the debt owed to him should not be discharged. The court specifically stated that it could not give the *pro se* [*3] Plaintiff any legal advice, but that [11 U.S.C. Section 523(a)](#) is the section of the Bankruptcy Code that governs the exceptions to the dischargeability of a debt. At the conclusion of the hearing, the court granted Plaintiff sixty (60) days to file an amended complaint. [Doc. # 11].

Plaintiff's Amended Complaint, filed on August 1, 2014, was titled "Motion to Dismiss Chapter 7 Bankruptcy Filing on Grounds of U.S. Code 727 - Discharge, an 'Abuse' of the Bankruptcy System, Income Test and Means Test Rules." Within the Complaint, under the subsection titled "U.S. Code 727 - Discharge Chapter 7 Bankruptcy Rule," Plaintiff alleged that the Defendant did not tell the truth in her bankruptcy petition. Plaintiff claimed that Defendant misstated her marital status, listed the wrong household size, and that the income listed in the means test did not match documentation from her bankruptcy. As a result of these alleged misstatements, Plaintiff claimed that Defendant violated 11. U.S.C. §727(a) and that her Chapter 7 bankruptcy case should, therefore, be dismissed. [Doc. #13]. At the end of this pleading, Plaintiff quotes Section 727(a)(4)(A-C), including the subsection dealing with a "false oath or account".

On August 5, 2014, Plaintiff filed a Supplement to his Amended Complaint [Doc. #14] and what Plaintiff referred to as a Motion to Dismiss [Doc. #15], in which he requested that the court dismiss Defendant's Chapter 7 case under Rule 4006[3], as an "abuse" of the bankruptcy system[4], and under Section 727. Plaintiff's Motion to Dismiss contained the same allegations that were in his Amended Complaint: that (1) Defendant stated the wrong household size on her petition; and (2) Defendant's current income does not match the documentation in her Chapter 7 case. [*Id.*].

> [3] As discussed at an earlier hearing, in this context, [Federal Rule of Bankruptcy Procedure 4006](#) deals with how notice is to be given if a discharge is denied, revoked or closed without a discharge being granted. It is not an independent basis for relief. *See also*, Rule 2002(f)(6).

> [4] Dismissal of a Chapter 7 case for abuse of the bankruptcy system is governed by [11 U.S.C. Section 707(b)](#).

In Defendant's Answer to Complaint [Doc. # 16] and her Response to Plaintiff's Motion to Dismiss [Doc. 17], she denied all allegations stated in the Complaint, requested that the action be dismissed at Plaintiff's cost, and that the Motion to Dismiss be denied. In support of her requests, Plantiff denied that she misstated any information in her petition, and she affirmatively stated that she provided evidence to the court that proved her income and that she listed the correct household size. [*Id.*] *4

In the order setting the Complaint for evidentiary hearing, the court clarified the issues at hand, while noting that a *pro se* complaint is to be liberally construed. *Boswell v. Mayer*, [169 F.3d 384, 387](#) (6th Cir. 1999). However, the Court is not required to fabricate allegations which are not pleaded, or conversely, ignore the facts that have been pleaded. *See, Estelle v. Gamble*, [429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251](#) (1976); *Haines*

Cousin v. Westbrook (In re Westbrook), Not Reported in... Case No. 13-35191 (Bankr. N.D. Ohio Nov. 5, 2014)

*v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979).

Based upon each party's filings, and discussions held with the parties at several pretrial hearings, the court set forth in its Order the factual issue that would support the relief sought in Plaintiff's Complaint (as amended and supplemented), which was dismissal of Kathryn B. Westbrook's Chapter 7 case. [Doc. #30]. The key issue was whether not the Defendant was married at the time of filing, and not divorced as reflected in her Petition, Schedules, and Form 22A Means test. According to Defendant-Debtor's Petition, she was not married at the time of filing, and the only income she and her two children received was from Social Security Disability[5]. However, if evidence were provided that the Defendant-Debtor was married, and if additional income from an undisclosed spouse was not included in her petition, then Plaintiff might have standing to seek dismissal under Section 707(b) of the Bankruptcy Code[6] because the Debtor might be over the median income level. If Defendant had no additional source of income separate from Social Security Disability, then Plaintiff could not utilize Section 707(b), as the Debtor would fall below the median income level in Ohio.

> [5] Under Section 101(10A)(B), "current monthly income" "excludes benefits received under the Social Security Act.
>
> [6] Plaintiff cited Section 727(a) as another basis for dismissal of the Chapter 7 case. However, dismissal is not a remedy that is available for violations of Section 727. Section 707(b) is the Code provision cited by Plaintiff that would permit dismissal of the bankruptcy case.
>
> --------

Section 707(b)(6) states:

(6) Only the judge or United States trustee (or bankruptcy administrator, if any) may file a motion under section 707(b), if the current monthly income of the debtor, or in a joint case, the debtor and the debtor's spouse, as of the date of the order for relief, when multiplied by 12, is equal to or less than-

(A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

*5

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $675 per month for each individual in excess of 4.

In this case, the Debtor's Petition, in both Line 14 of the Means Test and Schedule I, reflect a household size of three. [Case No. 13-35191, Doc. #1 at pp. 7 & 46].

The same issue, whether the Debtor's household size and income level were materially false, would determine whether the Debtor made a "false oath or account", under Section 727(a)(4), in filing out her Schedules, and the Means Test.



Cousin v. Westbrook (In re Westbrook), Not Reported... No. 12-3586 (B.A.P. N.D. Ohio Nov. 5, 2014)

At the Evidentiary Hearing, no evidence was offered by the Plaintiff. The Defendant offered six (6) exhibits, each of which was admitted into evidence without objection by the Plaintiff. Exhibit A was Defendant's Separation Agreement, entered into on May 21, 2012, which provided that Defendant and her then husband were separated as of the aforementioned date. Exhibit B was Defendant's "Statement Regarding [her] Income," which stated that "she has no pay advices to file with the court as she only has social security income." Exhibit C was a copy of the letter provided from Defendant's attorney to the Chapter 7 Trustee, which informed the Trustee that the Defendant "had no W-2 income for the past 2 years." [Doc. #36]

Exhibit D was a copy of a letter sent to Defendant from Rosalie N. Musachio, the attorney who represented Defendant in her divorce. The letter informed Defendant that a copy of the Final Decree of Dissolution was enclosed. Exhibit E was a "green card" from the United States mail, signed by the Plaintiff on October 6, 2014, which certified that a copy of the Defendant's Final Decree of Dissolution was received by Plaintiff. Exhibit F was a copy of Defendant's aforementioned Final Decree of Dissolution. The Final Decree of Dissolution was entered on August 9, 2012, by the Common Pleas Court of Lucas County, Ohio, Domestic Relations Division. [*Id*].

While Plaintiff made no objections to the admission of the Exhibits offered by the Defendant, he attempted to support his Complaint and his Motion to Dismiss by repeated *6 reference to the Ohio Rules of Civil Procedure, specifically "Civil Rule 86," which he also mentioned in his Response to the Order of the Court for Evidentiary Hearing. [Doc. #35]. However, the Federal Rules of Civil Procedure and federal common law govern claims brought in federal court. *See, Taylor v. Javitch, Block & Rathbone, LLC*., 2012 WL 2375494 at *2 n.1, 2012 U.S. Dist. LEXIS 86727 at *5-6 n.1 (N.D.

Ohio June 22, 2012)(a copy of the *Taylor* decision will be mailed out with this Memorandum); *see also, Gafford v. General Electric Co*., 997 F.2d 150, 165-66 (6th Cir. 1993)("The Federal Rules of Civil Procedure are the rules of practice which apply to civil actions in the federal courts. . .). Other than Civil Rule 86, Plaintiff did not cite any other basis under which a Chapter 7 case could be dismissed based upon a delay in providing notice to one creditor.

While Plaintiff's debt should have been listed by Debtor in the original bankruptcy filings, the deadlines creditor actions are generally set at Sixty (60) days from the first date set for the first meeting of creditors. *See*, Federal Rules of Bankruptcy Procedure 1017(e)(1), 4004(a) and 4007(c). The Plaintiff was listed in amendments filed on April 4, 2014, and his initial Complaint was filed before the expiration of the deadline on April 21, 2014. Thereafter, Plaintiff was granted Sixty (60) days to seek to obtain an attorney and to amend his Complaint.

In the case at hand, Defendant has provided sufficient evidence to prove to the court that she was not married at the time she filed her petition, and that her income, made up entirely of Social Security, does not exceed the median income level for the State of Ohio because Social Security income is excluded from the calculation by the statutory definition of "current monthly income". See, 11 U.S.C. §101(10A)(B). As such, the court finds that Plaintiff does not have standing to seek dismissal under Section 707(b), because the Debtor has income that is below the median income level for the State of Ohio. See, §707(b)(6). Moreover, the Debtor did not make a "false oath or account" under Section 727(a)(4) in listing her income and a family size of Three (3) in her bankruptcy court filings.

Accordingly, because the court finds that Plaintiff does not have standing to seek dismissal under 707(b), and because the Defendant presented the court with satisfactory evidence that proves she

Cousin v. Westbrook (In re Westbrook), Adv. Case No. 13-3539 (Bankr. N.D. Ohio Nov. 5, 2014)

did not make a "false oath or account" under Section 727(a)(4), the court shall enter judgment on the Complaint against the Plaintiff and in favor of the *7 Defendant.

For good cause shown, based on the foregoing reasons and authorities,

**IT IS ORDERED** that Plaintiff's Motion to Dismiss [Doc. # 15] is hereby **DENIED**.

The court will enter a separate Judgment in accordance with this memorandum of decision.

The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.

/s/_____

**John P. Gustafson**

**United States Bankruptcy Judge**

**Dated: November 5 2014**

###

casetext
Part of Thomson Reuters

5

No. 06-42263

United States Bankruptcy Court, D. Minnesota

# In re Ellringer

370 B.R. 905 (Bankr. D. Minn. 2007)

Decided Jun 20, 2007

No. 06-42263.

906 June 20, 2007. *906

Barbara J. May, Barbara J. May, Attorney at Law, Roseville, MN, for Debtor.

907 *907

## ORDER DENYING MOTION TO DISMISS

ROBERT J. KRESSEL, Bankruptcy Judge.

This case came on for hearing on the United States Trustee's motion to dismiss the debtor's chapter 7 case pursuant to 11 U.S.C. §§ 707(a), 707(b)(2), or 707(b)(3).

An evidentiary hearing was held on April 27, 2007. Michael R. Fadlovich appeared on behalf of the U.S. Trustee and Barbara J. May appeared on behalf of the debtor. Based on the evidence, I deny the United States Trustee's motion.

## FACTS

At the time of her bankruptcy filing, the debtor shared a home with Pamela Ellringer. The Ellringers owned their home as joint tenants and were jointly liable for the mortgage. They also had a joint bank account and jointly owned a 2002 Ford Focus. The debtor testified that only Pamela was liable for the loan which encumbered the Focus, although the parties stipulated that both the debtor and Pamela were liable for the loan. The debtor individually owns a 1988 Chevrolet Celebrity and a 2006 Saturn Ion. The Ion is subject to a lien. She also owned investment property, which was in foreclosure. The foreclosure sale occurred after she filed her petition

Prior to her bankruptcy filing, Pamela contributed $600 a month towards shared household expenses. This amount was used to pay the loan on the Focus and some of the additional living expenses the debtor incurred on behalf of Pamela. Except 2 for the $600, the debtor paid for all of the *2 mortgage, utilities, groceries, and other household necessities.

The debtor filed her petition on October 9, 2006. She had unsecured debts of approximately $11,000. Her original B22A form indicated that, at $44,276, her yearly income was above the applicable median income for a household of one in Minnesota, which is $42,028. The debtor did not include the $600 that Pamela gave her each month on line 8, which includes "any amounts paid by another person or entity on a regular basis, for the household expenses of the debtor or the 908 debtor's dependents." *908 In addition, the form included vehicle operating and ownership expenses for two cars. Using these figures, the debtor's disposable income each month was -$200.

On December 14, the U.S. Trustee filed a motion to dismiss this case for abuse. As part of the motion, the U.S. Trustee prepared an alternative B22A form with several changes. First, he included Pamela's $600 payment on line 8. Second, because the debtor's monthly income was higher by virtue of the $600, the U.S. Trustee increased the deduction for food, clothing,



1

In re El██████ ██, 370 B.R. 905 (Bankr. C.D. ███. 2007)

household supplies, personal care and miscellaneous expenses. Third, the U.S. Trustee allowed operating expenses for one vehicle, although he allowed ownership expenses for two vehicles. Finally, the U.S. Trustee deducted the monthly cost of administering a chapter 13 repayment plan. Using these figures, the debtor had nearly $400 of disposable income each month which over 60 months would result in $23,066 of disposable income. Thus, the U.S. Trustee sought dismissal of the debtor's chapter 7 case because it did not pass the means test.

In response to the trustee's motion, the debtor prepared a new means test form on March 23, 2007 which excluded the $600 payment Pamela made each month, gave a lower amount for national standards for food, clothing, household supplies, personal care and miscellaneous expenses, and included ownership and operating expenses for two vehicles. Also, the debtor deducted an extra *3 $200 for additional food and clothing expenses, although the debtor provided no documentation that the amount was reasonable and necessary. The debtor also included as secured debt repayment both the mortgage on her home and the mortgage on her investment property, although the debtor had no intention of retaining the investment property and had not made the mortgage payments for some time. She also included a monthly payment in order to cure the deficiency on the investment property's mortgage. Using this means test form, the debtor had -$1,741 of disposable income available each month.

Approximately two weeks before the evidentiary hearing held on April 27, 2007, Pamela moved out of the house which she shared with the debtor. Pamela ceased making $600 monthly payments to the debtor, and the debtor closed their joint bank account.

To demonstrate that the debtor's chapter 7 case violated the means test even after Pamela moved out, the Trustee prepared a second B22A form. In it, the U.S. Trustee excluded the $600 contribution that Pamela made to the debtor. The U.S. Trustee also used a lower amount for food, clothing, household supplies, personal care and miscellaneous expenses. He used ownership and operating expenses for one vehicle and eliminated the additional food and clothing expense. In addition, he did not allow the debtor to deduct the secured payments on the investment property or to cure the deficiency on the property. The U.S. Trustee also deducted the monthly expense necessary to administer a Chapter 13 plan. Using the U.S. Trustee's calculations, the debtor had $200 of disposable income available each month, which equals $12,000 over sixty months. The following table summarizes the differences among the four B22A forms. *909 **Table** *4

| Category | Debtor's first B22A form — Oct. 9, 2006 | U.S. Trustee's B22A form — March 23, 2007 | Debtor's second B22A form | U.S. Trustee's B22A form |
| --- | --- | --- | --- | --- |
| Line 8 — Regular contributions to the household expenses of the debtor | $ 0 | $ 600 | $ 0 | $ 0 |
| Line 13 — Annualized Current Monthly Income | $ 44,276.04 | $ 51,476.04 | $ 44,276.04 | $ 44,276.04 |
| Line 19 — National standards for food clothing, household supplies, personal care, and miscellaneous | $ 621 | $ 703 | $ 621 | $ 621 |
| Line 22 — Vehicle operation expense | $ 416 | $ 333 | $ 416 | $ 333 |
| Line 23 | $ 157.89 | $ 157.89 | $ 157.89 | $ 157.89 |
| 24 — Vehicle ownership expenses | $ 332 | $ 81.24 | $ 332 | $ 0 |
| Line 39 — Additional Food and Clothing Expenses | $ 0 | $ 0 | $ 200 | $ 0 |
| Line 42 — Deductions for Debt Payment | $ 1,398.59 | $ 1,637.18 | $ 2,648.59 | $ 1,398.59 |
| Line 45 — Administrative Expenses | $ 0 | $ 28.94 | $ 0 | $ 15.06 |
| Line 50 — Monthly Disposable Income | $ (199.79) | $ 384.44 | $ (1,741.46) | $ 200.15 |
| Line 51 — 60 Month Disposable Income | $ (11,987.40) | $ 23,066.40 | $ (104,487.60) | $ 12,009.00 |

## DISCUSSION *5

The court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334(a) (b); 28 U.S.C. §§ 157(a) (b)(1); 28 U.S.C. § 151 and Local Rule 1070-1.



In re Elsner, 377 B.R. 901, 905 (Bankr. M.D. Fla. 2007)

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) (B).

## The Plain Language of the Statute Determines Its Interpretation.

When interpreting a statute, the place to start is its plain meaning. The Supreme Court has stated "time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992). When the statute's language is plain, the sole function of the court — at least where the disposition required by the texts is not absurd — is to enforce it according to its terms. *Hartford Underwriters Ins. Corp. v. Union Planters Bank, N.A.,* 530 U.S.1, 6, 120 S.Ct. 1942, 1947 (2000). "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 532 (1991).

To determine the correct application of the means test, I look to the plain meaning of the statute describing the means test found in 11 U.S.C. § 707. Only if the result reached by the application the statute is absurd may I depart from its plain meaning. Absurdity is more than a result which does not reflect the reality of the debtor's situation. The means test will nearly always calculate a different disposable income than the debtor's actual income because it uses predetermined ₉₁₀ expenses *910 based on the debtor's income and household size and not the debtor's actual expenses. It also uses historical income rather than current income. Although the means test may lead to an unfair result in an individual's case, when Congress passed the BAPCPA amendments, *6 it was less concerned with fairness in any particular debtor's case than it was concerned with creating fairness and uniformity throughout the bankruptcy system as a whole. *See* 151 CONG. REC. S2470 (daily ed. Mar. 10, 2005) (statement of Sen. Nelson) ("First and foremost, the bill will curb

abuse of the bankruptcy system by implementing a means test to ensure that those who can afford to repay some portion of their unsecured debts are required to do so."). Thus, the means test limits judicial discretion to look at the actual circumstances of the debtor and substitutes a formula that allows only certain, predetermined expenses. It is not my role to question (or attempt to change) the outcome which the statute requires.

Although the parties argue a number of issues regarding the means test, I address only two, either of which independently results in a decision in the defendant's favor.

## The Date the Debtor Filed the Petition Determines the Debtor's Income, Expenses, and Household Size.

11 U.S.C. § 101(10A) indicates that "current monthly income" is determined by averaging the monthly income the debtor received over the previous six-month period ending on the last day of the calendar month immediately preceding the date of the commencement of the case. In addition, the standard expenses that the debtor may deduct for purposes of the means test are those that are in effect on the date of the order for relief. *See* 11 U.S.C. § 707(b)(2)(A)(ii). The debtor's monthly payments for secured debts are calculated as the sum of the total amounts contractually due in each month of the 60 months following the date of the petition divided by 60. 11 U.S.C. § 707(b)(2)(A)(iii).

The means test provides a snapshot of debtors' finances. The means test is not meant to be *7 continually updated as debtors' circumstances change. Thus, although Pamela moved out after she filed her petition, the debtor's income and expenses remained unchanged from the day she filed for purposes of the means test. Likewise household size should also be determined on the same day that the other elements of the means test are fixed.



In re Elliott (Bankr. C.D. Cal. 2007)

## The Debtor Resided in a Household of Two.

Under § 707(b)(6):

> Only the judge or the United States trustee . . . may file a motion under section 707(b) if the current monthly income of the debtor . . . as of the date of the order for relief, when multiplied by 12 is equal to or less than —
>
> (A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner.
>
> (B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals.

The Bankruptcy Code does not define what constitutes a household. 11 U.S.C. § 101(39A)(A) defines the "median family income" as "the median family income both calculated and reported by the Bureau of the Census." This calculation uses the Census Bureau's definition of household. Thus, the Census Bureau provides the most appropriate definition of "household" for use in the means test because it ensures that a

911 household in the means test *911 will have the same number of members as the calculation of median family income. The Census Bureau defines "household" as "all of the people, related and unrelated, who occupy a housing unit." U.S. CENSUS BUREAU, CURRENT POPULATION SURVEY (2004).http://www.census.gov/population/www/cps/cpsdef.html. A housing unit is a house, apartment, group of rooms or single room that is intended for occupancy as a separate living quarters. Id. Households may be either family or nonfamily. Id. Family households include the

8 householder and *8 all the other people in the living quarters who are related to the householder by birth, marriage, or adoption. Id. A nonfamily

household consists of a householder living alone, or a householder who shares the home exclusively with people to whom he or she is not related. Id. If Congress had intended to limit household size to only household members related by blood, marriage or adoption, it could have done so by saying "in the case of a debtor in a *family* of 2. . . ." However, in recognizing that there may be reasons why two unrelated, non-dependent individuals should be treated as a household for purposes of the means test, Congress elected to use the word "household" instead of the word "family."

The U.S. Trustee advocates using the Internal Revenue Manuel's definition of "household." The IRM does not define household, but indicates that the number of persons allowed under the national standard expenses should generally be the same as the number of dependents on the taxpayer's latest income tax return. INTERNAL REVENUE SERVICE, INTERNAL REVENUE MANUAL, § 5.15.1.7 (2004), *available at* http://www.irs.gov/irm/part5/ch15s01.html#d0e18 2366. I decline to use the IRM definition because it applies to the allowed expenses after the debtor is already found to have above median income. The IRM definition is not used to decide the threshold question of whether a debtor has above median income for her household size.

## The Debtor Must Include Part of Pamela's Monthly Contribution in Her Calculation of Current Monthly Income.

According to 11 U.S.C. § 101(10A) the term "current monthly income":

> (A) means the average monthly income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the 6-month period ending on —

In re Elkins, 371 B.R. 905 (Bankr. D.Minn. 2007)

(i) the last day of the calendar month immediately preceding the date *9 of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii);

(B) includes any amount paid by an entity other than the debtor . . . on a regular basis for the household expenses of the debtor or the debtor's dependents.

To the extent that Pamela's contributions were used to support the debtor or the debtor's dependents, the debtor must include them in her current monthly income. The remainder of the contributions are excluded because Pamela is not a dependent of the debtor and the statute does not require the inclusion of income from a third-party that is used to support a non-dependent. The U.S. Trustee argues that if the debtor's household includes Pamela, then Pamela's entire income must be included in the debtor's calculation of current monthly income. However, the statute only requires that the debtor include income provided by a person other than the debtor for support of the *debtor or the debtor's dependents*. Besides the sources of income included in the definition of "current monthly income," only the income of a debtor's spouse is included as part of the means test calculation. *See* 11 U.S.C. § 707(b)(7)(A). *912 As the debtor is not married to Pamela, she need not include any income that Pamela earns which Pamela uses to support herself.[1]

[1] Even if I were required to include Pamela's entire income in the means test, I would be unable to do so because the U.S. Trustee has not provided evidence of Pamela's income other than the $600 she contributes to the debtor's support.

## The Debtor's Income is Below the Median for a Household of Two.

$260 of Pamela's $600 monthly contribution is counted towards the debtor's current monthly income because she used it to pay the loan on the Focus, which was a household expense of the debtor. However, the debtor used the remainder of the $600 to pay Pamela's share of the household expenses, and it is therefore excluded from the debtor's calculation of current monthly income. *10 The applicable median income for a household of two in Minnesota is $55,338. If $260 a month is added to the debtor's income, the debtor has a annual income of $47,396.04. Even if the entire $600 were added to the debtor's income, the debtor would only have an annual income of $51,476.04. Because the debtor's income is below the median income for a family of two in Minnesota, the U.S. Trustee is barred by § 707(b)(6) from bringing this motion.

Even If the Debtor's Income Were Above the Median, the Presumption of Abuse Would Not Arise Because She Had Less Than $100 Per Month of Disposable Income.

11 U.S.C. § 707 provides that:

(2)(A)(i) The court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of —

(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or

(II) $10,000.



In re Elkwood (370 B.R. 905 (Bankr. C.D. Cal. 2007)

(ii)(I) The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent. . . . In addition, if it is demonstrated that it is reasonable and necessary, the debtor's monthly expenses may also include an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service.

Even if the debtor had above median income for her household size and the U.S. Trustee could therefore make a motion to dismiss the debtor's chapter 7 case, the U.S. Trustee would still need to prove that the debtor's disposable income was high enough that her case would be presumed abusive. Because the debtor's total unsecured debts were 11 less than $12,000, 25 percent of which *11 is $3000, the U.S. Trustee need only show that the debtor's disposable income is equal to or greater than $6000 over 60 months in order for the presumption of abuse to arise. In other words, the U.S. Trustee must show that the debtor's allowed 913 expenses under the *913 means test do not reduce her disposable income below $100 per month.

## The Debtor May Deduct Mortgage Payments Secured by Her Investment Property.

11 U.S.C. § 707(2)(A)(iii) allows the debtor to deduct monthly payments on secured debts which are calculated as the sum of:

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; divided by 60.

The debtor has deducted the scheduled payments on her investment property and a monthly amount necessary to cure the default that existed at the time of filing. The U.S. Trustee argues the debtor cannot deduct payments on her investment property because Congress's intent when enacting the BAPCPA amendments was to require those who can afford to repay some of their unsecured debts to do so. However, this broad statement of intention does not require that every provision of BAPCPA be interpreted, or in this case ignored, to the detriment of the debtor. Unless the plain meaning of the statute results in absurdity, the plain meaning must be followed, even if its meaning leads to a result that was arguably unforseen by Congress. Like the earlier discussion, if Congress intended the result promoted by the U. S. Trustee, it would have been easy enough to limit these deductions to those cases where the debtor intended to retain the property. It is not absurd to allow *12 the debtor to deduct secured loan payments as part of the means test without regard as to whether the debtor intends to retain the property. Nor does the fact that the provision favors the debtor contravene Congress's intention to create fairness throughout the bankruptcy system as a whole. That the outcome of the formula sometimes favors the debtor is not an indictment of the formula. Rather, it is the foreseeable outcome of applying a self-enforcing statutory mechanism to all debtors.



In re Elkins, 347 B.R. 905 (Bankr. D. Minn. 2007)

Another bankruptcy judge in this district has ruled that a debtor may deduct payments secured by her home even if she intends to abandon it. *See In re Hartwick,* 352 B.R. 867, 869 (Bankr. D. Minn. 2006). I agree with the decision in *Hartwick* that the plain language of the statute permits the debtor to deduct payments on secured property even if the debtor has no intention of retaining the property. The means test allows the debtor to deduct "all amounts scheduled as contractually due . . . in each month of the 60 months following the date of the petition." That the debtor has no intention to pay the debts at the time she filed does not change the fact that the debtor was contractually obligated to make payments on her mortgage at the time of filing. Contrary to what the U.S. Trustee suggests, there is no statutory requirement that the debtor intend to keep the secured property post-petition. Thus, the debtor may deduct, for purposes of the means test, payments on her investment property. If the debtor deducts the payments on her investment property from her income, then the debtor's disposable income would be negative even assuming that the remainder of the U.S. Trustee's calculations are accurate. Therefore, the debtor's case would not be presumed abusive even if the debtor had above median income. 914 *914

### The Debtor's Case Is Not Abusive for Bad Faith or Under the Totality of the Circumstances. 13 *13

If the presumption of abuse does not arise in this case or is rebutted, I may still find the debtor's case abusive for bad faith or under the totality of the circumstances. 11 U.S.C. § 707(b)(3) provides that:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(I) of such paragraph does not arise or is rebutted, the court shall consider —

> (A) whether the debtor filed the petition in bad faith; or

> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

The U.S. Trustee presented no evidence that the debtor filed her case in bad faith or that the totality of her circumstances indicates abuse. The debtor is of relatively limited means and she does not expect her income to increase in the foreseeable future. The debtor's living expenses are reasonable, and her living expenses consume a nearly all of her income. With the loss of Pamela's $600 monthly contribution, the debtor's finances will be even more stretched than at the time she filed the petition. Furthermore, the U.S. Trustee did not present evidence of the debtor's actual income and expenses from which I could determine whether the debtor has actual disposable income using her actual expenses and not the artificial expenses the means test requires. Thus, I find that the debtor did not file her case in bad faith and that the totality of the circumstances 14 does not indicate abuse. *14

## ORDER

THEREFORE, IT IS ORDERED:

The U.S. Trustee's motion to dismiss this case is denied.

In re Elkhair, 370 B.R. 905 (Bankr. M.D. 2007)



No. 20-32000-JDA

United States Bankruptcy Court, Eastern District of Michigan

# In re Augugliaro

Decided Sep 24, 2021

20-32000-JDA

09-24-2021

In Re: ZACHARY JOSEPH AUGUGLIARO, Debtor.

Joel D. Applebaum, United States Bankruptcy Judge

Chapter 7

## OPINION DENYING CREDITOR'S MOTION TO DISMISS

Joel D. Applebaum, United States Bankruptcy Judge

The matter before the Court is Creditor Mary Caswell's ("Ms. Caswell" or "Creditor") Motion to Dismiss. For the reasons set forth below, Ms. Caswell's Motion is DENIED.

I.

*FACTUAL BACKGROUND* In 2020, Ms. Caswell sued Zachary Augugliaro ("Debtor") and his company, Z&J Contracting, for breach of contract in State of Michigan 67th District Court (Case. No. C19G8814), alleging that she suffered damages as a result of Debtor's and/or Z&J Contracting's incomplete and shoddy concrete work at her home. Debtor did not appear at the state court hearing, and the state court awarded Ms. Caswell a default judgment in the amount of $4, 693.84, plus
1   interest. *1

On December 10, 2020, Debtor filed his chapter 7 bankruptcy petition. On his Summary of Assets and Liabilities, he lists $17, 900 in assets and $28,

507.84 in liabilities. According to Schedules E/F, Debtor's unsecured debt consists of student loans totaling $14, 382 and other general unsecured debt in the amount of $13, 976.84. The general unsecured debt is comprised of two judgments, one in the amount of $7, 500 and Ms. Caswell's judgment in the amount of $4, 708.84. The remainder of the debts listed on Schedule E/F consist of a debt of $634 to Commonwealth Financial Services, two debts in the amount of $567 each to Credit Business Services, and a $149 debt for "[o]bligations arising out of a separation agreement or divorce that you did not report as priority claims".

Along with his Schedules, Debtor filed his Form 122A-1 "Chapter 7 Statement of Your Current Monthly Income" which shows that Debtor's income is below the median for his size of household and that there is no presumption of abuse.

Debtor's bankruptcy filing then triggered the Court to issue a Notice of Chapter 7 Bankruptcy Case dated December 10, 2020 which was served on Debtor's creditors. The Notice indicated that the Debtor's section 341 first meeting of creditors would be held on January 11, 2021 and that the deadline for filing objections to Debtor's discharge
2   was March 12, 2021.[1] *2

1   The Notice states, in relevant part:



In re Augugliaro, [blank] BR [blank] (Bankr. C.D. Cal. Sep. 24, 2021)

For the debtors listed above, a case has been filed under chapter 7 of the Bankruptcy Code. An order for relief has been entered. This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read both pages carefully.

The debtors are seeking a discharge. Creditors who assert that the debtors are not entitled to a discharge of any debts or who want to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadlines specified in this notice. (See line 9 for more information.)

Line 9 of the Notice sets forth the date to object to discharge [under § 727] or to challenge whether certain debts are dischargeable [under § 523] and indicates that making those objections requires the filing of a complaint.

On February 8, 2021, Ms. Caswell sent a letter addressed to the Clerk of the Court and the chapter 7 Trustee in this case (the "Trustee") seeking to have Debtor's bankruptcy dismissed on the grounds that Debtor was allegedly hiding assets, understating his income, and not disclosing a marijuana business that he owns. The letter attaches over 80 pages of documents consisting of screenshots of Debtor's Facebook posts and text messages between Debtor and Ms. Caswell as examples of Debtor's many falsehoods. The last line of Ms. Caswell's letter states, "[B]ased upon this evidence of Augugliaro's dishonest statements and documentation below, I am requesting that his bankruptcy case be dismissed." The letter did not reference any section of the Bankruptcy Code. However, Ms. Caswell attached a copy of the text

of 11 U.S.C. § 727, the Bankruptcy Code section addressing whether a debtor's *3 general discharge should be denied based on certain conduct. Because Ms. Caswell's letter specifically requested that Debtor's case be dismissed and because no adversary proceeding was filed seeking a denial of discharge under § 727, [2] the Court docketed and treated Ms. Caswell's letter and attachments as a motion to dismiss Debtor's bankruptcy case under 11 U.S.C. § 707 (the "Motion").

> [2] Even though Ms. Caswell attached a copy of 11 U.S.C. § 727 to her letter, an action under § 727 must be filed as an adversary proceeding within a certain time period. Fed.R.Bankr.P. 7001(4); 4004(a). Based upon the allegations in Ms. Caswell's letter and the myriad attached documents, it is unlikely Debtor's actions would meet the standard for relief under § 727 even had Ms. Caswell timely filed an adversary proceeding under that section.

On March 8, 2021, Debtor responded to the Motion, refuting Ms. Caswell's allegations that he was dishonest on his bankruptcy schedules. Debtor further explained that any dishonest statements he made to Ms. Caswell about his work or his income were simply intended to calm the tension between Ms. Caswell and himself, and to assure her that he could and would perform under their contract.

On March 10, 2021, based on a stipulation between Debtor and the Trustee, the Court entered an order extending the deadline for filing a complaint objecting to discharge to April 30, 2021. (Docket No. 26) The extension of this deadline was not limited to the Trustee. No complaint objecting to discharge was ever filed by any party in interest. *4

On May 4, 2021, Ms. Caswell filed a Supplemental Motion to Dismiss (the "Supplement"), attaching additional documents

In re Augugliaro, ___ B.R. ___ (Bankr. M.D. Fla. Sep. 24, 2021)

setting forth other alleged dishonest statements by Debtor.

On May 5, 2021, this Court held a lengthy hearing on Ms. Caswell's Motion, at which time each party argued extensively. The Court adjourned the hearing until May 12, 2021 to allow the Trustee to report on her on-going investigation into Debtor's conduct and the allegations raised in Ms. Caswell's Motion and Supplement.

The Trustee appeared at the May 12, 2021 hearing and represented to the Court that, based on her investigation, she believed that Debtor's Schedules were accurate as filed, and that Debtor was a below median income debtor who did not have any assets available for distribution to creditors. The Trustee's conclusions were based, in part, on her examination of Debtor's bank accounts, business records, and tax returns, as well as Debtor's testimony at a Rule 2004 examination. *See Fed.R.Bankr.P. 2004* . During the Rule 2004 examination, Debtor testified that he was living off of odd jobs, unemployment compensation and food stamps. Moreover, Debtor testified that he suffers from a degenerative eye disease, is blind in one eye, and that his treatment is covered by Medicaid. (Docket No. 37, Rule 2004 Examination Transcript). The Court then inquired of Ms. Caswell whether, based on the Trustee's investigation and findings, she still wished to pursue her Motion. *5 Ms. Caswell indicated that she did because Debtor had been dishonest to her, had dodged service of process, and had avoided her efforts to collect on her state court judgment.

Ms. Caswell is prosecuting this Motion *pro se.* Because she acknowledges that she lacks personal knowledge of all or the overwhelming majority of the documents attached to her Motion and Supplement, and in an effort to allow both parties to avoid the costs associated with an evidentiary hearing, the Court and the parties crafted an agreed procedure for handling the hearing on the Motion. Under this procedure, the Court treats all of documents attached to Ms. Caswell's Motion

and Supplement as admitted into evidence. In addition, the Court treats Ms. Caswell's oral presentation and argument about her communications with Debtor as her testimony. The Debtor, in turn, relies on his schedules and amended schedules, his written and oral responses to the Motion and Supplement, and the transcript of his Rule 2004 examination.

On June 8, 2021, Ms. Caswell filed a letter asking permission to dispute statements Debtor made in his Rule 2004 examination once she has had an opportunity to review a copy of the examination transcript. That request was granted so that her supplements would be similarly treated under the agreed procedure.

On June 25, 2021, Debtor filed the transcript of his Rule 2004 examination. *6

On July 14, 2021, the Court held another hearing, at which time Debtor again confirmed that he would not be submitting any exhibits, and would rely on the Rule 2004 examination transcript, his oral and written responses to Ms. Caswell's submissions, and his schedules and amended schedules filed in the case. In light of the extensive arguments at previous hearings, the Court determined that further argument on the Motion would not be necessary or helpful to the Court in reaching a decision on the merits of the Motion.

On July 16, 2021 and on July 19, 2021, Ms. Caswell filed a second supplemental motion to dismiss and additional exhibits. As previously noted, the Court treats these additional exhibits as admitted into evidence and her second supplement as additional testimony in support of her Motion.

II.

*LAW AND ANALYSIS*

The question before the Court is whether Debtor's case should be dismissed under 11 U.S.C. § 707. Because Ms. Caswell did not specify whether she



In re Augugliaro, ... 2021 WL ... PA (Bankr. E.D. ... Sep. 24, 2021)

wanted to proceed under subsection (a) or (b), the Court will address both subsections.

## A. Analysis of 11 U.S.C. § 707(a)

Turning first to § 707(a) of the Bankruptcy Code, this subsection identifies three grounds that constitute "cause" for dismissal of a bankruptcy case; namely, 7 *7 unreasonable delay by debtor that is prejudicial to creditors, nonpayment of any fees or charges required under chapter 123 of title 28, and debtor's failure in a voluntary case to timely file certain required information. Dismissal because of this last ground may only be on a motion by the United States Trustee. None of these grounds apply here. The three enumerated grounds, however, are non-exclusive. Another ground for dismissal under § 707(a), albeit not explicitly stated in the statute, is a lack of good faith in filing the bankruptcy petition. *Industrial Insurance Services, Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1126-1127 (6th Cir. 1991); *Merritt v. Franklin Bank, N.A. (In re Merritt),* 211 F.3d 1269, *2 (6th Cir. 2000); *Rahim v. Pacifica Loan Four, LLC (In re Rahim),* 449 B.R. 527, 533 (E.D. Mich. 2011). In determining whether a debtor has filed bankruptcy in good faith, courts consider all of the facts and circumstances surrounding the bankruptcy filing. *Zick,* 931 F.2d at 1127-8. Some of the factors courts consider include: (1) whether the debtor enjoyed or continues to enjoy a lavish lifestyle; (2) whether the debtor made an effort to reduce expenses; (3) whether the debtor has an ability to repay creditors; (4) whether the debtor made any payments towards his debt; (5) whether the debtor is capable of making a substantial income; (6) whether the debtor filed bankruptcy to discharge a single debt or debts to a single creditor; (7) whether the debtor has assets available for distribution and, if so, whether those assets were properly disclosed; and (8) the age and health of the debtor. *See, Zick,* 931 F.2d at 1128, *In Rahim,* 449 B.R. 527, *8 531 (E.D. Mich. 2011), *In re Brown,* 88 B.R. 280, 283-4 (Bankr. D. Hawaii 1988). Each case, of course, must be evaluated on an individual basis. Courts may also

rely on what is commonly referred to as the "smell test" in determining good faith. *Zick,* 931 F.2d at 1127-8 *citing Morgan Fiduciary, Ltd. v. Citizens & Southern Intern. Bank,* 95 B.R. 232, 234 (S.D. Fla. 1988). The Sixth Circuit cautioned, however, that dismissal based on a lack of good faith should only be used in egregious cases. *Id.* at 1129; *See also, In re Mohr,* 425 B.R. 457, 466 (Bankr. S.D. Ohio 2010)("bad faith dismissals should not be taken lightly").

In this case, the Court finds that Debtor did not lack good faith in filing his bankruptcy. Debtor is a man in his 30's with a serious medical condition that has caused blindness in one eye and is impairing Debtor's sight in his other eye. He has a low income and very few assets. Debtor lives with his girlfriend and two children in a rental property. He does not enjoy a lavish lifestyle. While one of Debtor's largest debts is owed to Ms. Caswell, he owes a still larger judgment debt to another couple and has several other debts as well. Based on these specific circumstances, Debtor's case does not warrant a dismissal based on abuse.

With respect to Debtor's admission that he lied to Ms. Caswell about the success of his businesses and his ability to complete the job as bid, these lies, by themselves, do not rise to the level of conduct that the Sixth Circuit requires for dismissal under § 707(a). "[M]erely because a debtor has not dealt honestly with a 9 *9 particular creditor does not preclude that debtor from seeking bankruptcy relief." *In re Goyner,* 383 B.R. 316, 320 (Bankr.N.D.Ohio 2007)(the fact that debtor-wife received a large cash advance on the eve of filing did not warrant dismissal of the case on bad faith grounds).[3] Section 707 is "not directly concerned with a debtor's conduct toward individual creditors, but is rather focused on the debtor's conduct toward the bankruptcy process as a whole." *Id.* at 321. In this case, the Trustee examined Debtor's bank accounts, business records and tax returns, and questioned Debtor at his Rule 2004 Examination. As a result of this inquiry, the Trustee determined that Debtor's

Schedules were accurate as filed. For this reason, this Court finds that Debtor's conduct towards the bankruptcy process is not abusive. Fraud against a specific creditor such as Ms. Caswell is addressed *infra*.

> 3 The *Goyner* case was decided under § 707(b)(3)(A). As is discussed more fully *infra* p. 14-15, courts have treated § 707(a)'s "lack of good faith" and § 707(b)(3)(A)'s "bad faith" interchangeably.

Because dismissal under § 707(a) for a lack of good faith is not warranted here, the Court turns to § 707(b) to determine if the Debtor's case should be dismissed under that Code subsection. *10

### B. **Analysis of 11 U.S.C. § 707(b)**

Subject to certain limitations, § 707(b)(1) explicitly states that a bankruptcy case may be dismissed for abuse of the provisions of the bankruptcy code. Section 707(b)(1) states, in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. . . .

In this case, the most significant limitation on dismissal under § 707(b)(1) is set forth in § 707(b)(6), which provides that, with respect to a below median income debtor, "[o]nly the judge or United States trustee (or bankruptcy administrator, if any) may file a motion under section 707(b) . . . ." Here, as attested to in his schedules and as confirmed by the Trustee, Debtor is a below median income debtor and, therefore, only the Court or the United States trustee can pursue a

motion to dismiss under § 707(b). "This safe harbor preserves to some extent the protections against motions brought by creditors under section 707(b) to coerce or harass debtors who cannot afford to defend them. It limits the use of section 707(b) by creditors and trustees to debtors whose income is above the applicable state median income level." 6 *Collier on Bankruptcy* ¶ 707.04 (16th ed. 2021). Because Ms. Caswell is 11 *11 not authorized to bring this Motion to Dismiss against the below median income Debtor, her Motion must fail.

Even were the Court to find, contrary to the Trustee's investigation and Debtor's filings, that § 707(b)(6) is inapplicable, as the moving party under § 707(b), Ms. Caswell bears the burden of proving abuse by a preponderance of the evidence. *In re McVicker*, 546 B.R 46, 51 (Bankr.N.D.Ohio 2016). Here, Ms. Caswell cannot meet her burden. There are three pathways for a case to be dismissed as abusive under § 707(b). These are found in § 707(b)(2) and § 707(b)(3). Under § 707(b)(2), abuse is presumed if the debtor fails the "means test" - a mechanical pass/fail test that establishes a presumption of abuse when a debtor is deemed to have the ability to make a meaningful distribution to unsecured creditors in a chapter 13 plan. *See*, 11 U.S.C. § 707(b)(2). This presumption may be rebutted by special circumstances. *See*, 11 U.S.C. § 707(b)(2)(B). In this case, the Debtor's 122A-1 form indicates that he is a "below median income" debtor -- a finding which is unrebutted. Consequently, there is no presumption of abuse of the bankruptcy process by Debtor under § 707(b)(2).

Under § 707(b)(3), Debtor's case may nevertheless be dismissed if the Court determines that Debtor filed his case in "bad faith" or if "the totality of the circumstances demonstrates abuse." Section 707(b)(3) states:

In re Augugliaro ... (Bankr. ... Sep. 24, 2021)

In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which

12    *12 *12

the presumption in paragraph (A)(1) of such paragraph does not arise or is rebutted, the court shall consider-

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

In her Motion, Ms. Caswell argues that Debtor's case should be dismissed because he was hiding assets, understating his income, and not disclosing a marijuana business he owned. Ms. Caswell provided this Court with over eighty-three pages of text messages and Facebook posts which show or infer that Debtor was a skilled workman with a successful business and many jobs. Ms. Caswell argues that this evidence is inconsistent with his filed schedules and she therefore believes Debtor misrepresented his financial condition to the Court.

As the case progressed, Ms. Caswell also argued that Debtor dealt dishonestly with her personally by failing to complete the concrete job, making dishonest statements to her, providing her with false documentation and then avoiding service of process and collection efforts. Ms. Caswell also argues that Debtor is not needy, pointing again to Debtor's Facebook posts and text messages that state or infer that Debtor has a high income and substantial assets. These posts show off Debtor's expensive truck and Debtor's vacations with his girlfriend and kids. *13

13

In determining whether the case should be dismissed on the grounds of "bad faith" under § 707(b)(3)(A), courts have used the *Zick* standards for lack of good faith. *In re Oot*, 368 B.R. 662, 666 (Bankr.N.D.Ohio 2007) ("Although [*Zick* was] decided under subsection (a) of § 707, this decision's tenets have significant relevance in any "bad faith" analysis under § 707(b)"); *see also Kaylor v. Rankin*, 356 F.Supp.2d 839, 853 (N.D. Ohio 2005) (bad faith has been defined as the opposite of good faith); *In re Baum*, 386 BR 649, 652-3 (Bankr.N.D.Ohio 2008)(court used the standard set forth in *Zick* for determining lack of good faith under § 707(a) to evaluate bad faith under § 707(b)(3)(A)). This Court has already explained its reasoning for why Debtor's case should not be dismissed for lack of good faith under § 707(a). That same reasoning applies to Ms. Caswell's Motion under § 707(b)(3)(A) as well.

Under the "totality of the circumstances" test set forth in § 707(b)(3)(B), abuse can be shown either (1) where the debtor has acted dishonestly or (2) where the debtor is not needy, i.e. his financial situation does not warrant a discharge in exchange for the liquidation of his assets." *In re Weixel*, 494 B.R. 895, 901-902 (6thCir. BAP 2013) citing *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989). In determining whether a debtor is acting honestly, courts examine whether the debtor made substantial eve-of-bankruptcy purchases, was dishonest in filing his bankruptcy schedules and other court documents, and whether the bankruptcy was 14 *14 necessitated by unforeseen or catastrophic events. *In re Krohn*, 886 F.2d at 126. In determining whether a debtor is needy, the court must determine whether the debtor could pay his debts out of future earnings, *i.e.*, whether the debtor could fund a hypothetical Chapter 13 plan. Lack of neediness alone may compel a dismissal of the case. *Id.*; See also, *In re Zaporski*, 366 B.R. 758, 770-71 (Bankr. E.D. Mich. 2007) ("

14

In re Augugliaro, Not Reported in B.R. Rptr. (2021), 2021 WL 4352329, DA (Bankr. E.D. N.Y. Sep. 24, 2021)

[M]isconduct and improper purposes, or bad faith, are not necessary elements for a court to dismiss under new § 707(b)(3)(B)").

Ms. Caswell's argument -- that Debtor's bankruptcy should be dismissed because the Debtor acted dishonestly *towards her* -- does not present a basis for the dismissal of Debtor's case under § 707(b)(3)(B). In a case where a creditor is alleging fraud by the debtor, that creditor is better served by filing an adversary proceeding objecting to discharge under § 523 of the Bankruptcy Code. Section 523(a)(2) prevents the discharge of debts incurred by fraud, § 523(a)(4) prevents the discharge of debts incurred through embezzlement and larceny, and § 523(a)(6) excludes from discharge debts incurred by the willful and malicious actions of a debtor. Allowing dismissals under § 707(b)(3) for actions more specifically addressed by § 523(a) would render § 523 provisions largely redundant if, in most instances, the same wrongful acts supported both a finding of nondischargeability and the dismissal of the debtor's case under § 707(b)(3). The *Goyner* court explains this distinction: *15 *15

> Reading § 707(b)(3)(A) with too close a focus on the debtor's actions toward an individual creditor thus ignores the basic principle of statutory construction that an interpretation that renders another statute superfluous, especially one within the same statutory scheme, is to be avoided. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 35, 123 S.Ct. 2041, 2048, 156 L.Ed.2d 18 (2003). Additionally, affording too much weight to a debtor's conduct toward a single creditor ignores the statute's focus on the bankruptcy case as a whole.

*Goyner*, 383 B.R. at 321. This Court agrees. In this case, Debtor admits to lying to Ms. Caswell about his businesses and successes, and Debtor evaded service and collection in the state court case. This type of dishonesty, however, is not

dishonesty as to the bankruptcy case as a whole. For this reason, Debtor's actions towards Ms. Caswell do not support dismissal under § 707(b)(3)(B).

There are other reasons that militate in favor of an adversary proceeding rather than a motion to dismiss under § 707(b). Adversary proceedings under § 523 incorporate significant procedural safeguards associated with a lawsuit. Allowing a creditor with a § 523(a) action to simply seek the dismissal of the debtor's bankruptcy case under § 707(b)(3) would render those important safeguards meaningless. In this case, Ms. Caswell did not file an adversary proceeding alleging fraud under § 523(a) and, therefore, cannot pursue these fraud allegations under § 707.

Ms. Caswell also claims, based upon the numerous Facebook screenshots, that Debtor is not needy. It is certainly true that Debtor's Facebook posts brag that he is operating at least one, possibly two, profitable businesses. Self-serving Facebook posts, regardless of how often repeated, are simply not as credible as the bankruptcy 16 *16 filings Debtor made *under oath,* the testimony Debtor gave at his Section 341 hearing *under oath,* and the Trustee's independent investigation and review of Debtor's bank accounts, business records, and tax returns. For this reason, the Court relies upon the filed schedules and amended schedules and the Trustee's independent investigation and concludes that Debtor is in dire financial straits. Therefore, dismissal under § 707(b)(3)(B) would not be appropriate in this case.

III.

*CONCLUSION*

For the above stated reasons, the Court DENIES Creditor's Motion to Dismiss under 11 U.S.C. § 707(a) and (b). *17



In re Augugliaro, No. 20-22926-JAD (Bankr. E.D. Pa. Filed Sep. 24, 2021)



Case No. 11-11363 (ALG)

UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

# In re Ajunwa

Decided Sep 4, 2012

Case No. 11-11363 (ALG)

09-04-2012

In re NATHANIEL and REGINA AJUNWA
Debtors

LAW OFFICES OF GEORGE BASSIAS Counsel
to the Debtors By: George Bassias, Esq. THE
LAW OFFICE OF RENE MYATT Counsel to
Sean Hill By: Rene Myatt, Esq.

Allan L. Gropper

## Chapter 7

## <u>MEMORANDUM OF DECISION</u>

APPEARANCES: LAW OFFICES OF GEORGE
BASSIAS
*Counsel to the Debtors*

By: George Bassias, Esq.
THE LAW OFFICE OF RENE MYATT
*Counsel to Sean Hill*

By: Rene Myatt, Esq.
**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

2    *2

## <u>Introduction</u>

Sean Hill (hereinafter "Hill") has moved for an
order dismissing the Chapter 7 bankruptcy petition
of Nathaniel and Regina Ajunwa (hereinafter the
"Debtors") alleging that the case was filed in bad
faith under 11 U.S.C. §§ 707(a) and 707(b). Hill
asserts that the Debtors filed for bankruptcy only
to avoid paying a tort judgment entered in his

favor and have manipulated the Code to capitalize
on an expanded homestead exemption and to
ensure that no assets are available for distribution
to creditors. As discussed below, Congress has
established Chapter 7 as a means for a debtor to
obtain a fresh start and has provided only limited
reasons for dismissing a Chapter 7 petition as filed
in bad faith. The courts have not lightly expanded
these, and even if there is a non-statutory basis for
dismissing a Chapter 7 case as filed in bad faith,
this case does not merit such severe relief. The
motion is denied.

## <u>Background</u>

The facts are not disputed.

A. <u>The State Court Judgment</u>

On October 21, 2010, Hill obtained a judgment for
$431,827.50 against debtor Nathaniel Ajunwa in
the Kings County Supreme Court. The judgment
was for damages in a car accident in which
Ajunwa made an illegal turn and struck Hill,
causing extensive harm, including the loss of
Hill's spleen and a kidney. Ajunwa carried only
the statutory minimum automobile insurance of
$25,000 for non-fatal injuries, as required by
N.Y.C.R.R. 60-1.1. Ajunwa has made no
payments on the judgment, beyond whatever his
insurance company has paid.

B. <u>The Debtors' 2010 Chapter 13 Filing</u>

On November 9, 2010, Ajunwa and his wife filed
for relief under Chapter 13 of the Code in this
Court (Case No. 10-15981). The Debtors listed
real property in Bronx county with a *3 value of
$330,000 and a mortgage of $170,000 and no

3



other substantial assets. The Debtors used the New York state exemptions then in effect, and pursuant to CPLR 5206(a) claimed a $100,000 homestead exemption ($50,000 each), resulting in $60,000 of non-exempt home equity.

Although the Debtors never proposed a Chapter 13 Plan, under 11 U.S.C. § 1325(a)(4) they would presumably have been required to pay over to their one substantial creditor, Hill, the value of the non-exempt equity in their home. Hill's judgment accounted for over 90% of the total claims listed, and he stood to receive almost all of the Plan payments. Ajunwa's one-half interest in the property would be $30,000, although it is assumed that his survivorship interest would be even less.

C. <u>The Amendment to the New York Homestead Exemption</u>

In 2010, the New York State Legislature passed S7034A-2009, a bill which amended the New York homestead exemption under CPLR 5206(a), increasing the exemption for homes in the five New York City counties from $50,000 to $150,000. The bill was signed by the Governor on December 22, 2010 and went into effect on January 21, 2011. The Memorandum in Support of the Bill stated that the purpose was to "allow a debtor to keep enough property and money exempt from the satisfaction of a money judgment to continue to live without becoming a ward of the State."[1] The previous exemption of $50,000 was described as unrealistically low to achieve the purpose of the exemption: to keep debtors in their homes. CPLR 5206(a) (McKinney Supp. 2012).

4    *4

[1] S7034A-2009 Introducer's Memorandum, New York State Legislature, available at http://image.iarchives.nysed.gov/images/images/172190.pdf, (last visited August 23, 2012).

D. <u>The Dismissal of the Debtors' Chapter 13 Filing</u>

On January 11, 2011, a few days before the effective date of the new law, the Debtors filed a motion to convert their case to a Chapter 7 proceeding. However, this motion was withdrawn the next day, and on January 28, 2011, the Debtors filed a motion to voluntarily dismiss the Chapter 13 proceeding. The Debtors have never denied that the purpose of the Chapter 13 dismissal was to take advantage of the revised CPLR 5206(a), which would allow them to exempt all of their home equity and to receive a discharge in a subsequent Chapter 7 case without the liquidation of any of their assets. The motion to dismiss the Chapter 13 proceeding of dismissal was unopposed, and an order of dismissal was signed on January 31, 2011. Docket #24 in Case No. 10-15981. On February 4, 2011, after the order was signed but prior to its entry on the docket, Hill filed a motion for relief from the automatic stay to foreclose on his judgment, which was alleged to be a lien on the Debtors' real estate. The motion was rendered moot by the closing of the case.[2]

[2] It is assumed that this motion was brought so that the creditors could claim rights under statutory provisions that govern in a second bankruptcy case where the first case was dismissed after a motion for relief from stay had been filed. See, e.g., 11 U.S.C. § 362(c).

E. <u>The Debtors' 2011 Chapter 7 Filing</u>

On March 28, 2011, the Debtors filed for relief under Chapter 7 of the Bankruptcy Code. They listed the same real property of $330,000 on Schedule A with the same mortgage of $170,000 on Schedule D, but claimed a $300,000 ($150,000 each) homestead exemption on Schedule C. As a result, the petition on its face showed no assets available for distribution. The Debtors' current monthly income pursuant to § 101(10A) of the Code remained below the New York median for the Debtors' family size. *5

5

In re Ajunwa                           (ALCO-                     Sep. 4, 2012)

On April 26, 2011, Hill filed a motion to dismiss the Debtors' proceeding under §§ 707(a) and 707(b) of the Code. The motion alleges that the Debtors manipulated the Code to avoid paying Hill, and that their repeat filings were abusive as efforts to capitalize on the amended homestead exemption. The motion also claimed that the Debtors' election to maintain minimal car insurance was a conscious decision that has now imposed significant costs on Hill.[3]

> [3] The motion initially also charged that the Debtors had hidden assets and income. On June 26, 2011, Hill filed an application to conduct examinations of the Debtors pursuant to Fed. R. Bankr. P. 2004, and an order granting the examinations was entered on June 29, 2011. At a hearing on January 10, 2012, Hill's attorney indicated that no assets or fraudulent conduct were discovered during the examinations, and the allegations appear to have been laid to rest.

On August 26, 2011, the deadline to object to the Debtors' discharge under § 727 of the Code and the dischargeability of any debts under § 523 of the Code expired. The Chapter 7 trustee thereafter filed a report of no distribution. On December 7, 2011, the Debtors' discharge was granted. The discharge is subject to revocation if the instant motion is granted.

## Discussion

A number of issues are raised by Hill's argument that the Debtors are acting in bad faith and that their case should be dismissed under §§ 707(a) and 707(b) of the Code. First, the Court must determine whether the Debtors are eligible to claim the amended homestead exemption. Second, it must be determined whether the dismissal of the Chapter 13 proceeding and the refiling fifty-six days later of a Chapter 7 proceeding constituted bad faith. Finally, the Court must determine whether the Debtors have acted in good faith by filing for bankruptcy to discharge a tort judgment arising out of a car accident.

### A.  The Debtors Are Eligible to Claim the Amended Homestead Exemption

In *CFCU Community Credit Union v. Hayward,* 552 F.3d 253 (2d Cir. 2008), the Second Circuit held that a 2005 amendment to New York law, increasing the homestead exemption from *6 $10,000 to $50,000, applied retroactively to debts incurred prior to the effective date of the amendment, noting that state law governs the scope of the exemption. The Circuit Court found that the issue was governed by the intent of the New York Legislature in adopting the amendment, and that the 2005 amendment, unlike a 1997 change to state exemptions that was expressly made non-retroactive, was intended to be remedial and therefore to protect assets against claims that arose prior to the effective date of the amendment. *Id.* at 265. The 2011 amendment to CPLR 5206(a), like the amendment in 2005, is not expressly non-retroactive. Moreover, the amendment is clearly remedial and was described as completing work left unfinished by the 2005 amendment. CPLR 5206(a) (McKinney Supp. 2012). It should therefore be interpreted in the same way as the 2005 amendment to apply to debts or liabilities incurred prior to the effective date of the amendment.[4]

> [4] Additionally, it may be too late for Hill to raise an issue regarding the Debtors' exemption claim. Fed. R. Bankr. P. 4003(b)(1) permits a party in interest to object to a claimed exemption within 30 days following the meeting of creditors. Once this deadline has passed, a party in interest may not object to an exemption, even if the debtor had no colorable statutory basis for claiming it. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643-44 (1992). In this case, the meeting of creditors was concluded on April 26, 2011. Even though the Chapter 7 trustee obtained an extension of the objection period, the deadline under Fed. R. Bankr. P. 4003(b)(1) passed as to Hill on May 26, 2011.



In re Ajunwa    Case No. 14-13293 (ALG) (Bankr. S.D.N.Y. Sep. 4, 2012)

## B. The Debtors Did Not Act in Bad Faith by Dismissing Their Chapter 13 Proceeding and Filing a Chapter 7 Proceeding Fifty-Six Days Later

As indicated above, the Debtors have never disputed that they dismissed their prior Chapter 13 case in order to take advantage of the amendment to New York law increasing the homestead exemption, and that the Debtors assumed that the prior exemption amount would have applied in their Chapter 13 case, which was filed when the prior law was in effect. *See supra* note 3, at p. 4. The question is thus whether the Debtors acted in good faith in dismissing their original proceeding and refiling shortly thereafter in Chapter 7.

The Bankruptcy Code authorizes the dismissal of a Chapter 13 proceeding in 11 U.S.C. §1307(b), which provides that "on request of the debtor at any time," the court "shall dismiss" a \*7 case under Chapter 13 if the case has not been previously converted under §§ 706, 1112 or 1208. The Second Circuit has held that this provision affords a debtor an absolute right to dismiss a Chapter 13 proceeding. *Barbieri v. RAJ Acquisition Corp. (In re Barbieri),* 199 F.3d 616 (2d Cir. 1999). If *Barbieri* remains good law, the Debtors were merely exercising a statutory right and were not acting in bad faith when they dismissed their case.

With respect to the dismissal of the Debtors' first case, the only question as to the continuing vitality of *Barbieri* is a consequence of the Supreme Court's decision in *Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365 (2007). There the Court, construing the language of § 706(a) of the Bankruptcy Code, which is very similar to § 1307(b),[5] held that a debtor does not have an absolute right to convert a Chapter 7 proceeding to a Chapter 13 proceeding where there is evidence of bad faith. Courts in this Circuit are split on whether the holding of *Marrama* extends to the dismissal of Chapter 13 proceedings. *Compare In re Procel,* 467 B.R. 297, 305 (S.D.N.Y. 2012)

(holding that *Barbieri* remains binding in the Second Circuit unless and until overruled); *In re Armstrong,* 408 B.R. 559, 569 (Bankr. E.D.N.Y. 2009) (holding that *Marrama* abrogated *Barbieri* and that bad faith can be grounds to deny the voluntary dismissal of a Chapter 13 proceeding).

> [5] Section 706(a) reads: "The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section, 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable."

There is no need to consider whether *Marrama* abrogated *Barbieri* because even if it did, the Debtors did not act in bad faith in dismissing their Chapter 13 case and refilling to get the benefit of an increased exemption. The *Armstrong* Court, which reached the issue of good faith in the dismissal of a Chapter 13 case, applied a totality of the circumstances test consisting of 15 factors to determine good faith. *In re Armstrong,* 409 B.R. at 633-34 *citing Leavitt v. Soto (In re Leavitt),* 171 F.3d 1219 (9th Cir. 1999). Factors to consider include (1) whether the debtor has \*8 stated debts and expenses accurately; (2) whether the debtor has made any fraudulent representation to mislead the bankruptcy court or (3) has unfairly manipulated the Bankruptcy Code; (4) the nature of the debt, including the question whether the debt would be nondischargeable in a Chapter 7 proceeding; (5) the timing of the petition; (6) how the debt arose; (7) the debtor's motive in filing the petition; (8) how the debtor's actions affected creditors; (9) the debtor's treatment of creditors both before and after the petition was filed; (10) whether the debtor has been forthcoming with the bankruptcy court and the creditors; (11) whether the debtor misrepresented facts in the petition or plan; (12) whether the debtor unfairly manipulated the Bankruptcy Code, or otherwise filed the Chapter 13 petition or plan in an inequitable manner; (13) the debtor's history of filings and



dismissals; (14) whether the debtor only intended to defeat state court litigation; and (15) whether egregious behavior is present.

In the present case, assuming the issue of the dismissal of the Debtors' Chapter 13 case is not moot because it was not contested at the time, the *Armstrong* factors can be used to assess their conduct in dismissing the case. The Debtors have been honest with the Court on all matters, including the disclosures on their schedules and the reason for the dismissal of their Chapter 13 case. Although they filed to discharge a recently entered tort judgment, the discharge of such a debt is not prohibited, as further discussed below, and the filing was not a stalling tactic intended only to delay the state court litigation. The only adverse impact of the Chapter 13 dismissal was the subsequent maximization of their homestead exemption to the detriment of their one substantial creditor. However, exempting property is almost always a detriment to creditors, but it was the explicit goal of the New York Legislature to protect homesteads, notwithstanding creditor interests. Indeed, if Hill is successful in his motion to dismiss and attempts to collect on his judgment, he will presumably be met with the claim that the 10    current *9 CPLR 5206(a) exemption applies, not an exemption in effect several years ago. This Court cannot find a debtor's exercise of a right to use a state-authorized exemption to be an "unfair manipulation" of the Code.

As to the Debtors' conduct in filing a second case on the heels of the dismissal of the first, the Supreme Court has held that the filing of more than one bankruptcy petition does not in itself constitute bad faith. In *Johnson v. Home State Bank,* 501 U.S. 78 (1991), the Court held that repeat bankruptcy petitions are not categorically prohibited unless they fall under the specific provisions enumerated by Congress. Congress has dealt with repeat petitions in two sections. Section 109(g)(2) provides, in relevant part,

[N]o individual ... may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if - - the debtor *requested and obtained* the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title. (emphasis added).

In the situation at bar, Hill filed a stay relief motion on February 3, 2011, but the Debtors had already "requested" a dismissal of their Chapter 13 case and the order was signed on January 31, 2011. The dismissal order was not entered until February 3, 2011, which was the same date that the lift stay motion was filed; however, the dismissal order was entered first in time. In any event, even if there were a question concerning the timing of the dismissal, § 109(g)(2) uses the conjunctive, therefore the debtor must have *both* requested *and* obtained the voluntary dismissal *after* the creditor filed the lift stay motion for the section to apply. *In re Easton,* 166 B.R. 793, 795 (E.D.N.Y. 1994); *see also In re Hicks,* 138 B.R. 505, 507 (Bankr. D. Md. 1992). In the instant case, at a minimum, the Debtors requested the relief prior to Hill filing the motion to lift the stay. *10

Where a debtor files a Chapter 7 case within one year after the dismissal of his or her prior case, 11 U.S.C. § 362(c)(3) also provides that the second case is presumptively not filed in good faith as to all creditors if *inter alia* there has not been a substantial change in the financial or personal affairs of the debtor since the prior dismissal or any reason to conclude that the case will not result in a discharge. 11 U.S.C. § 362(c)(3)(C)(i)(III) (aa).[6] Such a proceeding is presumptively not filed in good faith as to a particular creditor if as of the date of dismissal of the prior case a motion for stay relief was still pending. 11 U.S.C. § 362(c)(3)(C)(ii).[7] The stay relief motion was not "pending" after the signing of the order of dismissal, and the Debtors should not be penalized for any delay in entry. Additionally, the Debtors' ability to exempt



Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 61 of 154

In re Ajunwa    C. No. 14-11352 (ALG) (Bankr. S.D. N.Y. Sep. 4, 2012)

all of their home equity rather than only a portion of it might possibly qualify as a change in the Debtors' financial affairs under 11 U.S.C. § 362(c)(3)(C)(i)(III).[8]

[6] Some courts have noted that the language of 11 U.S.C. § 362(c)(3)(C)(i) lacks clarity; nevertheless, the purpose of the section appears to be to create a presumption of a bad faith filing where a debtor files a subsequent bankruptcy case without the intent or ability to successfully conclude the case. *See, e.g., In re Castaneda,* 342 B.R. 90, 94 n. 5 (Bankr. S.D. Cal. 2006) (interpreting the Chapter 13 related subsection (bb), which is comparable to the Chapter 7 related subsection (aa), as appearing to contain a drafting error).

[7] Although the penalty for triggering § 362(c) would be the expiration of the automatic stay rather than dismissal of the case, the statute nonetheless provides a standard to assess good faith.

[8] While Hill's attorney argues that this does not qualify as a change in financial circumstances, Hill's Mot. Dismiss ¶54, it was this very change in circumstances that prompted the Debtors' dismissal and refiling, a point noted elsewhere in the motion. Id. at ¶14.

Courts have also created a test to assess good faith under § 362(c)(3) in the context of a motion to reimpose the automatic stay. *In re Montoya,* 342 B.R. 312, 317 (Bankr. S.D. Cal. 2006). The factors have included (1) whether the debtor misrepresented facts in the petition; (2) the debtor's history of filings and dismissals; (3) whether the debtor only intended to defeat state court litigation; and (4) whether egregious behavior is present. *Id. citing Leavitt,* 171 F.3d at 1224. Good faith requires "honesty of intention" by the debtor in question. *11

In the present case, the Debtors have only filed bankruptcy once before, have been honest with the court in both cases, and have not engaged in any egregious conduct. While the Debtors did refile to exempt assets from a state court judgment creditor, they did not file to stay state court litigation. Their case can easily be contrasted with the Chapter 13 debtor that repeatedly files to prevent a mortgagee from foreclosing on its collateral. Thus, the analysis of the Debtors' good faith here appear substantially similar to the analysis under the *Armstrong* factors, and the conclusion is the same.

## C. Hill's Motion to Dismiss Under §§ 707(a) and 707(b) Should Be Denied

The Bankruptcy Code also contains several statutory provisions that provide for dismissal of a filing as made in bad faith. First, under § 707(a), a court may dismiss a Chapter 7 case for "cause," including unreasonable delay by the debtor, nonpayment of any fees, or failure to comply with the duties imposed on a debtor by 11 U.S.C. § 521.[9] The statutory illustrations of cause are not exclusive but they all relate to a debtor's conduct after the petition has been filed. In the present case, none of these three factors is present.

[9] Section 707(a) provides:



In re Ajunwa    Case No. 11-13286 (ALG) (Bankr. S.D.N.Y. Sep. 4, 2012)

> The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
>
> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on motion by the United States trustee.

Prior to the amendments to the Bankruptcy Code in 2005, the Circuits were split on whether a standard such as bad faith can serve as "cause" for dismissal under § 707(a). *Compare Industrial Insurance Services, Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1126-27 (6th Cir. 1991) (finding lack of good faith as an implicit jurisdictional requirement and thus grounds for dismissal under § 707(a)); *with In re Padilla,* 222 F.3d 1184, 1191 (9th Cir. 2000) (finding § 707(a) reserved for technical violations of the Code). The Second Circuit did not rule on the *12 issue, but courts in this Circuit frequently followed *Zick* in dismissing cases under § 707(a) where there is an absence of good faith. *Dinova v. Harris (In re Dinova),* 212 B.R. 437, 442 (2d Cir. BAP 1997), citing H.R. Rep. No. 95-595, at 380 (1977), held that courts must engage in a case-by-case analysis to determine if dismissal is in the "best interest of all parties." *Dinova,* 212 B.R. at 442. The party moving for dismissal bears the burden of proving cause by a preponderance of the evidence, and court also exercises substantial discretion in determining a motion to dismiss under § 707(a). *In re Aiello,* 428 B.R. 296, 299 (Bankr. E.D.N.Y. 2010). *See also In re Lombardo,*

370 B.R. 506, 511 (Bankr. E.D.N.Y. 2007); *In re Griffieth,* 209 B.R. 823, 827-28 (Bankr. N.D.N.Y. 1996). Courts considered a variety of factors in assessing good faith under § 707(a). *In re Griffieth,* 209 B.R. at 827 (laying out a six factor test); *In re Keobapha,* 279 B.R. 49, 53 (Bankr. D. Conn. 2002) (laying out a fourteen factor test); *In re Lombardo,* 370 B.R. at 512-13 (adopting the *Griffieth* test while also using nine of the *Keobapha* factors). There is a further question whether the cases survived the 2005 Amendments, as the adoption in 2005 of a specific "filed in bad faith" standard in § 707(b) supports the proposition that bad faith cannot serve as a cause for dismissal under § 707(a). Marianne B. Culhane and Michaela M. White, Catching Can-Pay Debtors: Is the Means Test the Only Way?, 13 Am. Bankr. Inst. L. Rev. 665, 683, n.89 (2005), *citing In re Padilla,* 222 F.3d at 1191. In any event, this issue need not be reached; even assuming that there is continuing judicial discretion to dismiss for lack of good faith under § 707(a), the Debtors did not act in bad faith. The *Armstrong* factors discussed above compel this conclusion. The same result obtains under the fifteen factor approach in *Lombardo,* which is the most commonly and recently utilized § 707(a) test.[10] *See also In re *13 Parikh,* 456 B.R. 4, 20-21 (Bankr. E.D.N.Y. 2011); *In re Aiello,* 428 B.R. at 302; *In re Mazzella,* No. 09-78449, 2010 WL 5058395, at *5-6 (Bankr. E.D.N.Y. 2010). Indeed, there is general consensus that the standard for finding bad faith under § 707(a) is stringent, and "is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt *based on conduct akin to fraud, misconduct, or gross negligence." In re Zick,* 931 F.2d at 1129 (emphasis added).

> [10] The factors are (1) the debtor's manipulations having the effect of frustrating one particular creditor, (2) the

casetext
Part of Thomson Reuters

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 63 of 154

In re Ajunwa    Case No. 11-1887 (ALG), ... (Bankr. S.D. Fla. Sep. 4, 2012)

absence of an attempt to pay creditors, (3) the debtor's failure to make significant lifestyle changes, (4) the debtor has sufficient resources to pay substantial portion of debts, (5) the debtor inflates expenses to disguise financial well-being, (6) the debtor is overutilizing protections of the Bankruptcy Code to the unconscionable detriment of creditors; (7) the debtor reduced his creditors to a single creditor in the months prior to the filing of the petition; (8) the debtor filed in response to a judgment, pending litigation or collection action; (9) there is an intent to avoid a large single debt; (10) the debtor transferred assets; (11) the debtor is paying debts to insiders; (12) the debtor failed to make candid and full disclosure; (13) the debts are modest in relation to assets and income; (14) there are multiple bankruptcy filings or other procedural "gymnastics"; and (15) the unfairness of the use of Chapter 7.

There is no such conduct in the present case. Hill's bad faith allegations were initially grounded in large part on accusations of hidden assets or income. In fact, these accusations were resolved in the Debtors' favor following an examination of the Debtors pursuant to Fed. R. Bankr. P. 2004. As previously noted, bad faith cannot be found in the dismissal of the Debtors' first petition and the subsequent refiling. The principal grounds that appear to exist for dismissal are the Debtors' incurrence of a judgment for negligent operation of a motor vehicle, having only the minimum car insurance under 11 NYCRR § 60-1.1, and leaving no assets available for their one principal creditor by claiming the maximum homestead exemption under CPLR 5206(a). As a matter of policy, compliance with laws passed by the state Legislature should not serve as indicia of bad faith, and Hill has not met his burden of justifying dismissal by showing the sort of fraud or misconduct required under *Zick.*

Moreover, courts have frequently held that filing for bankruptcy in order to counter the collection efforts of one creditor without further indicia of bad faith is insufficient for dismissal *14 under § 707(a). *In re Sudderth,* No. 06-10660, 2007 WL 119141, at *2 (Bankr. M.D.N.C. 2007); *In re Glunk,* 342 B.R. 717, 736 (Bankr. E.D. Pa. 2006); *In re Mazzella,* 2010 WL 5058395, at *6 ("However, the fact that the Debtor filed for bankruptcy in response to pending litigation without more additional evidence of misconduct is not enough to dismiss this case for cause under 11 U.S .C. § 707(a)"). In *Keobapha,* 279 B.R. at 50, the Debtor caused two deaths in a car accident, then filed for bankruptcy after paying out the policy limit on his car insurance. The court held that filing in response to a single lawsuit is not by itself sufficient to justify dismissal under § 707(a). *Id.* at 53. By contrast, in *Lombardo,* where the debtor promised her attorney a share of a settlement in payment of the attorney's fees, then filed for bankruptcy before the attorney could perfect a lien on the funds, the court found the debtor's pre-petition deceit as to her only substantial creditor sufficient to warrant dismissal. 370 B.R. at 513-14. Here, the Debtors' conduct involved no pre-petition fraud, as was the case in *Lombardo.*

In addition to the possible availability of bad faith dismissal under § 707(a), § 707(b)(1) provides that a court may dismiss a case filed by a debtor whose debts are primarily consumer debts if it finds that "the granting of relief would be an abuse of the provisions" of Chapter 7. However, in determining whether the granting of relief would be abusive, a court must first determine if a "presumption of abuse" arises under the means test codified in § 707(b)(2). 11 U.S.C. § 707(b)(2)(A)(i). Where a presumption of abuse does not arise under the means test - - where Debtors' current monthly income, as defined under § 101(10A), multiplied by twelve is less than the median family income for the applicable household size - - only the judge or United States

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 64 of 154


In re Ajunwa    Cite as No. 11-3821 (ALG) (Bankr. S.D.N.Y. Sep. 4, 2012)

trustee may file a motion under § 707(b). 11 U.S.C. § 707(b)(6). Creditors such as Hill are not eligible to bring motions pursuant to § 707(b) where § 707(b)(6) applies. *In re Curcio*, 387 B.R. 278, 285 (Bankr. N.D. Fla. 2008). *15

Moreover, even if Hill did have standing to move to dismiss under § 707(b), the provisions does not apply because the Debtors' debts are not primarily consumer debts. *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1987) (whether the debtors have primarily consumer debts is a statutory threshold for a dismissal motion pursuant to § 707(b)). Consumer debts are defined as debts "incurred by an individual primarily for a personal, family or household purpose." 11 U.S.C. § 101(8). The standard was adopted from consumer protection laws to cover typical consumer credit transactions. *In re Booth*, 858 F.2d 1051, 1054 (5th Cir. 1988) *citing* H.R. Rep. No. 95-595 (1977). Courts have struggled to classify debts that fall outside the scope of this definition. *See In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996) (debt derived from lump sum award in divorce settlement a consumer debt because not incurred with profit motive); *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988) (a home equity line of credit can be consumer debt, depending on the purpose for which it was incurred); *In re Traub*, 140 B.R. 286, 288 (Bankr. D.N.M. 1992) (tax debts are not consumer debts). However, no court has held that a debt incurred from the negligent operation of an automobile is a consumer debt. *In re Alvarez*, 57 B.R. 65, 66 (Bankr. S.D. Fla. 1995); *In re White*, 49 B.R. 869, 872 (Bankr. W.D.N.C.) (holding that debts arising from negligence cannot be "incurred", as volition is required); *In re Marshalek*, 158 B.R. 704, 707 (Bankr. N.D. Ohio 1993) ("Simply stated, a judgment resulting from a vehicular accident, *per se*, is not a 'consumer debt' as that term is defined under the Code.") Accordingly, dismissal under § 707(b) is not a remedy available under the facts of this case.

Finally, two other sections of the Code have relevance to the issues raised in this motion. Section 523 of the Code identifies debts that are excepted from discharge; as relevant here, § 523(a)(6) provides for the nondischargeability of a debt arising from willful and malicious injury by the debtor. Many creditors have sought to hold debts arising from car accidents *16 nondischargeable under this provision, but absent a showing of intent to harm the plaintiff, even extreme recklessness is not deemed willful under § 523(a)(6). *Carrillo v. Su (In re Su),* 290 F.3d 1140, 1146 n.6 (9th Cir. 2002); *see also Kawaauhau v. Geiger,* 523 U.S. 57, 64 (1998). Claims under § 523(a)(6) as a result of the debtor's failure to carry any car insurance have also failed. *See In re Druen,* 121 B.R. 509, 512-13 (Bankr. W.D. Ky. 1991); *In re Fate,* 100 B.R. 141, 144-45 (Bankr. D. Mass. 1989); *Pechar v. Moore (In re Pechar),* 98 B.R. 488, 489-90 (D. Neb. 1988). It is also relevant that Congress amended the list of nondischargeable debts in 2005, adding § 523(a)(9) that provides for the nondischargeability of debts resulting from injuries caused by the debtor's operation of a motor vehicle while intoxicated. Congress did not deal with other motor vehicle accidents.

The second relevant statute is the limitation on the use of exemptions added in the 2005 Amendments. If a debtor elects to use State law exemptions, the amount of the exemptions may be capped at $146,450[11] as to certain assets, including homesteads, if the court determines that the filing of the case was an abuse of the Code or the debtor owes a debt arising from *inter alia* a "criminal act, intentional tort, or willful or reckless misconduct that caused serious physical injury or death to another individual in the preceding 5 years." 11 U.S.C. § 522(q)(1)(B)(iv). Negligent homicide caused by the operation of an automobile can trigger this limitation. *Larson v. Howell (In re Larson),* 513 F.3d 325, 330 (1st Cir. 2008) (holding that negligent homicide suffices as a criminal act, the court did not reach the issue of

reckless misconduct). Bankruptcy courts have used the *Restatement of Torts* to define reckless misconduct as an intentional act where it is known that there is at least a strong probability that harm may result. *Miller v. Burns (In re Burns),* 395 B.R. 756, 765 (Bankr. M.D. Fla. 2008). *17

17

> 11 This figure was originally $125,000, but has been increased pursuant to § 104(a) of the Code.
>
> --------

In the present case, even assuming *arguendo* that the Debtor's conduct was reckless in connection with the automobile accident, the only available relief to Hill would be to reduce the Debtors' homestead exemption from $150,000 to $146,450 for each Debtor. As the Debtors have only $160,000 of equity in their home, there would be no effect in this case. Indeed, by limiting the exemptions of debtors that have either abused the Code or committed certain acts, Congress appears to have implicitly authorized the use of the homestead exemption up to the dollar cap in § 522(q) of the Code by debtors that have engaged in such conduct, assuming the relevant debt is not

deemed nondischargeable. Under this analysis, the Debtors cannot be said to have acted in bad faith by claiming the amended New York homestead exemption because of the effect on a creditor injured by a negligent tort.

## Conclusion

For the foregoing reasons, Hill's motion to dismiss the Debtors' Chapter 7 bankruptcy petition for bad faith under §§ 707(a) and 707(b) of the Code is denied.

IT IS SO ORDERED Dated: New York, New York

September 4, 2012

**Allan L. Gropper**

UNITED STATES BANKRUPTCY JUDGE



Bankruptcy No. 09-15128-7
United States Bankruptcy Court, W.D. Wisconsin.

# Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse)

438 B.R. 631 (Bankr. W.D. Wis. 2010)
Decided Aug 13, 2010

Bankruptcy No. 09-15128-7. Adversary No. 09-219.

08-13-2010

In re Layne Dean SASSE, Debtor. Rice, Heitman & Davis, S.C., Plaintiff, v. Layne Dean Sasse, Defendant.

Terry A. Davis, Sparta, WI, for Plaintiff. Brian K. Murphy, Murphy Law Office, La Crosse, WI, for Defendant.

THOMAS S. UTSCHIG, Bankruptcy Judge.

632 *632

633 COPYRIGHT MATERIAL OMITTED.*633

634 COPYRIGHT MATERIAL OMITTED.*634

635 COPYRIGHT MATERIAL OMITTED.*635

Terry A. Davis, Sparta, WI, for Plaintiff.

Brian K. Murphy, Murphy Law Office, La Crosse, WI, for Defendant.

## *MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW*

THOMAS S. UTSCHIG, Bankruptcy Judge.

As a social concept, the notion of bankruptcy has existed in some form for hundreds of years. [1] The essential importance of the discharge-providing the "honest but unfortunate" debtor with a fresh start unfettered from the burden of debt-is largely an American construct, and the United States has often been regarded as offering the most "liberal" discharge laws in the world. [2] More recently, of course, the steady rise in bankruptcy filings has been cited as evidence that the "stigma" of bankruptcy has faded, and that the bankruptcy system has been too generous to debtors. [3] What

636 seems clear is that it remains *636 the rare individual who actively anticipates filing for bankruptcy, deceives his creditors with insincere promises "never" to file, and only then seeks to discharge his debts. [4] In this case, the plaintiff submits that the debtor, Layne Sasse, is exactly such a person. [5]

[1] *See* Charles Jordan Tabb, "The Historical Evolution of the Bankruptcy Discharge," 65 Am. Bankr. L.J. 325 (May 1991) ("Bankruptcy has been around for almost half a millennium in Anglo-American jurisprudence").

[2] *Id.* at 325. Indeed, "a strong pro-debtor policy has been a linchpin of the national bankruptcy laws for more than ninety years." *Id.* at 370.

[3] *See* Rafael Efrat, "Bankruptcy Stigma: Plausible Causes for Shifting Norms," 22 Emory Bankr.Dev. J. 481, 485 (Spring 2006) ("[J]urists, government officials, scholars, members of the credit industry, as well as popular culture media report the stigma traditionally associated with bankruptcy has declined in [the] recent past."). The skepticism toward bankruptcy is evidenced by the arguments in support of the "means test" components of the Bankruptcy Abuse Prevention and



Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

Consumer Protection Act of 2005. *See Morse v. Rudler (In re Rudler),* 576 F.3d 37, 40 (1st Cir.2009) (noting that BAPCPA was enacted in response to concerns that bankruptcy relief was "too readily available" and "sometimes used as a first resort, rather than a last resort"); *see also* Hon. Edith H. Jones and Todd J. Zywicki, "It's Time for Means-Testing," 1999 BYU L.Rev. 177, 185 ("Traditionally, bankruptcy was seen as a last resort, a remedy for those truly down on their luck, not a device for income-earning, middle-class families to walk away from their promises and shift the losses from themselves to others."); Brian Rothschild, "The Illogic of No Limits on Bankruptcy," 23 Emory Bankr. Dev. J. 473, 511 (Spring 2007) ("Bankruptcy, far from benefitting creditors and debtors, is burdening them.").

4  In March of 2010, The United States Trustee Program issued its public report on debtor audits conducted by the program during fiscal year 2009. The report indicated finding a high incidence of "material misstatements" or errors in the bankruptcy schedules subject to audit. However, the program also noted that in "many instances" no action was taken in regard to these errors because the debtors either corrected the mistake or the misstatement did not appear to be intentional. *See* Public Report: Debtor Audits by the United States Trustee Program Fiscal Year 2009 at 4, located at http:// www. justice. gov/ ust/ eo/ public_ affairs/ reports_ studies/ docs/ Debtor_ Audits_ FY_ 2009_ Public_ Report. pdf (last accessed July 21, 2010). This is consistent with the Court's experience over nearly a quarter of a century that bankruptcy petitions and schedules are often not as complete as they could be, but are rarely fraudulently prepared.

5  The plaintiff was represented at trial by Terry A. Davis, a member of the firm and Mr. Sasse's former attorney. Brian K.

Murphy represented Mr. Sasse at trial.

In 2004, the debtor was involved in an altercation outside a bar in La Crosse, Wisconsin. In a subsequent lawsuit stemming from the incident, the injured party contended that the debtor wrongfully assaulted him with a beer mug. [6] The debtor hired Terry Davis, a member of the law firm which is now the plaintiff in this adversary proceeding, to serve as his defense attorney. While the lawsuit dragged on, Mr. Davis became concerned that the debtor might not have the ability to pay his fees. [7] The parties apparently had several conversations about payment, including at least one conversation in which Mr. Davis advised the debtor about the "bankruptcy option." [8] Mr. Davis referred the debtor to another attorney in La Crosse who handled bankruptcy cases for an opinion, and noted in his correspondence to the debtor that "[i]n the event you file bankruptcy, my fees would also be discharged." [9] It is unclear whether the debtor actually contacted a bankruptcy attorney at this time, although in a subsequent letter Mr. Davis stated, "I understand you are following my recommendation to see [the bankruptcy attorney]." [10]

6  *See* Plaintiff's Statement of the Case at 1.

7  According to Mr. Davis, the debtor paid only $2,500 in fees, with "minimal" incremental payments from January 2006 until July 2008. The debtor was supposed to pay him a retainer of $4,000 but paid only $1,500, and Mr. Davis provided as Exhibit 1 a series of letters written to the debtor which repeatedly requested payment of the outstanding fees.

8  *See* Plaintiff's Exhibit 1 (letter of July 14, 2006).

9  *See* Plaintiff's Exhibit 1 (letter of July 14, 2006).



Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

10  *See* Plaintiff's Exhibit 1 (letter of July 18, 2006). During the meeting of creditors, the debtor stated that he did not consult with the recommended attorney and only spoke with him to tell him that he wasn't interested in filing bankruptcy. *See* Plaintiff's Exhibit 3 on the sixth unnumbered page. There was no testimony to the contrary during the trial.

Mr. Davis testified that in September 2006, he met with the debtor about the case and again discussed the issue of his fees. At this time, the balance due was $4,012.28. [11] Mr. Davis testified that it was during this meeting that the debtor clearly *637 promised that he would not file bankruptcy, and that even if he did, he would not file "on" his attorney. In the letter which appears to memorialize this meeting, Mr. Davis again referenced his concern that "given a bankruptcy" his firm might not be paid for its work, and he wrote that "I am just not willing to be your lender at the risk of losing all my fees based upon a bankruptcy, if it eventually occurs." [12] The letter does not mention the debtor's promise not to file bankruptcy, but it is worth noting that none of Mr. Davis's subsequent letters reference the concern about a bankruptcy filing. Despite repeated requests, the debtor did not bring his account current and Mr. Davis asked that the debtor sign a consent order allowing him to withdraw as counsel in June of 2008. [13]

11  *See* Plaintiff's Exhibit 1 (letter of September 15, 2006).

12  *See* Plaintiff's Exhibit 1 (letter of September 15, 2006).

13  *See* Plaintiff's Exhibit 1 (letter of June 5, 2008, and letter of July 2, 2008). The debtor did indicate he made some payments, about $1,000, on the account. *See* Defendant's Statement of the Case at 2.

Mr. Davis did not, however, withdraw from the case. Instead, he continued working on the debtor's behalf, and the underlying state court case was ultimately settled for, as he puts it, minimal money. [14] The settlement was finalized in early May of 2009. The debtor first met with his current bankruptcy attorney after the state court matter was settled, and this case was filed on July 31, 2009. [15] Of course, Mr. Davis's fees were listed among the debts in the debtor's schedules. Mr. Davis filed this adversary complaint because he believes that the debtor lied to him and fraudulently induced him to continue his representation in the state court lawsuit. He feels that he justifiably relied upon the debtor's promise not to file bankruptcy (or, at least, not to file bankruptcy "on" the claim for attorney's fees), and that his claim for attorney's fees constitutes an obligation for money or credit the debtor "obtained" through fraud.

14  *See* Plaintiff's Statement of the Case at 2. According to Mr. Davis, the debtor had to pay $800 and turn over a big screen television; the rest of the settlement amount was funded by the debtor's insurance company.

15  Four days before the bankruptcy was filed, Mr. Davis wrote the debtor and indicated that if the debtor did not contact him to discuss payment arrangements, he would start legal action to collect the account. According to Mr. Davis's letter, the outstanding balance at that time was $12,499.83. *See* Plaintiff's Exhibit 1 (letter of July 27, 2009). The debtor's attorney submitted a copy of a calendar page indicating he may have first met Mr. Sasse on June 30, 2009. *See* Defendant's Exhibit 13. At the meeting of creditors conducted in September 2009, the debtor indicated he met with his attorney "about three months ago." *See* Plaintiff's Exhibit 3 on the sixth unnumbered page.

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

Mr. Davis is also concerned with what happened when this case was filed. As part of his bankruptcy petition, the debtor prepared a Form B22A, the chapter 7 statement of current monthly income and means-test calculation (otherwise known simply as the "means test"). In his means test form, the debtor indicated that he had current monthly income of $3,043.91 and that he was part of a one-person household. His annualized current monthly income as listed on line 13 of the means test was $36,526.92, which was less than the applicable median family income of $42,816.00 for a single person household. This meant that the debtor was "below median income" and that his bankruptcy filing was not subject to scrutiny under the "presumption of abuse" found in 11 U.S.C. § 707(b)(2)(A). The U.S. Trustee's office did not file a motion to dismiss for abuse (whether presumed or under the "totality of the circumstances"), and the case proceeded. *638

638

The chapter 7 trustee filed a no-asset report on September 1, 2009, the debtor filed his certification of completion of the required financial management course on October 19, 2009, and the deadline for filing objections to discharge expired November 2, 2009. The debtor was eligible for a discharge after that date. [16]

> [16] This adversary proceeding was filed on October 30, 2009. Neither the plaintiff nor any other party in interest objected to the debtor's discharge under 11 U.S.C. § 727(a), and a discharge would have normally been issued despite this adversary proceeding, as the discharge order notes that it does not affect any pending proceedings to determine dischargeability of a particular debt. For some reason, the discharge was not entered. As will be discussed below, this poses a minor conceptual dilemma but is ultimately not critical to the outcome.

I. Motion to dismiss under § 707(b) or, in the alternative, to revoke the debtor's discharge

Shortly before the scheduled trial date, the plaintiff filed a motion to dismiss the bankruptcy case for abuse under § 707(b) or, in the alternative, to revoke the debtor's discharge. [17] The plaintiff believes that the debtor improperly completed his means test by omitting the income of his girlfriend, who lives with him. Under the plaintiff's calculations, if the girlfriend's income was included, the debtor would have failed the "presumption of abuse" under § 707(b)(2)(A). According to the plaintiff, the girlfriend's income of $1,505.00 per month should be added to the debtor's current monthly income because she deposited her income into a joint bank account with the debtor. Under this calculation, the debtor's current monthly income would be $4,548.00, which would result in an annualized current monthly income of $54,576.00. This, submits the plaintiff, "puts him [the debtor] over the Means Test by $11,760." [18] From this conclusion, the plaintiff extrapolates two further contentions: that either the case should be dismissed under § 707(b)(2) because the debtor has failed to rebut the presumption of abuse, or that the debtor's discharge should be denied/revoked because he "fraudulently" prepared the means test form.

> [17] As indicated, the order of discharge had not been issued as of the date of trial. Consequently, it would be difficult to "revoke" the discharge, although the request could be characterized as something of a preemptive strike or, if nothing else, an objection to the issuance of the discharge in the first instance.

> [18] See Plaintiff's Statement of the Case at 4.

There are several problems with this. First of all, a motion to dismiss for abuse under § 707(b) may be filed "only within 60 days after the first date set for the meeting of creditors," unless the court for cause extends the time for filing the motion to dismiss on a request filed before the time expired. See Fed. R. Bankr.P. 1017(e); see also Morse v.

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

*Rudler (In re Rudler),* 576 F.3d 37, 44 n. 10 (1st Cir.2009) ("These various provisions ensure that motions under section 707(b) are made early in the bankruptcy case"); *In re Ansar,* 383 B.R. 344, 348 (Bankr.D.Minn.2008) (motion to dismiss for abuse may only be filed within 60 days of the first date set for the meeting of creditors); *In re Byrne,* 376 B.R. 700, 704 (Bankr.W.D.Ark.2007) (same). [19]

639 Put simply, the *639 plaintiff's request to dismiss the case under § 707(b) is untimely. *In re Russo,* 2008 WL 5412106, at *4 (Bankr.E.D.Pa. Oct.20, 2008).

> [19]  For purposes of clarity, the Court notes that Rule 1017(e)(1) provides that the 60-day deadline applies "[e]xcept as otherwise provided in § 704(b)(2)." Under § 704(b)(2), the U.S. Trustee is expected to file motions to dismiss for presumed abuse within 30 days after the filing of the "10 day" statement required by § 704(b)(1)(A). The general deadline is applicable to the plaintiff's motion.

In response, Mr. Davis suggested that the 60-day period should be equitably tolled in some fashion because the "fraud" was not discovered until depositions were taken in early March of 2010 in which the debtor's girlfriend acknowledged depositing her paychecks into the joint account. However, at the meeting of creditors, the chapter 7 trustee asked the debtor how many people lived in his current household, and the debtor responded by saying "I live there and my girlfriend lives there." [20] The transcript of the meeting of creditors indicates that Mr. Davis attended and questioned the debtor. He knew, or should have known, that the debtor lived with his girlfriend, and he has not explained why he did not investigate their relationship prior to the expiration of the 60-day period, or why he did not request an extension of the deadline.

> [20]  *See* Plaintiff's Exhibit # 3, on the last unnumbered page.

The plaintiff has not offered any evidence that the debtor attempted to conceal his relationship with the girlfriend, the fact that she lived with him, or that she both earned an income and had expenses of her own. This case was filed on July 31, 2009. The meeting of creditors was scheduled for September 1, 2009. A motion to dismiss under § 707(b) should have been filed by November 2, 2009. The plaintiff's motion was filed March 31, 2010, almost six months after the deadline had passed. The purpose of Rule 1017(e) is to assure that 707(b) motions are made early in the case. *Rudler,* 576 F.3d at 44 n. 10. The plaintiff has not demonstrated any justifiable reason to excuse compliance with the express terms of Rule 1017(e), and in the context of a motion to dismiss under 707(b), the plaintiff's concerns about the debtor's means test calculations must be rejected as untimely.

Despite the fact that the 707(b) motion was filed outside of the 60-day window, the Court allowed limited testimony about the preparation of the means test form to the extent that it was relevant to the question of either denying or revoking the debtor's discharge for purported "fraud" in the preparation of the bankruptcy petition. Complaints objecting to the debtor's discharge must be filed within 60 days of the first date set for the meeting of creditors. *See* Fed. R. Bankr.P. 4004(a). While this adversary proceeding was filed in a timely fashion, the plaintiff only sought a determination that *its* claim should be excepted from discharge. [21] Given that no objection to discharge was interposed prior to the deadline, the debtor would normally have received an order of discharge. [22] The plaintiff clearly received notice of the Rule 4004(a) deadline and is not entitled to object to the debtor's discharge under § 727(a) at this late date. 640 [23] *640 Instead, the plaintiff's motion requests that the Court "revoke" the debtor's discharge under § 727(d), even though the discharge has not formally been issued. Technically, the plaintiff's request in this regard must be dismissed for failure to state a claim upon which relief can be granted.

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

*See Zedan v. Habash,* 529 F.3d 398, 405 (7th
Cir.2008) (complaint to revoke a discharge before
it has been entered is properly dismissed because
"[a] bankruptcy court cannot revoke an order that
it has never issued").

> [21] The plaintiff's 523(a)(2)(A) claim also had
> to be brought within the 60-day window or
> it was discharged. *See* Fed. R. Bankr.P.
> 4007(c) ("a complaint to determine the
> dischargeability of a debt under § 523(c)
> shall be filed no later than 60 days after the
> first date set for the meeting of creditors").

> [22] The fact that the discharge order was not
> issued shortly after November 2, 2009,
> appears to be an inadvertent oversight. It is
> permissible, and relatively routine, for a
> court to grant a discharge when no
> complaint objecting to discharge has been
> filed at the expiration of the 60-day period,
> notwithstanding a pending claim under §
> 523 seeking to exempt a particular debt
> from discharge. *See Disch v. Rasmussen,*
> 417 F.3d 769, 775 (7th Cir.2005).

> [23] The plaintiff suggests that the provisions of
> Rule 4004(a) are not jurisdictional, and
> cites *Kontrick v. Ryan,* 540 U.S. 443, 124
> S.Ct. 906, 157 L.Ed.2d 867 (2004), for
> support. It is true that in *Kontrick* the
> Supreme Court affirmed the Seventh
> Circuit's ruling that the deadline to object
> to discharge is akin to an affirmative
> defense and is subject to waiver, estoppel,
> or equitable tolling. But the plaintiff has
> not demonstrated any basis for equitable
> tolling or waiver of the deadline. Mr. Davis
> had plenty of opportunity to investigate
> prior to the deadline and did not do so.
> Further, unlike the situation in *Disch,* the
> plaintiff's § 727 concerns do not stem from
> the same set of operative facts as its claim
> under § 523(a). *See* 417 F.3d at 776 (late
> amendment of claim allowed in part
> because the § 727 claim "arose from the
> same conduct, transactions, and
> occurrences" as the § 523 claim).
> Consequently, there is no basis to permit

the plaintiff to amend its complaint to
incorporate a § 727(a) objection, and in
any event the plaintiff has not articulated a
basis for the denial of the debtor's
discharge under that section.

Even if the discharge had been issued shortly after
the November 2, 2009, deadline, the plaintiff's
claim would fail on the merits in any event. Under
§ 727(d)(1), the court may revoke a discharge if
the discharge was "obtained through fraud of the
debtor," and the requesting party did not know of
such fraud until after the granting of the discharge.
Revocation of discharge under § 727(d) is an
"extraordinary remedy to be sparingly applied."
*Fokkena v. Peterson (In re Peterson),* 356 B.R.
468, 475 (Bankr.N.D.Iowa 2006). The creditor has
the burden of proof on the issue of lack of
knowledge, which is an essential component of the
claim. *Murrietta v. Fehrs (In re Fehrs),* 391 B.R.
53, 80 (Bankr.D.Idaho 2008); *Neary v. Darby (In
re Darby),* 376 B.R. 534, 539
(Bankr.E.D.Tex.2007). Dismissal of a § 727(d)(1)
action is appropriate where, before discharge, the
creditor knows sufficient facts to constitute notice
of a possible fraud, and the burden is on the
creditor to investigate diligently any fraudulent
conduct before discharge. *Mid-Tech Consulting,
Inc. v. Swendra,* 938 F.2d 885, 888 (8th Cir.1991).

In this case, the only alleged fraud involved the
preparation of a means test form which did not
include the income of the debtor's girlfriend. The
plaintiff, through Mr. Davis, was aware that the
debtor lived with the girlfriend because the debtor
testified to this fact at the meeting of creditors,
which Mr. Davis attended. Section 727(d)(1)
provides creditors with "an incentive to actively
investigate a debtor for potential fraud before the
period to object closes." *Zedan,* 529 F.3d at 406.
Long before the time to object to discharge
expired, Mr. Davis possessed sufficient
information to put him on notice of the purported
"fraud," and he did not take action. A claim for
revocation of discharge would thus fail on this
ground as well.

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

Ultimately, the plaintiff's claims under either § 707(b) or 727(d) rest on the same contention: namely, that the debtor improperly calculated the means test. The debtor filed his means test form indicating that he was the only member of his "household." As such, he excluded his girlfriend's income from the calculation of his "current monthly income" on the means test form. The debtor's argument is that to the extent her contributions to *641 their joint account could (or should) have been disclosed on the means test form, he would have been entitled to modify the means test and claim that he was part of a two-person household, rather than a single person household. Under the applicable income guidelines, the median income for a two-person household at the time this case was filed was $57,657.00. Even if all of the girlfriend's income was included on the means test form, the debtor believes he would have still been considered below median income and not subject to dismissal for presumed abuse. [24]

> [24] As the plaintiff notes, inclusion of the girlfriend's income would have resulted in an annualized current monthly income of $54,576.00, which is below the stated median family income for a two-person household.

The precise method for calculating current monthly income has been the subject of some debate since the enactment of BAPCPA. Clearly, 11 U.S.C. § 101(10A)(B) contemplates that amounts paid (or contributed) by another to the household expenses of the debtor must be included in the calculation of the debtor's current monthly income. But the statute does not require the inclusion of all income from a third party when the funds are used to support a non-dependent of the debtor. *In re Ellringer,* 370 B.R. 905, 911 (Bankr.D.Minn.2007). In *Ellringer,* the court rejected the idea that "if the debtor's household includes [another person], then [that person's] entire income must be included in the debtor's calculation of current monthly income."

*Id.* Instead, a household member's contributions should only be included to the extent that they were "used to support the debtor or the debtor's dependents." *Id.*

The testimony of the debtor and his girlfriend indicated that her expenses were generally paid out of the joint account. As the court observed in *In re Roll,* 400 B.R. 674 (Bankr.W.D.Wis.2008), it would be "patently illogical" to conclude that all of one household member's income is used to pay for the household expenses of another, but that is precisely what the plaintiff proposes should be done in this case. Had the motion to dismiss under § 707(b) been filed on a timely basis, it would have been the creditor's burden to prove how much of the girlfriend's income should have been imputed to the payment of the debtor's expenses rather than her own. *Id.* at 676. The plaintiff was not able to demonstrate that all of the girlfriend's income was used solely for the support of the debtor. More critically, the plaintiff cannot demonstrate why amending the means test to include the girlfriend's income would not result in a corresponding increase in the household size.

It is uncontested that the debtor and his girlfriend live together and use their combined income to support themselves. Are they members of the same "household" for purposes of the means test calculation? The Census Bureau defines "household" as "all of the people, related and unrelated, who occupy a housing unit." In *Ellringer,* the court concluded that this definition is the most appropriate one as § 101(39A)(A) defines median family income as "the median family income both calculated and reported by the Bureau of the Census." 370 B.R. at 910. According to this reasoning, Congress elected to use the broader term "household size" on line 14(b) of Form B22A "in recognizing that there may be reasons why two unrelated, non-dependent individuals should be treated as a household for purposes of the means test." *Id.* at 911. Admittedly, other courts have rejected this "heads on beds" approach and taken a more restrictive

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

642    view of "household size." For example, in *642 *In re Jewell,* 365 B.R. 796, 800 (Bankr.S.D.Ohio 2007), the court observed:

> If a person lives in the home with the debtor but the debtor does not support that person, then inclusion of that person for purposes of calculating the applicable median family income and disposable income would give rise to a faulty calculation and would result in an inaccurate figure for both.

Similarly, in *In re Herbert,* 405 B.R. 165, 169 (Bankr.W.D.N.C.2008), the court concluded that while unrelated, non-dependent individuals may be part of a household, the "heads on beds" approach is too broad because it includes anybody who may be residing under the debtor's roof without regard to their financial contributions to the household or the monetary support they may be receiving from the debtor.

Under the *Jewell* approach, occupancy cannot be immediately equated with household size. However, these courts have still rejected strict adherence to a standard which would limit "household size" to those people claimed as dependents on a tax return. *See Jewell,* 365 B.R. at 801 (such an approach "fails to recognize those instances when a debtor may be actually providing support for a household member"); *Herbert,* 405 B.R. at 169 (that standard "[does] not account for the situation in which a debtor may be supporting an individual without declaring that person as a dependent on his tax return"). Instead, these courts examine the relationships of those living with the debtor and the financial arrangements between them on a case-by-case basis because "debtors have a variety of different living arrangements that defy being pigeonholed into a neat formula for purposes of defining household size." *Id.*

More recent decisions have responded to the *Jewell* court's concerns about the "heads on beds" approach by challenging its reliance on a case-by-case examination of the debtor's financial commitments. As one court observed, Congress

does not require courts to take into account the financial contribution of other household members, their relationship to the debtor, or issues of dependency when determining household size. *In re Smith,* 396 B.R. 214, 218 (Bankr.W.D.Mich.2008). Or as another court concluded, "Absent Congressional direction, it is inappropriate to consider a household member's dependency on the Debtor when determining household size; accordingly, household should be understood in the ordinary sense of the word." *In re Epperson,* 409 B.R. 503, 507 (Bankr.D.Ariz.2009). More pertinent to the present case, in *Epperson* the court observed that:

> Congress did not state that two unrelated roommates or a cohabitating couple should not be counted as part of the same household. In the absence of Congressional guidance, it is unreasonable to conclude that two persons living in the same home are not a part of the same household.

409 B.R. at 507; *see also Ellringer,* 370 B.R. at 911 ("Households may be either family or nonfamily.... If Congress had intended to limit household size to only household members related by blood, marriage, or adoption, it could have done so"). Ultimately, under either the "heads on beds" approach or the "case-by-case" approach, the debtor in this case could have claimed a household size of two, because he and his girlfriend cohabitate and their shared income supports both of them. *See Herbert,* 405 B.R. at 170 (household size of 11 was allowed under case-by-case approach because "[t]he reality of this debtor's situation is that he is-and has been for several years-supporting his girlfriend, *643 their daughter, and her eight children"). [25]

---

[25]    In this regard, both the debtor and his girlfriend testified that the money that went into their joint account supported them both, and that in fact the debtor's funds undoubtedly subsidized or "supported" the

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

girlfriend, whose income would otherwise have been insufficient to afford a similar lifestyle.

In *Epperson,* the debtor had claimed a household size of two and included a "contribution" of $900 from a roommate in his monthly income calculation. The U.S. Trustee argued that the debtor needed to either include the roommate's entire income in the calculation of current monthly income, or that the debtor's household size should be reduced to one. According to the U.S. Trustee, the debtor sought to "have his cake and eat it too" by increasing the household size without a corresponding increase in income. 409 B.R. at 506. [26] In this case, it is the plaintiff who wishes to eat the cake; he wants the debtor to include all of his girlfriend's income as part of his current monthly income, but ignore the reality that she is part of the resulting "household." It is as if the plaintiff suggests that she is little more than a phantom, existing only to supply the debtor with additional income but never actually resting her head in a physical location.

[26] The *Epperson* court disagreed with the U.S. Trustee's conclusion, finding it appropriate to leave the household size at two and only include the $900 contribution from the roommate as part of the debtor's current monthly income. "Including all of the Roommate's income would do violence to [the] statutory directive" found in § 101(10A)(B) that limits a third party's contribution to the current monthly income to the amount the third party pays toward "the household expenses of the debtor." 409 B.R. at 508.

The reality of this case is that the debtor and his girlfriend live together. If they did not live together, his household expenses for such things as rent, food, and utilities would likely change. Under the facts, it makes no difference whether he excluded her income from the calculation of his current monthly income and then claimed a household of one or claimed a two-person

household and either attempted to allocate a portion of her income to the payment of "household" expenses or claimed all of it as part of current monthly income. Even if all of her income was included in the means test calculation, the debtor would still be below the median income for a household of two. The plaintiff's purported "fraud" upon the court involves a legal determination that may have an impact in some cases, but has no practical effect in this one.

The paralegal for the debtor's attorney testified that they opted to list only his income and claim the single household because they believed it appropriate to do so. [27] Presumably, they did so because they concluded that she did not make any significant "contributions" to the debtor's support, or because they determined that it made no practical difference in the outcome of the means test. Given the directive of Section 101(10A)(B), there may be instances in which another household member makes sufficient contributions to the debtor's current monthly income such that the debtor simply cannot claim a smaller household size or exclude the totality of that person's income. The burden is on the creditor, however, to prove that the contributions are so substantial as to alter the equation. *Roll,* 400 B.R. at 676; *see also* *644 *In re Justice,* 404 B.R. 506, 519 (Bankr.W.D.Ark.2009) ("As the objecting party, [the creditor] had the burden of proving that a portion of the amounts [the debtor] received were paid on a regular basis and paid for the household expenses of the debtor and his dependents."). Here, even accepting the plaintiff's allegations at face value-i.e., even assuming for sake of argument that every penny of the girlfriend's income could be imputed to the debtor-the debtor's household size would justifiably increase and the debtor would still be below median income. [28] The debtor relied upon his attorney to prepare the means test form, and the decision to claim only a single member household did not materially misrepresent the debtor's financial situation. There simply is no "fraud" in

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

the calculation of the means test, and there is no substantive basis for dismissing the case or "revoking" the debtor's discharge.

> 27  As the *Epperson* case indicates, this would appear to be the position of the U.S. Trustee program. *See* 409 B.R. at 504 ("The UST argues that the Debtor must either include all of the Roommate's income in current monthly income or reduce the household size to one.").

> 28  Consequently, even if the plaintiff's request to dismiss the case under § 707(b) could be construed as timely, it would be precluded by the express provisions of § 707(b)(6), which states that "[o]nly the judge or United States trustee ... may file a motion under section 707(b)" if the debtor is below median income. Further, not even the U.S. Trustee can seek to dismiss a case under § 707(b)(2) if the debtor is below median income. *See* 11 U.S.C. § 707(b)(7).

II. Exception to discharge under 11 U.S.C. § 523(a)(2)(A)

Having resolved the problems the plaintiff perceived in the bankruptcy filing itself, the Court now turns to the adversary complaint and the allegation that the debtor "obtained" something from the plaintiff through a fraudulent representation or actual fraud. It is a fundamental axiom of bankruptcy jurisprudence that exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor. *See In re Scarlata,* 979 F.2d 521, 524 (7th Cir.1992). A plaintiff must prove all elements of the proffered exception to discharge by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287-88, 111 S.Ct. 654, 659-60, 112 L.Ed.2d 755 (1991). In that regard, § 523(a)(2)(A) prevents the discharge of debts for money obtained by "false pretenses, a false representation, or actual fraud." The statute requires proof of false or deceptive

conduct, fraudulent intent, and justifiable reliance. *Mayer v. Spanel Int'l,* 51 F.3d 670, 674 (7th Cir.1995).

In order to except a debt from discharge under this section, a creditor is typically required to establish the following elements: (i) the debtor made a false representation of fact, (ii) the debtor either knew the representation was false or made the representation with reckless disregard for its truth, (iii) the representation was made with an intent to deceive, and (iv) the plaintiff justifiably relied upon the false representation. *See In re Kimzey,* 761 F.2d 421, 423-24 (7th Cir.1985), *abrogated on other grounds by Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Vozella v. Basel-Johnson (In re Basel-Johnson),* 366 B.R. 831 (Bankr.N.D.Ill.2007). In *McClellan v. Cantrell,* 217 F.3d 890 (7th Cir.2000), the court noted that "actual fraud" in the context of the statute is broader than, and need not take the form of, a specific misrepresentation. As the Seventh Circuit recognized,

No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions. "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the \*645 suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." [Citation omitted].

*Id.* at 893.

As the Supreme Court has repeatedly stressed, the "fresh start" promised by the bankruptcy code is designed for the "honest but unfortunate" debtor. *Grogan,* 111 S.Ct. at 660. Consequently, a debtor who schemes to cheat another is undeserving of a discharge. The crucial question in all such cases is whether there was some scheme to defraud

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

another party. Here, the plaintiff's entire case is essentially summed up in this fashion: In 2006, the debtor lied to the plaintiff and told him either that he would never file bankruptcy, or that if he did, "I won't file on you." Almost three years later, the debtor's plan was realized when, after finally obtaining a favorable result in the state court trial, he was able to do what he intended to do all along-file for bankruptcy.

A party can prove an intent to deceive through direct evidence. Wrongful intent may also "logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan." *In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995). Proof of the intent to deceive is measured by the debtor's subjective intention at the time the representation was made. *CFC Wireforms, Inc. v. Monroe (In re Monroe),* 304 B.R. 349, 356 (Bankr.N.D.Ill.2004). As the court observed in the case of *Vozella v. Basel-Johnson (In re Basel-Johnson),* 366 B.R. 831, 845 (Bankr.N.D.Ill.2007), "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive."

The plaintiff's case hinges on the notion that the debtor "lied" about his intention to file bankruptcy. The first issue is what, precisely, the debtor told Mr. Davis. The debtor testified that he didn't remember telling Mr. Davis that he wouldn't file for bankruptcy, or that he wouldn't file "on" this debt. Mr. Davis, on the other hand, was adamant that the debtor did in fact make this promise. The correspondence from Mr. Davis to the debtor indicates that Mr. Davis was quite concerned about the "bankruptcy option" until their September 2006 meeting. After that date, the letters are silent as to the possibility of bankruptcy. It is certainly possible to infer that something was said during that meeting which caused Mr. Davis to believe the debtor didn't intend to file for bankruptcy. For the sake of this decision, the Court presumes that some sort of statement was

made. The problem is that the plaintiff has not offered sufficient evidence of fraudulent intent or justifiable reliance to justify a ruling in its favor.

To begin with, pre-petition waivers of discharge or a promise not to file bankruptcy are not enforceable. *See* 11 U.S.C. § 524(a)(1) and (2) (a discharge voids judgments and operates as an injunction against the continuation of any action against a debtor personally, "whether or not discharge of such debt is waived"). Post-petition waivers of discharge are only allowed in very specific contexts, such as reaffirmation under § 524(c) or a court-approved waiver of discharge under § 727(a)(10). In *Klingman v. Levinson,* 831 F.2d 1292 (7th Cir.1987), the Seventh Circuit rejected the contention that a provision in a state court consent judgment under which the debtor agreed that the judgment was nondischargeable in bankruptcy constituted a waiver of dischargeability. *646

[29] The court concluded that public policy does not permit a debtor, pre-bankruptcy, to contract away the right to the discharge of a debt. *Id.* at 1296 n. 3. In noting the very narrow mechanisms for waiver of discharge under § 727(a)(10) and reaffirmation under § 523(c), another court observed:

> [29] 831 F.2d at 1296 n. 3 ("Generally, all debts are dischargeable in bankruptcy unless specifically excepted by a provision in the Bankruptcy Code."). The bankruptcy court decision, which the Seventh Circuit observed "properly noted" the legal standard, was even clearer on this point. While the bankruptcy court ultimately enforced the judgment based on separate collateral estoppel grounds, it gave "no weight to that portion ... of the state court's order that specifically stated that the parties agreed that the debt would not be discharged by the debtor in bankruptcy." *Klingman v. Levinson,* 58 B.R. 831, 836 (Bankr.N.D.Ill.1986).

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

Congress has only provided two methods for a debtor to waive the discharge of all debts or the dischargeability of specific debts. Section 727(a) (10) permits a debtor to waive the discharge of *all* debts simply by executing a postbankruptcy written agreement that is approved by the bankruptcy court. *See* 11 U.S.C. § 727(a)(10). Similarly, a debtor may waive the dischargeability of a *specific* debt if the waiver satisfies the reaffirmation requirements of § 524(c). *See* 11 U.S.C. § 524(c). Where Congress has failed to include language in statutes, it is presumed to be intentional when it has used such language elsewhere in the Code. [citation omitted]. Here, Congress' failure to authorize prepetition waivers of discharge, while at the same time authorizing certain postpetition waivers of discharge ... must be viewed as intentional.

*Hayhoe v. Cole (In re Cole),* 226 B.R. 647, 653-4 (9th Cir. BAP 1998). Put simply, a prepetition waiver of the dischargeability of a debt undermines the purpose of the bankruptcy code to give an honest but unfortunate debtor a fresh start, and the prospective waiver of dischargeability of a debt is unenforceable. *Id.* at 654; *see also Giaimo v. Detrano (In re Detrano),* 222 B.R. 685, 688 (Bankr.E.D.N.Y.1998) ("As a matter of superseding federal bankruptcy policy, ... a prepetition waiver of a discharge of a particular debt or of all debts is against public policy and unenforceable."); *In re Minor,* 115 B.R. 690, 694 (D.Colo.1990) (waiver of discharge must comply with provisions of bankruptcy code). [30]

[30] A distinction must be made between simply "waiving" discharge and stipulating to facts which, once subsumed into a judgment, may be given collateral estoppel effect. *Klingman,* 831 F.2d at 1296 n. 3 ("a debtor may not contract away the right to a discharge in bankruptcy. However, a debtor may stipulate to the underlying facts that the bankruptcy court must examine to determine whether a debt is dischargeable").

In *Bank of China v. Huang (In re Huang),* 275 F.3d 1173 (9th Cir.2002), the debtor entered into a settlement agreement which, among other things, contained a representation that the debtor would not file for bankruptcy. Noting the principle that it is against public policy for a debtor to waive the prepetition protection of the bankruptcy code, the court then observed that, "This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive." *Id.* at 1177. In this case, the plaintiff does not contend that the debtor's representation constitutes an enforceable waiver of bankruptcy protection. Instead, the plaintiff argues that the representation was fraudulent. But this raises an interesting question: If a debtor makes a representation about filing bankruptcy which is unenforceable by operation *647 of that very same law, can a creditor complain that he relied upon that representation to his detriment? If so, one would assume that astute creditors would, as the *Huang* court suggests, routinely require such representations in order to complain that they were "defrauded" by a subsequent bankruptcy filing. [31]

[31] It is also worth noting that debtors and creditors alike often assume that it is possible to avoid the discharge of a debt simply by not listing it in the schedules. But even an unscheduled creditor may have its claim discharged if it has actual knowledge of the bankruptcy filing. *See* 11 U.S.C. § 523(a)(3).

The plaintiff's argument is that he "trusted" the debtor, but arguably the creditor in *Huang* trusted the debtor to honor various prepetition representations about bankruptcy as well. [32] A prepetition waiver of discharge "undermines the purpose of the Code." *Cole,* 226 B.R. at 654. The same must be said of a prepetition promise not to file bankruptcy at all, which is essentially the same as a promise to forego the primary benefit afforded by filing. *Huang,* 275 F.3d at 1177 (debtor's promise "not [to] enter bankruptcy" was unenforceable). Logically, it seems inappropriate

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

to find that a debtor's breach of a promise not to seek a discharge could serve as the grounds for a fraud claim when the debtor was simply exercising a statutory right. Indeed, in *Minor* the court reached this very conclusion, finding that a debtor's breach of a promise not to seek discharge of a state court judgment did not constitute misrepresentation. 115 B.R. at 696 (the creditor's argument that the debtor's conduct amounted to misrepresentation was not persuasive). At best, Mr. Davis obtained an unenforceable promise from the debtor not to file bankruptcy. Turning that unenforceable promise into the basis of a nondischargeability claim would itself seem to undermine the purpose of the code, which is to grant debtors a discharge in all but those few cases in which fraud is clearly proven.

32  Indeed, the agreement in *Huang* provided for a prepetition waiver of the automatic stay in the event of bankruptcy and contained a representation and acknowledgment by the debtor that the bank would not have entered into the agreement "[b]ut for Defendants agreeing to allow [the creditor] to have relief from the stay." 275 F.3d at 1177.

Even presupposing that this purported representation can serve as the basis of a nondischargeability claim, the plaintiff's claim collapses as it seeks to leap the hurdles of fraudulent intent and reliance. Essentially, the plaintiff argues that the debtor's fraud arose from a misstatement of future intention-i.e., that he promised not to file bankruptcy and didn't really mean it. As this court noted a number of years ago, a promise of future performance or intention is actionable as fraud if at the time the statement was made, the debtor never actually intended to honor it. *Chevy Chase Bank, FSB v. Briese (In re Briese),* 196 B.R. 440, 449 (Bankr.W.D.Wis.1996). As the Restatement (Second) of Torts § 530(1) (1977) states, "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he

does not have that intention." Further, a promise as to the future course of events "may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable." *See* Restatement (Second) of Torts § 525 cmt. f (1977). As far as misrepresentations are concerned, the debtor's rejection of the "bankruptcy option" in his meeting with Mr. Davis could likely be characterized more as an expression of opinion or a hope than a factual assertion, but the Court will assume *648 for the moment that it can be fairly regarded as a promise about future events.

In *Briese,* this Court borrowed the classic cartoon characters of Popeye and Wimpy to make the observation that while Wimpy always promised to pay on Tuesday for a hamburger today, Wimpy is not guilty of fraud just because he doesn't have the money when Tuesday rolls around. A finding of fraud requires evidence that he acted with an intent to deceive when he made the promise-that when he told Popeye he would repay the loan, he never actually intended to fork over the cash. *Briese* at 451. Transposing Wimpy to the present case, if Wimpy told Popeye that he would pay him Tuesday for a hamburger today, and further promised that he would not file bankruptcy on Monday, neither the failure to pay nor the filing of bankruptcy, in and of themselves, would be actionable as fraud. Hindsight in such cases is irrelevant; the fact that Wimpy filed bankruptcy on Monday does not prove that he intended to do so when Popeye lent him the money for a hamburger. Instead, the question is whether Wimpy intended to file bankruptcy all along, and whether his representation to the contrary masked the knowledge that his promise would go unfulfilled.

Intriguingly, two cases featuring similar allegations were decided by other courts shortly before the trial in this matter. In *DePerno Law Office v. Sears (In re Sears),* 2010 WL 1664024, at *2 (Bankr.S.D.Ala. Apr.22, 2010), the plaintiff was an attorney who contended that the debtor had

13

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

committed fraud by not disclosing that he had obtained credit counseling and intended to file bankruptcy. The court noted that "the subsequent failure of the debtor to pay, without more, is not sufficient to establish that the debtor lacked the intent to pay." *Id.* at *3. Finding that plaintiff had failed to offer any factual evidence that the debtor "intended all along" to deceive him, there was no evidence of fraudulent intent, and the debt was determined to be dischargeable. *Id.*

In *Andresen & Arronte, PLLC v. Hill (In re Hill),* 425 B.R. 766 (Bankr.W.D.N.C.2010), a law firm contended that the debtor had fraudulently induced the firm to continue its representation through a variety of email contacts in which he promised to explore "other options" to pay the firm's fees, such as refinancing his home. The firm argued that the "false assurance of payment" justified a finding that the fees were nondischargeable under § 523(a)(2)(A), especially since the debtor did not disclose the fact that he had obtained credit counseling and was considering filing bankruptcy. Finding that the emails "illustrate a client communicating about hope for future payment at an unspecified later date," the court rejected the notion that the statements constituted misrepresentations. *Id.* at 775. Even an intentional breach of contract is not fraud under § 523(a)(2), and a promise about future acts, without more, likewise does not constitute a misrepresentation. *Id.* [33] Not even the debtor's failure to apprise the firm about the impeding bankruptcy altered the outcome since the debtor did not have a duty to
649 disclose. *Id.* at 776.*649

[33] Both *Sears* and *Hill* involve situations in which the debtor sought credit counseling and prepared to file bankruptcy while the attorneys were still actively working on their clients' behalf. Here, the debtor did not seek credit counseling until after the state court matter was resolved (in fact, the certificate of credit counseling filed with the court indicates that the debtor obtained counseling on June 24, 2009). The plaintiff

did not offer any evidence that the debtor actually consulted with a bankruptcy attorney while the state court matter was pending.

Fraud cases, especially those involving promises about future events, are challenging to prove. They require evidence of the debtor's subjective fraudulent intent, which debtors are unlikely to confess. Consequently, courts are left to discern the debtor's intent from circumstantial evidence. Here, the only circumstantial evidence the plaintiff can offer is the timing of the bankruptcy filing, in that it followed rather quickly on the heels of the settlement of the state court action. That might be considered suspicious, but it remains conceptually difficult to connect the filing with an alleged fraudulent representation made more than two years before. During that time, Mr. Davis wrote the debtor numerous times about payment, and even considered withdrawing as counsel. It does not appear that the debtor made any additional "representations" about his financial condition, or that he attempted to hide his difficulties from Mr. Davis. Even the state court settlement was something of a Pyrrhic victory given that he ended up owing more than $12,000 in attorney's fees. Quite simply, it appears he simply held out as long as he could before filing bankruptcy.

The plaintiff believes that the debtor represented that he intended to reject the possibility of bankruptcy relief. The Court questions whether the statement was as absolute as the plaintiff suggests, and doubts that it is the sort of statement that can serve as the basis of a claim under § 523(a)(2)(A) without far more evidence of fraudulent intent. The plaintiff's position appears to be that the debtor plotted, or conspired, to discharge the attorney's fees, but there is no evidence that the debtor didn't intend to perform in accordance with his purported promise at the time he made it. In fact, what remains incongruous about the plaintiff's argument is that it was Mr. Davis who initially advised the debtor to file bankruptcy. It was Mr. Davis who told the debtor

that filing bankruptcy would discharge his fees as well. The debtor apparently told Mr. Davis that he was not going to file bankruptcy, or words to that effect. Mr. Davis says he believed the debtor. However, when advising and counseling the debtor about the practical implications of a filing (such as the discharge of his own fees), Mr. Davis should have realized that it was impossible for the debtor to "waive" the protection of the bankruptcy code.

Indeed, as between the two parties, Mr. Davis would have been in the better position to understand that under the bankruptcy code, prepetition waivers of discharge or promises not to file are unenforceable. And yet it is Mr. Davis who now contends that the debtor not only promised to waive the discharge of these fees, but also knew enough about bankruptcy law to realize that he could still discharge the fees despite the promise. [34] After considering the debtor's testimony, the Court finds as a matter of fact that the debtor had no such knowledge. To the extent he said anything to Mr. Davis about not filing bankruptcy, he intended to honor his obligation to pay the attorney's fees when the representation was made. There is no evidence to the contrary, or any proof that the debtor had any idea (or expectation) that he could somehow renege upon his promise. There has been no showing of fraudulent intent or that the debtor obtained legal services from the plaintiff through a knowing misrepresentation or 650 fraud.*650

> [34] In essence, Mr. Davis contends that his client knew more about bankruptcy law at the time of the "promise" not to file than an experienced attorney.

The Court must also conclude that Mr. Davis did not justifiably rely upon the purported representation by the debtor. Justifiable reliance is a minimal, subjective standard that encompasses "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a

community standard of conduct to all cases." *Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). While justifiable reliance does not obligate a creditor to investigate everything a debtor says, the creditor may not "blindly" rely upon a misrepresentation which could have been proven false through a "cursory examination or investigation." *Id.* If the surrounding circumstances raise red flags, or if the creditor's own capacity and knowledge would justify further investigation, a duty to investigate may arise. *Id.* at 72, 116 S.Ct. 437. In *Hill,* the court rejected the law firm's argument that it justifiably relied upon the debtor's promises of payment because it was a sophisticated party who proceeded with its representation of the debtor despite "obvious warning flags." 425 B.R. at 777.

As early as September of 2006, Mr. Davis was aware that the debtor's financial situation was precarious. He himself advised his client to consider bankruptcy. Even after their September conversation, the debtor routinely failed to make payments on the account, and the correspondence from Mr. Davis reflects an escalating urgency regarding the fees. He clearly recognized the issue, and even requested that the debtor consent to his withdrawal from representation. As the Court has already noted, between an experienced attorney and a client relying upon his advice, it was Mr. Davis who should have known that the prepetition promise not to file bankruptcy was unenforceable. He was concerned enough to worry that his fees might be discharged in bankruptcy, and an attorney in his position could have exercised caution when evaluating a "promise" not to file from a client. There were plenty of indications that the debtor was in dire financial straits, and the facts reflect that Mr. Davis essentially ignored numerous red flags and warning signs, opting instead to gamble that the debtor would pay his fees. He cannot be said to have justifiably "relied" upon the promise not to file bankruptcy, as even a cursory investigation would have led to the conclusion that it was

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

unreasonable to believe that the debtor might not ultimately seek a fresh start under the bankruptcy code. For all of these reasons, his claim under § 523(a)(2)(A) simply must fail.

## III. Debtor's motion for attorney's fees under § 523(d)

The debtor seeks an award of attorney's fees under 11 U.S.C. § 523(d), which provides that if a creditor requests the determination of dischargeability of a consumer debt and the debt is discharged, the court shall award attorney's fees to the debtor if the position of the creditor was not "substantially justified." The debtor's position is that the plaintiff should have known, long before the filing of this adversary proceeding, that its fraud claims were unjustified. At the close of the trial, the Court requested that the debtor's attorney submit a bill of costs and fees. The attorney did so, and has requested an award of $7,171.25 in costs and fees. [35] In response, the plaintiff

651    contends that the complaint *651 was substantially justified and that in any event the debtor's attorney should not be compensated for the time associated with defending the motion to dismiss.

> [35]  This amount includes $908.75 in costs and attorney's fees at a billable rate of $125.00 an hour.

The purpose of § 523(d) is to discourage creditors from bringing actions in the hopes of obtaining (or coercing) a settlement from an honest debtor desperate to avoid the cost of litigation. *See Bridgewater Credit Union v. McCarthy (In re McCarthy),* 243 B.R. 203, 208 (1st Cir. BAP 2000); *Manufacturers Hanover Trust Co. v. Hudgins,* 72 B.R. 214, 219 (N.D.Ill.1987). For the debtor to prevail on the request for fees, he must prove that the creditor requested a determination of dischargeability, the debt was a "consumer debt," and the debt was discharged. *American Express Travel Related Servs. v. Baker (In re Baker),* 206 B.R. 507, 509 (Bankr.N.D.Ill.1997). Once these elements are shown, the burden shifts to the creditor to show that the action was

substantially justified. *Phillips v. Napier (In re Napier),* 205 B.R. 900, 908 (Bankr.N.D.Ill.1997). [36]

> [36]  A consumer debt is defined as debt "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Clearly the plaintiff's claim for attorney's fees qualifies under this section. Likewise, the creditor filed the adversary proceeding and the debt has now been found dischargeable. Consequently, the debtor has met its burden under § 523(d) for an award of fees.

For a creditor to be "substantially justified" in filing a fraud-based nondischargeability complaint, there must have been a reasonable basis for doing so in both law and fact. *First Card v. Hunt (In re Hunt),* 238 F.3d 1098 (9th Cir.2001). Where the evidence presented at trial had "virtually no tendency" to show that the debtor lacked the intent to repay the debt, it is appropriate to find that the complaint lacked substantial justification. *Id.* at 1103. Put another way, courts frequently ask whether the action had a reasonable basis in truth for the facts alleged, a reasonable basis in law for the theory propounded, and a reasonable support in the facts alleged for the legal theory advanced. *See McCarthy,* 243 B.R. at 208 (citing *Brinker v. Guiffrida,* 798 F.2d 661, 664 (3d Cir.1986)). It also means that the creditor must meet a higher burden than simply justifying the complaint under Fed. R. Bankr.P. 9011. *See Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) ("To be substantially justified means, of course, more than merely undeserving of sanctions for frivolousness"). [37]

> [37]  Section 523(d) was patterned after the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), and courts have typically looked to cases interpreting the EAJA, such as *Pierce,* for guidance in construing § 523(d). *See In re Hingson,* 954 F.2d 428, 429 (7th Cir.1992).

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

Since it is the creditor's burden to demonstrate substantial justification, it is incumbent upon the plaintiff to illustrate how the evidence presented to the Court supported his case. *Hunt,* 238 F.3d at 1103-4. The allegations about the debtor's alleged fraudulent scheme to induce the plaintiff to continue representing him, however, find absolutely no support in the record. Certainly Mr. Davis felt wronged by the debtor. But feeling wronged and being wronged are not the same thing, and *proving* wrongdoing is yet another matter. In the case of *Chase Bank USA v. Landry (In re Landry),* 2009 WL 959421, at *2 (E.D.Wis. Apr.7, 2009), the court observed that it was "at a loss to discern" what evidence supported the creditor's notion that the debtor was engaged in fraud, and stated:*652

652 [The creditor] bandies about such terms as recklessness, insolvency, and "overextended lifestyle" as though they are dispositive of something, when in fact they are simply the meat and potatoes of consumer bankruptcy.

Likewise, in the present case all the plaintiff offered the Court was a purported promise made two years prior to the filing in a conversation the debtor only vaguely remembered. There were no repeated promises, no half-truths, no concealment of financial condition, and no evidence of fraudulent intent at all. The feeling that wrongdoing occurred, while undoubtedly genuine, is not evidence; it proves nothing more than a sense of injury.

The plaintiff's case centered around an unenforceable promise not to file bankruptcy. Mr. Davis realized his fees might be subject to discharge, and he very easily could have ascertained that a prepetition waiver of bankruptcy protection was not enforceable. He also should have realized before filing this adversary proceeding that he had no evidence tending to support the claim that the debtor actually intended

to file bankruptcy in September of 2006 but deliberately waited until 2009 so as to discharge the attorney's fees. Even if he did not realize this problem prior to filing, he should have recognized it long before the matter went to trial. The debtor had no choice but to defend the adversary proceeding. Mr. Davis, however, could have chosen to recognize the flaws in his case and abandon it, but did not. Under § 523(d), a victorious debtor is entitled to an award of fees unless the creditor's claim was substantially justified. The gaping hole in the plaintiff's case cannot be ignored, and the Court must conclude that Mr. Davis has not shown that the claim had a reasonable basis in law or fact.

An award of fees and costs is therefore appropriate. After reviewing the affidavit of the debtor's attorney, the Court finds both the costs and the hourly rate requested to be reasonable. However, the plaintiff's concern about the time expended defending the motion to dismiss and/or to revoke the discharge is well taken, as those amounts are not properly included in a fee award under § 523(d). A review of the time records submitted by the debtor's attorney indicates that approximately $2,000.00 of the requested fees were devoted to responding to that motion. The Court finds it appropriate to award $5,000.00 to the debtor as constituting a reasonable amount for fees and costs under § 523(d).

Accordingly, the defendant shall have judgment against the plaintiff dismissing this adversary proceeding and awarding the sum of $5,000.00 in attorney's fees and costs to the defendant pursuant to § 523(d).

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

casetext
Part of Thomson Reuters

17

Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse), 438 B.R. 631 (Bankr. W.D. Wis. 2010)

casetext
Part of Thomson Reuters

Case No. 807-72869-reg

United States Bankruptcy Court, E.D. New York.

# Desiderio v. Parikh (In re Parikh)

508 B.R. 572 (Bankr. E.D.N.Y. 2014)

Decided Apr 17, 2014

Case No. 807–72869–reg Adv. Proc. No. 808–8062–reg

2014-04-17

In re: Sunil Parikh, Debtor. John Desiderio, Plaintiff, v. Sunil Parikh, Defendant.

John S. Desiderio, D&F Associates LLP, Garden City Park, NY, for Plaintiff. Marc A. Pergament, Weinberg Gross & Pergament LLP, Garden City, NY, for Defendant.

Hon. Robert E. Grossman

578    *578

John S. Desiderio, D&F Associates LLP, Garden City Park, NY, for Plaintiff. Marc A. Pergament, Weinberg Gross & Pergament LLP, Garden City, NY, for Defendant.

## Chapter 7

## *DECISION*

## (Re: MOTION FOR SANCTIONS [DKT # 191] and MOTION TO BE RELIEVED AS COUNSEL [DKT # 197] )

**Hon. Robert E. Grossman, U.S.B.J.**

Before the Court is the motion ("Motion") by the Plaintiff, John Desiderio Sr. ("Desiderio"), seeking sanctions against the Defendant/Debtor, Sunil Parikh (the "Debtor"), the Debtor's wife, Meena

Parikh ("Meena"), the Debtor's counsel, Marc Pergament, Esq. ("Pergament"), and his law firm Weinberg Gross & Pergament LLP ("WGP"), for their alleged bad faith bankruptcy filing and conduct in this adversary proceeding and Debtor's Chapter 7 bankruptcy case. [Adversary Proceeding Docket ("AP Dkt") # 191]. In seeking sanctions Desiderio relies upon this Court's inherent power, 11 U.S.C. §§ 105(a), 707(b)(4)(C), 707(b)(4)(D), 28 U.S.C. § 1927, and/or Federal Rule of Bankruptcy Procedure 9011 ("Sanctions"). Desiderio also seeks to have costs awarded to him in this adversary proceeding pursuant to 28 U.S.C. § 1920 ("Costs"). He further requests entry of a money judgment against the Debtor and Meena pursuant to an Order of this Court, dated November 4, 2008 [Bankruptcy Case Docket ("BK Dkt") # 72], granting daily monetary sanctions for failure to comply with subpoenas under Federal Rule of Bankruptcy Procedure 2004 ("Judgment on Prior Sanctions").

This Court previously denied the Motion by Order, dated March 13, 2012. [AP Dkt # 199]. Desiderio appealed [AP Dkt # 200], and upon review by the District Court for the Eastern District of New York, this Court's denial was vacated and this matter remanded for (1) "further findings regarding whether the actions of the Debtor, [Meena], Pergament, and/or WGP were sanctionable," and (2) further findings regarding the entry of a Judgment on Prior Sanctions. [AP Dkt # 209, Civil Action No. 12–cv–02148].



Desiderio v. Parikh (In re Parikh), 508 B.R. 572 (Bankr. E.D.N.Y. 2014)

Upon reconsideration of the Motion, this Court finds that to the extent the Motion seeks a finding that Pergament's conduct was sanctionable, it should be granted, in part, pursuant to Rule 9011 as to Pergament and WGP. Rule 9011(b) requires an attorney to conduct an inquiry "reasonable under the circumstances" prior to filing a bankruptcy petition and schedules. Here, Pergament signed the Debtor's Chapter 7 petition [BK Dkt # 1] which contained incomplete or incorrect information. These inaccuracies and omissions should have been apparent to the Debtor's counsel based on the existence of a readily-available prior Chapter 13 petition [Case No. 8–06–71203–sb Docket ("Ch. 13 Dkt") # 1, 14, 15] which should have caused counsel to conduct a further inquiry into the facts. Had counsel conducted this inquiry it would have revealed facts very different from the facts presented in the Chapter 7 petition, as filed. As a result the Court finds that the Debtor's counsel's conduct in this case is sanctionable under Rule 9011.

Pergament's attempt to avoid a finding that his conduct was sanctionable by assertion of the attorney-client privilege fails, as does his defense that this was a "bare bones" petition filed in an emergency filing. First, were counsel able to use the attorney-client privilege as a defense to Rule
579  9011 or other sanctions, the Court's *579 ability to sanction counsel would be entirely circumvented. Second, the Chapter 7 petition filed in this case was not a "bare bones" petition. A bare bones petition would have been a three-page document consisting of the petition only (Official Form 1). What Pergament filed was a 40–page document including all, or almost all, of the schedules and statements required of a Chapter 7 debtor. The problem is, the information included in those filings was incomplete and/or inaccurate, and if Pergament had conducted a reasonable inquiry, he would have known that. The emergency nature of a bankruptcy filing does not excuse compliance with Rule 9011(b). *See In re Moffett,* 10–71920,

2012 WL 693362 (Bankr.C.D.Ill. Mar. 2, 2012); *In re Alessandro,* 10–12511 AJG, 2010 WL 3522255 (Bankr.S.D.N.Y. Sept. 7, 2010).

This Court's ruling is about the fine line lawyers must navigate between zealous advocacy on behalf of their clients and conduct that is sanctionable. The Court is mindful and strongly believes that zealous advocacy is the bedrock of our legal system. Any restraint or limits placed on a lawyer in the performance of his duties must be applied with the utmost care. However, the Court is also duty bound to ensure the integrity of this Court and hold attorneys who practice before it accountable for conduct that goes beyond zealous advocacy into the realm of sanctionable conduct.

Counsel for debtors in bankruptcy have to be particularly mindful of their duty to conduct an inquiry into the facts presented in a bankruptcy petition and schedules that is reasonable under the circumstances. First, the filing of a bankruptcy petition affords immediate and significant benefits to a debtor. The Court and parties in interest rely heavily on the information disclosed in the petition and schedules. Second, bankruptcy is not a typical adversarial proceeding where abuses by one party are likely to be exposed by another party. Chief Justice Burger famously described the adversarial system of justice as a tripod, one leg representing the court and the other two legs representing the adversaries. Justice William H. Erickson, *The History of the Tripod of Justice,* 64 Mil. L.Rev. 79, 100 (1974) (citing Chief Justice Warren E. Burger, Second Plenary Session American Bar Association Annual Meeting, July 16, 1971). Each leg must be equally strong to maintain justice. *Id.* In enacting the Bankruptcy Code, Congress recognized that creditors lack incentive to participate as actively against a debtor in bankruptcy as they would in normal litigation involving a plaintiff and a defendant because "[i]n contrast to general civil litigation, where cases affect only two or a few parties at most, bankruptcy cases may affect hundreds of scattered and ill-represented creditors." H.R.Rep. No. 595,

95th Cong., 1st Sess. 88 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6050. In addition, creditors in non-bankruptcy litigation engage in a race to the bottom against a defendant, where the most aggressive, fast-acting creditor recovers the most. However, once a debtor enters bankruptcy, similarly situated creditors recover the same amount from the debtor, often less than the full amount owed to them, regardless of their participation. In bankruptcy, the debtor's "leg" is relatively strong-debtors are afforded an immediate automatic stay and are highly incentivized to zealously participate in their case-while the creditor's leg is relatively weak. Thus, in bankruptcy, the line between zealousness and abuse must be firmly observed to maintain the balance of the bankruptcy process. Courts use sanctions to draw this line and ensure that it is 580 observed. *See* *580 *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO,* 948 F.2d 1338, 1343 (2d Cir.1991).

Desiderio has asked this Court to redress the sanctionable conduct in this case by the imposition of monetary sanctions payable to him. However, the Court finds that publication of this Decision is an appropriate sanction in this case – sufficient to deter future sanctionable conduct.

The remainder of the relief sought by Desiderio in the Motion is denied for the reasons as set forth herein. Finally, Pergament's motion to be relieved as counsel to the Debtor and Meena will be granted.

## PROCEDURAL HISTORY AND RELEVANT FACTS[1]

[1] A fuller history of this adversary proceeding and the facts upon which it is based can be found in this Court's Decision after Trial, dated May 24, 2011, denying the Debtor's discharge.

Prior to filing the instant Chapter 7 petition, the Debtor had filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code ("Chapter 13 Petition") on May 30, 2006 ("Chapter 13 Petition Date") with the assistance of bankruptcy counsel. Among the personal property disclosed in the Chapter 13 Petition was a Citibank checking account (account number ending in X9420) held jointly by the Debtor and Meena, with a balance of $146.67. [Ch. 13 Dkt # 1]. The Debtor also scheduled first and second mortgage liens on his residence in favor of Wells Fargo and Citibank, respectively, totaling approximately $200,000, plus a third mortgage to Meera Management LLC ("Meera Mortgage") in the amount of $300,000. Schedule J listed the monthly payment on the Debtor's first mortgage as $823.73, and on the second mortgage, $550. In the Chapter 13 case, the Debtor also listed Peter Devani and Meena as co-debtors of the Debtor, $2,500 monthly income from Meena, and interests in two businesses (Health Heaven and Kuliwala Food Corp.).

The Chapter 13 Petition was dismissed by Order, dated November 2, 2006 [Ch. 13 Dkt # 16], on motion of the United States Trustee [Ch. 13 Dkt # 9] for the Debtor's failure to produce documents.

Desiderio was a creditor in the Chapter 13 case as he is in the instant Chapter 7 case. Prior to the Chapter 13 Petition Date, on July 19, 2004, Desiderio commenced an action in the Supreme Court of Nassau County against the Debtor and Peter Devani ("Devani") to enforce personal guarantees related to a commercial transaction among the parties (Index # 009557/04) ("Guaranty Action"). The state court entered judgment in favor of Desiderio, but collection efforts were stayed upon the filing of the Chapter 13 Petition. After the Bankruptcy Court granted the Chapter 13 Trustee's motion to dismiss, but before entering an order dismissing the case Desiderio moved for an amended judgment in the Guaranty Action. On November 1, 2006, the state court entered an amended judgment in favor of Desiderio in the

amount of $98,328.28 against the Debtor and Devani, and an additional $44,784.28 against Debtor, [AP Dkt # 22–53], for a total of $143,112.56.

2

> 2  No one has raised the issue of whether the entry of this judgment prior to the entry of the Order dismissing the Chapter 13 case constituted a violation of the automatic stay. 11 U.S.C.§ 362(c).

In the Guaranty Action, the Debtor was found in contempt on March 16, 2006 for failing to comply with subpoenas and was afforded an opportunity to purge his contempt. [AP Dkt # 22–51]. The Debtor was further sanctioned on June 14, 2006 for failing to comply with subpoenas, and *581 was again afforded an opportunity to comply. *Id.* The Debtor was fined a total of $100.00 for these two contempt findings. Desiderio moved for a warrant of commitment after the Chapter 13 Petition was dismissed, and on January 24, 2007, the state court held that the Debtor had refused to purge his contempt and entered a Final Order of Contempt and Warrant of Commitment. [AP Dkt # 22–52]. The court entered judgment on the Final Order of Contempt and Warrant of Commitment on April 3, 2007, and directed the Nassau County sheriff's office to arrest the Debtor. [AP Dkt # 22–51].

On March 16, 2007, Meera Management LLC brought an action against the Debtor, Meena, and Desiderio, a judgment lien creditor, to foreclose on the Meera Mortgage—a third mortgage against the Debtor's residence. (Index # 00217/07) ("Foreclosure Action"). Desiderio moved for summary judgment denying the foreclosure on the ground that the mortgage was a fraudulent conveyance. [AP Dkt # 22–20]. The state court agreed, and on June 13, 2007 entered a short form decision and order finding that the Meera Mortgage was a fraudulent conveyance to a related entity done with the intention of depleting the available equity in the Debtor and Meena's real

property ("June 13 Order"). [AP Dkt # 22–20]. The court specifically held that Debtor and Meena "continue to engage in a planned, calculated scheme to defraud and delay Desiderio from the collection of his judgment." [AP Dkt # 22–20 at *4]. The June 13 Order directed Desiderio to submit a proposed judgment, by notice of settlement, vacating the Meera Mortgage. Also in the June 13 Order, the state court awarded Desiderio $7,575.00 in attorney's fees jointly and severally against Meera Management, LLC, the Debtor, and Meena, and directed the County Clerk to enter judgment for said amount. The state court subsequently, on June 20, 2007, entered a judgment granting Desiderio $7,575.00 in attorney's fees, plus 9% interest from the date of June 13, 2007, which amounted to $7,590.15 ("June 20 Judgment") [AP Dkt # 22–23]. On July 31, 2007, the state court entered a judgment directing the Nassau County Clerk to vacate the Meera Mortgage. [AP Dkt # 22–24].

On July 30, 2007 (the "Chapter 7 Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code ("Chapter 7 Petition") with the assistance of WGP. Pergament signed the petition. The schedules as originally filed did not disclose the Citibank bank account that was previously disclosed in the Chapter 13 Petition. Schedule J listed the Debtor's first and second mortgage payments as $1,700 and $880, respectively (a total $1,200 increase from the Chapter 13 Petition). Schedule D listed Desiderio as a secured creditor holding judgment lien(s) in the amount of $150,702.72, which appears to be the total amount of the judgment(s) obtained by Desiderio as of the Chapter 7 Petition Date.

3  However, the Chapter 7 Petition, as originally filed, failed to list Devani as a co-debtor on any judgment, failed to list Meena as a co-debtor with respect to the June 20th Judgment, and failed to list the Debtor's interest in Kuliwala Food Corp. *582 The Chapter 7 Petition also failed to list, in response to Question 19 of the Statement of

Financial Affairs, any accountant that kept the Debtor's books and records within the two years prior to the Chapter 7 Petition Date. On Schedule I, the Chapter 7 Petition listed the Debtor's current income as $800 per month, and Meena's income as $2,326.82. In response to Question 1 of the Statement of Financial Affairs, the Chapter 7 Petition reflected the Debtor's income from 2005 as $52,638.00.

> 3  In the Decision After Trial [AP Dkt # 189] the Court noted that the judgments attached to Desiderio's Proof of Claim added up to only $143,112.56, including interest. The June 20th Judgment was not attached to the Proof of Claim. However, the difference between the scheduled amount of $150,702.72 and $143,112.56 is $7,590.16, the exact amount of the June 20th Judgment for attorney's fees. Thus, it appears that the Debtor scheduled all of the judgments memorializing debts owed to Desiderio at the time of the Chapter 7 Petition.

The petition and schedules did not report a $45,000 withdrawal from the Debtor and Meena's VRESA (home equity line of credit) account, a portion of Desiderio's claim for attorney's fees that remained unsecured because it had been awarded but not yet reduced to judgment, or the Debtor's ownership in 2001 of Davenil Consulting. The Debtor listed on Schedule F, *inter alia,* a debt for $700.00 to American Express, $2,500.00 to Bank of America, a debt to Shah & Pandya, for $4,000, and a debt to Solomon Lowenbraun for $5,562.56. The Debtor's Statement of Current Monthly Income and Means Test Calculation [BK Dkt # 2] listed his marital status as legally separated or living apart. Despite this, on September 17, 2007, the Debtor filed an Amended Statement of Current Monthly Income and Means Test Calculation [BK Dkt # 12] to include Meena's income and indicated that they were not separated or living apart.

Eighteen months after the initial filing, on January 27, 2009, Pergament filed amended schedules, including Schedule J, to reduce the monthly first mortgage payment from $1,700 to $823.73 (the same amount originally reflected in the Chapter 13 Petition). [BK Dkt # 79]. Pergament also listed Desiderio as an unsecured creditor on Schedule F for legal fees, although he noted that they were contingent, disputed, and unliquidated. At that time, the Debtor also filed an amended Statement of Financial Affairs to report that the accountants, Shah & Pandya, CPA, P.C. provided services to the Debtor from 1995 to the Chapter 7 Petition Date. The Debtor also filed an amended Schedule H to list Pever Devani as a co-debtor on the Debtor's obligations to Desiderio. At no time in the Chapter 7 case did the Debtor disclose the Citibank account as being open within one year of the bankruptcy filing as required by the Statement of Financial Affairs.

Desiderio filed a proof of claim in the Chapter 7 case in the total amount of $281,311.45 which is based upon the pre-petition state court judgment(s), plus additional counsel fees in the amount of $128,635.83. [Claim 1–1].

Desiderio filed an adversary proceeding in the Chapter 7 case on March 27, 2008 seeking to dismiss the petition as a bad faith filing pursuant to 11 U.S.C.§ 707(a), or alternatively, to deny the Debtor's discharge pursuant to §§ 727(a)(2)(A),727(a)(3), 727(a)(4)(A), 727(a)(4)(B), 727(a)(4)(D), 727(a)(5), and/or 727(a)(6)(A).

4  [AP Dkt # 1]. Desiderio alleged, *inter alia,* that the Debtor had omitted information from his Chapter 7 Petition, that the Debtor filed the petition solely to frustrate Desiderio's collection efforts, and that the Debtor fraudulently conveyed assets to various parties to shield them from Desiderio.

> 4  Desiderio also alleged causes of action pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B), but withdrew these claims at the



Desiderio v. Parikh (In re Parikh), 508 B.R. 572 (Bankr. E.D.N.Y. 2014)

conclusion of trial.

Both parties filed various motions in the adversary proceeding, including Desiderio's Motion for Summary Judgment [AP Dkt # 22], which was denied on April 2, 2009 [AP Dkt # 41]. Desiderio sought leave from the District Court to appeal the 583 *583 interlocutory order denying his motion for summary judgment. [AP Dkt # 43]. The District Court denied that request on July 31, 2009 [AP Dkt # 61].

As a result of discovery misconduct by both parties, the Bankruptcy Court sanctioned the Debtor by prohibiting him from producing documents at trial that were not produced to Desiderio. The Court also sanctioned Desiderio by prohibiting him from producing documents at trial, namely records relating to his attorney's fees. [AP Dkt # 42].

The Court held a trial on the merits over several days from November 2009 through June 2010. On May 24, 2011, the Court issued its Decision After Trial [AP Dkt # 189] ("D.A.T."), which held that Desiderio sustained his burden of proof to dismiss the case for cause under § 707(a) and to deny discharge under § 727(a)(4)(A) and (a)(2)(A). However, the Court declined dismissal of the case and instead denied the discharge.

On June 28, 2011, Desiderio filed the present Motion for sanctions against Pergament, WGP, Debtor, and Meena pursuant to Rule 9011, § 707(b)(4)(C) and (D), 11 U.S.C. § 105, 28 U.S.C. § 1920, 28 U.S.C. § 1927, and the Court's inherent powers. On March 5, 2012, the Court held a hearing on the Motion and denied it for the reasons given on the record. Desiderio appealed, and on March 29, 2013, the District Court remanded the matter for further findings. After giving the parties an opportunity to submit further papers on the issues presented, this matter was marked submitted on June 3, 2013.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H), (I), (J) and (O). The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

## DISCUSSION

## I. Motion for Sanctions

### A. Sanctions against Pergament and WGP

Desiderio seeks sanctions against Pergament and WGP, in the total amount of $239,252.69, in the form of attorneys' fees and costs incurred by Desiderio in this bankruptcy case, pursuant to Rule 9011, 11 U.S.C. § 707(b)(4)(C) and (D), 28 U.S.C. § 1927, 11 U.S.C. § 105, 28 U.S.C. § 1920, and the Court's inherent power. The Court will address the separate theories in order.

### i. Rule 9011 and 11 U.S.C. § 707(b)(4)

According to Rule 9011(b) the signature by an attorney or unrepresented party on any paper filed with the court constitutes a certification "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

1. it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

2. the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

3. the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

584  *584

4. the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
Fed. R. Bankr.P. 9011(b).

If a court makes a finding that Rule 9011(b) has been violated, Rule 9011(c) permits the court, within its discretion, to impose sanctions upon the offending attorney or party. *See Perez v. Posse Comitatus,* 373 F.3d 321, 325 (2d Cir.2004) ("Even if the district court concludes that the assertion of a given claim violates Rule 11, however, the decision whether or not to impose sanctions is a matter for the court's discretion."). "Absent exceptional circumstances" an attorney's law firm will be held jointly and severally liable for Rule 9011(b) violations by its attorneys or employees. Fed. R. Bankr.P. 9011(c)(1)(A).

In determining whether to exercise discretion to impose Rule 9011 sanctions, the Court should be guided by the purposes of Rule 9011 sanctions, which is to "deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr.P. 9011(c)(2); *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.,* 07–CV–3208 KAM SMG, 2010 WL 4878955 at *2 (E.D.N.Y. Nov. 23, 2010) ("[I]n exercising its broad discretion to impose Rule 11 sanctions in an appropriate amount, this court must also contemplate the limited permissible purposes for Rule 11 sanctions. ") (quoting Advisory Committee Note (1993) ("The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the

sanctions should not be more severe than reasonably necessary to deter repetition of the conduct....")).

Although the primary purpose of Rule 9011 is deterrence, compensation is considered a secondary purpose. *See*Fed. R. Bankr.P. 9011(c)(1)(A)( "If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion."). *But see* Advisory Committee Note (1993) ("Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty.").

If sanctions pursuant to Rule 9011 are sought by motion of a party, the movant must comply with a safe-harbor provision contained in Rule 9011(c)(1)(A) which requires that the offending party be given notice and an opportunity to cure the offending conduct. Specifically, the safe harbor provision requires that:

...The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected ...
Fed. R. Bankr.P. 9011(c)(1)(A). However, the safe harbor provision does not apply where the offending conduct is the filing of a bankruptcy petition in violation of Rule 9011(b). *Id.*

Assuming the movant has complied with the safe harbor provisions of Rule 9011(c), awarding sanctions pursuant to the "improper purpose" prong of Rule 9011(b)(1) requires a finding of subjective bad faith. This differs from sanctions under Rule 9011(b)(2), where an attorney fails make a reasonable inquiry into whether claims asserted are "warranted in law," which uses an objective bad faith standard that requires frivolousness. Although the Court may infer
585  subjective bad faith from *585 a frivolous filing, or

Desiderio v. Parikh (In re Parikh), 508 B.R. 572 (Bankr. E.D.N.Y. 2014)

one that is entirely without merit, frivolity is not a necessary finding under the "improper purpose" prong of Rule 9011(b). Sanctions may be—but need not be—imposed when court filings are used for an "improper purpose," or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous. *Ipcon Collections LLC v. Costco Wholesale Corp.,* 698 F.3d 58, 63 (2d Cir.2012); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985), *cert. denied,*484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) (sanctions can be imposed for filings made for an "improper purpose" even where the attorney conducted a reasonable investigation).

Subjective bad faith can occur when a paper is submitted to harass a litigant or unnecessarily delay the proceedings. However, the delay or frustration to creditors must be unnecessary; delay and frustration alone are insufficient for sanctions under Rule 9011(b)(1). *See Matter of Cohoes Indus. Terminal, Inc.,* 931 F.2d 222, 228 (2d Cir.1991) ("Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some breathing room from creditors, it is almost inevitable that creditors will, in some sense, be 'frustrated' when their debtor files a bankruptcy petition.") (internal citations omitted). Another major purpose behind our bankruptcy laws is to afford a debtor a fresh start through discharge or reorganization. Thus, sanctions pursuant to Rule 9011(b)(1)'s "improper purpose" clause are inappropriate where delay or frustration to creditors occurs because a debtor needs breathing room to legitimately pursue discharge or reorganization. *Cf. In re Intercorp Int'l, Ltd.,* 309 B.R. 686, 697 (Bankr.S.D.N.Y.2004) (sanctioning attorney under the improper purpose prong who filed petition to stay foreclosure sale where there was "no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings") (quoting *Cohoes,* 931 F.2d at 227).

Determining whether an investigation was reasonable pursuant to Rule 9011(b)(3) requires a case-by-case, fact intensive analysis dependent on all the circumstances. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 404, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). At a minimum, Rule 9011(b)(3) places on attorneys a duty to make at least some affirmative investigation into the facts represented in documents submitted to the court. *In re Obasi,* 10–10494 SHL, 2011 WL 6336153 at *5 (Bankr.S.D.N.Y. Dec. 19, 2011). While "the investigation performed by a signatory need not be to the point of certainty to be reasonable," a "signer must explore readily available avenues of factual inquiry." *In re Obasi* at *5. (internal citations omitted).

Although an attorney may generally rely on objectively reasonable client representations, *Hadges v. Yonkers Racing Corp.* 48 F.3d 1320, 1329 (2d Cir.1995) (internal citations omitted), the attorney must independently verify publicly available facts to determine if the client representations are objectively reasonable. *Televideo Sys., Inc. v. Mayer,* 139 F.R.D. 42, 47 (S.D.N.Y.1991); *In re Withrow,* 391 B.R. 217, 228 (Bankr.D.Mass.2008), *aff'd,*405 B.R. 505 (1st Cir. BAP 2009); *In re Seare,* 493 B.R. 158, 209–11 (Bankr.D.Nev.2013) (quoting *ABA Attorney Liability* 697 at 704). If independent verification reveals inconsistencies or other problems, an attorney must "probe further—by asking questions, obtaining additional documents, or by some other means." *Seare,* 493 B.R. at 211; *In re Dean,* 401 B.R. 917, 920 (Bankr.D.Idaho 2008) ("Simply put, having previously identified that a problem may *586 exist with the Gladman lien, Beeman could not reasonably rely upon his clients' statements").

"[H]ow much time the attorney had for the investigation" is a relevant factor in the Rule 9011 analysis, *Televideo Sys., Inc.,* 139 F.R.D. at 47, however, the emergency nature of a filing does not excuse an attorney from this obligation to independently verify publicly available



information and probe further if the attorney is unable to do so. *In re Alessandro,* 10–12511 AJG, 2010 WL 3522255 at *3 (Bankr.S.D.N.Y. Sept. 7, 2010); *In re Mofett,* 10–71920, 2012 WL 693362 at *1 (Bankr.C.D.Ill. Mar. 2, 2012). For instance, in *Seare,* debtor's counsel was sanctioned for failing to review a judgment obtained by a hospital, where a review would have revealed that the judgment was for fraud, not medical bills, and thus nondischargeable. *Seare,* 493 B.R. at 211. The court rejected counsel's argument "that he did not have an independent duty to investigate the nature of the Judgment." *Id.* at 176.

Generally, Rule 11 and Rule 9011 impose no continuing duty to amend a paper bearing the attorney's signature. *Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986)(rejecting movant's claim that Rule 11 imposes a continuing obligation and holding that "the signer's conduct is to be judged as of the time the pleading or other paper is signed.").

Section 707(b)(4), added to the Bankruptcy Code by the 2005 Amendments, makes it explicit that Rule 9011 applies to debtors' counsel in the context of the filing of the petition and schedules in bankruptcy cases. In addition to, but essentially reflective of, Rule 9011 sanctions, § 707(b)(4)(C) provides that "[t]he signature of an attorney on a petition, pleading, or written motion shall constitute a certification that the attorney has—(i) performed a reasonable investigation into the circumstances that gave rise to the petition, pleading, or written motion; and (ii) determined that the petition, pleading, or written motion—(I) is well grounded in fact; and (II) is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and does not constitute an abuse under paragraph (1)." 11 U.S.C. § 707(b)(4)(C). Section 707(b)(4)(D) makes it clear that the debtor's counsel's signature on the bankruptcy petition also includes a certification that the attorney "has no knowledge

after an inquiry that the information in the schedules filed with such petition is incorrect." 11 U.S.C. § 707(b)(4)(D).

Section 707(b)(4)(A) and (B) contain certain remedies. Section 707(b)(4)(A) provides that a debtor's attorney may be required to reimburse the trustee for "all reasonable costs in prosecuting a motion filed under section 707(b), including reasonable attorneys' fees" if the court grants a motion by the trustee to dismiss or convert the case under § 707(b), and finds that the conduct of the debtor's attorney in filing the petition violated Rule 9011. Section 707(b)(4)(B) provides that "[i]f the court finds that the attorney for the debtor violated rule 9011 of the Federal Rules of Bankruptcy Procedure, the court, on its own initiative or on the motion of a party in interest, in accordance with such procedures, may order—(i) the assessment of an appropriate civil penalty against the attorney for the debtor; and (ii) the payment of such civil penalty to the trustee, the United States trustee (or the bankruptcy administrator, if any)." 11 U.S.C. § 707(b)(4)(B). Neither § 707(b)(4)(A) nor § 707(b)(4)(B) contemplate that damages in the form of attorneys' fees should be payable to a creditors' counsel directly.

## a. Arguments of the Parties

Desiderio argues that his motion for sanctions was not subject to the safe harbor *587 provision of Rule 9011 because the motion is based upon information omitted from the Chapter 7 Petition—and the filing of the petition is not subject to the safe harbor provisions. On the merits, Desiderio alleges that Pergament violated Rule 9011 by failing to conduct a reasonable investigation and accurately disclose: the Debtor's bank accounts, monthly mortgage payments; co-debtors; income from his spouse; that his income in 2005 was combined with Meena; the Debtor's job title as described in the petition; the Debtor's monthly income as $866 instead of $800; the Meera Mortgage; Debtor's interest in Kuliwala, Health

Desiderio v. Pergament (In re Novak), 508 B.R. 516, 573 (Bankr. E.D.N.Y. 2014)

Heaven, and Davenil Consulting; the June 20th Judgment; the $45,000 VRESA transfer; that a portion of Desiderio's claim for attorney's fees remained unsecured and should have been listed on Schedule F; whether Debtor and Meena were separated; documentation of the amount of Debtor's debts to credit card companies, Shah & Pandya, or Solomon Lowenbraun; and the Debtor's accountants. Desiderio also alleges that Pergament violated Rule 9011(b)(1) by filing the petition for an "improper purpose" because it was patently obvious that the bankruptcy filing was made solely to frustrate Desiderio's collection efforts, and the Debtor had the ability to repay Desiderio. Desiderio further argues that Pergament's year and a half delay in amending the petition and schedules once he had actual knowledge of the correct information violates Rule 9011 because that Rule imposes a continuing duty to correct incorrect information. Finally, Desiderio seeks to hold Pergament and WGP jointly and severally liable for these alleged violations.

Pergament responds that Desiderio is procedurally barred from seeking sanctions under Rule 9011 because he failed to comply with Rule 9011's safe harbor provision, and that Desiderio's own overly litigious conduct during the case waives, estops, or precludes him from seeking sanctions. [AP Dkt # 214]. First, Pergament argues that Desiderio waived his right to seek Rule 9011 sanctions by filing an adversary proceeding to deny the Debtor's discharge instead of moving more expeditiously to dismiss this bankruptcy case. According to Pergament, the Bankruptcy Code contemplates that bad faith petitions should be met with a timely motion to dismiss instead of an adversary proceeding because such motions minimize hindsight and encourages prompt resolution of issues. Second, Pergament argues that *Cohoes,* 931 F.2d 222 (2d Cir.1991), which held that a party's failure to expeditiously move to dismiss the petition estopped him from alleging that the petition violated Rule 9011's requirement

to reasonably investigate whether the petition was warranted by law, requires this Court to deny sanctions. Similarly, Pergament asserts that the Court's denial of Desiderio's Motion for Summary Judgment on his "bad faith filing" claims precludes a finding that the petition was frivolously filed. Last, Pergament asserts that the Court has already ruled on Desiderio's request for sanctions in the Decision After Trial and that Desiderio cannot have a "second bite at the apple."

Substantively, Pergament asserts that he cannot be sanctioned under Rule 9011 for filing the petition with an "improper purpose" unless the filing is frivolous, and that the filing was not frivolous. Pergament asserts that he cannot be sanctioned under Rule 9011 for failing to conduct a reasonable investigation because he is entitled to rely on his client's representations and that any ambiguity as to whether his acts are objectively reasonable should be resolved in his favor. He argues that Desiderio has merely "raised questions" as to whether Pergament and WGP should have *588 accepted the Debtor's representations, and that without more, the dispute should be resolved in Pergament and WGP's favor. He also asserts that the information omitted from or incorrectly reflected in the bankruptcy petition, was not independently verifiable by him, and that the emergency nature of the filing, based on Debtor's fears of imminent arrest, justifies the level of investigation conducted by his office. Pergament notes that sanctions under Rule 9011 should be invoked sparingly because a "request for sanctions under Rule 11 is not a tactical device," *In re Taub,* 439 B.R. 276, 281 (Bankr.E.D.N.Y.2010) (quoting *Nakash v. U.S. Dep't of Justice,* 708 F.Supp. 1354, 1370 (S.D.N.Y.1988)), and that conduct must be egregious to warrant sanctions. Pergament also argues that the attorney-client privilege precludes him from providing an explanation for his conduct with regard to information that was not verifiable by independent means.

## b. Safe harbor provisions

The Court finds that Desiderio did not comply with the safe-harbor provision of Rule 9011(c). This alone precludes the imposition of Rule 9011 sanctions with regard to all papers filed by Pergament in this case— **other than** the bankruptcy petition and schedules. *In re Taub* at 282. The safe harbor provision does not apply to the filing of the petition because "petitions, unlike papers, claims, defenses, contentions, allegations, or denials, cause immediate collateral effects and, moreover, a petition cannot be withdrawn without the court's consent." *Levey v. Kesser Cleaners Corp.,* 06CV02530(DLI), 2007 WL 2177048 at *3 (E.D.N.Y. July 27, 2007). In *Levey,* the court concluded that this rationale applied even where the petition had already been withdrawn and the collateral implications were no longer in effect. Thus, this Court may analyze Pergament's role in connection with the filing of the bankruptcy petition and schedules under Rule 9011, despite Desiderio's failure to satisfy the safe harbor provision, even though Debtor's discharge has been denied and the exigencies of the situation have waned.

## c. Attorney client privilege

The Court finds that Pergament was not entitled to rely on his client's representations, so his attempt to invoke attorney-client privilege, given the unique facts and circumstances of this case, is fundamentally flawed. He argues that the attorney-client privilege prevents him from responding to the allegations against him. Although the attorney-client privilege bars an attorney from disclosing the contents of privileged communications, it cannot give Pergament an absolute defense to the imposition of sanction under the facts in this case. To hold otherwise, would allow counsel to circumvent the reach of Rule 11 or other sanctions in connection with factual misrepresentations made in court filings. In any event, the Court in this Decision is imposing sanctions on Pergament for failing to adequately investigate publicly available information regardless of information his client communicated in confidence. Under the particular facts of this case, Pergament had a duty to externally verify the information provided to him by his client because sufficient red flags existed that should have prompted a further investigation which would have revealed information to him that should have been included in the Chapter 7 Petition.

589 [5] *589 The attorney-client privilege cannot shield Pergament from the basic independent verification he was expected to do.

---

[5] The Court notes that it is not drawing a negative inference from Pergament's invocation of the attorney-client privilege. *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 225–26 (2d Cir.1999)*abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). Rather, the Court finds that the record, as a whole, demonstrates that Pergament's actions were objectively unreasonable, regardless of evidence that could have been procured in the absence of attorney-client privilege.

## d. Delay in filing motion to dismiss

The Court finds that Desiderio's decision to file an adversary proceeding instead of a more expeditious motion to dismiss does not preclude sanctions related to filing the Chapter 7 Petition. Several courts have held that sanctions may be imposed under Rule 9011 even after the dismissal of a bankruptcy case. *In re Berger Indus., Inc.,* 298 B.R. 37, 40 (Bankr.E.D.N.Y.2003) (motions for sanctions pursuant to Rule 9011 with regard to the filing of a bankruptcy petition was timely, even though bankruptcy case had closed, because "[i]t is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation, and in the case of motions at the time the motion is decided or shortly thereafter.") (quoting Advisory Committee Note (1983); *In re Mem'l Estates, Inc.,*



Desiderio v. Pariram (In re Pariram), 508 B.R. 678 (Bankr. E.D.N.Y. 2014)

116 B.R. 108, 112 (N.D.Ill.1990)); *Matter of Jones,* 117 B.R. 415, 419 (Bankr.N.D.Ind.1990) (citing *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 398, 110 S.Ct. 2447, 2457, 110 L.Ed.2d 359 (1990)("[A] litigant who violates Rule 11 merits sanctions even after a dismissal.")). Thus, Desiderio's failure to seek sanctions against Pergament in a more timely manner is not fatal to the relief he seeks.

### e. Previous denial of Desiderio's motion for summary judgment

The Court finds that the previous denial of Desiderio's motion for summary judgment does not preclude the imposition of sanctions here. Relevant to his argument in this regard, Pergament relies on *Cohoes,* 931 F.2d 222. First, *Cohoes* analyzed sanctions under Rule 9011(b)(2), which requires attorneys to ensure that their claims are warranted in law. *Id.* at 227. In the Second Circuit, an attorney may only violate Rule 9011(b)(2) if the claims asserted are frivolous. *Id.* Non-frivolousness is determinative of Rule 9011(b)(2), but is not determinative of Rule 9011(b)(1) which prohibits filings for an improper purpose, or Rule 9011(b)(3), which requires a reasonable investigation into whether facts asserted have evidentiary support. Thus, the denial of summary judgment does not preclude sanctions for violation of Rule 9011(b)(1) or (b)(3).

Second, the denial of summary judgment in this case was based in large part on disputes over facts that the Debtor eventually conceded, either by amending the petition or stipulating to them prior to trial. Neither the Debtor nor Debtor's counsel can delay amending the petition or admitting to material facts until after summary judgment is denied, and then use the denial of summary judgment as a defense to sanctions.

Third, *Cohoes* emphasized that the party seeking sanctions in that case gained some advantage from the pendency of the bankruptcy case. *Id.* at 239. Here, there is no evidence that Desiderio ever gained an advantage from the pendency of this

Chapter 7 case. Thus, *Cohoes* does not prohibit the Court from imposing sanctions under the circumstances of this case simply because the Debtor survived a motion for summary judgment on Desiderio's § 707 bad faith filing claims.

### f. Failure to address sanctions in the Decision After Trial

Pergament writes that the Decision after Trial "denied" Desiderio's motion for *590 sanctions, and that Desiderio's failure to appeal the Decision after Trial prevents him from seeking sanctions now. [AP Dkt # 214 at 2, 18]. However, on the final day of that trial, this Court made it clear that it was only ruling on the issues presented by the adversary proceeding complaint, and that sanctions would be addressed in the main bankruptcy case, which at the time was being handled by Judge Eisenberg. [Trial Transcript 82:13–15, AP Dkt # 170]. In any event, Desiderio ultimately filed the Sanctions Motion before this Court, appealed this Court's ruling denying those sanctions, and this matter is squarely back before this Court on remand pursuant to a final Order of the United States District Court for the Eastern District of New York vacating this Court's denial. This Court can hardly find, at this stage in the proceedings, that Desiderio is precluded from pursuing these sanctions.

### g. Analysis of Rule 9011(b)(1)

On the merits of the allegations, the Court finds that Pergament's conduct is not sanctionable pursuant to Rule 9011(b)(1), which prohibits filings made for an improper purpose. In its prior Decision in this case, the Court found that the *Debtor* 's sole purpose in filing the petition was to avoid paying Desiderio, even though he appeared to have the ability to do so. *D.A.T.* at 31. The Court determined that the Debtor had the ability to pay because: he fraudulently conveyed equity in his home via the Meera Mortgage (as found by the state court); there was a $45,000 withdrawal from the Debtor and Meena's home equity line designed to further deplete the equity in his home; the



Desiderio v. Pari... Pergament... 508 ... B.R. ... (Bankr. E.D.N.Y. 2014)

Debtor had transferred assets to Meena to shield his business assets from collection; the Debtor had paid extensive attorney fees litigating with Desiderio; and Desiderio's judgments appeared to be the only significant debt owed by the Debtor. *Id.* The Court has no reason to attribute any of this bad faith conduct to Pergament. Based on the objectively verifiable facts supporting this Court's bad faith finding against the Debtor, the most Pergament should have known, at the time of filing, was that Debtor was involved in a fraudulent conveyance (the Meera Mortgage) and that most of his debts were owed to Desiderio. This Court is not prepared to find that Pergament filed this bankruptcy petition with an improper purpose sufficient to sanction him under Rule 9011(b)(1) under these facts.

## h. Analysis of Rule 9011(b)(3)

However, this Court finds that Pergament's conduct in this case did violate Rule 9011(b)(3) which provides that counsel's signature on a bankruptcy petition is a certification that "after an inquiry reasonable under the circumstances,—the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery ..." The Chapter 13 Petition was readily available to Pergament at the time of the preparation and filing of the Chapter 7 Petition. At a minimum, Pergament should have reviewed the Chapter 13 Petition and schedules and known that there were several discrepancies between the information presented in the Chapter 7 Petition and the Chapter 13 Petition.

First, the Schedule H to the Chapter 13 Petition reflected that Peter Devani was a co-debtor of the Debtor's. Not only that, Desiderio had filed a proof of claim (# 1) in the Chapter 13 case which attaches a copy of a judgment against the Debtor clearly showing that Mr. Devani was jointly and severally liable with the Debtor. The Court can think of no reason to exclude Mr. Devani from

591 Schedule H to the *591 Chapter 7 Petition other than counsel's failure to conduct an "inquiry reasonable under the circumstances," prior to his certification in Schedule H, that there existed no co-debtors other than Meena.

6

> 6  The Court also notes that although Meena was listed in Schedule H, she was only listed as a co-debtor with respect to the first and second mortgage loans. Pergament knew or should have known that the June 20th Judgment against the Debtor also imposed joint and several liability upon Meena, and she should have been included in Schedule H to the original Chapter 7 Petition.

Second, the Chapter 13 Petition, specifically, Schedule J, reflected monthly payments on the Debtor's first mortgage of $823.73. Despite this, Schedule J to the Chapter 7 Petition reflects a monthly first mortgage payment of $1,700. In light of this discrepancy, it would have been reasonable for Pergament to obtain from the Debtor a copy of his most recent first mortgage statement. As we now know, if he had done so, it would have shown that the monthly payment on the Debtor's first mortgage was in fact still $823.73 the month prior to the Chapter 7 Petition Date. As with the failure to list Peter Devani as a co-debtor, the Court finds that Pergament failed to conduct an inquiry reasonable under the circumstances prior to his certification that the monthly mortgage payment listed in Schedule J to the Chapter 7 Petition was correct.

In fact, although this Court is not prepared to hold that Rule 9011(b) imposes a continuing duty to amend a faulty petition and schedules, the record in this case reflects that Pergament knew or should have known of the inaccuracy of the monthly first mortgage payment as early as January 28, 2008, when he, on behalf of the Debtor, produced mortgage statements to Desiderio in Rule 2004



Desiderio v. Pari... (In re Pari...), 508 B.R. 579 (Bankr. E.D.N.Y. 2014)

discovery that reflected monthly first mortgage payments of $823.73 for May through July 2007 (Adv. Doc # 191–14 at 5).

[7] Despite having this information in January of 2008, Pergament did not amend the petition and schedules to reflect the correct monthly first mortgage payment until one year later, on January 27, 2009.

> [7] The monthly first mortgage statements were also attached as an exhibit to the motion for summary judgment filed by Desiderio in the adversary proceeding on November 18, 2008. [AP Dkt # 22–50]. Pergament received electronic notification of the motion upon filing, and was served with a copy of the motion, by regular mail on November 19, 2008. [AP Dkt # 36].

The Court and the chapter 7 trustee rely heavily on debtors and debtors counsel to provide truthful and accurate information in the petition and schedules. Specifically, the information provided in a debtor's schedule I (income) and schedule J (expenses), as well as the "means test" (Official Form 22A) is critical to an analysis of a debtor's good faith in filing the petition as well as whether the debtor should be required to repay a certain portion of his debts in a Chapter 13. If debtors and debtors' counsel are not held accountable for inaccuracies in the petition and schedules, the system simply will not work.

Third, Pergament signed the Chapter 7 Petition which reflected in Schedule B that the Debtor did not hold any cash, nor did he have any checking or savings accounts as of the Chapter 7 Petition Date. In addition, the response to Question 11 of the Statement of Financial Affairs indicated that the Debtor did not have any financial accounts that were closed within the one year prior to the Chapter 7 Petition Date. Pergament failed to reflect the Citibank bank account in the Chapter 7 Petition despite the fact that the account was
592 disclosed in the Chapter 13 case. Specifically,*592

the original Chapter 13 Petition, filed on May 30, 2006, reflected the Citibank account. Pergament was thus on notice that this bank account existed prior to the Chapter 7 Petition Date, and he failed to reflect it in the Chapter 7 Petition. Pergament apparently relied on his client's representations that the account was closed more than one year prior to the Chapter 7 Petition Date. The Court finds, however, that the fact that this bank account was reflected in the Chapter 13 schedules was sufficient to put Pergament on notice of its existence and it would have been a reasonable investigation under the circumstances for Pergament to require of his client an account closing statement. Absent that, Pergament should have erred on the side of disclosing the bank account.

As with the inaccuracies with respect to the Debtor's monthly first mortgage payment, the Court will note that the record reflects that Pergament did in fact know about the Citibank account—and that it was in fact open as of the Chapter 7 Petition Date—as early as September 29, 2008 when Pergament's office signed an amended response to Desiderio's Rule 2004 discovery request. [AP Dkt # 153]. In response to Question 6, which requested the Debtor's bank statements from January 2001 to July 30, 2007, the Debtor produced documents with Bates Stamp numbers 000275 through 000657. In Desiderio's motion for sanctions [AP Dkt # 191–17], Desiderio attached copies of a Citibank bank statement, for Acct. # xxx9420 (the same as was disclosed in the Chapter 13), held jointly by the Debtor and Meena, showing a $646.67 balance as of November 6, 2006. The bottom of that bank statement shows a bates stamp # of 000553— which is within the range of the bates numbers of the documents that Pergament produced to Desiderio in September of 2008. This clearly shows that Pergament knew, or should have known, the account was open and held a balance, as early as September of 2008, and yet he amended neither the Debtor's Schedule B, nor

Desiderio v. Pari (In re Pari), 508 B.R. 57 (Bankr. E.D.N.Y. 2014)

Question 11 of the Statement of Financial Affairs. The Debtor, in opposition to Desiderio's motion for summary judgment in late 2008, argued that Desiderio was fully aware of the Citibank account because it was Desiderio who had the account restrained in November 2006. However, this is no defense to a failure to disclose an interest in a bank account, and Pergament should have known that.

Further, in the joint pretrial memorandum, dated October 28, 2009, signed by Pergament, he admits that "[t]he partial statements of account that were eventually produced by Debtor indicate that he had a checking account with Citibank which was open and had a positive balance at least until November 6, 2006." [AP Dkt # 69, at 10]. Yet, the schedules were *never* amended to reflect the existence of the Citibank account.

593 8 *593

8 Desiderio also argues that Pergament knew of and failed to disclose one or more bank accounts at Chase bank. In the Chapter 13 case, in October of 2006, the Debtor filed an amended Schedule B which reflected that the Debtor held Chase checking and savings accounts (account numbers ending X3639–65) jointly with Meena, with a balance of $22.44. Desiderio's sanctions motion attaches copies of a "Transaction History" for the Chase Account # xxx3901, showing a $0 balance as of October 17, 2006. There is a handwritten note on the document, "Account Closed," however, the transaction history shows that there was a $4.54 balance in the account from July 21, 2006 until August 18, 2006 when a $9.00 service fee created a $4.46 overdraft in the account. Therefore the record suggests that the Chase account # xxx3901 was open within the one year prior to the Chapter 7 Petition Date and should have been reflected in the petition and/or schedules. However, it is not clear that the Chase account # xxx3901 was the same as that which was disclosed in the Chapter 13

Petition and schedules. In fact, the account numbers do not match. Therefore, the Court will not attribute knowledge of this open Chase account to Pergament as of the date of the Chapter 7 Petition such that his conduct for failing to include it in the Chapter 7 Petition would be sanctionable under Rule 9011(b)(3).

Fourth, the Court finds that the Chapter 7 Petition did not accurately reflect the status of the Meera Mortgage as of the Chapter 7 Petition Date. Pergament was fully aware of the state court Foreclosure Action and the findings made therein. Therefore, he knew or should have known that as of the Chapter 7 Petition Date the state court had not yet entered an order vacating the Meera Mortgage and as a result, as of the Chapter 7 Petition Date, the Meera Mortgage was a valid lien on the Debtor's residence. Admittedly, it was a mortgage that was subject to vacatur, but this does not justify the manner in which Pergament reflected the Meera Mortgage in the Chapter 7 Petition. To list the litigation in response to Question 4 of the Statement of Financial Affairs and simply note that the action was "to be discontinued" was the kind of partial and inaccurate disclosure that is inexcusable.

Fifth, the Court finds that Pergament's failure to include the Debtor's ownership interests in Kuliwala Food Corp. in Schedule B of the Chapter 7 Petition was the result of Pergament's failure to conduct a reasonable inquiry under the circumstances. Amended Schedule B to the Chapter 13 Petition, filed on October 16, 2006, shows that the Debtor reported having a 70% ownership interest in Kuliwala at least as of the Chapter 13 Petition Date. Despite this, the Chapter 7 Petition as originally filed does not contain *any* reference to Kuliwala. Given the prior disclosure of this corporate interest, it would have been reasonable under the circumstances, for Pergament to conduct a search of corporate filings to objectively verify the information given to him by



Desiderio v. Pariment Chan, D.C. 508 B.R. 571 (Bankr. E.D.N.Y. 2014)

his client. As it turns out, in September of 2007, Pergament filed an amended Schedule B to list, among other things, a 100% interest in Kuliwala, as "nominee."

Sixth, the Debtor testified at trial that prior to filing the Chapter 7 Petition, he provided Pergament's office with a draft of his 2006 tax return prepared by his accountant, Shah & Pandya, C.P.A. [Trial Transcript, June 6, 2010 [AP Dkt # 169] at 166:20–167:5, Exh. 29]. This draft showed gross income by the Debtor of $10,036, tax liability of $1,418, listed the Debtor's job title as "manager," and identified Shah & Pandya, C.P.A. as tax preparers. [AP Dkt # 191–24]. Pergament never denied that this draft was provided to him pre-petition. The fact that the Debtor's income and income tax liability reflected in that draft tax return was exactly the same as what was reported in the Chapter 7 Petition also suggests that his office had the draft tax return when it prepared the Chapter 7 Petition. Yet in response to Question 19 of the Statement Financial Affairs—which requires debtors to list bookkeepers and accountants who have "keep or supervised the keeping of books of account and records" of the debtor, who have "audited the books of account and records, or prepared a financial statement of the debtor," or who possessed the books of account and records of the debtor—does not disclose Shah & Pandya, C.P.A. The Statement of Financial Affairs was not amended until January of 2009 to disclose the Debtor's accountants. The Court finds that Pergament had this information prior to filing the Chapter 7 Petition, and it should have been included with the original filings.

Finally, Pergament asserts that the "emergency" nature of the filing of the Chapter 7 Petition 594 excuses the deficiencies *594 in the petition as originally filed, and that the petition was amended "as information was obtained and provided to us." [AP Dkt # 214 at 5]. He claims that because the Debtor "was facing an imminent arrest due to a state court finding of contempt ... we filed a bare bones bankruptcy petition to avoid having him

arrested." *Id.* First, the Court notes that the arrest warrant was issued on April 3, 2007. The Chapter 7 Petition was not filed until July 30, 2007. If there were truly an emergency here, the bankruptcy would have been filed shortly after the April 3rd arrest warrant. Even so, the emergency nature of a bankruptcy filing does not necessarily excuse compliance with Rule 9011(b). *See In re Alessandro,* 10–12511 AJG, 2010 WL 3522255 at *3 (Bankr.S.D.N.Y. Sept. 7, 2010); *In re Moffett,* 10–71920, 2012 WL 693362 at *1 (Bankr.C.D.Ill. Mar. 2, 2012). Second, the Chapter 7 Petition was not "bare bones." Rather, most if not all of the required schedules were attached to the petition— they just were not accurate. If Pergament had checked the Chapter 13 Petition and conducted an independent verification of the information provided to him where inconsistencies existed, he would have known that the Chapter 7 Petition was not accurate. Finally, as previously explained, Pergament's contention that the petition was amended as information was provided to them, is just not true.

For all of the foregoing reasons, the Court finds that Pergament's conduct is sanctionable pursuant to Rule 9011(b)(3).

[9]

<hr>

[9]    The Court declines to find that Pergament should be held accountable under Rule 9011(b) for the remainder of the inaccuracies in the Chapter 7 Petition. Pergament appears to have included the monetary award in the June 20th Judgment within the scheduled amount of Desiderio's claim. He included Meena's income, and an accurate estimate of Debtor's monthly second mortgage obligations in the Chapter 7 Petition. *See* AP Dkt # 139. The Court finds that the remainder of the inaccuracies of which Desiderio complains were not independently verifiable by Pergament and therefore he will not be sanctioned for



Desiderio v. Pergament (In re Novak), 508 B.R. 51 (Bankr. E.D.N.Y. 2014)

failing to conduct an "inquiry reasonable under the circumstances."

### i. Section 707(b)(4)

Having found that Pergament's conduct violates Rule 9011(b)(3), the Court declines to engage in a separate analysis of his conduct under § 707(b)(4). First, without deciding this issue, it is not entirely clear to the Court that Desiderio has standing to seek relief under § 707(b)(4). *See* 11 U.S.C. § 707(b)(6) ("Only the judge or United States trustee ... may file a motion under section 707(b) ..." if a debtor's current monthly income is below the median). Second, § 707(b)(4) does not provide Desiderio with any direct claim against Pergament to collect his legal fees incurred in this bankruptcy case. *See* 11 U.S.C. § 707(b)(4)(C) and (D).

10

> 10  Moreover, § 707(b)(4)(A) and (B) do not allow for attorney's fees to the moving party, they merely allow for reimbursement to the trustee, United States trustee, or bankruptcy administrator, if any. Because analysis under § 707(b)(4)(C) and (D) are redundant under these facts based on Desiderio's failure to comply with the safe harbor provision of Rule 9011, this Court declines to address whether § 707(b)(4)(C) and (D) ever allow for the award of attorney's fees to the moving party.

Third, even if he had standing and a separate claim for damages, this Court declines to award monetary sanctions for Pergament's conduct in this case.

Finally, this Court finds that the safe harbor provisions of Rule 9011(c) also apply to a motion for sanctions under 11 U.S.C. § 707(b)(4). As a result, even if the statute did give him an individual remedy, any attempt by Desiderio to apply § 707(b)(4) beyond the initial filing of the bankruptcy petition—which has already \*595 been

595

addressed under Rule 9011(b)(3)—fails. *Cf. In re OBrien,* 443 B.R. 117, 144 (Bankr.W.D.Mich.2011) ("If the Attorney has violated her obligations [under § 707(b)(4)(C) and (D) ], she may be held accountable in accordance with Bankruptcy Rule 9011(c)"). Section 707(b)(4)(C) and (D) should be read in conjunction with § 707(b)(4)(A) and (B), which both refer specifically to Rule 9011 and/or the "procedures described in rule 9011 of the Federal Rules of Bankruptcy Procedure." A finding that the safe harbor provisions do not apply to sanctions under § 707(b)(4)(C) and (D) would eviscerate the safe harbor provision of Rule 9011. As this Court previously stated, § 707(b)(4) sanctions were intended to be an explicit extension of Rule 9011 sanctions to debtor's counsel into the bankruptcy context. *See In re Withrow,* 07–41243–HJB, 2008 WL 2945423 at \*2 (Bankr.D.Mass. July 25, 2008) ("§§ 707(b)(4)(C) and (D) parallels Rule 9011. It created no new standard. It simply codified and put an exclamation point on Rule 9011 in the preparation of certain documents."). The standards under both provisions are similar, and if § 707(b)(4)(C) and (D) did not require compliance with the safe harbor provision of Rule 9011, a moving party could do an end run around Rule 9011 safe harbor provisions in the bankruptcy context by simply moving under § 707(b)(4) instead. This would be an absurd result and minimize the safe harbor's "salutary effect of providing appropriate due process considerations to sanction litigation, reducing Rule 11 volume and eliminating abuses proscribed by this Rule." *Photocircuits Corp. v. Marathon Agents, Inc.,* 162 F.R.D. 449, 452 (E.D.N.Y.1995); *See also In re Pennie & Edmonds LLP,* 323 F.3d 86, 91 (2d Cir.2003).

### j. Remedy

The Court must exercise its discretion to determine the nature of the appropriate sanction. Possible sanctions include an award of attorney's fees, but they can also include a range of other actions, from reprimand to disbarment. *Matter of Omega Trust,* 120 B.R. 265, 270 (S.D.N.Y.1990).



Desiderio v. Pergament (In re Novak), 508 B.R. 651 (Bankr. E.D.N.Y. 2014)

Generally, the Court should award the minimum sanction necessary to deter future sanctionable conduct. *Id.* at 271. The Court may also consider, *inter alia,* the reasonableness of costs and expenses incurred by the party seeking sanctions, prejudice suffered by the party seeking sanctions, the relative culpability of client and counsel, the degree to which the party seeking sanctions caused the expenses for which recovery is sought, whether the sanctionable conduct was a conscious disregard of duty, and the general reputation of the individual to be sanctioned. *Id.* at 271; *In re Witt,* 481 B.R. 468, 480 (Bankr.N.D.Ind.2012) (censure was appropriate sanction under Rule 9011 where there was no "conscious disregard of [attorney's] obligations under Rule 9011."); *In re Martinez,* 393 B.R. 27, 41 (Bankr.D.Nev.2008) (public reprimand was sufficient to deter future violations of Rule 9011 based on attorney's "general reputation" for "appear[ing] regularly before [the] court, and ... [being] courteous and civil in all matters.").

The Court does not find that Pergament engaged in a conscious disregard of his duties. Mainly, the Court believes that Pergament's conduct in this case was careless and easily addressed by a change in Pergament's office procedures related to intake and preparation of bankruptcy petitions. Pergament is a respected practitioner before this Court, and the Court is confident that in the future he will conduct sufficiently reasonable investigations under Rule 9011. Based on a consideration of all of the above factors, the Court finds that publication of this Decision is a 596 sufficient*596 sanction against Pergament and WGP pursuant to Rule 9011, and it is within this Court's discretion to decline the imposition of monetary sanctions for violation of those provisions.

The Court finds that WGP is jointly and severally liable for Pergament's sanctions pursuant to Rule 9011 because no extraordinary circumstances exist that would exclude the law firm from liability. *See* Rule 9011(c)(1)(A).

## ii. Bad faith and sanctions pursuant to 11 U.S.C. § 105, the Court's inherent power and 28 U.S.C. § 1927

Desiderio argues that, even if the delay in amending the schedules did not violate Rule 9011, it unreasonably and vexatiously multiplied the proceedings in violation of 28 U.S.C. § 1927, and could be subject to sanctions pursuant to 11 U.S.C. § 105 and this Court's inherent power because Pergament's conduct was in bad faith, vexatious, wanton, or oppressive. Desiderio also asserts that Pergament engaged in discovery misconduct and filed frivolous motions.

With regard to § 105, § 1927 and this Court's inherent power to sanction, Pergament responds that bad faith is required under each theory, and a finding of bad faith sufficient to dismiss the petition does not necessarily include a finding of bad faith on the part of the attorney sufficient to impose sanctions. *In re HBA E., Inc.,* 101 B.R. 411, 418 (Bankr.E.D.N.Y.1989).

11 U.S.C. § 105 provides that:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
*Id.*

Section 105 may provide a basis to impose sanctions, but only against bad-faith conduct and only when it is tied to a specific provision of the Bankruptcy Code, "rather than to further the purposes of the Code generally ... and not merely [tied] to a general bankruptcy concept or objective." *In re Smart World Technologies, LLC,* 423 F.3d 166, 184 (2d Cir.2005) (internal quotation marks and citations omitted).



Desiderio v. Parikh, (In re Parikh) 508 B.R. 572 (Bankr. E.D.N.Y. 2014)

A court may use 28 U.S.C. § 1927 to sanction attorneys for bad-faith conduct that is not necessarily "entirely without merit" or tied to a specific Code provision, but which unnecessarily delays the proceedings. 28 U.S.C. § 1927 provides that:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

"The purpose of the statute is to deter unnecessary delays in litigation." *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986) (quoting H.R.Conf.Rep. No. 1234, 96th Cong., 2d Sess. 8, reprinted in 1980 U.S. Code Cong. & Ad. News, 2716, 2782); *See Hudson Motors P ' sh i p v. Crest Leasing Enterprises, Inc.,* 845 F.Supp. 969, 978–79 (E.D.N.Y.1994) (describing non-exclusive list of examples of conduct that violates § 1927). Courts within the Second Circuit construe § 1927 "narrowly and with great caution, so as not to stifle the enthusiasm or chill the creativity that is *597 the very lifeblood of the law." *Mone v. Com is. of Internal Revenue,* 774 F.2d 570, 574 (2d Cir.1985)(internal citations omitted). The imposition of sanctions pursuant to 28 U.S.C. § 1927 is discretionary, and courts may decline to award sanctions even where conduct has unreasonably or vexatiously multiplied the proceedings in the interest of justice, such as when the party seeking sanctions is primarily responsible for the multiplication of the proceedings. *Oliveri,* 803 F.2d at 1279 (reversing award of sanctions where moving party caused the delay in proceedings).

A bankruptcy court also "has inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons." *In re 680 Fifth Ave. Associates,* 218 B.R. 305, 323 (Bankr.S.D.N.Y.1998). In the Second

Circuit, inherent power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes. *Wolters Kluwer Fin. Servs., Inc. v. Scivantage,* 564 F.3d 110, 114 (2d Cir.2009); *Sierra Club v. U.S. Army Corps of Eng'rs,* 776 F.2d 383, 390 (2d Cir.1985) ("The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice."). Specifically, "[c]onduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney." *Wolters Kluwer Fin. Servs. ,* 564 F.3d at 114.

Sanctions under § 105, § 1927, and the Court's inherent power all require bad faith, and the bad faith analysis under each is generally the same requiring clear and specific findings of bad faith. *Oliveri,* 803 F.2d at 1273 ("[W]e hold today that an award made under § 1927 must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power. Indeed, the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is, as noted above, that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.") (internal citations omitted); *In re Negosh,* 06–CV–5617 (JS), 2007 WL 2445158 at *10 (E.D.N.Y.2007) ( "In imposing sanctions pursuant to Section 105(a), courts have required a showing of bad faith similar to that required in imposing sanctions under the court's inherent power."); *In re Smith,* BR 896–80189–478, 2011 WL 222146 at *3 (E.D.N.Y. Jan. 21, 2011) (sanctions were a "close call" but the court declined to sanction under 28 U.S.C. § 1927 where it could not "state with certainty that Appellants acted in bad faith"); *But see Wilder v. GL Bus Lines,* 258 F.3d 126, 130 (2d Cir.2001) (requiring bad faith, negligence or recklessness in

Desiderio v. Pergament (In re Pergament), 508 B.R. 544 (Bankr.E.D.N.Y. 2014)

performing responsibilities as an officer of the court) (citing *United States v. Seltzer,* 227 F.3d 36, 40 (2d Cir.2000)).

The Court declines to sanction Pergament pursuant to either its inherent power, 28 U.S.C. § 1927, or § 105 because the record does not allow a specific, clear finding of bad faith. The circumstances of this case do not support inferring bad faith; Pergament made no affirmative misrepresentations to the Court and the petition as whole was not so utterly without merit that bad faith can be presumed. Nor is the Court prepared to find that Pergament's conduct rose to the level of negligence or recklessness.

Further, under 28 U.S.C. § 1927, even if the Court were to find that Pergament acted "unreasonably or vexatiously," it cannot find that his conduct was the cause of the "multiplication" of these proceedings.*598 To the contrary, if anyone is to blame for the overly litigious nature of these proceedings, it is Desiderio. Desiderio's counsel has been more than a zealous advocate in this case and his conduct in seeking to collect sanctions and attorneys' fees from the Debtor, Meena and their counsel at every turn has bordered on the fanatical. As this Court previously found, the Debtor filed this case in bad faith, and his conduct in this case warranted a denial of discharge, which is the one of the most severe penalties to be imposed on a Chapter 7 debtor. To the extent Desiderio complains of Pergament's conduct during discovery, that misconduct was addressed by the prior monetary sanctions awarded against him, as well as the decision by Judge Eisenberg to limit the parties' use of certain evidence at trial.

To date, according to this Court's calculations, Desiderio has total pre-petition judgments against the Debtor for over $152,675.62, including interest, all stemming from ***actual damages*** of $76,143.97.

[11] He also obtained a monetary award in the bankruptcy case jointly and severally against Debtor, Meena, Pergament and WGP in the

amount of $6,758.10. This means that Desiderio has at least obtained judgments against the Debtor, on account of legal fees, expenses and/or sanctions, in the amount of approximately $83,289.75. He also seeks an additional $128,635.83 in pre-petition legal fees that have not been reduced to judgment, which means that, not including what he seeks in this motion for sanctions, he has already sought $211,925.58 in legal fees in connection with only $76,143.97 in actual losses. (Attachment to Claim # 1–1). In this Motion, Desiderio seeks an additional $253,953.69 in legal fees for his work in the bankruptcy case, which means that he seeks a total of $465,579.27 in fees, almost ten times the amount of his actual damages. [AP Dkt # 191–26].

> [11] Desiderio was able to offset this loss by obtaining a $30,000 judgment in a legal malpractice suit against the attorney who represented him negotiating the promissory note and lease, so Desiderio's true damages are only $46,143.97.

The Court is not suggesting that Desiderio was not entirely within his rights to seek and obtain monetary relief against the Debtor, Meena and Pergament, but it also will not grant Desiderio the relief he seeks against Pergament for unnecessary multiplication of these proceedings under 28 U.S.C. § 1927.

### iii. *Taxation of costs*—28 U.S.C. § 1920

Section 1920 sets forth examples of the types of costs that may be shifted to an opposing party if costs are in fact shifted, such as filing, transcription, expert witness and other fees associated with the litigation. 28 U.S.C. § 1920. Section 1920 does not, however, create a basis for shifting costs. It merely enumerates and limits the costs that may be taxed when a court *does* shift costs. *See* ("Section 1920 enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54(d). It is

Desiderio v. Pergament, 508 B.R. 542 (Bankr. E.D.N.Y. 2014)

phrased permissively because Rule 54(d) generally grants a federal court discretion to refuse to tax costs in favor of the prevailing party.")

In proceedings governed by the Federal Rules of Civil Procedure, § 1920 is read in conjunction with Fed.R.Civ.P. 54(d)(1), which states that " costs—other than attorney's fees— *should* be allowed to the prevailing party." (emphasis added). However, the Bankruptcy Rules do not incorporate Fed.R.Civ.P. 54(d) into bankruptcy proceedings. Instead, Fed. R. Bankr.P. 7054(b), states that "[t]he court *may* allow costs to the prevailing party except when a statute of the

599  United States *599 or these rules otherwise provides." Fed. R. Bankr.P. 7054(b) (emphasis added)

Desiderio seeks relief under 28 U.S.C. § 1920, but did not cite to Rule 7054. Even if he did cite to it, cost-shifting under that Rule is discretionary. A prevailing party is not necessarily entitled to cost-shifting in bankruptcy. Several other statutes allow for the costs defined in 28 U.S.C. § 1920 to be shifted in bankruptcy proceedings, but none apply here. *See* 11 U.S.C. § 110(j)(1) and (4); § 303(i); § 362(k)(1); § 363(n); § 502(b); § 506(b); § 523(d); § 526(a)(3); § 707(b)(4)(A) and (b)(5)(A); Fed. R. Bankr.P. 7041, 7068 and 8014. Absent some more specific cost-shifting statute relevant to these proceeding which *require* the Court to shift costs, the Court will not do so. For all of same reasons described earlier in this Decision to support this Court's denial of sanctions against Pergament under 28 U.S.C. § 1927, this Court declines to tax costs against Pergament or the Debtor in this case. Desiderio's legal fees and expenses in this case are partly attributable to Desiderio's legitimate concerns in this case, but largely attributable to his own litigiousness. If, in fact, Desiderio has a contractual basis to collect reasonable legal fees and expenses in connection with collection of his debt, he can do so outside of the context of these proceedings.

## iv. *Damages caused by the increase in New York's homestead exemption*

Finally, Desiderio seeks $100,000.00 in damages from WGP and Pergament resulting from the increase in the New York homestead exemption during the pendency of this case, from $50,000 to $150,000 in January of 2011. Desiderio argues that he would have been able to satisfy his pre-petition judgment lien(s) from substantial equity in the Debtor and Meena's home if this case had not been delayed as a result of the misconduct in this case by the Debtor, Meena, Pergament and WGP. Desiderio does not cite any authority for the premise that he may recover damages caused by an increase in the Debtor's available homestead exemption.

Desiderio's request for damages due to the change in the New York homestead exemption during the pendency of this case is denied. First, were there to be a sale of the real property in this case by the Trustee and subsequent distribution to creditors from the non-exempt equity, it is the homestead exemption *on the date of filing* that would be relevant, not on any subsequent date. *See* 11 U.S.C. § 522(b)(3). Second, it is only within the bankruptcy context, specifically § 522(f) of the Bankruptcy Code, that the homestead exemption can be used to avoid the fixing of a judgment lien to the extent that it impairs the homestead exemption. Outside of bankruptcy, a judgment debtor cannot use the homestead exemption to come ahead of or avoid payment of a judgment lien, if there is a surplus above consensual liens, upon foreclosure by a mortgagee. *See First Federal Savings and Loan Assn . v. Brown*, 434 N.Y. S.2d 306 (N.Y.App.Div. 4th Dept.1980). Even if the Court were to attribute the substantial delays in administering this case to the Debtor, Meena, Pergament and /or WGP, it could not find that the change in the New York homestead exemption caused any monetary damage to Desiderio. Nor can this Court find any authority,

Desiderio v. Pergament, 508 B.R. 522 (Bankr. E.D.N.Y. 2014)

and Desiderio has cited to none, to impose damages for such a change in the law during the pendency of a bankruptcy case.

## B. Sanctions against the Debtor

In the Motion, Desiderio seeks to impose monetary sanctions against the Debtor in an amount equal to all of Desiderio's *600 legal fees and expenses incurred in connection with this bankruptcy proceeding. Initially, Desiderio contends that he is entitled to such fees and expenses under the terms of the contract entered into by the Debtor and Desiderio pre-petition. Next, he cites to 11 U.S.C. § 105 and 28 U.S.C. § 1920, and argues that sanctions are appropriate because the Debtor filed the petition in bad faith, engaged in discovery misconduct, filed frivolous motions, and lied at his § 341 meeting. Pergament responds that the finding of bad faith sufficient to dismiss the Chapter 7 Petition does not automatically require sanctions.

First, Desiderio's claim for legal fees and expenses against the Debtor in this case under a pre-petition contract theory fails. Generally, only an *oversecured* creditor is entitled to a claim for legal fees and expenses incurred during the pendency of the bankruptcy case. *See* 11 U.S.C. § 506(b). Even then, the allowance by the bankruptcy court of post-petition legal fees and expenses of an oversecured creditor is only relevant as part of the *claims allowance* process. In this case, the Trustee has indicated that there will be no distribution to creditors, secured or unsecured, and therefore there is no point in allowing or disallowing claims in this case. This Court has already denied the discharge in this case and so the bankruptcy discharge will pose no bar to Desiderio pursuing the Debtor outside of bankruptcy for any legal fees and expenses that he may be entitled to under the contractual agreements between the parties.

Second, the Court declines to impose further monetary sanctions against the Debtor under the other theories asserted by Desiderio. Although the Court recognizes that it made specific findings of bad faith conduct by the Debtor in connection with the filing of the Chapter 7 Petition, it is clear in this case that the imposition of monetary sanctions against the Debtor at this stage of the proceedings will serve no purpose. First, the Debtor has already received the ultimate sanction for his conduct in connection with this bankruptcy case: the denial of discharge. At the conclusion of these proceedings – nearing seven years in duration – the Debtor will have received no relief in the form of a bankruptcy discharge. Although denial of discharge does not automatically preclude sanctions under Rule 9011(b)(1) for filing a petition for an improper purpose, in this case, additional sanctions would not add any deterrence value. Second, the record in this case reflects that the Debtor is no longer living in the United States, and perhaps is living in India. Any monetary sanctions issued by the Court at this point might be largely unenforceable and/or uncollectible. Nonetheless, as a result of denial of the discharge, Desiderio is free, upon this case closing, to pursue the Debtor in a non-bankruptcy forum for any and all damages to which he believes he is entitled. Finally, the Court will not impose costs against the Debtor pursuant to 28 U.S.C. § 1920 for the same reasons explained earlier in this Decision with respect to imposition of costs against Pergament.

## C. Sanctions against Meena

The Court finds that the only possible basis to impose sanctions upon Meena, a non-debtor and non-attorney, in this case would be pursuant to this Court's inherent power.

[12] A non-party may only *601 be sanctioned pursuant to the Court's inherent power if they (1) violate a specific Court order or (2) act in bad faith, have a substantial interest in the litigation, and play a substantial role in the litigation. *Amerisource Corp. v. Rx USA Int'l Inc.,* 02–CV–2514 (JMA), 2010 WL 2730748 at *5–6 (E.D.N.Y. July 6, 2010) *aff'd sub nom. New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.,* 432 Fed.Appx. 25 (2d Cir.2011)



Desiderio v. Parkale...    508 B.R...    55 B.R...3...(...D.N.Y. 2014)

(sanctioning majority shareholder and chief executive who managed litigation and represented the party-defendant "at every step") (citing *Helmac Products Corp. v. Roth (Plastics) Corp.,* 150 F.R.D. 563, 564–68 (E.D.Mich.1993)); *Helmac,* 150 F.R.D. at 564–65 (sanctioning owner and principal of debtor who was "as much involved in the litigation as any party would be"). Courts have occasionally held that other non-parties are subject to sanctions under *Helmac. See In re Novak,* 932 F.2d 1397, 1408 (11th Cir.1991) (nonparty insurers have real stake in the litigation because they are financially liable for judgments against the insured); *Bartos v. Pennsylvania,* CIV. 1:08–CV–0366, 2010 WL 1816674 (M.D.Pa. May 5, 2010) (finding that witnesses substantially participated in employment discrimination action by engaging in egregious conduct like lying and forwarding disparaging reports about Plaintiff to employer and had a substantial interest because they were still employed by Defendant); *In re White,* 2:07CV342, 2013 WL 5295652 (E.D.Va. Sept. 13, 2013) (Neo–Nazi leader who sent packages containing racial epithets, swastikas, and threats to Plaintiffs in housing discrimination action and threatened and posted personal information of Plaintiff's counsel and his wife to the internet substantially participated in the litigation to subject him to inherent power sanctions).

12    Only attorneys may be sanctioned pursuant to 28 U.S.C. § 1927, and only *parties* or attorneys may be sanctioned pursuant to Rule 9011. Section 105 sanctions may only be applied in order to further some other Code provision, in this case, § 707(b)(4)(C) and (D), and those sections are directed only to debtors' attorneys. As discussed above, the Court will not shift costs under 28 U.S.C. § 1920.

With regard to Meena's alleged substantial interest in these proceedings, Desiderio argues that Meena is the Debtor's spouse, she funded his case, and

assisted the Debtor "every step of the way." (Sanctions Motion at 23). With regard to her substantial participation in this case, Desiderio argues that Meena (1) was a "willful participant" in fraudulent conveyances by the Debtor, (2) made false statements under oath, (3) submitted an affidavit she knew to be false regarding the debtor's income, (4) "engaged in dilatory, evasive and contemptuous conduct intended to hinder, impair and impede Plaintiff," and (5) funded Debtor's bankruptcy case. (Sanctions Motion at 20–23).

Pergament asserts that Desiderio's allegations against Meena are irrelevant because they did not involve the violation of a Court order and because Meena did not act in bad faith.

The Court declines, under the facts of this case, to sanction Meena. Unlike the cases above, Desiderio points to no "substantial interest" by Meena other than her status as a spouse who funded her husband's case and assisted him. Desiderio does not point to a single case where a spouse, or any family member, was held to have a substantial interest in a proceeding sufficient to sanction. If the Court adopts Desiderio's argument that Meena has a "substantial interest" in this proceeding sufficient to subject her to non-party sanctions absent violation of a Court order, the Court would be expanding its jurisdiction over debtors' spouses well beyond the confines of existing law. This the Court declines to do.

Even if her conduct was sufficient to create a substantial interest in this case, Meena did not substantially participate in the proceeding. Meena testified, in person *602 and via affidavit, and was the subject of subpoenas. This alone is insufficient to establish sufficient participation. Her participation in the fraudulent conveyances outside of these proceedings does not implicate participation within the Court proceedings. In fact, even if this Court had jurisdiction to sanction



Meena, it would not do so because it can point to no conduct by Meena within these proceedings that would subject her to sanctions.

Because Meena lacked substantial interest and did not substantially participate, the Court may only sanction her pursuant to its inherent powers if she violated a specific Court order. The only order Meena may arguably have violated was Judge Eisenberg's November 4, 2008 Order, and that Order delineated the specific sanctions that would apply if it was violated. Sanctions pursuant to that Order are addressed in this Decision, and this Court will not address Meena's alleged violation of that Order pursuant its inherent powers.

## D. Motion to Enter Judgment on Judge Eisenberg's November 4, 2008 Order

On October 10, 2007, Desiderio filed a motion for permission to conduct Rule 2004 examinations of the Debtor and Meena. [BK Dkt # 14]. Desiderio sought Rule 2004 discovery "to investigate the truthfulness of the Debtor's claims with respect to his salary and ownership interests in Health Heaven, Inc., Dave's Health Foods, Kuliwala Food Corporation, and/or any other business interest which the Debtor failed to disclose in his petition and schedule." [BK Dkt # 14, ¶ 40]. He requested an examination of the Debtor and Meena regarding the circumstances surrounding: (a) their acquisition of Dave's Health Foods and/or any other business ownership interest; (b) their financial status; (c) the acquisition and disbursement of the $300,000 mortgage obtained from Meera Management, LLC; and (d) such other matters bearing on the potential discovery of assets of the Debtor's estate. [BK Dkt # 14, ¶ 41].

Over the objection of the Debtor and Meena, Judge Rosenthal entered the Rule 2004 order on November 29, 2007. [BK Dkt # 31]. Desiderio served Rule 2004 discovery requests on November 30, 2007, and then a supplemental request on February 14, 2008.

In January, 2008, the Debtor and Meena produced partial responses and objections to the initial Rule 2004 subpoenas, and on February 19, 2008, filed a motion for protective order arguing that the document requests were irrelevant, overbroad and overburdensome. [BK Dkt # 43]. Desiderio opposed the motion for protective order and moved to hold the Debtor and Meena in contempt for failure to comply with the Rule 2004 subpoenas. [BK Dkt # 47]. Shortly thereafter, on March 27, 2008, Desiderio filed a complaint against the Debtor seeking to dismiss the bankruptcy case as a bad faith filing, to deny the Debtor's discharge and/or determine the debt owed to Desiderio to be non-dischargeable. *See* 11 U.S.C. §§ 707, 727 and 523. The basis for the complaint—26 pages in total—was the Debtor's alleged failure to disclose a variety of business interests in this petition and schedules, as well as other material misstatement and/or omissions. The Court notes that this appears to be the same subject matter on which Desiderio sought Rule 2004 discovery.

At a hearing held on May 29, 2008, Judge Eisenberg denied the Debtor and Meena's motion for protective order, and granted Desiderio's motion for sanctions against the Debtor and Meena for their failure to comply with the Rule 2004 subpoenas. Judge Eisenberg found that the 603 *603 filing of the adversary proceeding on March 27, 2008 did not necessarily preclude the Debtor's and Meena's obligations to comply with a previously issued Rule 2004 order. Prior to entry of the Order memorializing this ruling, on June 26, 2008, the Debtor and Meena moved to reconsider the Court's decision. [BK Dkt. # 57]. At the same time, the Debtor filed a motion in the adversary proceeding to compel discovery that had commenced under the Federal Rules of Civil Procedure. [AP Dkt # 6]. The Debtor's motion to compel discovery in the adversary proceeding was denied by Order, dated July 28, 2008. [AP Dkt # 10].

Desiderio v. Parikh (In re Parikh), 508 B.R. 572 (Bankr. E.D.N.Y. 2014)

On September 4, 2008, Desiderio moved to compel discovery in the adversary proceeding, [AP Dkt # 11], and on October 18, 2008, Judge Eisenberg entered an Order requiring the Debtor to respond to discovery requests in the adversary proceeding by October 24, 2008. [AP Dkt # 19].

On September 29, 2008, the Debtor and Meena provided Desiderio with supplemental document responses to the Rule 2004 discovery.

On November 4, 2008, Judge Eisenberg denied the Debtor and Meena's motion for reconsideration and entered an Order granting Desiderio's March 10th contempt motion and sanctioning the Debtor and Meena $100 per day *payable to Desiderio* "for every day as of the date of [the] Order until they produce the documents demanded pursuant to the Rule 2004 Subpoena, Examination Order, and the Supplemental Document Request, and appear for examination ..."

13 [BK Dkt. # 72]. Two weeks later, on November 18, 2008, Desiderio filed a motion for summary judgment in the adversary proceeding arguing that based on the facts as established by his voluminous exhibits, judgment should enter in his favor in the adversary proceeding as a matter of law. The motion for summary judgment was denied by Order, dated April 2, 2009.

---

13  The November 4, 2008 Sanctions Order also sanctioned the Debtor, Meena and WGP, jointly and severally, for certain attorney's fees and costs incurred by Desiderio, in the sum of $6,758.10. It is this Court's understanding that the $6,758.10 sanction was paid and the Desiderio is not seeking judgment for that portion of the sanctions awarded by Judge Eisenberg in the November 4, 2008 Sanctions Order.

On January 23, 2009, Desiderio filed a motion in the adversary proceeding to strike the Debtor's answer and enter default against the Debtor for his failure to comply with the Rule 2004 subpoena(s). In that motion, Desiderio also sought to impose further sanctions against the Debtor for this alleged failure to comply, including apprehension and incarceration by the United States Marshal Service. [AP Dkt # 32]. On March 17, 2009, the Debtor filed a motion to dismiss the adversary proceeding for failure to comply with discovery under the Federal Rules of Civil Procedure. [AP Dkt # 36]. On April 2, 2009, Judge Eisenberg entered an Order prohibiting either party from producing at trial any document or record that was not previously produced to opposing counsel. [AP Dkt # 42]. Judge Eisenberg specifically deferred ruling on Desiderio's request for monetary and other sanctions for failing to comply with the Rule 2004 subpoenas, and that portion of Desiderio's motion, [AP Dkt# 32], was pending at the time of the trial conducted by this Court from November 2009 through June 2010.

Although not articulated in this Court's Decision after Trial, it was this Court's belief that the entry of a judgment denying the Debtor's discharge sufficiently addressed and mooted Desiderio's request for civil contempt sanctions against the 604 Debtor for failing to comply with *604 Rule 2004 discovery requests. In addition and more significantly, prior to trial Judge Eisenberg had already issued an order prohibiting the use at trial of any document not previously exchanged in discovery. Regardless of whether the Debtor and Meena had produced each and every document requested in the Rule 2004 subpoenas, they claim to have given Desiderio all of the documents in their possession and control that were responsive to the subpoenas. Moreover, the documents sought in the Rule 2004 subpoenas were intended, among other things, to provide Desiderio with the very information he used to successfully prosecute his § 727 objection to discharge. This alone indicated to this Court that the Rule 2004 examinations had

Desiderio v. Purcariu (In re Purcariu), 508 B.R. 553 (Bankr. E.D.N.Y. 2014)

served their intended purpose. It is also this Court's belief that, although early on in the adversary proceeding Judge Eisenberg found it appropriate to continue to enforce the Rule 2004 subpoenas, it is generally appropriate upon the filing of an adversary proceeding—on the same facts that are the subject of Rule 2004 subpoenas —to abandon enforcement of the Rule 2004 subpoena—which is generally very broad in scope —and defer to the discovery rules under the Federal Rules of Civil Procedure with all its procedural safeguards. *In re Enron Corp.,* 281 B.R. 836, 840 (Bankr.S.D.N.Y.2002) ("[O]nce an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004"); *See also In re Glitnir banki hf.,* 08–14757 SMB, 2011 WL 3652764 at *4 (Bankr.S.D.N.Y. Aug. 19, 2011) (explaining the 'pending proceeding' rule).

On June 28, 2011, following this Court's May 24, 2011 Decision after Trial granting the relief sought by Desiderio in the adversary proceeding and denying the Debtor's discharge, Desiderio renewed his request for a judgment memorializing the sanctions of $100 per day against the Debtor and Meena pursuant to Judge Eisenberg's November 4, 2008 Order. [AP Dkt # 191]. In the motion, Desiderio requested that this Court enter judgment against the Debtor and Meena in the total amount of $11,300 representing sanctions of $100 per day from November 4, 2008 through February 26, 2009 (the date the Debtor and Meena appeared for Rule 2004 depositions). This Court denied the motion, without reasons, by Order, dated March 13, 2012, frustrated by Desiderio's seemingly insatiable appetite for sanctions and contempt even after he successfully prosecuted litigation against the Debtor. Desiderio appealed.

Upon remand by the District Court and a directive to provide reasoning to support denial of the request, this Court directed Desiderio's counsel to file, and settle on the Debtor and his counsel, a proposed judgment, along with a detailed accounting of the proposed judgment amount. [AP Dkt # 211]. Desiderio submitted a proposed judgment seeking monetary sanctions of $93,100.00 against the Debtor and Meena, jointly and severally, based on a calculation of $100 a day from November 4, 2008 to May 24, 2011, the date on which this Court denied the Debtor's discharge. [AP Dkt # 211]. Desiderio contends that the Debtor and Meena did not appear for their Rule 2004 examination until February 26, 2009, and that they never completed their responses to the document requests. Desiderio argues that the sanctions should continue to run until the Debtor and Meena produce the requested documents, but concedes that it is appropriate to terminate sanctions as of the date the discharge was denied. Desiderio also requests interest on the judgment from May 24, 2011. The $93,100 monetary judgment sought by Desiderio *605 far exceeds the amount originally sought in the motion.

The Debtor and Meena objected to the proposed judgment. [AP Dkt # 212]. First, they point out that they appeared on February 26, 2009 for their Rule 2004 Examinations, and Desiderio does not seem to dispute this fact. Second, as to document production they argue that they were in "substantial compliance" with the Rule 2004 discovery request when they produced documents to Desiderio on September 29, 2008. Finally, the Debtor and Meena argue that any alleged lack of response "did not prevent Desiderio from successfully prosecuting the adversary proceeding and obtaining a judgment denying Sunil's discharge" [Doc. # 212, ¶ 5], and therefore, the imposition of sanctions is not warranted.

As recognized by Judge Seybert on appeal, this Court has discretion in deciding whether and in what amount to award a monetary judgment to Desiderio based on Judge Eisenberg's November 4, 2008 Order. The imposition of civil contempt sanctions similar to the one imposed in the November 4, 2008 Order may serve the dual purposes of compelling future compliance with court orders, and compensating the aggrieved

party. *Paramedica Electromedicina Comercial Ltda. v. GE Med . Sys. Info . Tech . , Inc.,* 369 F.3d 645, 657 (2d Cir.2004) (citing *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1,5 (2d Cir.1989)); accord *Chere Amie, Inc. v. Windstar Apparel Corp.,* 175 F.Supp.2d 562, 566 (S.D.N.Y.2001) ( "The purpose of civil contempt sanctions is coercive and compensatory rather than punitive.") (citing *Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995)).

Any monetary award under the Order should consider the purpose of the sanction and should be narrowly tailored to achieve that purpose. The purpose of compensating the aggrieved party, in this instance, was achieved. In the November 4, 2008 Order, Judge Eisenberg sanctioned the Debtor, Meena and WGP, jointly and severally, $6,758.10 which represents Desiderio's attorney's fees and costs incurred relative to the proceedings at that time. Pursuant to separate Order, dated November 4, 2008, Judge Eisenberg awarded an additional $2,470 in attorney fees to Desiderio. According to Pergament, a total of $9,228.10 has been paid to Desiderio under the November 4, 2008 orders. In addition to these awards, Desiderio claims to be entitled to $128,635.83 in pre-petition state court legal fees that were, according to the proof of claim filed in this case, awarded to Desiderio but not yet reduced to judgment when the bankruptcy was filed. Upon closing of this case, Desiderio is free to pursue collection of those amounts, in addition to any further legal fees expenses to which he believes he is entitled.

As for the coercive element to civil contempt sanctions, this Court finds that little to no purpose would be served in entering a monetary judgment against the Debtor and Meena at this stage in the proceedings. First, although the Debtor admits that he and Meena did not appear for Rule 2004 depositions until February 26, 2009—nearly four months after the November 4th Order—the Court cannot find that such delay was entirely attributable to the Debtor and Meena. Desiderio

has not directed this Court to any specific date after November 4, 2008, that his counsel was ready to in fact proceed with a deposition at which the Debtor and Meena failed to appear. The record reflects that Pergament did, in fact, suggest Rule 2004 deposition dates in early November 2008 which apparently did not come to fruition. Then in January 2009 Pergament suggested February 17 and 19, 2009. Apparently Desiderio's counsel was not available those days and the agreed date was moved to *606 February 26, 2009, at which time the depositions proceeded. Entry of a judgment enforcing a $100 per day sanction is a severe penalty. This Court cannot find that the delay in appearing for the Rule 2004 deposition was solely attributable to the Debtor and Meena and as a result will not enter judgment for same.

Finally, to the extent Desiderio requested Rule 2004 document discovery to investigate the Debtor's "right to a discharge" in this case, he has succeeded. Fed. R. Bankr.P.2004(a). To the extent Desiderio pursued Rule 2004 discovery in relation to "any matter which may affect the administration of the debtor's estate," that purpose also has been served. On December 9, 2011, the chapter 7 trustee filed a "report of no distribution" indicating that he "made a diligent inquiry into the financial affairs of the debtor[ ] and the location of property belonging to the estate; and that there is no property available for distribution from the estate." This bankruptcy case is, except for this motion, ready to be closed without a discharge. If Desiderio wants to continue to seek information related to the Debtor's assets in efforts to collect on his various judgments, he can do so outside the jurisdiction of this Court. For these reasons, the Court declines to enter monetary judgment awarding daily civil contempt sanctions payable to Desiderio for the Debtor and Meena's alleged failure to comply with Rule 2004 subpoenas.

## II. Motion to relieve Pergament and WGP as Debtor's Counsel in the Adversary Proceeding

Desiderio v. Parikh, 508 B.R. 640 (Bankr. S.D.N.Y. 2014)

On August 19, 2011, Weinberg, Gross & Pergament LLP ("WGP") moved to be relieved as counsel for the Debtor–Defendant in the adversary proceeding. [Doc # 197].

[14] The Court has received no opposition to this motion. In support of the motion, Pergament filed an Affirmation stating that he has been unable to contact Sunil Parikh for at least sixty days and believes he may have left for India. Absent opposition from any party, the Court will enter an order granting this motion.

[14] In the motion, WGP does not seek to be relieved as the Debtor's counsel in the main bankruptcy case. Nor does it seek to be relieved as counsel to Meena.

## CONCLUSION

For the foregoing reasons, the Court grants Desiderio's Motion for Sanctions against Pergament pursuant to Rule 9011(b)(3) but declines to impose any monetary relief for such violation. The Court denies the remainder of the relief sought against Pergament, the Debtor and Meena. Further, the Court declines to enter any monetary award in connection with Judge Eisenberg's November 4, 2008 Order. Finally, the Court grants Pergament and WGP's motion to be relieved as counsel to the Debtor in the above-captioned adversary proceeding.

Orders consistent with this Decision will issue forthwith.



CASE NO. 06-13354-BKC-PGH

United States Bankruptcy Court, S.D. Florida

# In re Henebury

361 B.R. 595 (Bankr. S.D. Fla. 2007)

Decided Mar 16, 2007

CASE NO. 06-13354-BKC-PGH.

596 March 16, 2007. *596

Stuart A. Young, West Palm Beach, FL, for Debtors.

Michael R. Bakst, West Palm Beach, FL, for Trustee.

Heidi A. Feinman, Office of the U.S. Trustee, Miami, FL, for U.S. Trustee.

597 *597

## ORDER DISMISSING CHAPTER 7 CASE UNLESS DEBTORS MOVE TO CONVERT TO CHAPTER 13 WITHIN TEN DAYS OF ENTRY OF THIS ORDER

PAUL G. HYMAN, Bankruptcy Judge.

**THIS MATTER** came before the Court for evidentiary hearing on January 25, 2007 upon the United States Trustee's ("UST") *Amended Motion to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(1)(b)(3)* ("Motion") filed on November 17, 2006. On December 19, 2006, Debtors filed a *Response to UST's [Motion]*.

## BACKGROUND

Mark Andrew Henebury ("Mr. Henebury") and Yvette Joan Henebury ("Mrs. Henebury") (collectively, "Debtors") filed a joint petition for Chapter 7 bankruptcy relief on July 21, 2006.

2 Debtors are married and have three minor children. The Debtors moved to Florida *2 from Massachusetts in May 2005. Contemporaneously with the filing of their petition, Debtors filed their Schedules, Statement of Financial Affairs, and Official Form B22A: Statement of Current Monthly Income and Means Test Calculation ("Means Test"). The Debtors' Means Test shows annualized Current Monthly Income ("CMI") in the amount of $96,768.24 which is above the median income for a family of five residing in Florida[1]. Debtors' Means Test indicates that Debtors had negative monthly disposable income of $1,128.07 after calculating deductions to CMI. Thus, although the Means Test shows that Debtors had above median income, a presumption of abuse did not arise pursuant to 11 U.S.C. § 707(b)(2).

> [1] At the time of filing, the applicable median income for a family of five residing in Florida was $68,125.00.

The Debtors' Schedules show that as of the petition date, the Debtors owned real property located in Lake Worth, Florida valued at $295,000.00 ("Lake Worth Property") with a mortgage of approximately $233,237.81. Debtors claimed that the Lake Worth Property was exempt as their homestead. However at trial, Mr. 598 Henebury *598 testified that the family no longer resides at the Lake Worth Property, and that the family now resides in Port Orange near Daytona Beach, Florida.[2] Mr. Henebury testified that he has 3 not *3 made mortgage payments on the Lake Worth Property since June 2006.[3] Mr. Henebury



In re Henebury, 361 B.R. 595 (Bankr. M.D. Fla. 2007)

further testified that the Debtors hoped to keep the home "and sell it and obviously use the proceeds to buy another home."

<sup>2</sup> A Notice of Change of Address filed September 28, 2006 indicated Debtors' address as 300 N. Atlantic Ave., Daytona Beach. A subsequent Notice of Change of Address filed October 11, 2006 shows Debtors' current address as 5338 Plantation Home Way, Port Orange, Florida.

<sup>3</sup> On August 16, 2006, secured creditor GMAC filed a Motion for Relief from Stay respecting the Lake Worth Property alleging that the Lake Worth Property had been claimed as exempt but was not adequately protected. The Chapter 7 Trustee filed an Objection to GMAC's Motion for Relief from Stay on the basis that there existed non-exempt equity in the Lake Worth Property. On September 12, 2006 the Chapter 7 Trustee also filed an Objection to Debtors' Claim of Exemptions alleging that Debtors improperly claimed both federal and Massachusetts exemptions on their bankruptcy schedules. On September 26, 2006, prior to the hearing scheduled on the matter, GMAC withdrew its Motion for Relief from Stay. On November 2, 2006, the Chapter 7 Trustee withdrew her Objection to Debtors' Claim of Exemptions.

Mr. Henebury also testified that he had not been happy with his job since it was not in the hotel industry in which he had pursued his career. Subsequently when a job in the hotel industry opened in Daytona Beach, he applied and obtained the job. Mr Henebury currently is, and as of the petition date was, employed as an engineer for Fairfield Resorts in Daytona Beach earning an annual salary of $85,000.00.

Debtors provided the UST with revised Schedules I and J on November 7, 2006 ("Proposed Revised Schedules") (Debtor Ex. 2; UST Ex. F). The Proposed Revised Schedules were not filed with

the Court. However they show that the Port Orange residence where the family now resides is rented at a cost of $1,550.00 per month.

In addition to the Lake Worth Property, the Debtors also scheduled a 0.4349% ownership interest in a Disney Vacations Development, Inc. timeshare ("Timeshare") with a listed value of *4 $15,000.00 that was secured by debt in the amount of $12,415.85. On November 30, 2006, Debtors signed a reaffirmation agreement for the Timeshare debt ("Reaffirmation Agreement"). The Reaffirmation Agreement was filed with the Court on December 21, 2006. The UST filed an Objection to the Reaffirmation Agreement. The Court heard the matter on December 27, 2006, and entered an Order Denying Reaffirmation Agreement on December 28, 2006.

Debtors' Schedule D also shows secured debt in the amount of $264.00 for a 1998 Subaru automobile valued at $1,200.00. Debtors listed no unsecured priority claims on Schedule E. Schedule F reflects unsecured nonpriority claims totaling $73,799.46. It is uncontested that essentially all of the debts are consumer/non-business debts.

Mrs. Henebury testified that she was unemployed prepetition because she needed to care for her five year old daughter who had undergone surgery in September 2005. However on Debtors' Schedule I, filed July 21, 2006, in answer to the line 17 directive to describe any increase or decrease in income reasonably anticipated to occur within the year postpetition, Debtors indicated: "Debtor wife will begin a teaching position on 7/25/06 for approximate wages of $39,000 per year." Mrs. Henebury *599 testified that she indeed began working as a teacher at Spruce Creek High School in Port Orange the week after Debtors filed their petition. Debtors' Schedule I, as filed, lists only Mr. Henebury's gross monthly *5 income of $7,122.87 with his net monthly income as $4,836.88. Schedule J reflects total monthly expenses of $5,871.66. Included in these expenses are mortgage payments for the Lake Worth

Property in the amount of $2,403.97, and monthly payments for the Timeshare in the amount of $252.56. Debtors' filed Schedules indicate that as of the petition date Debtors had negative monthly net income in the amount of $576.86.

The Proposed Revised Schedules, which were admitted into evidence but not filed with the Court, list Mrs. Henebury's monthly income as $3,401.66 with net monthly income of $2,875.00. The Proposed Revised Schedules list Debtors' combined net monthly income as $7,711.88. Proposed Revised Schedule J shows monthly expenses of $9,039.66. This expense amount represents an increase of $3,168.00 over the monthly expenses listed in Debtors' Schedule J which was filed on the petition date. Part of the increased expense reflected on Debtors' Proposed Schedule J is due to Debtors' listing expenses for both the Port Orange rental home where the family resides, and the Lake Worth Property where they do not reside and for which they stopped paying the mortgage prior to filing for bankruptcy. The Proposed Revised Schedules indicate that Debtors had negative monthly net income of $1,327.78.

At the January 25, 2007 hearing, Debtors introduced Exhibit 3 which was a second revised Schedule J dated November 30, 2006, that had not been previously filed with the Court ("Second Revised *6 Schedule J"). Second Revised Schedule J shows even further increased expenses for home maintenance, medical expenses, and recreation resulting in total monthly expenses of $10,207.66. However upon questioning, Debtors were unable to substantiate the increased expenses claimed with any documentary proof.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and(b)(2)(A) and (O).

### A. Procedural Posture and Arguments of the Parties

Debtors filed their petition on July 21, 2006 and therefore the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") governs this matter.

Interim Federal Rule of Bankruptcy Procedure 1017(e)(1) states in pertinent part that:

> a motion to dismiss a case for abuse under § 707(b) or (c) may be filed only within 60 days after the first date set for the meeting of creditors under § 341(a), unless, on request filed before the time has expired, the court for cause extends the time for filing the motion to dismiss. The party filing the motion shall set forth in the motion all matters to be considered at the hearing. A motion to dismiss under § 707(b)(1) and (3) shall state with particularity the circumstances alleged to constitute abuse.

Interim Bankr. R. 1017(e)(1)[4] *7

> [4] Administrative Order 05-4 of the United States Bankruptcy Court for the Southern District of Florida adopted the Interim Rules of Bankruptcy Procedure effective October 17, 2005 for application in all cases filed on or after October 17, 2005 which are subject to BAPCPA.

The § 341 meeting of creditors in this case was held and concluded on August 18, *600 2006. Thus pursuant to Rule 1017(e)(1), the sixty day deadline to file a motion to dismiss pursuant to § 707(b)(3) would have expired October 17, 2006. However on October 16, 2007, the UST timely filed an *Amended Agreed Ex-Parte Motion for Order for Extension of Time to File Motion to Dismiss Under 11 U.S.C. § 707(b)(3) and For Extension of Time to Object to Discharge Pursuant to 11 U.S.C. § 727* ("Motion for Extension of Time"). The Court entered the parties' *Agreed Order Granting UST's [Motion for Extension of Time]* which pursuant to the parties' agreement extended the deadlines for filing a

motion to dismiss and a complaint objecting to discharge until November 20, 2006. The UST's Motion seeking dismissal was thus timely filed on November 17, 2006.

The UST's Motion argues with particularity that based upon the totality of circumstances of the Debtors' financial situation, the granting of relief to the Debtors in this case would be an abuse of the provisions of Chapter 7 pursuant to 11 U.S.C. § 707(b)(1) and (3). The UST further argues that the Debtors have the present ability to pay some, if not all, of their unsecured debts based upon Mrs. Henebury's employment as a teacher earning $39,000 per year and based upon the Debtors not making payments for among other things, the Lake Worth Property mortgage and the Timeshare debt. Finally, the UST argues that Debtors' other expenses are *8 overstated.

Debtors' counsel argues that a debtor's ability to pay standing alone is insufficient cause for dismissal pursuant to § 707(b)(3)(B) which looks to the totality of the circumstances of debtor's financial situation to determine if the granting of Chapter 7 relief would be an abuse. Debtors' counsel further argues that Debtors have no ability to pay creditors because their expenses exceed their income.[5]

> [5] Debtors' Response framed the issue as: "When Debtors are uncertain of their ability to pay contractually due payments in the future on secured properties, are those scheduled payments part of the Debtor's current monthly income for purposes of the `means test' of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005?" The Court notes that this statement of the issue is not on point because the UST's Motion does not challenge Debtors' Means Test calculations. The UST's Motion relies on § 707(b)(3), not § 707(b)(2).

In the Court's view, the arguments of counsel raise questions of "what" and "when". First, under BAPCPA what is meant by the totality of the circumstances of the Debtors' financial situation. Second, are post petition events relevant to the determination of whether the granting of relief would be an abuse of the provisions of Chapter 7 based upon the totality of the circumstances of the Debtors' financial situation, when — as in this case — the circumstances of the Debtors' financial situation change over time. Both of these questions require a study of 11 U.S.C. § 707(b) as it has been reconstructed under BAPCPA. *9

## B. 11 U.S.C. § 707(b) 1. BAPCPA's Overhaul of 11 U.S.C. § 707(b)

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 extensively modified § 707(b) which previously provided for dismissal of a Chapter 7 case under circumstances of substantial abuse. The § 707(b) modifications — as the act's title announces — were intended to prevent perceived bankruptcy abuses by Chapter 7 debtors who have the ability to pay some, if not all, of their debts to creditors. *See e.g., In re Singletary*, 354 B.R. 455, 459 (Bankr. S.D. Tex. 2006) ("The abuse that concerned Congress was debtors receiving a full discharge under Chapter 7 when they had regular income that could be used to repay some portion of their unsecured debt in a Chapter 13 plan."); *In re Hardacre*, 338 B.R. 718, 720 (Bankr. N.D. Tex 2006) ("Among the abuses identified by Congress was the easy access to Chapter 7 liquidation proceedings by consumer debtors who, if required to file under Chapter 13, could afford to pay some dividend to their unsecured creditors.") ( *citing* 151 Cong. Rec. S2459, 2469-70 (March 10, 2005)). "While the legislative purpose behind the modifications to section 707(b) is easy to discern, courts have struggled with its application." *In re Wilson*, 356 B.R. 114, 117 (Bankr. D. Del. 2006).



In re Hamilton, 399 B.R. 717, 595 (Bankr. C.D.Cal. 2007)

The pre-BAPCPA version of § 707(b), contained in a single paragraph, was replaced in BAPCPA with seven complex sub-parts. *10 Subsections 707(b)(1)-(3) are germane to this matter.

## 2. 11 U.S.C. § 707(b)(1)

Pre-BAPCPA § 707(b) was retained with significant alterations in § 707(b)(1).[6] Pre-BAPCPA § 707(b) only provided for dismissal of a Chapter 7 case, while § 707(b)(1) now provides for dismissal, or with the debtor's consent, conversion to a case under Chapter 11 or 13. Standing to bring a motion to dismiss under pre-BAPCPA section 707(b) was explicitly denied to anyone but the United States Trustee or the court upon its own motion. Under BAPCPA, standing is now conferred upon any party in interest. The § 707(b) threshold for dismissal has been changed from "substantial abuse" under the pre-BAPCPA version of the statute to "abuse" under BAPCPA.

[6] 11 U.S.C. § 707(b)(1) states:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

Newly added subsections 707(b)(2) and (3) now provide two methods for determining whether or not there is abuse under section 707(b)(1). *Singletary*, 354 B.R. at 459. Section 707(b)(2) requires debtors who seek bankruptcy relief to complete a means test. There now exists a statutory presumption that the granting of Chapter 7 *11 relief to debtors who "fail" the means test would be abusive. Thus pre-BAPCPA § 707(b)'s "presumption in favor of granting the relief requested by the debtor" has been removed, and been replaced with post-BAPCPA § 707(b)(2)'s presumption of abuse against debtors who, as determined by the means test, have sufficient monthly disposable income to repay a portion of their unsecured debts. Section 707(b)(3) provides



Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 117 of 154

In re Henderson, 395 B.R. 599 (Bankr. C.D. Cal. 2007)

for dismissal in cases where the presumption of abuse under the means test does not arise or is rebutted.

## 2. 11 U.S.C. § 707(b)(2) — The Means Test

Section 707(b)(2)(A) provides for the means test and the presumption of abuse for debtors who "fail" the means test. The Statement of Current Monthly Income and *602 Means Test Calculation (Official Form B22A) serves as a template for the means test calculations contained in § 707(b)(2)(A)(i)-(iv). The means test requires debtors to determine their CMI[7] which is the debtor's *12 average monthly income received from all sources in the six month period ending on the last day of the calendar month preceding the commencement of the case. Thus, there is nothing "current" about CMI which by definition is an historical measure of average monthly income. The debtor's CMI must then be compared with the applicable median family income for similarly sized households within the debtor's state of residence. The distinction between the debtor's CMI being above or below the applicable median income is significant for debtors. If the debtor's CMI is below the applicable median family income, the debtor need not complete the remainder of the means test because there is no presumption of abuse for below median income debtors. If the debtor's income is above the applicable median family income, the debtor must complete the remainder of means test.[8]

---

[7] 11 U.S.C. § 101 (10A) states "current monthly income" —

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on —

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

[8] The distinction between above and below median income is also significant in Chapter 13 cases because it determines the applicable plan period (36 — 60 months) and whether standard or actual expenses are to be used to determine disposable income available for plan payments. *See* 11 U.S.C. §§ 1322(d) and 1325(b)(3).



The means test directs above median income debtors to calculate deductions to CMI using Internal Revenue Service ("IRS") national standards for similarly sized households for living expenses (food, clothing, personal care, household supplies), and IRS local standards for housing and utilities, mortgage/rent expense, and transportation expense. To these standard deductions *13 debtors may add other necessary expenses actually incurred for taxes, mandatory payroll expenses, life insurance, court-ordered payments, education expenses for employment or for a physically or mentally challenged child, childcare, healthcare, and tele-communication expenses.

The means test permits debtors to include additional expense deductions for amounts actually expended in several categories such as average monthly amounts actually expended for health insurance, continued contributions to the care of household or family members, disability insurance and health savings accounts, protection against family violence, home energy costs in excess of the specified IRS allowance, limited education expenses for dependent children under 18, additional food and clothing expense with documentation *603 that such expense is reasonable and necessary, and continued charitable deductions.

The last part of the means test provides for deductions to CMI for future payments on secured claims, past due payments or cure amounts on secured claims for property that is necessary to the support of the debtor or the debtor's dependents, payments on priority claims such as alimony and child support, and Chapter 13 administrative expenses. The total of all deductions is subtracted from CMI to determine if a presumption of abuse arises. Such a presumption will arise — *14

> if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of —

> (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or

> (II) $10,000.

11 U.S.C. § 707(b)(2)(A)(i). The debtor may rebut a presumption of abuse by demonstrating special circumstances such as a serious medical condition or a call to active duty in the Armed Forces that justifies additional expense or adjustments to CMI pursuant to § 707(b)(2)(B).

The means test is the embodiment of Congress' intent "that there be an easily applied formula for determining when the Court should *presume* that a debtor is abusing the system by filing a Chapter 7 petition." *In re Fowler*, 349 B.R. 414, 419 (Bankr. D. Del. 2006). The means test has been criticized as "a blind legislative formula that attempts to direct debtors to a Chapter that provides for at least some measure of repayment to unsecured creditors over a period of years. Like any other effort at social or economic legislation, it is not perfect." *In re Barraza*, 346 B.R. 724, 729 (Bankr. N.D. Tex. 2006). "The means test presents a backward looking litmus test performed using mathematical computations of arbitrary numbers, often having little to do with a particular debtor's actual circumstances and ability to pay a portion of debt. Congress has already determined the fairness of application of the means test, and a major objective of the *15 legislation was to remove judicial discretion from the process." *In re Hartwick*, 352 B.R. 867, 868 (Bankr. D. Minn. 2006). The Court notes that the means test's use of national and local standards rather than actual expenses, and historical rather than current actual income "was not intended to and does not produce the most accurate prediction of the debtor's ability to fund a Chapter 13 plan." *In re Walker*, 2006 WL 1314125 at *6 (Bankr. N.D. Ga. May 1, 2006). The purpose of the means test is to determine whether a presumption of abuse arises, however "a presumption is just that a presumption." *In re Lenton*, 2006 WL 3850011, at *6 (Bankr. E.D. Pa.

Dec. 15, 2006). "Presumptions are typically created to avoid litigation." *Fowler*, 349 B.R. at 420. Thus, "whether the debtor passes or fails the means test is relevant only to the question of whether the U.S. Trustee will benefit from a presumption of abuse. In cases in which the presumption of abuse does not arise or is rebutted, the U.S. Trustee may pursue dismissal of a debtor's case under section 707(b)(3)." *In re Walker*, 2006 WL 1214125, at *8.

Thus while the presumption of abuse did not arise in this case, Debtors' passing the means test does not end the inquiry nor does it preclude a discretionary finding of abuse by the Court. *In re Simmons*, 2006 WL 3782959, at *7 (Bankr. N.D. Ohio Dec. 11, 2006); *Nockerts*, 2006 WL 3689465, at *8 (Bankr. E.D. Wis. Dec. 14, 2006). BAPCPA provides a two-step process to detect and deter abusive filers: the above described *604 objective means test prescribed in § 707(b)(2), *16 and the more subjective test of § 707(b)(3) which requires an analysis of the facts of a particular case. *In re Hare*, 2007 WL 201249, at *3 (Bankr. E.D. Cal. Jan. 24, 2007); *In re Wilson*, 356 B.R. 114, 121 (Bankr. D. Del. 2006).

## 3. 11 U.S.C. § 707(b)(3) — What Circumstances are Embraced by the Totality of the Circumstances of the Debtors' Financial Situation?

In cases where the presumption of abuse does not arise or is rebutted, section 707(b)(3) requires courts to consider whether the granting of relief would be an abuse of the provisions of Chapter 7 based upon the following criteria:

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The UST's Motion, which is based upon § 707(b)(3), argues that the granting of relief would be an abuse of the provisions of Chapter 7 given the totality of the circumstances of the Debtors' financial situation.

Section 707(b)(3) incorporates the judicially constructed concepts of bad faith and totality of the circumstances. Therefore pre-BAPCPA case law applying these concepts can still be helpful in determining abuse under BAPCPA. *In re Mestermaker*, 2007 WL 79306, at *5 (Bankr. N.D. Ohio Jan, 10, 2007); *In re Pak*, 343 B.R. 239, *17 243 (Bankr. N.D. Cal. 2006). Pre-BAPCPA, there was a split of authority among the circuits regarding what constituted "substantial abuse."[9] The First, Fourth, Sixth, Eight and Ninth Circuits used varying tests to determine the existence of "substantial abuse" pursuant to § 707(b). *In re Lamanna*, 153 F.3d 1, 4 (1st Cir. 1998). The First Circuit acknowledged that although the tests used by various courts of appeal did not employ precisely the same language, they shared common elements. *Id.* While a debtor's ability to pay was always a factor in a court's substantial abuse determination, the extent to which courts relied on the debtor's ability to pay varied. *In re DeGross*, 272 B.R. 309, 312 (Bankr. M.D. Fla. 2001).

[9] There are no pre-BAPCPA Eleventh Circuit opinions on this issue.

The Sixth Circuit's test to determine § 707(b) substantial abuse, as stated in *Krohn*, directs courts to ascertain from the totality of the circumstances whether the debtor:



is merely seeking an advantage over his creditors, or instead is `honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is `needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. *Substantial abuse can be predicated upon either lack of honesty or want of need* .

*Krohn*, [886 F. 2d 123](#),126 (6th Cir. 1989) (emphasis added).

*Krohn* suggests that the factors relevant to a debtor's honesty include the debtor's good faith and candor in filing schedules, whether the debtor engaged in "eve of bankruptcy" purchases, and *18 whether the debtor was forced into bankruptcy by unforeseen or catastrophic events. *Id.* The factors relevant to whether a debtor is needy include whether the debtor enjoyed a stable source of future income, whether *605 the debtor was eligible for Chapter 13 relief, and whether his expenses could be reduced significantly without depriving him of necessities. *Id.* at 126-27. *Krohn* observed that courts would "not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease." *Id.* Thus *Krohn* attempted to separate the bad faith and ability to pay inquiries for determining the existence of substantial abuse that would warrant dismissal of a Chapter 7 case.

The First Circuit adopted the Sixth Circuit's formulation of the totality of circumstances test noting that the *Krohn* test demanded a "comprehensive review of the debtors current and potential financial history." *Lamanna*, [153 F. 3d at 4](#). The First Circuit found that ability to pay was the primary, but not conclusive, factor for determining substantial abuse. The First Circuit held that "a bankruptcy court may, but is not required to, find `substantial abuse' if the debtor

has an ability to repay, in light of all of the circumstances." *Id.* at 5. While rejecting "any per se rules mandating dismissal for `substantial abuse' whenever the debtor is able to repay his debt out of future disposable income, or forbidding dismissal on that basis alone," the First *19 Circuit did not require courts to look beyond the debtor's ability to repay if that factor alone warranted dismissal. *Id.* at 2 and 4.

In *Kelly*, the Ninth Circuit determined that a finding of a debtor's ability to pay his debts standing alone justified § 707(b) dismissal for substantial abuse. *Zolg, v. Kelly (In re Kelly)*, [841 F. 2d 908, 914](#) (9th Cir. 1988). "This is not to say that inability to pay will shield a debtor from [section 707(b)](#) dismissal where bad faith is otherwise shown." *Id.* at 915. The Eighth Circuit subsequently agreed with the Ninth Circuit in *In re Walton*, [866 F.2d 981](#) (8th Cir. 1989). The Eighth Circuit rejected debtor's argument that "substantial abuse" must be equated with "bad faith," and in so doing reasoned that the debtor's "cramped interpretation of [section 707(b)](#) . . . would drastically reduce the bankruptcy courts' ability to dismiss cases filed by debtors who are not dishonest, but who also are not needy." *Id.* at 983. In concurring with *Kelly's* analysis and result, *Walton* "clearly contemplate[d] that the ability to fund a Chapter 13 plan can be sufficient reason to dismiss a Chapter 7 petition under [§ 707(b).](#)" *United States Trustee, v. Harris*, [960 F.2d 74, 76](#) (8th Cir. 1992). Thus, the Ninth Circuit's determination that ability to pay standing *is* sufficient cause for dismissal may be distinguished from the First, Sixth, and Eight Circuits' determination that ability to pay standing alone *can* be sufficient cause for dismissal.

In contrast, the Fourth Circuit determined that "solvency alone *20 is *not* a sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7." *In re Green*, [934 F.2d 568, 572](#) (4th Cir. 1991) (emphasis added). *Green* instructs courts to conduct

substantial abuse determinations pursuant to a totality of the circumstances test that evaluates several factors including:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

> (3) Whether the debtor's proposed family budget is excessive or unreasonable;

606   *606 (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

> (5) Whether the petition was filed in good faith.

*Id.*

The *Green* court rejected *Kelly's* "per se" ruling that a debtor's ability to pay standing alone justifies dismissal of a Chapter 7 case for substantial abuse. *Id.* at 573. The *Green* court reasoned that such a *per se* rule would be inconsistent with the (pre-BAPCPA) § 707(b) presumption in favor of granting the relief requested by the debtor. *Id.* In addition, *Green* determined that section 707(b) "was intended to explicitly recognize the court's ability to dismiss a Chapter 7 petition for lack of good faith — when `the total picture is abusive.'" *Id.* at 572.

Debtors' counsel urges the Court to follow *Green's* totality of the circumstances test and relies heavily
21   on *In re Nockerts*, *21 2006 WL 3689465 (Bankr. E.D. Wis. Dec. 14, 2006), to argue that while an inquiry into ability to pay may be appropriate for below median income debtors who have not taken the means test, the inquiry under the "totality of the circumstances test" for debtors who have "passed" the means test requires something more than just ability to pay. To the extent that the ruling on the motion to dismiss in *Nockerts* was

based upon § 707(b)(2), *Nockerts* is not on point because in this case the UST's Motion is based upon § 707(b)(3). To the extent *Nockerts* invokes *Green* to hold that something more than ability to pay is required for dismissal under § 707(b)(3)(B), the Court respectfully disagrees for the reasons discussed below.[10]

> [10] The motion to dismiss in *Nockerts*, which was based upon § 707(b)(2), presented the issue of whether the means test deduction for payments "scheduled as contractually due" should include payments for debt on property that debtors intended to surrender. *Nockerts*, 2006 WL 3689465 (Bankr. E.D. Wis. Dec. 14, 2006). The *Nockerts* court concluded that such payments were properly included in the means test calculation to determine if a presumption of abuse arises. The *Nockerts* court scheduled a further hearing to consider whether the case should be dismissed pursuant to § 707(b)(3) based upon the "totality of the circumstances".

Notwithstanding the opinion of the *Nockerts* court, section 707(b) has been so extensively modified that the Court doubts *Green's* vitality post-BAPCPA. The presumption in favor of granting the relief requested by the debtor which *Green* sought to safeguard through its formulation of the totality of the circumstances test has been discarded by Congress in favor of a presumption of abuse for debtors who have the ability to pay their debts as determined by the means test. Thus,
22   although *Green* rejected *Kelly's* per se *22 ruling that ability to pay standing alone justifies dismissing a Chapter 7 case for substantial abuse, *Kelly's* per se rule has been codified in BAPCPA by § 707(b)(2)'s presumption of abuse for debtors, who "fail" the means test. Eugene R. Wedoff, *Means Testing in the New 707(b)*, 79 Am. Bankr. L.J. 231, 235 (Spring 2005); *Nockerts*, 2006 WL 3689465, at *7.

Despite the argument of Debtors' counsel, the Court does not find that *Green* provides guidance post-BAPCPA for analyzing the totality of the circumstances of debtor's financial situation under § 707(b)(3).[11] The *Green* totality of the *607 circumstances test requires consideration of factors that look at ability to pay *conjunctively* with bad faith. *Green's* inquiry into whether the petition was filed because of sudden illness, calamity, disability, or unemployment is relevant to the debtor's ability to repay creditors. However *Green's* inquiry into whether the petition was filed in good faith, by negative implication, determines whether bad faith exists. Thus, the *Green* factors consider ability to pay together with bad faith, *23 however BAPCPA requires a separate evaluation for bad faith and totality of the debtor's financial circumstances pursuant to subsections 707(b)(3) (A) and (B) respectively. "By listing `bad faith' and `totality of the circumstances' disjunctively, the statutory language [of § 707(b)(3)(A) and (B)]indicates that bad conduct by the debtor in connection with the bankruptcy is a ground for 707(b) relief independent of financial circumstances indicating that the debtor could repay debt." Wedoff, *Means Testing*, 79 Am. Bankr. L.J. at 236.

---

[11] The UST quotes a lengthy section of a December 7, 2000 Committee Report on bankruptcy reform legislation for its apparent approval of the court's decision in *Lamanna* and disapproval of *Green*. However, "[i]t is necessary to note that the history of the legislative efforts culminating in the 2005 Act is not the same as the legislative history of the 2005 Act. To the extent legislative history of the 2005 Act can be used to resolve any arguable ambiguity in the statutory language, it is of dubious assistance. First, there is no joint conference statement because the 2005 Act did not have a conference committee." *In re Sorrell*, 2007 WL 211276, at *7 (S.D. Ohio Jan, 26, 2007). *See also In re McNabb*, 326 B.R. 785, 789 (Bankr. D.

Ariz. 2005) ("Legislative history is virtually useless as an aid to understanding the language and intent of BAPCPA.") The Court's interpretation of § 707(b)(3) is based upon the plain meaning of the statute. The Court does not find it necessary to divine legislative intent from legislative history, at least not with respect to § 707(b)(3).

The Court notes that pre-BAPCPA substantial abuse cases speak generally of the "totality of the circumstances test". *See e.g. In re Lamanna*, 153 F.3d 1 (1st Cir. 1998); *In re Stewart*, 175 F.3d 796 (10th Cir. 1999). In contrast, post-BAPCPA § 707(b)(3)(B) specifically delineates the pertinent inquiry as the "totality of the circumstances *of the debtor's financial situation* ". 11 U.S.C. § 707(b) (3)(B). Thus, the debtor's total financial situation as a measure of ability to pay, and bad faith are separate and sufficient grounds for dismissal. Either ability to pay *or* bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3).

There has been no allegation of bad faith in this matter. The issue is whether the totality of the circumstances of the Debtors' financial situation indicates that Debtors have the ability to pay a substantial portion of their unsecured nonpriority debts. For the *24 reasons stated, the Court concludes that under BAPCPA the ability to pay, standing alone, is sufficient to warrant dismissal of a Chapter 7 case for abuse pursuant to 11 U.S.C. § 707(b)(3)(B).

## C.   Does Totality of the Circumstances of Debtors' Financial Situation Include Consideration of Post-Petition Events?

In this case Mrs. Henebury's commencing employment earning $39,000.00 per year just days after the Debtors filed for Chapter 7 relief significantly affects the Debtors' ability to pay creditors. Thus the issue for the Court is whether it is proper to consider the Debtors' post-petition

In re Henebury, 361 B.R. 595 (Bankr. M.D. Fla. 2007)

financial situation in determining if the granting of relief would be an abuse of the provisions of Chapter 7. For the reasons stated below, the Court finds that the Debtors' post-petition financial situation is relevant and properly considered in the § 707(b)(3)(B) analysis.

## 1. Cortez

The Fifth Circuit's pre-BAPCPA § 707(b) analysis of whether dismissal for substantial abuse permits consideration of post-petition events in *Cortez* was 608 decided *608 under factually similar circumstances to this matter. *United States Trustee, v. Cortez (In re Cortez)*, 457 F.3d 448 (5th Cir. 2006). Like Mrs. Henebury, the debtor in *Cortez* was unemployed on the petition date, but he commenced employment at an annual salary of $95,000.00 just two weeks after filing. In response to the Schedule I directive to disclose reasonably anticipated 25 increases or decreases in income in *25 the coming twelve months, the debtor indicated that he expected to be employed in the current month but had not started working as of the petition date. *Id.* at 451. Based upon the debtor's new employment and consequent ability to repay a substantial portion of his unsecured debts, the United States Trustee moved for dismissal for substantial abuse. In deciding *Cortez*, the Fifth Circuit relied heavily on the language of § 707(b) to determine that substantial abuse dismissal analyses may consider post-petition events. *Id.* at 455. The *Cortez* court first noted that "courts of appeals considering § 707(b) have implicitly, if not explicitly, recognized that `granting of relief' means a Chapter 7 discharge." *Id.* The Fifth Circuit's analysis then stated that § 707(b) `does not condition dismissal on the *filing* of bankruptcy being a `substantial abuse' but rather on the *granting of relief*, which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted." *Id.* (emphasis in original). In addition the Fifth Circuit quoted the last sentence of § 707(b) which states: " [i]n making a determination whether to dismiss a

case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions . . .". *Id.* The phrase "or continues to make" suggested to the Fifth Circuit that with the exception of charitable contributions, courts are "entitled to focus on subsequent developments in the debtor's 26 financial condition." *Id.* *26 The pre-BAPCPA § 707(b) language relied upon by the Fifth Circuit in *Cortez* has been retained in § 707(b)(1) and thus the holding of *Cortez* remains persuasive post-BAPCPA. There is also additional new forward-looking language in § 707(b)(3)(B) wherein courts are directed to consider whether:

> the totality of the circumstances (including *whether the debtor seeks to reject* a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3)(B) (emphasis added).

Although personal services contracts are not at issue in this matter, in cases where they are implicated section 707(b)(3)(B) *requires* courts to consider future events under the totality of the circumstances of the debtor's financial situation test for abuse. Thus the statutory language of post-BAPCPA § 707(b)(1) and (3) adds further support to *Cortez'* conclusion that courts can consider post-petition events occurring prior to discharge in making dismissal for abuse determinations.

The Fifth Circuit's analysis continued by noting that other circuit courts had not considered the propriety of considering post-petition events for substantial abuse determinations. 457 F.3d at 456. Nevertheless, the Fifth Circuit found support for its conclusion in the other circuits agreement "that a debtor's ability to repay his debts out of *future* income is a primary factor to be considered in determining whether to dismiss for substantial abuse." *Id.* (emphasis added); *see also Walton*, 866 27 F. 2d at 984. The *Cortez* *27 court stated that "[i]f sufficient income to fund a Chapter 13 plan is

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 124 of 154

In re Henderson, 395 B.R. 625, 595 B.R. (Bankr. C.D. Cal. 2007)

_anticipated_ , a complete discharge of the debtor's obligations would constitute a substantial abuse of Chapter 7." 457 F.3d at 457 *609 (emphasis added). The Fifth Circuit found additional support for its forward-looking analysis in a Chapter 13 debtor's obligation to amend their schedules to include subsequent income even if that income was not known or realized at the time of the filing. _Id._ Thus while post-petition earnings are not property of the estate, the Fifth Circuit determined that courts "can and should take them into account for purposes of determining substantial abuse under § 707(b)." _Id._ at 458. The _Cortez_ case was remanded to the bankruptcy court for consideration of any post-petition events affecting the debtor's financial situation including any post-petition changes in income.

The Fifth Circuit's reasoning in _Cortez_ continues to provide guidance post-BAPCPA.[12] The statutory language relied upon in _Cortez_ is unchanged. If anything, BAPCPA's statutory modifications render it easier for a movant to establish abuse. _Lenton_, 2006 WL 385001, *28 at *11 (Bankr. E.D. Pa. Dec. 15, 2006). The threshold for dismissal has been lowered to "abuse" from "substantial abuse", and the pre-BAPCPA presumption in favor of granting the relief requested by the debtor has been eliminated in favor of a presumption of abuse for debtors who have an ability to pay a portion of their debts pursuant to the means test.

> [12] The effect of _Cortez_ post-BAPCPA has been debated. _See_ John H. Dion, _Timing is Everything . . . Or Is It?_ 25-Oct Am Bankr. Inst. J. 1 (2006) (suggesting that _Cortez_ is relevant and important post-BAPCPA. The decision is statutorily well-reasoned despite the outcome being contrary to most practitioner's concepts of Chapter 7 timing and planning); _but cf._ Rafael I. Pardo, _Analyzing Chapter 7 Abuse Dismissal Motions Post-BAPCPA: A Reply on Cortez_, 25-Jan Am. Bankr. Inst. J. 16 (suggesting that the statutory definition of current monthly income being historical virtually

eliminates _Cortez_-style judicial discretion to consider post-petition income fluctuations in abuse dismissal motions based on the means test. Only when the presumption of abuse does not arise or is rebutted will courts have a meaningful opportunity to evaluate the effect of a post-petition increase in a debtor's income).

## 2. Post-BAPCPA cases

Post-BAPCPA, other bankruptcy courts have held that abuse determinations pursuant to the totality of the circumstances of the debtor's financial situation requires analysis of a debtor's actual ability to pay and therefore post-petition events are properly considered under § 707(b)(3)(B). _In re Lenton_, 2006 WL 3850011 (Bankr. E.D. Pa. Dec. 15, 2006) ( _citing, In re Richie_, 353 B.R. 569 (Bankr. E.D. Wis. 2006); _In re Paret_, 347 B.R. 12 (Bankr. D. Del. 2006); _In re Pak_, 343 B.R. 239 (Bankr. N.D. Cal. 2006)).

In _In re Pennington_, 348 B.R. 647 (Bankr. D. Del. 2006) the issue was framed by the court as: "whether the Court, in considering the `totality of the circumstances . . . of the debtor's financial situation' is limited to the Debtor's financial situation as of the date of the filing of the petition or may/must consider the Debtor's financial situation at the time the motion to dismiss is heard." _Id._ at 651. In _Pennington_, the United States Trustee filed a motion to dismiss for abuse because the debtor was funding a savings account through payroll deductions of $430.00 per month. In addition, the *29 debtor's schedules reflected $91.00 in additional net monthly income that could be used to pay creditors. Prior to the hearing on the motion to dismiss, the debtor filed an amended Schedule J reflecting increased car expenses of $557.00 per month. However, the debtor testified that $557.00 was not his actual car expense because he surrendered the car post-petition and bought a less expensive model. _Id._ at 648. *610

In granting the United States Trustee's motion, the *Pennington* court reasoned that:

> [a] ruling that the Court may only consider the Debtor's financial situation at the time of the filing would cut both ways. If a debtor incurred additional expenses post-petition (for example, he needed a new car or had additional unexpected medical expenses), the Court would not be able to consider it. Such an arbitrary rule is not mandated by the language of the Code, nor does it appear to be reasonable."

*Id.* at 651.

The *Pennington* court found that the very broad language of § 707(b)(3) "was meant to give courts considerable leeway to consider all aspects of the debtor's financial situation." *Id.* In rejecting debtor's argument that the court's analysis should be limited to the financial situation as of the petition filing date, the *Pennington* court noted that, "[t]here is no indication in the language of the statute or the legislative history that Congress meant to limit temporally the Court's consideration of the Debtors' financial condition when determining whether to dismiss a case for abuse." *Id.* The court concluded that it must 30 consider the debtor's financial *30 situation "at the time of the hearing on the motion to dismiss in determining whether granting Chapter 7 relief is an abuse under section 707(b)(3)." *Id.* *Pennington's* conclusion is also consistent with cases holding that courts must consider the debtor's future, rather than historical, income and expenses when determining confirmation of a Chapter 13 plan. *Id.* at 651 ( *citing In re Demonica*, 345 B.R. 895, 900 (Bankr. N.D. Ill. 2006); *In re McGuire*, 342 B.R. 608, 614 (Bankr. W.D. Mo. 2006); *In re Jass*, 340 B.R. 411 (Bankr. D. Utah 2006); *In re Hardacre*, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006)).

The *Pak* court also found that the totality of the circumstances of the debtor's financial situation required the court to consider whether the debtor

had the ability to pay unsecured claims through a hypothetical Chapter 13 plan. *In re Pak*, 343 B.R. 239, 246 (Bankr. N.D. Cal. 2006). The *Pak* court reasoned that a debtor's

> actual and anticipated future income must be considered, rather than simply his [historical] `current monthly income,' in determining . . . `projected disposable income' for purposes of confirming a chapter 13 plan. Thus, this is also the correct income figure to use in deciding whether to grant or deny a motion to dismiss a chapter 7 case under section 707(b)(3)(B).

*Id.* at 245-46. Thus, the *Pak* court found it proper to include post-filing changes in circumstances such as increased or decreased income in its dismissal for abuse analysis.

The *Richie* court, relying upon *Pennington* and *Pak*, similarly determined that if a debtor's ability 31 to repay creditors is *31 different at the time of filing and at the time of the hearing on the motion to dismiss, the ability to pay analysis is properly conducted based upon the debtor's financial circumstances existing at the time of the hearing on the motion to dismiss, not the petition date. *In re Richie*, 353 B.R. 569, 575-76 (Bankr. E.D. Wis. 2006).

In *In re Hare*, 2007 WL 201249 (Bankr. E.D. Cal. Jan. 24, 2007) the above median income debtors had "passed" the means test because they claimed a large deduction for contractual mortgage payments due on a residence that was effectively surrendered in bankruptcy. *Id.* at *1. The court granted the United States Trustee's motion to dismiss for abuse because the debtors had the actual ability to pay a substantial portion of their debts through a Chapter 13 plan. *Id.* at *4. In addition, *611 the court considered the debtors' attempt "to claim a substantial Means Test deduction for a mortgage payment which they never intended to pay, and which in fact ceased to

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 126 of 154

In re H_____ _____, 360 B.R. 595 (Bankr. N.D. Ohio 2007)

exist after they filed for bankruptcy protection, . . . a further `circumstance' . . . suggest[ing] that a Chapter 7 discharge would be an abuse." *Id.*

The *Lenton* court determined that it's § 707(b)(3) abuse analysis required the court to consider the debtor's "actual and anticipated financial situation over the applicable Chapter 13 commitment period." *Lenton*, 2006 WL 3850011, at *10 (Bankr. E.D. Pa. Dec. 15, 2006). Thus, the *Lenton* 32 court's analysis was also *32 forward-looking.

This Court agrees with the reasoning in the cases discussed above. In determining if the granting of relief would be an abuse of the provisions of Chapter 7, courts are required to determine if the debtor has the ability to pay a substantial portion of their unsecured claims through a Chapter 13 plan based upon the totality of the debtor's financial circumstances. If a Chapter 13 plan is to be feasible it must be based on the debtor's actual or anticipated ability to pay and therefore consideration of post-petition changes in the financial circumstances of the debtor is appropriate. *See, e.g.*, *In re Edmunds*, 350 B.R. 636, 647 n. 16 (Bankr. D.S.C. 2006).

## 3. What determines ability to pay for an above median income debtor?

Having determined that courts pre- and post-BAPCPA generally determine ability to pay by analyzing whether the debtor has sufficient projected disposable income to fund a hypothetical Chapter 13 case, *see, e.g.*, *In re Jones*, 335 B.R. 206, 208 (Bankr. M.D. Fla. 2005); *In re Richie*, 353 B.R. 569, 575 (Bankr. E.D. Wis. 2006), the issue post-BAPCPA is how to calculate ability to pay for the above median income Debtors in this case. While the purpose and outcome of an objection to confirmation and a motion to dismiss a Chapter 7 case for abuse are materially different, Chapter 13 cases are instructive. *Zak*, 2007 WL 143065, at *6 (Bankr. N.D. Ohio Jan. 12, 2007). " [A] Chapter 13 case is prospective, i.e., it encompasses a debtor's current and future

33 financial circumstances for a period *33 of three to five years." *Lenton*, 2006 WL 3850011, at *6. "Section 1325(b)(1)(B) requires Debtors to use all of their `projected disposable income' to pay unsecured creditors during the applicable commitment period" of a Chapter 13 plan. *In re Edmunds*, 350 B.R. 636, 640 (D.S.C. 2006). Post-BAPCPA, the expense amounts used to calculate projected disposable income for below median income debtors continues to be determined by examining Schedule J, however the calculation of applicable expenses for above median income debtors highlights the odd manner in which BAPCPA has been drafted. While "projected disposable income" is not defined, "disposable income" is a defined term under BAPCPA. "`Disposable income,' for above median income debtors is defined as `current monthly income,' also a defined term . . . less amounts reasonably necessary `to be expended' as determined by § 707(b)(2)(A) (B)." *Id.* (paraphrasing § 1325(b) (3)). As previously noted, current monthly income is based upon historical average monthly income over a six month period prior to the filing of the bankruptcy. Section § 1325(b)(3) now directs above median income debtors to calculate expense deductions to CMI based upon the means test formula found in § 707(b)(2)(A) and (B). *In re Miller*, 2007 WL 128790, at *3 (Bankr. N.D. Ala. Jan. 18, 2007). Under the means test formula, above median income debtor's applicable monthly expense amounts are based upon IRS national and local standards plus the debtor's actual monthly 612 *612 expenses for certain other categories. *Id.* 34 Thus for purposes of Chapter 13 plan *34 confirmation, above median income debtors calculate their disposable income by using an historical average for income, that may or may not reflect the debtor's current income, from which standard amounts rather than actual amounts are deducted for several categories of expenses. How this seeming anomaly is to be harmonized with the requirement that debtors use all of their projected disposable income to pay unsecured creditors has led to different opinions by different courts in



interpreting the calculation and use of "projected disposable income" versus "disposable income" for above median income debtors in Chapter 13 cases.[13] Since the Court is not actually adjudicating Debtor's projected disposable income in the context of a confirmation hearing, these issues while instructive *35 need not be decided here.

35

[13] The Miller court categorized the varying bankruptcy court decisions. "One line of cases holds that post-BAPCPA, Schedule J is irrelevant to the determinations of disposable income for above median income debtors." *In re Miller,* 2007 WL 128790, at *4 (Bankr. N.D. Ala. Jan. 18, 2007) ( *citing In re Farrar-Johnson,* 353 B.R. 224 (Bankr. N.D. Ill. 2006); *In re Alexander,* 344 B.R. 742 (Bankr. E.D.N.C. 2006); *In re Barr,* 341 B.R. 181 (Bankr. M.D.N.C. 2006); *In re Guzman,* 345 B.R. 640 (Bankr. E.D. Wis. 2006); *In re Hanks,* 2007 WL 60812 (Bankr. D. Utah 2007)). "Other courts have turned to Schedules I and J finding that the terms `projected disposable income' as used in § 1325(b)(1)(B) and `disposable income' as used in § 1325(b)(2) are not synonymous. Because Congress added the word `projected' to § 1325(b)(1)(B) which is a forward looking concept, some courts hold that the expense component of `projected disposable income' must necessarily be a forward looking reflection of the debtor's projected expenses allowed by the means test." *Id.* "Other courts suggest that the concept of good faith under § 1325(a)(3) demands a review of the debtor's actual income and expenses." *Id.* ( *citing In re Edmunds,* 350 B.R. 636 (Bankr. D.S.C. 2006); *In re Kibbe,* 342 B.R. 411 (Bankr. D.N.H. 2006)). "Another line of cases has focused upon the issue of whether debtors are entitled to deduct from disposable income payments on secured debts for which the debtors will not actually be liable as a result of their decision to surrender the collateral securing the debt." *Id.* at 5 (

*citing In re Love,* 350 B.R. 611 (Bankr. M.D. Ala. 2006); *In re Crittendon,* 2006 WL 2547102 (Bankr. M.D.N.C. 2006); *In re Hardacre,* 338 B.R. 718 (Bankr. N.D. Tex. 2006); *In re Oliver,* 2006 WL 2086691 (Bankr. D. Or. 2006); *In re Grunert,* 353 B.R. 591 (Bankr. E.D. Wis. 2006); *In re Haley,* 2006 WL 2987947 (Bankr. D.N.H. 2006)). The foregoing cases suggest several issues that could arise if this were an objection to Chapter 13 confirmation proceeding.

Having determined in this matter that the totality of the circumstances of the Debtor's financial situation is concerned with Debtor's actual ability to pay some, if not all, of Debtor's unsecured nonpriority debt through a hypothetical Chapter 13 plan and that post-petition events are relevant to, and properly considered, the Court finds it appropriate to begin its analysis with the Debtors' Means Test which should reflect Debtors' applicable expenses using the IRS national and local standards described in section 707(b)(2)(A).[14] From this starting point adjustments may be necessary based on the Debtors' actual financial circumstances. *See e.g., Singletary,* 354 B.R. 455, 462 n. 6 (S.D. Tex. 2006) (If "the UST elects to file a motion under § 707(b)(3), the UST may include a means test calculation based on the circumstances on the *613 date of the filing of the motion or any date in the future. In that case, the court would be able to consider this means test as relevant evidence under the totality of circumstances analysis of § 707(b)(3). . . ."). In determining if the granting of relief would be an abuse of the provisions of Chapter 7 based upon the totality of the Debtors' financial situation, the Court finds it *36 appropriate and equitable to include Mrs. Henebury's income from the teaching job she started just four days after Debtors filed their petition. If the Court adds Mrs. Henebury's net monthly income of $2,875.00 to Debtors' CMI as listed on their Means Test, the Debtors' monthly disposable income would be $1,746.93 rather than

613

36



In re Henebury, 361 B.R. 595 (Bankr. M.D. Fla. 2007)

negative $1,128.07. This amount would allow the Debtors to repay 100% of their $73,799.46 unsecured debt in less than 43 months.

> [14] The required use of standard applicable expenses for calculating disposable income sets spending limits on above median income debtors. *See Fuller,* 346 B.R. 472, 484 (Bankr. S.D. Ill. 2006) (In "attempting to avoid a scenario in which an above median-income debtor could reduce his disposable income by claiming what Congress might consider to be unreasonably high expenses" such debtors are told how much they can spend each month for food, clothing and housing.)

Alternatively, if the Court bases its analysis on Debtors' filed Schedules but adds Mrs. Henebury's net monthly income of $2,875.00 to Debtors' Schedule I and deducts the expenses listed on Debtors' Schedule J, Debtors' monthly disposable income would be $2,298.14 rather than negative $576.86. This amount would allow Debtors to repay 100% of their $73,799.46 in unsecured debt in less than 33 months.

Even using a third calculation based upon the Proposed Revised Schedules that Debtors' counsel introduced as evidence of Debtors inability to repay creditors, the Debtors would have sufficient disposable monthly income to repay unsecured creditors. The Proposed Revised Schedules included Mrs. Henebury's income but also included substantially greater expenses than the amount listed on Debtors' filed Schedule J. The UST objected on the basis that Debtors are not making all of the payments listed on Proposed Revised Schedule J. For example, Debtors ceased making mortgage payments of $2,403.97 for the Lake Worth Property prior to the petition date and Mr. *37 Henebury testified that the family no longer resides there. Debtors now reside instead in a rental property in Port Orange that costs $1,550.00 per month. The Court does not find that it is proper to include the expenses associated with two residences in a calculation to determine whether Debtors have the ability to repay their creditors. The cost of two residences is neither necessary to be expended for the support of the Debtors, nor is it reasonable. Debtors also included payments for the Timeshare, a debt for which the Court subsequently denied reaffirmation. If the Court uses Debtors' Proposed Revised Schedules but eliminates the duplicated housing cost of $2,403.97 for the Lake Worth monthly mortgage payment and the Timeshare payment of $252.56, Debtors Proposed Schedule J expense would equal $6,383.13. Debtors monthly disposable income pursuant to Debtors' Proposed Revised Schedules without these expenses would be $1,328.75, rather than negative $1,327.78 as listed. This amount of monthly disposable income would be sufficient to repay 100% of Debtors' $73,799.46 in unsecured debt in less than 56 months.

Debtors' counsel argues that Debtors have neither abandoned nor surrendered the Lake Worth Property and that this contractually due payment should be considered. However the "contractually due" payments standard applies to Means Test calculations that determine whether the presumption of abuse arises. The presumption of abuse calculations are not entirely relevant to the Debtors' actual *38 current and prospective financial situation. Moreover, there is a distinction between the objective presumption of abuse analysis under § 707(b)(2) which excludes judicial discretion, and the subjective dismissal *614 for abuse analysis under § 707(b)(3)(B) which permits the Court's "case-by-case analysis . . . to address what Congress expected would be the inevitable exceptional cases." *Wilson*, 356 B.R. at 121. Having not made payments for the Lake Worth Property since June, Debtors have effectively, if not formally, surrendered the Lake Worth Property. Inclusion of these payments distorts Debtor's actual current and prospective financial situation. The Court also notes that in the context of Chapter 13, which has become a de facto test

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 129 of 154

In re Henebury, 361 B.R. 595 (Bankr. S.D. Fla. 2007)

for Chapter 7 dismissal for abuse based upon a debtor's ability to pay, when a debtor proposes a plan for confirmation

> the terms of the plan determine whether payments have been scheduled for payment in the future and also establishes the classification of creditors on the effective date of the plan. The confirmed chapter 13 plan constitutes a new agreement between the debtor and the creditors and is controlling as to the payments to be made to creditors, as well as to which of the creditors are secured creditors.

*Crittendon*, 2006 WL 2547102, at *4 (Bankr. M.D.N.C. Sept. 1, 2006).

The Court recognizes that this is not a Chapter 13 confirmation proceeding. However since a confirmable plan would not include costs for two residences, the inclusion of costs for two residences is not proper in an analysis that looks to see if Debtors have the ability to repay a substantial portion of their unsecured creditors based *39 upon Debtors' ability to fund a hypothetical Chapter 13 plan.

Debtors have been shown to have sufficient disposable monthly income to pay most, if not all, of their unsecured nonpriority debt pursuant to three different calculations. Under the totality of these financial circumstances the entry of a Chapter 7 discharge would be an abuse. Having determined the existence of abuse, the Court need not address the other expenses that the UST alleges are overstated. The Court notes that there have been no allegations of bad faith and there is nothing in Debtors' lifestyle that suggests they

have lived extravagantly or been reckless in dealing with their finances. Nevertheless, Debtors do have an ability to repay a substantial portion of their unsecured debt and therefore the granting of Chapter 7 relief is unwarranted.

## CONCLUSION

There has been no allegation of bad faith in this matter. While the Debtors filing for Chapter 7 protection only four days before Mrs. Henebury became employed may have been an opportunistic filing, it was not illegal. However the Court is compelled to review the totality of the Debtors' financial circumstances, and for the reasons stated, the Court finds that the Debtors have the ability to repay a substantial portion of their unsecured debt. Therefore pursuant to 11 U.S.C. § 707(b)(3)(B), the granting of a Chapter 7 discharge in this case would be an abuse of the provisions of Chapter 7.

40  *40

## ORDER

The Court, having heard the argument of counsel, considered the testimony and evidence presented, reviewed the applicable law, and being otherwise fully advised in the premises does hereby:

**ORDER AND ADJUDGE** that the UST's Motion is **GRANTED.** The above-captioned case shall be dismissed within ten days following entry of this Order unless Debtors move to convert this case to one under Chapter 13 with said ten days.

ORDERED in the Southern District of Florida.

615  *615



CASE NO. 06-13354-BKC-PGH

United States Bankruptcy Court, S.D. Florida

# In re Henebury

361 B.R. 595 (Bankr. S.D. Fla. 2007)

Decided Mar 16, 2007

CASE NO. 06-13354-BKC-PGH.

596 March 16, 2007. *596

Stuart A. Young, West Palm Beach, FL, for Debtors.

Michael R. Bakst, West Palm Beach, FL, for Trustee.

Heidi A. Feinman, Office of the U.S. Trustee, Miami, FL, for U.S. Trustee.

597 *597

## ORDER DISMISSING CHAPTER 7 CASE UNLESS DEBTORS MOVE TO CONVERT TO CHAPTER 13 WITHIN TEN DAYS OF ENTRY OF THIS ORDER

PAUL G. HYMAN, Bankruptcy Judge.

**THIS MATTER** came before the Court for evidentiary hearing on January 25, 2007 upon the United States Trustee's ("UST") *Amended Motion to Dismiss Case Pursuant to 11 U.S.C. § 707(b)(1) (b)(3)* ("Motion") filed on November 17, 2006. On December 19, 2006, Debtors filed a *Response to UST's [Motion]*.

## BACKGROUND

Mark Andrew Henebury ("Mr. Henebury") and Yvette Joan Henebury ("Mrs. Henebury") (collectively, "Debtors") filed a joint petition for Chapter 7 bankruptcy relief on July 21, 2006.

2 Debtors are married and have three minor children. The Debtors moved to Florida *2 from Massachusetts in May 2005. Contemporaneously with the filing of their petition, Debtors filed their Schedules, Statement of Financial Affairs, and Official Form B22A: Statement of Current Monthly Income and Means Test Calculation ("Means Test"). The Debtors' Means Test shows annualized Current Monthly Income ("CMI") in the amount of $96,768.24 which is above the median income for a family of five residing in Florida[1]. Debtors' Means Test indicates that Debtors had negative monthly disposable income of $1,128.07 after calculating deductions to CMI. Thus, although the Means Test shows that Debtors had above median income, a presumption of abuse did not arise pursuant to 11 U.S.C. § 707(b)(2).

> 1 At the time of filing, the applicable median income for a family of five residing in Florida was $68,125.00.

The Debtors' Schedules show that as of the petition date, the Debtors owned real property located in Lake Worth, Florida valued at $295,000.00 ("Lake Worth Property") with a mortgage of approximately $233,237.81. Debtors claimed that the Lake Worth Property was exempt as their homestead. However at trial, Mr.
598 Henebury *598 testified that the family no longer resides at the Lake Worth Property, and that the family now resides in Port Orange near Daytona Beach, Florida.[2] Mr. Henebury testified that he has
3 not *3 made mortgage payments on the Lake Worth Property since June 2006.[3] Mr. Henebury


Part of Thomson Reuters

1

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 131 of 154

In re Henebury, 361 B.R. 595 (Bankr. M.D. Fla. 2007)

further testified that the Debtors hoped to keep the home "and sell it and obviously use the proceeds to buy another home."

> 2  A Notice of Change of Address filed September 28, 2006 indicated Debtors' address as 300 N. Atlantic Ave., Daytona Beach. A subsequent Notice of Change of Address filed October 11, 2006 shows Debtors' current address as 5338 Plantation Home Way, Port Orange, Florida.

> 3  On August 16, 2006, secured creditor GMAC filed a Motion for Relief from Stay respecting the Lake Worth Property alleging that the Lake Worth Property had been claimed as exempt but was not adequately protected. The Chapter 7 Trustee filed an Objection to GMAC's Motion for Relief from Stay on the basis that there existed non-exempt equity in the Lake Worth Property. On September 12, 2006 the Chapter 7 Trustee also filed an Objection to Debtors' Claim of Exemptions alleging that Debtors improperly claimed both federal and Massachusetts exemptions on their bankruptcy schedules. On September 26, 2006, prior to the hearing scheduled on the matter, GMAC withdrew its Motion for Relief from Stay. On November 2, 2006, the Chapter 7 Trustee withdrew her Objection to Debtors' Claim of Exemptions.

Mr. Henebury also testified that he had not been happy with his job since it was not in the hotel industry in which he had pursued his career. Subsequently when a job in the hotel industry opened in Daytona Beach, he applied and obtained the job. Mr Henebury currently is, and as of the petition date was, employed as an engineer for Fairfield Resorts in Daytona Beach earning an annual salary of $85,000.00.

Debtors provided the UST with revised Schedules I and J on November 7, 2006 ("Proposed Revised Schedules") (Debtor Ex. 2; UST Ex. F). The Proposed Revised Schedules were not filed with

the Court. However they show that the Port Orange residence where the family now resides is rented at a cost of $1,550.00 per month.

In addition to the Lake Worth Property, the Debtors also scheduled a 0.4349% ownership interest in a Disney Vacations Development, Inc. timeshare ("Timeshare") with a listed value of *4 $15,000.00 that was secured by debt in the amount of $12,415.85. On November 30, 2006, Debtors signed a reaffirmation agreement for the Timeshare debt ("Reaffirmation Agreement"). The Reaffirmation Agreement was filed with the Court on December 21, 2006. The UST filed an Objection to the Reaffirmation Agreement. The Court heard the matter on December 27, 2006, and entered an Order Denying Reaffirmation Agreement on December 28, 2006.

Debtors' Schedule D also shows secured debt in the amount of $264.00 for a 1998 Subaru automobile valued at $1,200.00. Debtors listed no unsecured priority claims on Schedule E. Schedule F reflects unsecured nonpriority claims totaling $73,799.46. It is uncontested that essentially all of the debts are consumer/non-business debts.

Mrs. Henebury testified that she was unemployed prepetition because she needed to care for her five year old daughter who had undergone surgery in September 2005. However on Debtors' Schedule I, filed July 21, 2006, in answer to the line 17 directive to describe any increase or decrease in income reasonably anticipated to occur within the year postpetition, Debtors indicated: "Debtor wife will begin a teaching position on 7/25/06 for approximate wages of $39,000 per year." Mrs. Henebury *599 testified that she indeed began working as a teacher at Spruce Creek High School in Port Orange the week after Debtors filed their petition. Debtors' Schedule I, as filed, lists only Mr. Henebury's gross monthly *5 income of $7,122.87 with his net monthly income as $4,836.88. Schedule J reflects total monthly expenses of $5,871.66. Included in these expenses are mortgage payments for the Lake Worth



In re Henebury, 361 B.R. 595 (Bankr. M.D. Fla. 2007)

Property in the amount of $2,403.97, and monthly payments for the Timeshare in the amount of $252.56. Debtors' filed Schedules indicate that as of the petition date Debtors had negative monthly net income in the amount of $576.86.

The Proposed Revised Schedules, which were admitted into evidence but not filed with the Court, list Mrs. Henebury's monthly income as $3,401.66 with net monthly income of $2,875.00. The Proposed Revised Schedules list Debtors' combined net monthly income as $7,711.88. Proposed Revised Schedule J shows monthly expenses of $9,039.66. This expense amount represents an increase of $3,168.00 over the monthly expenses listed in Debtors' Schedule J which was filed on the petition date. Part of the increased expense reflected on Debtors' Proposed Schedule J is due to Debtors' listing expenses for both the Port Orange rental home where the family resides, and the Lake Worth Property where they do not reside and for which they stopped paying the mortgage prior to filing for bankruptcy. The Proposed Revised Schedules indicate that Debtors had negative monthly net income of $1,327.78.

At the January 25, 2007 hearing, Debtors introduced Exhibit 3 which was a second revised Schedule J dated November 30, 2006, that had not been previously filed with the Court ("Second Revised *6 Schedule J"). Second Revised Schedule J shows even further increased expenses for home maintenance, medical expenses, and recreation resulting in total monthly expenses of $10,207.66. However upon questioning, Debtors were unable to substantiate the increased expenses claimed with any documentary proof.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and(b)(2)(A) and (O).

### A.    Procedural Posture and Arguments of the Parties

Debtors filed their petition on July 21, 2006 and therefore the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") governs this matter.

Interim Federal Rule of Bankruptcy Procedure 1017(e)(1) states in pertinent part that:

> a motion to dismiss a case for abuse under § 707(b) or (c) may be filed only within 60 days after the first date set for the meeting of creditors under § 341(a), unless, on request filed before the time has expired, the court for cause extends the time for filing the motion to dismiss. The party filing the motion shall set forth in the motion all matters to be considered at the hearing. A motion to dismiss under § 707(b)(1) and (3) shall state with particularity the circumstances alleged to constitute abuse.

7    Interim Bankr. R. 1017(e)(1)[4] *7

> [4] Administrative Order 05-4 of the United States Bankruptcy Court for the Southern District of Florida adopted the Interim Rules of Bankruptcy Procedure effective October 17, 2005 for application in all cases filed on or after October 17, 2005 which are subject to BAPCPA.

The § 341 meeting of creditors in this case was held and concluded on August 18, *600 2006. Thus pursuant to Rule 1017(e)(1), the sixty day deadline to file a motion to dismiss pursuant to § 707(b)(3) would have expired October 17, 2006. However on October 16, 2007, the UST timely filed an *Amended Agreed Ex-Parte Motion for Order for Extension of Time to File Motion to Dismiss Under 11 U.S.C. § 707(b)(3) and For Extension of Time to Object to Discharge Pursuant to 11 U.S.C. § 727* ("Motion for Extension of Time"). The Court entered the parties' *Agreed Order Granting UST's [Motion for Extension of Time]* which pursuant to the parties' agreement extended the deadlines for filing a

casetext
Part of Thomson Reuters

motion to dismiss and a complaint objecting to discharge until November 20, 2006. The UST's Motion seeking dismissal was thus timely filed on November 17, 2006.

The UST's Motion argues with particularity that based upon the totality of circumstances of the Debtors' financial situation, the granting of relief to the Debtors in this case would be an abuse of the provisions of Chapter 7 pursuant to 11 U.S.C. § 707(b)(1) and (3). The UST further argues that the Debtors have the present ability to pay some, if not all, of their unsecured debts based upon Mrs. Henebury's employment as a teacher earning $39,000 per year and based upon the Debtors not making payments for among other things, the Lake Worth Property mortgage and the Timeshare debt. Finally, the UST argues that Debtors' other expenses are *8 overstated.

Debtors' counsel argues that a debtor's ability to pay standing alone is insufficient cause for dismissal pursuant to § 707(b)(3)(B) which looks to the totality of the circumstances of debtor's financial situation to determine if the granting of Chapter 7 relief would be an abuse. Debtors' counsel further argues that Debtors have no ability to pay creditors because their expenses exceed their income.[5]

> [5] Debtors' Response framed the issue as: "When Debtors are uncertain of their ability to pay contractually due payments in the future on secured properties, are those scheduled payments part of the Debtor's current monthly income for purposes of the `means test' of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005?" The Court notes that this statement of the issue is not on point because the UST's Motion does not challenge Debtors' Means Test calculations. The UST's Motion relies on § 707(b)(3), not § 707(b)(2).

In the Court's view, the arguments of counsel raise questions of "what" and "when". First, under BAPCPA what is meant by the totality of the circumstances of the Debtors' financial situation. Second, are post petition events relevant to the determination of whether the granting of relief would be an abuse of the provisions of Chapter 7 based upon the totality of the circumstances of the Debtors' financial situation, when — as in this case — the circumstances of the Debtors' financial situation change over time. Both of these questions require a study of 11 U.S.C. § 707(b) as it has been reconstructed under BAPCPA. *9

## B. *11 U.S.C. § 707(b)* 1. BAPCPA's Overhaul of 11 U.S.C. § 707(b)

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 extensively modified § 707(b) which previously provided for dismissal of a Chapter 7 case under circumstances of substantial abuse. The § 707(b) modifications — as the act's title announces — were intended to prevent perceived bankruptcy abuses by Chapter 7 debtors who have the ability to pay some, if not all, of their debts to creditors. *See e.g., In re Singletary*, 354 B.R. 455, 459 (Bankr. S.D. Tex. 2006) ("The abuse that concerned Congress was debtors receiving a full discharge under Chapter 7 when they had regular income that could be used to repay some portion of their unsecured debt in a Chapter 13 plan."); *In re Hardacre*, 338 B.R. 718, 720 (Bankr. N.D. Tex 2006) ("Among the abuses identified by Congress was the easy access to Chapter 7 liquidation proceedings by consumer debtors who, if required to file under Chapter 13, could afford to pay some dividend to their unsecured creditors.") ( *citing* 151 Cong. Rec. S2459, 2469-70 (March 10, 2005)). "While the legislative purpose behind the modifications to section 707(b) is easy to discern, courts have struggled with its application." *In re Wilson*, 356 B.R. 114, 117 (Bankr. D. Del. 2006).



The pre-BAPCPA version of § 707(b), contained in a single paragraph, was replaced in BAPCPA with seven complex sub-parts. *10 Subsections 707(b)(1)-(3) are germane to this matter.

10

## 2. 11 U.S.C. § 707(b)(1)

Pre-BAPCPA § 707(b) was retained with significant alterations in § 707(b)(1).[6] Pre-BAPCPA § 707(b) only provided for dismissal of a Chapter 7 case, while § 707(b)(1) now provides for dismissal, or with the debtor's consent, conversion to a case under Chapter 11 or 13. Standing to bring a motion to dismiss under pre-BAPCPA section 707(b) was explicitly denied to anyone but the United States Trustee or the court upon its own motion. Under BAPCPA, standing is now conferred upon any party in interest. The § 707(b) threshold for dismissal has been changed from "substantial abuse" under the pre-BAPCPA version of the statute to "abuse" under BAPCPA.

6  11 U.S.C. § 707(b)(1) states:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d) (4)).

Newly added subsections 707(b)(2) and (3) now provide two methods for determining whether or not there is abuse under section 707(b)(1). *Singletary*, 354 B.R. at 459. Section 707(b)(2) requires debtors who seek bankruptcy relief to complete a means test. There now exists a statutory presumption that the granting of Chapter 7 *11 relief to debtors who "fail" the means test would be abusive. Thus pre-BAPCPA § 707(b)'s "presumption in favor of granting the relief requested by the debtor" has been removed, and been replaced with post-BAPCPA § 707(b)(2)'s presumption of abuse against debtors who, as determined by the means test, have sufficient monthly disposable income to repay a portion of their unsecured debts. Section 707(b)(3) provides

11



Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 135 of 154

In re Henderson, 395 B.R. 593 (Bankr. S.D. Tex. 2007)

for dismissal in cases where the presumption of abuse under the means test does not arise or is rebutted.

## 2. 11 U.S.C. § 707(b)(2) — The Means Test

Section 707(b)(2)(A) provides for the means test and the presumption of abuse for debtors who "fail" the means test. The Statement of Current Monthly Income and *602 Means Test Calculation (Official Form B22A) serves as a template for the means test calculations contained in § 707(b)(2)(A)(i)-(iv). The means test requires debtors to determine their CMI[7] which is the debtor's *12 average monthly income received from all sources in the six month period ending on the last day of the calendar month preceding the commencement of the case. Thus, there is nothing "current" about CMI which by definition is an historical measure of average monthly income. The debtor's CMI must then be compared with the applicable median family income for similarly sized households within the debtor's state of residence. The distinction between the debtor's CMI being above or below the applicable median income is significant for debtors. If the debtor's CMI is below the applicable median family income, the debtor need not complete the remainder of the means test because there is no presumption of abuse for below median income debtors. If the debtor's income is above the applicable median family income, the debtor must complete the remainder of means test.[8]

---

[7] 11 U.S.C. § 101 (10A) states "current monthly income" —

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on —

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

[8] The distinction between above and below median income is also significant in Chapter 13 cases because it determines the applicable plan period (36 — 60 months) and whether standard or actual expenses are to be used to determine disposable income available for plan payments. *See* 11 U.S.C. §§ 1322(d) and 1325(b)(3).



The means test directs above median income debtors to calculate deductions to CMI using Internal Revenue Service ("IRS") national standards for similarly sized households for living expenses (food, clothing, personal care, household supplies), and IRS local standards for housing and utilities, mortgage/rent expense, and transportation expense. To these standard deductions *13 debtors may add other necessary expenses actually incurred for taxes, mandatory payroll expenses, life insurance, court-ordered payments, education expenses for employment or for a physically or mentally challenged child, childcare, healthcare, and tele-communication expenses.

The means test permits debtors to include additional expense deductions for amounts actually expended in several categories such as average monthly amounts actually expended for health insurance, continued contributions to the care of household or family members, disability insurance and health savings accounts, protection against family violence, home energy costs in excess of the specified IRS allowance, limited education expenses for dependent children under 18, additional food and clothing expense with documentation *603 that such expense is reasonable and necessary, and continued charitable deductions.

The last part of the means test provides for deductions to CMI for future payments on secured claims, past due payments or cure amounts on secured claims for property that is necessary to the support of the debtor or the debtor's dependents, payments on priority claims such as alimony and child support, and Chapter 13 administrative expenses. The total of all deductions is subtracted from CMI to determine if a presumption of abuse arises. Such a presumption will arise — *14

> if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of —

> (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or

> (II) $10,000.

11 U.S.C. § 707(b)(2)(A)(i). The debtor may rebut a presumption of abuse by demonstrating special circumstances such as a serious medical condition or a call to active duty in the Armed Forces that justifies additional expense or adjustments to CMI pursuant to § 707(b)(2)(B).

The means test is the embodiment of Congress' intent "that there be an easily applied formula for determining when the Court should *presume* that a debtor is abusing the system by filing a Chapter 7 petition." *In re Fowler*, 349 B.R. 414, 419 (Bankr. D. Del. 2006). The means test has been criticized as "a blind legislative formula that attempts to direct debtors to a Chapter that provides for at least some measure of repayment to unsecured creditors over a period of years. Like any other effort at social or economic legislation, it is not perfect." *In re Barraza*, 346 B.R. 724, 729 (Bankr. N.D. Tex. 2006). "The means test presents a backward looking litmus test performed using mathematical computations of arbitrary numbers, often having little to do with a particular debtor's actual circumstances and ability to pay a portion of debt. Congress has already determined the fairness of application of the means test, and a major objective of the *15 legislation was to remove judicial discretion from the process." *In re Hartwick*, 352 B.R. 867, 868 (Bankr. D. Minn. 2006). The Court notes that the means test's use of national and local standards rather than actual expenses, and historical rather than current actual income "was not intended to and does not produce the most accurate prediction of the debtor's ability to fund a Chapter 13 plan." *In re Walker*, 2006 WL 1314125 at *6 (Bankr. N.D. Ga. May 1, 2006). The purpose of the means test is to determine whether a presumption of abuse arises, however "a presumption is just that a presumption." *In re Lenton*, 2006 WL 3850011, at *6 (Bankr. E.D. Pa.

Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 137 of 154

In re Hay, 2007 B.R. ... 595 ... (Bankr. M.D. Fla. 2007)

Dec. 15, 2006). "Presumptions are typically created to avoid litigation." *Fowler*, 349 B.R. at 420. Thus, "whether the debtor passes or fails the means test is relevant only to the question of whether the U.S. Trustee will benefit from a presumption of abuse. In cases in which the presumption of abuse does not arise or is rebutted, the U.S. Trustee may pursue dismissal of a debtor's case under section 707(b)(3)." *In re Walker*, 2006 WL 1214125, at *8.

Thus while the presumption of abuse did not arise in this case, Debtors' passing the means test does not end the inquiry nor does it preclude a discretionary finding of abuse by the Court. *In re Simmons*, 2006 WL 3782959, at *7 (Bankr. N.D. Ohio Dec. 11, 2006); *Nockerts*, 2006 WL 3689465, at *8 (Bankr. E.D. Wis. Dec. 14, 2006). BAPCPA provides a two-step process to detect and deter abusive filers: the above described objective means test prescribed in § 707(b)(2), and the more subjective test of § 707(b)(3) which requires an analysis of the facts of a particular case. *In re Hare*, 2007 WL 201249, at *3 (Bankr. E.D. Cal. Jan. 24, 2007); *In re Wilson*, 356 B.R. 114, 121 (Bankr. D. Del. 2006).

## 3. 11 U.S.C. § 707(b)(3) — What Circumstances are Embraced by the Totality of the Circumstances of the Debtors' Financial Situation?

In cases where the presumption of abuse does not arise or is rebutted, section 707(b)(3) requires courts to consider whether the granting of relief would be an abuse of the provisions of Chapter 7 based upon the following criteria:

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The UST's Motion, which is based upon § 707(b)(3), argues that the granting of relief would be an abuse of the provisions of Chapter 7 given the totality of the circumstances of the Debtors' financial situation.

Section 707(b)(3) incorporates the judicially constructed concepts of bad faith and totality of the circumstances. Therefore pre-BAPCPA case law applying these concepts can still be helpful in determining abuse under BAPCPA. *In re Mestermaker*, 2007 WL 79306, at *5 (Bankr. N.D. Ohio Jan, 10, 2007); *In re Pak*, 343 B.R. 239, 243 (Bankr. N.D. Cal. 2006). Pre-BAPCPA, there was a split of authority among the circuits regarding what constituted "substantial abuse."[9] The First, Fourth, Sixth, Eight and Ninth Circuits used varying tests to determine the existence of "substantial abuse" pursuant to § 707(b). *In re Lamanna*, 153 F.3d 1, 4 (1st Cir. 1998). The First Circuit acknowledged that although the tests used by various courts of appeal did not employ precisely the same language, they shared common elements. *Id.* While a debtor's ability to pay was always a factor in a court's substantial abuse determination, the extent to which courts relied on the debtor's ability to pay varied. *In re DeGross*, 272 B.R. 309, 312 (Bankr. M.D. Fla. 2001).

[9] There are no pre-BAPCPA Eleventh Circuit opinions on this issue.

The Sixth Circuit's test to determine § 707(b) substantial abuse, as stated in *Krohn*, directs courts to ascertain from the totality of the circumstances whether the debtor:



Case 8:24-bk-10187-SC   Doc 35   Filed 07/02/24   Entered 07/02/24 21:28:31   Desc
Main Document   Page 138 of 154

In re Henderson, 23 B.R. 595 (Bankr. S.D. Cal. 2007)

is merely seeking an advantage over his creditors, or instead is `honest,' in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings, and whether he is `needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. *Substantial abuse can be predicated upon either lack of honesty or want of need* .

*Krohn,* 886 F. 2d 123,126 (6th Cir. 1989) (emphasis added).

*Krohn* suggests that the factors relevant to a debtor's honesty include the debtor's good faith and candor in filing schedules, whether the debtor engaged in "eve of bankruptcy" purchases, and *18 whether the debtor was forced into bankruptcy by unforeseen or catastrophic events. *Id.* The factors relevant to whether a debtor is needy include whether the debtor enjoyed a stable source of future income, whether *605 the debtor was eligible for Chapter 13 relief, and whether his expenses could be reduced significantly without depriving him of necessities. *Id.* at 126-27. *Krohn* observed that courts would "not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease." *Id.* Thus *Krohn* attempted to separate the bad faith and ability to pay inquiries for determining the existence of substantial abuse that would warrant dismissal of a Chapter 7 case.

The First Circuit adopted the Sixth Circuit's formulation of the totality of circumstances test noting that the *Krohn* test demanded a "comprehensive review of the debtors current and potential financial history." *Lamanna,* 153 F. 3d at 4. The First Circuit found that ability to pay was the primary, but not conclusive, factor for determining substantial abuse. The First Circuit held that "a bankruptcy court may, but is not required to, find `substantial abuse' if the debtor

has an ability to repay, in light of all of the circumstances." *Id.* at 5. While rejecting "any per se rules mandating dismissal for `substantial abuse' whenever the debtor is able to repay his debt out of future disposable income, or forbidding dismissal on that basis alone," the First *19 Circuit did not require courts to look beyond the debtor's ability to repay if that factor alone warranted dismissal. *Id.* at 2 and 4.

In *Kelly,* the Ninth Circuit determined that a finding of a debtor's ability to pay his debts standing alone justified § 707(b) dismissal for substantial abuse. *Zolg, v. Kelly (In re Kelly),* 841 F. 2d 908, 914 (9th Cir. 1988). "This is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown." *Id.* at 915. The Eighth Circuit subsequently agreed with the Ninth Circuit in *In re Walton,* 866 F.2d 981 (8th Cir. 1989). The Eighth Circuit rejected debtor's argument that "substantial abuse" must be equated with "bad faith," and in so doing reasoned that the debtor's "cramped interpretation of section 707(b) . . . would drastically reduce the bankruptcy courts' ability to dismiss cases filed by debtors who are not dishonest, but who also are not needy." *Id.* at 983. In concurring with *Kelly's* analysis and result, *Walton* "clearly contemplate[d] that the ability to fund a Chapter 13 plan can be sufficient reason to dismiss a Chapter 7 petition under § 707(b)." *United States Trustee, v. Harris,* 960 F.2d 74, 76 (8th Cir. 1992). Thus, the Ninth Circuit's determination that ability to pay standing alone *is* sufficient cause for dismissal may be distinguished from the First, Sixth, and Eight Circuits' determination that ability to pay standing alone *can* be sufficient cause for dismissal.

In contrast, the Fourth Circuit determined that *20 "solvency alone *20 is *not a* sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7." *In re Green,* 934 F.2d 568, 572 (4th Cir. 1991) (emphasis added). *Green* instructs courts to conduct

substantial abuse determinations pursuant to a totality of the circumstances test that evaluates several factors including:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3) Whether the debtor's proposed family budget is excessive or unreasonable;

606    *606 (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

(5) Whether the petition was filed in good faith.

*Id.*

The *Green* court rejected *Kelly's* "per se" ruling that a debtor's ability to pay standing alone justifies dismissal of a Chapter 7 case for substantial abuse. *Id.* at 573. The *Green* court reasoned that such a *per se* rule would be inconsistent with the (pre-BAPCPA) § 707(b) presumption in favor of granting the relief requested by the debtor. *Id.* In addition, *Green* determined that section 707(b) "was intended to explicitly recognize the court's ability to dismiss a Chapter 7 petition for lack of good faith — when `the total picture is abusive.'" *Id.* at 572.

Debtors' counsel urges the Court to follow *Green's* totality of the circumstances test and relies heavily 21    on *In re Nockerts*, *21 2006 WL 3689465 (Bankr. E.D. Wis. Dec. 14, 2006), to argue that while an inquiry into ability to pay may be appropriate for below median income debtors who have not taken the means test, the inquiry under the "totality of the circumstances test" for debtors who have "passed" the means test requires something more than just ability to pay. To the extent that the ruling on the motion to dismiss in *Nockerts* was

based upon § 707(b)(2), *Nockerts* is not on point because in this case the UST's Motion is based upon § 707(b)(3). To the extent *Nockerts* invokes *Green* to hold that something more than ability to pay is required for dismissal under § 707(b)(3)(B), the Court respectfully disagrees for the reasons discussed below.[10]

> [10]  The motion to dismiss in *Nockerts*, which was based upon § 707(b)(2), presented the issue of whether the means test deduction for payments "scheduled as contractually due" should include payments for debt on property that debtors intended to surrender. *Nockerts*, 2006 WL 3689465 (Bankr. E.D. Wis. Dec. 14, 2006). The *Nockerts* court concluded that such payments were properly included in the means test calculation to determine if a presumption of abuse arises. The *Nockerts* court scheduled a further hearing to consider whether the case should be dismissed pursuant to § 707(b)(3) based upon the "totality of the circumstances".

Notwithstanding the opinion of the *Nockerts* court, section 707(b) has been so extensively modified that the Court doubts *Green's* vitality post-BAPCPA. The presumption in favor of granting the relief requested by the debtor which *Green* sought to safeguard through its formulation of the totality of the circumstances test has been discarded by Congress in favor of a presumption of abuse for debtors who have the ability to pay their debts as determined by the means test. Thus, 22    although *Green* rejected *Kelly's* per se *22 ruling that ability to pay standing alone justifies dismissing a Chapter 7 case for substantial abuse, *Kelly's* per se rule has been codified in BAPCPA by § 707(b)(2)'s presumption of abuse for debtors, who "fail" the means test. Eugene R. Wedoff, *Means Testing in the New 707(b)*, 79 Am. Bankr. L.J. 231, 235 (Spring 2005); *Nockerts*, 2006 WL 3689465, at *7.

Despite the argument of Debtors' counsel, the Court does not find that *Green* provides guidance post-BAPCPA for analyzing the totality of the circumstances of debtor's financial situation under § 707(b)(3).[11] The *Green* totality of the *607 circumstances test requires consideration of factors that look at ability to pay *conjunctively* with bad faith. *Green's* inquiry into whether the petition was filed because of sudden illness, calamity, disability, or unemployment is relevant to the debtor's ability to repay creditors. However *Green's* inquiry into whether the petition was filed in good faith, by negative implication, determines whether bad faith exists. Thus, the *Green* factors consider ability to pay together with bad faith, *23 however BAPCPA requires a separate evaluation for bad faith and totality of the debtor's financial circumstances pursuant to subsections 707(b)(3) (A) and (B) respectively. "By listing `bad faith' and `totality of the circumstances' disjunctively, the statutory language [of § 707(b)(3)(A) and (B)]indicates that bad conduct by the debtor in connection with the bankruptcy is a ground for 707(b) relief independent of financial circumstances indicating that the debtor could repay debt." Wedoff, *Means Testing*, 79 Am. Bankr. L.J. at 236.

---

[11] The UST quotes a lengthy section of a December 7, 2000 Committee Report on bankruptcy reform legislation for its apparent approval of the court's decision in *Lamanna* and disapproval of *Green*. However, "[i]t is necessary to note that the history of the legislative efforts culminating in the 2005 Act is not the same as the legislative history of the 2005 Act. To the extent legislative history of the 2005 Act can be used to resolve any arguable ambiguity in the statutory language, it is of dubious assistance. First, there is no joint conference statement because the 2005 Act did not have a conference committee." *In re Sorrell*, 2007 WL 211276, at *7 (S.D. Ohio Jan, 26, 2007). *See also In re McNabb*, 326 B.R. 785, 789 (Bankr. D.

Ariz. 2005) ("Legislative history is virtually useless as an aid to understanding the language and intent of BAPCPA.") The Court's interpretation of § 707(b)(3) is based upon the plain meaning of the statute. The Court does not find it necessary to divine legislative intent from legislative history, at least not with respect to § 707(b)(3).

The Court notes that pre-BAPCPA substantial abuse cases speak generally of the "totality of the circumstances test". *See e.g. In re Lamanna*, 153 F.3d 1 (1st Cir. 1998); *In re Stewart*, 175 F.3d 796 (10th Cir. 1999). In contrast, post-BAPCPA § 707(b)(3)(B) specifically delineates the pertinent inquiry as the "totality of the circumstances *of the debtor's financial situation* ". 11 U.S.C. § 707(b)(3)(B). Thus, the debtor's total financial situation as a measure of ability to pay, and bad faith are separate and sufficient grounds for dismissal. Either ability to pay *or* bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3).

There has been no allegation of bad faith in this matter. The issue is whether the totality of the circumstances of the Debtors' financial situation indicates that Debtors have the ability to pay a substantial portion of their unsecured nonpriority debts. For the *24 reasons stated, the Court concludes that under BAPCPA the ability to pay, standing alone, is sufficient to warrant dismissal of a Chapter 7 case for abuse pursuant to 11 U.S.C. § 707(b)(3)(B).

## C. Does Totality of the Circumstances of Debtors' Financial Situation Include Consideration of Post-Petition Events?

In this case Mrs. Henebury's commencing employment earning $39,000.00 per year just days after the Debtors filed for Chapter 7 relief significantly affects the Debtors' ability to pay creditors. Thus the issue for the Court is whether it is proper to consider the Debtors' post-petition

financial situation in determining if the granting of relief would be an abuse of the provisions of Chapter 7. For the reasons stated below, the Court finds that the Debtors' post-petition financial situation is relevant and properly considered in the § 707(b)(3)(B) analysis.

## 1. Cortez

The Fifth Circuit's pre-BAPCPA § 707(b) analysis of whether dismissal for substantial abuse permits consideration of post-petition events in *Cortez* was 608 decided *608 under factually similar circumstances to this matter. *United States Trustee, v. Cortez (In re Cortez)*, 457 F.3d 448 (5th Cir. 2006). Like Mrs. Henebury, the debtor in *Cortez* was unemployed on the petition date, but he commenced employment at an annual salary of $95,000.00 just two weeks after filing. In response to the Schedule I directive to disclose reasonably anticipated 25 increases or decreases in income in *25 the coming twelve months, the debtor indicated that he expected to be employed in the current month but had not started working as of the petition date. *Id.* at 451. Based upon the debtor's new employment and consequent ability to repay a substantial portion of his unsecured debts, the United States Trustee moved for dismissal for substantial abuse. In deciding *Cortez*, the Fifth Circuit relied heavily on the language of § 707(b) to determine that substantial abuse dismissal analyses may consider post-petition events. *Id.* at 455. The *Cortez* court first noted that "courts of appeals considering § 707(b) have implicitly, if not explicitly, recognized that `granting of relief' means a Chapter 7 discharge." *Id.* The Fifth Circuit's analysis then stated that § 707(b) `does not condition dismissal on the *filing* of bankruptcy being a `substantial abuse' but rather on the *granting of relief*, which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted." *Id.* (emphasis in original). In addition the Fifth Circuit quoted the last sentence of § 707(b) which states: " [i]n making a determination whether to dismiss a

case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions . . .". *Id.* The phrase "or continues to make" suggested to the Fifth Circuit that with the exception of charitable contributions, courts are "entitled to focus on subsequent developments in the debtor's 26 financial condition." *Id.* *26 The pre-BAPCPA § 707(b) language relied upon by the Fifth Circuit in *Cortez* has been retained in § 707(b)(1) and thus the holding of *Cortez* remains persuasive post-BAPCPA. There is also additional new forward-looking language in § 707(b)(3)(B) wherein courts are directed to consider whether:

> the totality of the circumstances (including *whether the debtor seeks to reject* a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3)(B) (emphasis added).

Although personal services contracts are not at issue in this matter, in cases where they are implicated section 707(b)(3)(B) *requires* courts to consider future events under the totality of the circumstances of the debtor's financial situation test for abuse. Thus the statutory language of post-BAPCPA § 707(b)(1) and (3) adds further support to *Cortez*' conclusion that courts can consider post-petition events occurring prior to discharge in making dismissal for abuse determinations.

The Fifth Circuit's analysis continued by noting that other circuit courts had not considered the propriety of considering post-petition events for substantial abuse determinations. 457 F.3d at 456. Nevertheless, the Fifth Circuit found support for its conclusion in the other courts agreement "that a debtor's ability to repay his debts out of *future* income is a primary factor to be considered in determining whether to dismiss for substantial abuse." *Id.* (emphasis added); *see also Walton*, 866 27 F. 2d at 984. The *Cortez* *27 court stated that "[i]f sufficient income to fund a Chapter 13 plan is

*anticipated* , a complete discharge of the debtor's obligations would constitute a substantial abuse of Chapter 7." 457 F.3d at 457 *609 (emphasis added). The Fifth Circuit found additional support for its forward-looking analysis in a Chapter 13 debtor's obligation to amend their schedules to include subsequent income even if that income was not known or realized at the time of the filing. *Id.* Thus while post-petition earnings are not property of the estate, the Fifth Circuit determined that courts "can and should take them into account for purposes of determining substantial abuse under § 707(b)." *Id.* at 458. The *Cortez* case was remanded to the bankruptcy court for consideration of any post-petition events affecting the debtor's financial situation including any post-petition changes in income.

The Fifth Circuit's reasoning in *Cortez* continues to provide guidance post-BAPCPA.[12] The statutory language relied upon in *Cortez* is unchanged. If anything, BAPCPA's statutory modifications render it easier for a movant to establish abuse. *Lenton,* 2006 WL 385001, *28 at *11 (Bankr. E.D. Pa. Dec. 15, 2006). The threshold for dismissal has been lowered to "abuse" from "substantial abuse", and the pre-BAPCPA presumption in favor of granting the relief requested by the debtor has been eliminated in favor of a presumption of abuse for debtors who have an ability to pay a portion of their debts pursuant to the means test.

12  The effect of *Cortez* post-BAPCPA has been debated. *See* John H. Dion, *Timing is Everything . . . Or Is It?* 25-Oct Am Bankr. Inst. J. 1 (2006) (suggesting that *Cortez* is relevant and important post-BAPCPA. The decision is statutorily well-reasoned despite the outcome being contrary to most practitioner's concepts of Chapter 7 timing and planning); *but cf.* Rafael I. Pardo, *Analyzing Chapter 7 Abuse Dismissal Motions Post-BAPCPA: A Reply on Cortez,* 25-Jan Am. Bankr. Inst. J. 16 (suggesting that the statutory definition of current monthly income being historical virtually

eliminates *Cortez*-style judicial discretion to consider post-petition income fluctuations in abuse dismissal motions based on the means test. Only when the presumption of abuse does not arise or is rebutted will courts have a meaningful opportunity to evaluate the effect of a post-petition increase in a debtor's income).

## 2. Post-BAPCPA cases

Post-BAPCPA, other bankruptcy courts have held that abuse determinations pursuant to the totality of the circumstances of the debtor's financial situation requires analysis of a debtor's actual ability to pay and therefore post-petition events are properly considered under § 707(b)(3)(B). *In re Lenton,* 2006 WL 3850011 (Bankr. E.D. Pa. Dec. 15, 2006) ( *citing, In re Richie,* 353 B.R. 569 (Bankr. E.D. Wis. 2006); *In re Paret,* 347 B.R. 12 (Bankr. D. Del. 2006); *In re Pak,* 343 B.R. 239 (Bankr. N.D. Cal. 2006)).

In *In re Pennington,* 348 B.R. 647 (Bankr. D. Del. 2006) the issue was framed by the court as: "whether the Court, in considering the `totality of the circumstances . . . of the debtor's financial situation' is limited to the Debtor's financial situation as of the date of the filing of the petition or may/must consider the Debtor's financial situation at the time the motion to dismiss is heard." *Id.* at 651. In *Pennington,* the United States Trustee filed a motion to dismiss for abuse because the debtor was funding a savings account through payroll deductions of $430.00 per month. In addition, the *29 debtor's schedules reflected $91.00 in additional net monthly income that could be used to pay creditors. Prior to the hearing on the motion to dismiss, the debtor filed an amended Schedule J reflecting increased car expenses of $557.00 per month. However, the debtor testified that $557.00 was not his actual car expense because he surrendered the car post-petition and bought a less expensive model. *Id.* at 648. *610

In granting the United States Trustee's motion, the *Pennington* court reasoned that:

> [a] ruling that the Court may only consider the Debtor's financial situation at the time of the filing would cut both ways. If a debtor incurred additional expenses post-petition (for example, he needed a new car or had additional unexpected medical expenses), the Court would not be able to consider it. Such an arbitrary rule is not mandated by the language of the Code, nor does it appear to be reasonable."

*Id.* at 651.

The *Pennington* court found that the very broad language of § 707(b)(3) "was meant to give courts considerable leeway to consider all aspects of the debtor's financial situation." *Id.* In rejecting debtor's argument that the court's analysis should be limited to the financial situation as of the petition filing date, the *Pennington* court noted that, "[t]here is no indication in the language of the statute or the legislative history that Congress meant to limit temporally the Court's consideration of the Debtors' financial condition when determining whether to dismiss a case for abuse." *Id.* The court concluded that it must 30 consider the debtor's financial *30 situation "at the time of the hearing on the motion to dismiss in determining whether granting Chapter 7 relief is an abuse under section 707(b)(3)." *Id.* *Pennington's* conclusion is also consistent with cases holding that courts must consider the debtor's future, rather than historical, income and expenses when determining confirmation of a Chapter 13 plan. *Id.* at 651 ( *citing In re Demonica*, 345 B.R. 895, 900 (Bankr. N.D. Ill. 2006); *In re McGuire*, 342 B.R. 608, 614 (Bankr. W.D. Mo. 2006); *In re Jass*, 340 B.R. 411 (Bankr. D. Utah 2006); *In re Hardacre*, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006)).

The *Pak* court also found that the totality of the circumstances of the debtor's financial situation required the court to consider whether the debtor

had the ability to pay unsecured claims through a hypothetical Chapter 13 plan. *In re Pak*, 343 B.R. 239, 246 (Bankr. N.D. Cal. 2006). The *Pak* court reasoned that a debtor's

> actual and anticipated future income must be considered, rather than simply his [historical] `current monthly income,' in determining . . . `projected disposable income' for purposes of confirming a chapter 13 plan. Thus, this is also the correct income figure to use in deciding whether to grant or deny a motion to dismiss a chapter 7 case under section 707(b)(3)(B).

*Id.* at 245-46. Thus, the *Pak* court found it proper to include post-filing changes in circumstances such as increased or decreased income in its dismissal for abuse analysis.

The *Richie* court, relying upon *Pennington* and *Pak*, similarly determined that if a debtor's ability 31 to repay creditors is *31 different at the time of filing and at the time of the hearing on the motion to dismiss, the ability to pay analysis is properly conducted based upon the debtor's financial circumstances existing at the time of the hearing on the motion to dismiss, not the petition date. *In re Richie*, 353 B.R. 569, 575-76 (Bankr. E.D. Wis. 2006).

In *In re Hare*, 2007 WL 201249 (Bankr. E.D. Cal. Jan. 24, 2007) the above median income debtors had "passed" the means test because they claimed a large deduction for contractual mortgage payments due on a residence that was effectively surrendered in bankruptcy. *Id.* at *1. The court granted the United States Trustee's motion to dismiss for abuse because the debtors had the actual ability to pay a substantial portion of their debts through a Chapter 13 plan. *Id.* at *4. In 611 addition, *611 the court considered the debtors' attempt "to claim a substantial Means Test deduction for a mortgage payment which they never intended to pay, and which in fact ceased to

exist after they filed for bankruptcy protection, . . . a further `circumstance' . . . suggest[ing] that a Chapter 7 discharge would be an abuse." *Id.*

The *Lenton* court determined that it's § 707(b)(3) abuse analysis required the court to consider the debtor's "actual and anticipated financial situation over the applicable Chapter 13 commitment period." *Lenton*, 2006 WL 3850011, at *10 (Bankr. E.D. Pa. Dec. 15, 2006). Thus, the *Lenton* 32 court's analysis was also *32 forward-looking.

This Court agrees with the reasoning in the cases discussed above. In determining if the granting of relief would be an abuse of the provisions of Chapter 7, courts are required to determine if the debtor has the ability to pay a substantial portion of their unsecured claims through a Chapter 13 plan based upon the totality of the debtor's financial circumstances. If a Chapter 13 plan is to be feasible it must be based on the debtor's actual or anticipated ability to pay and therefore consideration of post-petition changes in the financial circumstances of the debtor is appropriate. *See, e.g.*, *In re Edmunds*, 350 B.R. 636, 647 n. 16 (Bankr. D.S.C. 2006).

## 3. What determines ability to pay for an above median income debtor?

Having determined that courts pre- and post-BAPCPA generally determine ability to pay by analyzing whether the debtor has sufficient projected disposable income to fund a hypothetical Chapter 13 case, *see, e.g., In re Jones*, 335 B.R. 206, 208 (Bankr. M.D. Fla. 2005); *In re Richie*, 353 B.R. 569, 575 (Bankr. E.D. Wis. 2006), the issue post-BAPCPA is how to calculate ability to pay for the above median income Debtors in this case. While the purpose and outcome of an objection to confirmation and a motion to dismiss a Chapter 7 case for abuse are materially different, Chapter 13 cases are instructive. *Zak*, 2007 WL 143065, at *6 (Bankr. N.D. Ohio Jan. 12, 2007). " [A] Chapter 13 case is prospective, i.e., it encompasses a debtor's current and future

financial circumstances for a period *33 of three to five years." *Lenton*, 2006 WL 3850011, at *6. "Section 1325(b)(1)(B) requires Debtors to use all of their `projected disposable income' to pay unsecured creditors during the applicable commitment period" of a Chapter 13 plan. *In re Edmunds*, 350 B.R. 636, 640 (D.S.C. 2006). Post-BAPCPA, the expense amounts used to calculate projected disposable income for below median income debtors continues to be determined by examining Schedule J, however the calculation of applicable expenses for above median income debtors highlights the odd manner in which BAPCPA has been drafted. While "projected disposable income" is not defined, "disposable income" is a defined term under BAPCPA. "`Disposable income,' for above median income debtors is defined as `current monthly income,' also a defined term . . . less amounts reasonably necessary `to be expended' as determined by § 707(b)(2)(A) (B)." *Id.* (paraphrasing § 1325(b) (3)). As previously noted, current monthly income is based upon historical average monthly income over a six month period prior to the filing of the bankruptcy. Section § 1325(b)(3) now directs above median income debtors to calculate expense deductions to CMI based upon the means test formula found in § 707(b)(2)(A) and (B). *In re Miller*, 2007 WL 128790, at *3 (Bankr. N.D. Ala. Jan. 18, 2007). Under the means test formula, above median income debtor's applicable monthly expense amounts are based upon IRS national and local standards plus the debtor's actual monthly 612 *612 expenses for certain other categories. *Id.* 34 Thus for purposes of Chapter 13 plan *34 confirmation, above median income debtors calculate their disposable income by using an historical average for income, that may or may not reflect the debtor's current income, from which standard amounts rather than actual amounts are deducted for several categories of expenses. How this seeming anomaly is to be harmonized with the requirement that debtors use all of their projected disposable income to pay unsecured creditors has led to different opinions by different courts in



interpreting the calculation and use of "projected disposable income" versus "disposable income" for above median income debtors in Chapter 13 cases.[13] Since the Court is not actually adjudicating Debtor's projected disposable income in the context of a confirmation hearing, these issues while instructive *35 need not be decided here.

[13] The Miller court categorized the varying bankruptcy court decisions. "One line of cases holds that post-BAPCPA, Schedule J is irrelevant to the determinations of disposable income for above median income debtors." *In re Miller*, 2007 WL 128790, at *4 (Bankr. N.D. Ala. Jan. 18, 2007) ( *citing In re Farrar-Johnson*, 353 B.R. 224 (Bankr. N.D. Ill. 2006); *In re Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006); *In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006); *In re Guzman*, 345 B.R. 640 (Bankr. E.D. Wis. 2006); *In re Hanks*, 2007 WL 60812 (Bankr. D. Utah 2007)). "Other courts have turned to Schedules I and J finding that the terms `projected disposable income' as used in § 1325(b)(1)(B) and `disposable income' as used in § 1325(b)(2) are not synonymous. Because Congress added the word `projected' to § 1325(b)(1)(B) which is a forward looking concept, some courts hold that the expense component of `projected disposable income' must necessarily be a forward looking reflection of the debtor's projected expenses allowed by the means test." *Id.* "Other courts suggest that the concept of good faith under § 1325(a)(3) demands a review of the debtor's actual income and expenses." *Id.* ( *citing In re Edmunds*, 350 B.R. 636 (Bankr. D.S.C. 2006); *In re Kibbe*, 342 B.R. 411 (Bankr. D.N.H. 2006)). "Another line of cases has focused upon the issue of whether debtors are entitled to deduct from disposable income payments on secured debts for which the debtors will not actually be liable as a result of their decision to surrender the collateral securing the debt." *Id.* at 5 (

*citing In re Love*, 350 B.R. 611 (Bankr. M.D. Ala. 2006); *In re Crittendon*, 2006 WL 2547102 (Bankr. M.D.N.C. 2006); *In re Hardacre*, 338 B.R. 718 (Bankr. N.D. Tex. 2006); *In re Oliver*, 2006 WL 2086691 (Bankr. D. Or. 2006); *In re Grunert*, 353 B.R. 591 (Bankr. E.D. Wis. 2006); *In re Haley*, 2006 WL 2987947 (Bankr. D.N.H. 2006)). The foregoing cases suggest several issues that could arise if this were an objection to Chapter 13 confirmation proceeding.

Having determined in this matter that the totality of the circumstances of the Debtor's financial situation is concerned with Debtor's actual ability to pay some, if not all, of Debtor's unsecured nonpriority debt through a hypothetical Chapter 13 plan and that post-petition events are relevant to, and properly considered, the Court finds it appropriate to begin its analysis with the Debtors' Means Test which should reflect Debtors' applicable expenses using the IRS national and local standards described in section 707(b)(2)(A).[14] From this starting point adjustments may be necessary based on the Debtors' actual financial circumstances. *See e.g., Singletary*, 354 B.R. 455, 462 n. 6 (S.D. Tex. 2006) (If "the UST elects to file a motion under § 707(b)(3), the UST may include a means test calculation based on the circumstances on the *613 date of the filing of the motion or any date in the future. In that case, the court would be able to consider this means test as relevant evidence under the totality of circumstances analysis of § 707(b)(3). . . ."). In determining if the granting of relief would be an abuse of the provisions of Chapter 7 based upon the totality of the Debtors' financial situation, the Court finds it *36 appropriate and equitable to include Mrs. Henebury's income from the teaching job she started just four days after Debtors filed their petition. If the Court adds Mrs. Henebury's net monthly income of $2,875.00 to Debtors' CMI as listed on their Means Test, the Debtors' monthly disposable income would be $1,746.93 rather than



Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 146 of 154

In re Henebury, 361 B.R. 595 (Bankr. M.D. Fla. 2007)

negative $1,128.07. This amount would allow the Debtors to repay 100% of their $73,799.46 unsecured debt in less than 43 months.

[14] The required use of standard applicable expenses for calculating disposable income sets spending limits on above median income debtors. *See Fuller*, 346 B.R. 472, 484 (Bankr. S.D. Ill. 2006) (In "attempting to avoid a scenario in which an above median-income debtor could reduce his disposable income by claiming what Congress might consider to be unreasonably high expenses" such debtors are told how much they can spend each month for food, clothing and housing.)

Alternatively, if the Court bases its analysis on Debtors' filed Schedules but adds Mrs. Henebury's net monthly income of $2,875.00 to Debtors' Schedule I and deducts the expenses listed on Debtors' Schedule J, Debtors' monthly disposable income would be $2,298.14 rather than negative $576.86. This amount would allow Debtors to repay 100% of their $73,799.46 in unsecured debt in less than 33 months.

Even using a third calculation based upon the Proposed Revised Schedules that Debtors' counsel introduced as evidence of Debtors inability to repay creditors, the Debtors would have sufficient disposable monthly income to repay unsecured creditors. The Proposed Revised Schedules included Mrs. Henebury's income but also included substantially greater expenses than the amount listed on Debtors' filed Schedule J. The UST objected on the basis that Debtors are not making all of the payments listed on Proposed Revised Schedule J. For example, Debtors ceased making mortgage payments of $2,403.97 for the Lake Worth Property prior to the petition date and Mr. *37 Henebury testified that the family no longer resides there. Debtors now reside instead in a rental property in Port Orange that costs $1,550.00 per month. The Court does not find that it is proper to include the expenses associated with two residences in a calculation to determine

whether Debtors have the ability to repay their creditors. The cost of two residences is neither necessary to be expended for the support of the Debtors, nor is it reasonable. Debtors also included payments for the Timeshare, a debt for which the Court subsequently denied reaffirmation. If the Court uses Debtors' Proposed Revised Schedules but eliminates the duplicated housing cost of $2,403.97 for the Lake Worth monthly mortgage payment and the Timeshare payment of $252.56, Debtors Proposed Schedule J expense would equal $6,383.13. Debtors monthly disposable income pursuant to Debtors' Proposed Revised Schedules without these expenses would be $1,328.75, rather than negative $1,327.78 as listed. This amount of monthly disposable income would be sufficient to repay 100% of Debtors' $73,799.46 in unsecured debt in less than 56 months.

Debtors' counsel argues that Debtors have neither abandoned nor surrendered the Lake Worth Property and that this contractually due payment should be considered. However the "contractually due" payments standard applies to Means Test calculations that determine whether the presumption of abuse arises. The presumption of abuse calculations are not entirely relevant to the Debtors' *38 current and prospective financial situation. Moreover, there is a distinction between the objective presumption of abuse analysis under § 707(b)(2) which excludes judicial discretion, and the subjective dismissal *614 for abuse analysis under § 707(b)(3)(B) which permits the Court's "case-by-case analysis . . . to address what Congress expected would be the inevitable exceptional cases." *Wilson*, 356 B.R. at 121. Having not made payments for the Lake Worth Property since June, Debtors have effectively, if not formally, surrendered the Lake Worth Property. Inclusion of these payments distorts Debtor's actual current and prospective financial situation. The Court also notes that in the context of Chapter 13, which has become a de facto test

In re Henebury, 361 B.R. 595 (Bankr. M.D. Fla. 2007)

for Chapter 7 dismissal for abuse based upon a debtor's ability to pay, when a debtor proposes a plan for confirmation

> the terms of the plan determine whether payments have been scheduled for payment in the future and also establishes the classification of creditors on the effective date of the plan. The confirmed chapter 13 plan constitutes a new agreement between the debtor and the creditors and is controlling as to the payments to be made to creditors, as well as to which of the creditors are secured creditors.

*Crittendon*, 2006 WL 2547102, at *4 (Bankr. M.D.N.C. Sept. 1, 2006).

The Court recognizes that this is not a Chapter 13 confirmation proceeding. However since a confirmable plan would not include costs for two residences, the inclusion of costs for two residences is not proper in an analysis that looks to see if Debtors have the ability to repay a substantial portion of their unsecured creditors based *39 upon Debtors' ability to fund a hypothetical Chapter 13 plan.

Debtors have been shown to have sufficient disposable monthly income to pay most, if not all, of their unsecured nonpriority debt pursuant to three different calculations. Under the totality of these financial circumstances the entry of a Chapter 7 discharge would be an abuse. Having determined the existence of abuse, the Court need not address the other expenses that the UST alleges are overstated. The Court notes that there have been no allegations of bad faith and there is nothing in Debtors' lifestyle that suggests they

have lived extravagantly or been reckless in dealing with their finances. Nevertheless, Debtors do have an ability to repay a substantial portion of their unsecured debt and therefore the granting of Chapter 7 relief is unwarranted.

## CONCLUSION

There has been no allegation of bad faith in this matter. While the Debtors filing for Chapter 7 protection only four days before Mrs. Henebury became employed may have been an opportunistic filing, it was not illegal. However the Court is compelled to review the totality of the Debtors' financial circumstances, and for the reasons stated, the Court finds that the Debtors have the ability to repay a substantial portion of their unsecured debt. Therefore pursuant to 11 U.S.C. § 707(b)(3)(B), the granting of a Chapter 7 discharge in this case would be an abuse of the provisions of Chapter 7.

*40

## ORDER

The Court, having heard the argument of counsel, considered the testimony and evidence presented, reviewed the applicable law, and being otherwise fully advised in the premises does hereby:

**ORDER AND ADJUDGE** that the UST's Motion is **GRANTED.** The above-captioned case shall be dismissed within ten days following entry of this Order unless Debtors move to convert this case to one under Chapter 13 with said ten days.

ORDERED in the Southern District of Florida.

615  *615



No. 06-10066 (MFW)

United States Bankruptcy Court, D. Delaware

# In re Pennington

348 B.R. 647 (Bankr. D. Del. 2006)

Decided Aug 30, 2006

No. 06-10066 (MFW).

648 August 30, 2006. *648

Cynthia L. Carroll, Newark, DE, for Debtor.

## **MEMORANDUM OPINION** [1]

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Motion of the United States Trustee (the "UST") to dismiss the chapter 7 case of Joseph Pennington, Jr. (the "Debtor") for abuse pursuant to section 707(b)(1) and (3) of the Bankruptcy Code. The Motion is opposed by the Debtor. For the reasons stated below, the Court will grant the Motion and dismiss the Debtor's case, unless he converts it to chapter 13.

## I. BACKGROUND

The Debtor filed his voluntary petition under chapter 7 on January 24, 2006. On February 9, 2006, the Debtor filed his Schedules and Statement of Financial Affairs. The Schedules reveal unsecured debt of $18,299 and net monthly income, after expenses, of $91. The meeting of creditors under section 341 was held on March 8, 2 2006. *2

On May 8, 2006, the UST filed its Motion to dismiss, to which the Debtor responded on June 8, 2006. A hearing on the UST's Motion was held on July 26, 2006. At that hearing, the UST offered evidence that the Debtor had $430 per month deducted from his paycheck and paid into a savings account. The Debtor's Schedule I reflects an additional $91 per month in net income available to pay creditors. As a result, the UST contended that the Debtor really has net monthly income of $521.

At the hearing, the Debtor offered an Amended Schedule J, which he had filed shortly before the hearing, to evidence an additional car expense of $557 per month. The Debtor admitted, however, that this car payment was not his current expense because subsequent to the filing, he had surrendered that car and bought a less expensive model, which costs $272.77 per month.

The Court admitted the Amended Schedule J, subject to the Debtor submitting a certification 649 verifying the information *649 on it, and took the matter under advisement. The Debtor subsequently filed a document showing his car insurance premium has increased from the amount reflected on the Amended Schedule J by approximately $43 per month and a statement showing the current car payment has been reduced to $265.29 per month. The UST filed a post-hearing brief on August 1, 2006. The matter is ripe 3 for decision. *3

## II. JURISDICTION


Part of Thomson Reuters

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 157(b)(2)(A) (O).

III. DISCUSSION

The UST seeks dismissal of the Debtor's chapter 7 case pursuant to section 707(b)(1) and (3). Section 707(b)(1) provides that the Court "may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Section 707(b)(3) provides:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption [of abuse] . . . does not arise or is rebutted, the court shall consider —
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

Id. at § 707(b)(3).[2] The UST does not suggest that there is \*4 fraud; nor is there any issue relating to the rejection of a personal services contract. The UST simply asserts that under the totality of the circumstances of the debtor's financial situation, the granting of relief under chapter 7 would be an abuse. The UST relies largely on precedent under former section 707(b), which held that a case could be dismissed for "substantial abuse." Courts interpreting that section held that the debtor's ability to repay creditors was the primary determinant of substantial abuse. See, e.g., First U.S.A. v. Lamanna (In re Lamanna), 153 F.3d 1, 5 (1st Cir. 1998) (adopting "totality of the circumstances" test and holding that "courts

should regard the debtor's ability to repay out of future disposable income as the primary, but not necessarily conclusive, factor of `substantial abuse'"); In re Walton, 866 F.2d 981, 984-85 (8th Cir. 1989) (concluding that debtor's ability to pay from future income should be considered in determining substantial abuse and finding that debtor's ability to repay two-thirds of unsecured debt within three years and 100% within five years rebutted the presumption that the debtor should be afforded relief under chapter 7); Zolg v. Kelly (In re Kelly), 841 F.2d 908, 914-15 (9th Cir. 1988) (stating that the primary question in determining substantial abuse is whether the debtor could repay his debts under a chapter 13 plan). \*5

[2] Because the Debtor's income is below the median income in Delaware, no presumption of abuse can arise. 11 U.S.C. § 707(b)(7).

The Debtor raises two defenses. First, the Debtor asserts that his income falls below the median income for Delaware and, therefore, under section 707(b)(7) there cannot be a finding of abuse based on the Debtor's ability to repay his creditors. \*650

The Court recently rejected a similar argument in In re Paret, No. 06-10272, 2006 WL 2138116, at \*11 (Bankr. D. Del. Aug. 1, 2006). For the reasons articulated in Paret, the Court will also reject the Debtor's argument in this case. Accord, In re Pak, 343 B.R. 239, 244 (Bankr. N.D. Cal. 2006). Instead, the Court concludes that under section 707(b)(3) the Court must determine if the Debtor's chapter 7 filing is an abuse by considering the "totality of the circumstances . . . of the debtor's financial situation" including whether the Debtor has the ability to repay his creditors. 11 U.S.C. § 707(b)(3).

Second, the Debtor argues that for purposes of determining whether he has the ability to repay creditors, the Court must consider his financial condition at the time he filed his petition (when he had a car payment of $557) rather than at the time of the hearing (when he had a car payment of



Case 8:24-bk-10187-SC    Doc 35    Filed 07/02/24    Entered 07/02/24 21:28:31    Desc
Main Document    Page 150 of 154

In re Perr    (Bankr. M.D.R. 6 Bankr. M.D. Fla. 2006)

$265.29 and increased insurance premiums of
$43). The Debtor argues that the Pak and In re
Walker, 2006 WL 1314125 (Bankr. N.D. Ga. May
1, 2006) cases support his position.

The UST argues that neither case supports the
Debtor's argument. The Court agrees with the
UST. The Walker Court *6 addressed the issue of
whether car payments due at the time of filing
were used for purposes of the means test under
section 707(b)(2), but not for purposes of the
totality of the circumstances test under section
707(b)(3). Id. at *2.[3]

> [3] The Walker Court held that car payments
> due at the time of the filing must be
> included, even though the car was
> subsequently surrendered, based on the
> "plain language" of section 707(b)(2). 2006
> WL 1314125 at *4. That section requires
> that the Court consider those amounts that
> are "scheduled as contractually due to
> secured creditors in each month of the 60
> months following the date of the petition."
> 11 U.S.C. § 707(b)(2)(A)(iii).

Similarly, the Pak case does not support the
Debtor's argument that the Court may only look at
the Debtor's financial condition as of the date of
the filing. The Pak Court, in determining that it
must consider the Debtor's current income rather
than income as of the petition date, considered the
standard for confirmation of a chapter 13 plan,
which is based on the Debtor's "projected
disposable income" under section 1325(b)(3). 343
B.R. at 244-45.

The UST further argues that prior to enactment of
the Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005 ("BAPCPA"), courts
routinely excluded payments due on debt secured
by collateral that is subsequently surrendered by
the debtor. See, e.g., In re Hall, 258 B.R. 45
(Bankr. M.D. Fla. 2001); In re Vianese, 192 B.R.
61 (Bankr. N.D.N.Y. 1996); In re Day, 77 B.R.
225, 226-28 (Bankr. D.N.D. 1987). The UST
argues *7 that precedent is still applicable.

The cases cited by the UST, however, are less than
compelling. In Hall, the payment for the expired
car lease was not included by consent of the
debtors. 258 B.R. at 52. In Vianese, the Court
deducted the car payment from expenses because
it was a business debt, rather than consumer debt,
and not because the car had been surrendered. 192
B.R. at 68. Finally, in Day, the Court apparently
deducted all payments on secured debt, even debt
secured by a car that had not been surrendered.[4]
*651

> [4] The Day Court noted that the debtor's
> monthly expenses totaled $967 "including
> an indicated payment of $546.00 per month
> toward bank loans and creditor payments."
> 77 B.R. at 226. Although the debtor had
> surrendered much of the collateral, he had
> retained the car. Id. That entire expense
> was later deducted by the Court in
> considering the debtor's ability to pay: "it
> appears at the present time there exists,
> after elimination of bank and creditor
> payments, a budgetary excess of $390.00
> per month." Id. at 228.

The question presented to this Court is whether
the Court, in considering the "totality of the
circumstances . . . of the debtor's financial
situation" is limited to the Debtor's financial
situation as of the date of the filing of the petition
or may/must consider the Debtor's financial
situation at the time the motion to dismiss is
heard.

A ruling that the Court may only consider the
Debtor's financial situation at the time of the filing
would cut both ways. If a debtor incurred
additional expenses post-petition (for example, he
needed a new car or had additional unexpected *8
medical expenses), the Court would not be able to
consider it. Such an arbitrary rule is not mandated
by the language of the Code, nor does it appear to
be reasonable.

Contrary to such a restrictive reading of the Code, the Court concludes that the language of section 707(b)(3) is very broad and was meant to give the Court substantial leeway to consider all aspects of the Debtor's financial condition. There is no indication in the language of the statute or in the legislative history that Congress meant to limit temporally the Court's consideration of the Debtor's financial condition when determining whether to dismiss a case for abuse. Therefore, the Court concludes that it must consider the Debtor's financial condition at the time of the hearing on the motion to dismiss in determining whether granting chapter 7 relief is an abuse under section 707(b)(3).

This ruling is consistent with the "substantial abuse" cases under former section 707(b). See, e.g., Lamanna, 153 F.3d at 5 (considering debtor's future income and expenses in applying "totality of the circumstances" test); Green v. Staples (In re Green), 934 F.2d 568, 572 (4th Cir. 1991) (holding that "[e]xploring . . . the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy *9 process by a debtor seeking to take unfair advantage of his creditors").

9

This conclusion is also consistent with cases which hold that in determining confirmation of a chapter 13 plan, the Court must consider the Debtor's future, rather than historical, income and expenses. See, e.g., In re Demonica, 345 B.R. 895, 900 (Bankr. N.D. Ill. 2006) (holding that to confirm chapter 13 plan, court must consider projected or anticipated income, not income as of petition date); In re McGuire, 342 B.R. 608, 614 (Bankr. W.D. Mo. 2006) (noting that if debtor requires a new car during life of chapter 13 plan, plan payments can be adjusted to account for that new expense); In re Jass, 340 B.R. 411, 418 (holding that in considering expenses under section 1325(b), court must apply standards under section 707(b)(2)(B) and allow a debtor who fails

the means test to rebut the presumption of abuse by showing special circumstances such as a change in income or expenses); In re Hardacre, 338 B.R. 718, 722 (Bankr. N.D. Tex. 2006) (concluding that chapter 13 plan confirmation "must be based upon the debtor's anticipated income during the term of the plan, not merely an average of her prepetition income"). Because the effect of a threatened dismissal of a chapter 7 case is often conversion to chapter 13, it is significant to consider how the income and expenses of the Debtor would be treated in chapter 13. *10

10

Considering the Debtor's anticipated income and expenses in this case requires the Court to acknowledge that the Debtor is no longer paying $557 for a car. The Debtor's net monthly income of $521 less his current car payment and additional car insurance of $308.29 leaves disposable income of $212.71 per month. With this net income, the Debtor is able to *652 repay 42% of his unsecured debt in a three-year plan and 69% of his unsecured debt in a five-year plan. Because this is significantly above the 25% threshold where abuse is presumed, the Court concludes that it would be an abuse to grant chapter 7 relief to the Debtor. 11 U.S.C. § 707(b)(2)(A)(i)(I). See Hon. Eugene R. Wedoff, Judicial Discretion to Find Abuse Under § 707(b)(3), Am. Bankr. Inst. Journal, April 2006, at 52 (concluding that "the [25% repayment] threshold [contained in section 707(b)(2)] fixes the level at which debt-paying ability becomes abusive of chapter 7. When judges are required to make determinations of abuse under § 707(b)(3), they should accordingly use the means-test threshold: If a debtor's actual disposable income, determined by the court, is below that threshold, there should be no finding of abuse based on debt-paying ability; if disposable income meets or exceeds the threshold, abuse should be found.") *11

652

11

IV. <u>CONCLUSION</u>

In re Perez, Case No. (Bankr. C.D. Cal. 2006)

For the foregoing reasons, the Court concludes that the Debtor has the ability to repay his creditors and granting relief under chapter 7 would be an abuse. The Court will, accordingly, grant the UST's Motion to Dismiss unless the Debtor converts his case to a case under chapter 13 within 30 days of the entry of the Court's order.

An appropriate order is attached.

1    *1

---



# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

26632 Towne Centre Drive #300, Foothill Ranch, CA 92610

A true and correct copy of the foregoing document entitled (*specify*):

Request for Judicial Notice

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____07/02/2024_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Anerio V Altman LakeForestBankruptcy@jubileebk.net, lakeforestpacer@gmail.com;ecf@casedriver.com
Benjamin Heston bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
Richard G. Heston rheston@hestonlaw.com,
yflores@hestonlaw.com,docs@hestonlaw.com;HestonRR41032@notify.bestcase.com,handhecf@gmail.com
Karen S Naylor (TR) alane@ringstadlaw.com, knaylor@IQ7technology.com;ecf.alert+Naylor@titlexi.com
United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**

On (*date*) _____07/02/2024_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____07/02/2024_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Delivery to the court per the court manual.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

| 07/02/2024 | Anerio Ventura Altman, Esq. | /s/ Anerio Ventura Altman, Esq. |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                 **F 9013-3.1.PROOF.SERVICE**