1    HESTON & HESTON, ATTORNEYS AT LAW
RICHARD G. HESTON (SBN 90738)
2    19700 Fairchild Road, Suite 280
Irvine, California 92612
3    Tel: 949-222-1041
Fax: 949-222-1043
4    rheston@hestonlaw.com

5    Attorney for Creditor,
Hollie A. Lemkin

6

7                    **UNITED STATES BANKRUPTCY COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9                         **SANTA ANA DIVISION**

10   In re:                                    **Case No: 8:24-bk-10187-SC**

11   **SUSAN JO WHITE**,                        **Chapter 7**

12             Debtor.                          **REQUEST FOR JUDICIAL NOTICE IN**
                                                **SUPPORT OF MOTION TO DISMISS**
13                                              **CHAPTER 7 CASE PURSUANT TO**
                                                **SECTION 707(b)(2) & (3)**
14
                                                **Hearing:**
15                                              Date:  July 16, 2024
                                                Time:  10:00
16                                              Courtroom:  5C
                                                Location:  411 West Fourth Street
17                                                          Santa Ana, CA 92701

18

19        Pursuant to Federal Rule of Evidence 201, Creditor, Hollie Lemkin, hereby requests that

20   this Court take judicial notice of the following documents:

21   • Amended Judgment entered in Orange County Superior Court case <u>Susan J. White v.</u>

22   <u>Hollie A. Lemkin</u> (case no: 30-2017-00933576-CU-PN-CJC), a true and correct copy of

23   which is attached hereto as Exhibit A.

24   ///

25   ///

26   ///

27   ///

28   ///

1    • Transcript of Debtor's Rule 2004 Exam taken on May 13, 2024, a true and correct copy

2    of which is attached hereto as Exhibit B.

3

4                                                HESTON & HESTON,
                                                 Attorneys at Law

5    Date: July 10, 2024

6                                                RICHARD HESTON,
                                                 Attorney for Creditor

7

# EXHIBIT A

Electronically Received by Superior Court of California, County of Orange, 02/04/2021 04:42:00 PM.
30-2017-00933576-CU-PN-CJC - ROA # 183 - DAVID H. YAMASAKI, Clerk of the Court By Anh Dang, Deputy Clerk.

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

FEB 1 6 2021

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

| | |
|---|---|
| SUSAN J. WHITE,<br><br>Plaintiff,<br><br>vs.<br><br>HOLLIE A. LEMKIN, an individual; LAW OFFICES OF HOLLIE A. LEMKIN, APC, a corporate business entity; JAMES G. BOHM, an individual and dba BOHM WILDISH; DANIEL R. WILDISH, an individual and dba BOHM WILDISH; BOHM WILDISH, a partnership business entity; BOHM WILDISH LLP, a partnership business entity and DOES 1 to 10, inclusive<br><br>Defendants.<br>_____<br><br>LAW OFFICES OF HOLLIE A. LEMKIN APC,<br><br>Cross-Complainant,<br><br>vs.<br><br>SUSAN J WHITE, and ROES 1 through 20, inclusive,<br><br>Cross-Defendants. | Case No.: 30-2017-00933576-CU-PN-CJC<br><br>[PROPOSED] AMENDED JUDGMENT<br><br>ROA Reference Nos. 2 and 27<br><br>IMAGED FILE<br><br>Dept:    C33<br>Judge:   Hon. James Crandall<br><br>Action Filed:   7/24/2017<br><br>Judicial Referee:<br>Hon. Mary Fingal Schulte (Ret.)<br>ADR Services, Inc.<br><br>Trial by Reference Date: 9/14/20-9/18/20,<br>            9/30/20, & 10/20/20 |

///

1

1    This cause came on regularly for trial by reference on September 14, September 15, September

2    16, September 17, September 18, September 30, and October 20, 2020, remotely via "Zoom" virtual

3    platform, before the Hon. Mary Fingal Schulte (Ret.), of ADR Services, Inc. ("Referee"), presiding,

4    from the inventory of the Hon. James Crandall, of the Orange County Superior Court, pursuant to an

5    order of general reference under *Code of Civil Procedure* Section 638.  Plaintiff/Cross-Defendant

6    SUSAN J. WHITE appeared by and through her attorneys of record John Mulvana and Cisca Stellhorn.

7    Defendant BOHM WILDISH, LLP appeared by and through its attorney of record Jon Schwalbach.

8    Defendants HOLLIE A. LEMKIN and LAW OFFICES OF HOLLIE A. LEMKIN, APC appeared by

9    and through their attorneys of record Charles Grebing and Mallory Holt.  Cross-Complainant LAW

10    OFFICES OF HOLLIE A. LEMKIN, APC appeared by and through its attorney of record John Teal,

11    Jr.

12    Trial was to the Referee. Witnesses were sworn and testified. Documents and testimony were

13    admitted into evidence. After hearing the evidence and arguments of counsel, the matter was taken

14    under submission. The Referee thereafter issued its signed Tentative Statement of Decision pursuant

15    to *Code of Civil Procedure* Sections 632, 638, 643, and 644, and California Rules of Court, Rules 3.1590

16    and 3.1591.

17    The Referee's Tentative Statement of Decision was electronically served on parties and counsel

18    on November 9, 2020. The Referee's Tentative Statement of Decision provided that "This tentative

19    decision shall be the statement of decision unless within ten days a party specifies one or more

20    controverted issues or makes proposals not covered in the tentative decision."

21    On December 3, 2020, having received no proposals or objections to the content of the Tentative

22    Statement of Decision within the statutory time, the Referee issued its signed final Statement of

23    Decision pursuant to *Code of Civil Procedure* Sections 632, 638, 643, and 644, and California Rules of

24    Court, Rules 3.1590 and 3.1591.

25    The Referee's signed final Statement of Decision is attached hereto as **Exhibit A** and

26    incorporated herein by reference.

27    / / /

28    / / /

1    Subsequently, on January 21, 2021, the Referee entered an order awarding Cross-Complainant,

2  Law Offices of Hollie A. Lemkin APC, the amount of $162,202.48 for attorney's fees and costs.  A

3  copy of the Referee's Order is attached hereto as **Exhibit B** and incorporated herein by reference. None

4  of the parties filed any objections to the Referee's Order.

5    **IT IS THEREFORE FINALLY ORDERED, ADJUDGED AND DECREED,**

6    Plaintiff SUSAN J. WHITE shall take nothing on her Complaint, with judgment hereby entered

7  in favor of Defendants BOHM WILDISH, LLP, HOLLIE A. LEMKIN, and LAW OFFICES OF

8  HOLLIE A. LEMKIN, APC;

9    Cross-Complainant LAW OFFICES OF HOLLIE A. LEMKIN, APC is awarded judgment on

10  its Cross-Complaint in the sum of Three Hundred and Six Thousand Three Hundred and Forty-Seven

11  Dollars and Four Cents ($306,347.04).

12    Cross-Complainant LAW OFFICES OF HOLLIE A. LEMKIN, APC is awarded its recoverable

13  costs, including reasonable attorney's fees, as approved and ordered by the Referee and this Court, in

14  the amount of $162,202.48.

15    The foregoing awards shall bear interest thereon at the rate of ten percent (10%) per annum from

16  the date of the entry of this Judgment until paid.

17

18  DATED:  2 - 16 - 21                    By:  _____

19                                             Hon. James Crandall

                                            Judge of the Superior Court

20

21

22

23

24

25

26

27

28

1   Honorable Mary Fingal Schulte (Ret.)
    ADR SERVICES, INC.
2   19000 MacArthur Boulevard, Suite 550
    Irvine, California 92615
3   (949) 863-9800 PH
    (949) 863-9888 FAX
4
5
6
7
8               SUPERIOR COURT FOR THE STATE OF CALIFORNIA
9                      FOR THE COUNTY OF ORANGE
10
11  SUSAN J. WHITE,                     )   CASE NO. 30-2017-00933576-CU-PN-CJC
                                        )
12              Plaintiff,              )
                                        )
13        vs.                           )    STATEMENT OF DECISION (CCP § §
                                        )   632, 638, 643, 644, CRC 3.1590 and
14                                      )   3.1591)
    HOLLIE A. LEMKIN; LAW OFFICES OF    )
15  HOLLIE A. LEMKIN; JAMES G. BOHM;    )
16  DANIEL R. WILDISH; BOHM WILDISH     )
    LLP,                                )   Judge: Hon. James Crandall
17                                      )   Dept.: C33
18              Defendants.             )
                                        )
19
20
    ***The Reference***
21
        This is a trial reference from the inventory of the Honorable James Crandall of the
22
    Orange County Superior Court, pursuant to an order of reference under CCP § 638. This is a
23
    consensual general reference, and thus § 644(a) applies.
24
        *§ 638. Appointment of referee; agreement of parties*
25
        "A referee may be appointed upon the agreement of the parties filed with the clerk, or
26
    judge, or entered in the minutes, or upon the motion of a party to a written contract or lease that
27
    provides that any controversy arising therefrom shall be heard by a referee if the court finds a
28
    reference agreement exists between the parties:
29

EXHIBIT A

1  (a) To hear and determine any or all of the issues in an action or proceeding, whether of fact or

2  of law, and to report a statement of decision.

3  (b) To ascertain a fact necessary to enable the court to determine an action or proceeding."

4  *§ 643. Written report; time; objections*

5      "(a) Unless otherwise directed by the court, the referee or commissioner must report their

6  statement of decision in writing to the court within 20 days after the hearing, if any, has been

7  concluded and the matter has been submitted…"

8      *§ 644 Effect of referee's decision*

9      "(a) In the case of a consensual general reference pursuant to <u>Section 638</u>, the decision of

10  the referee or commissioner upon the whole issue must stand as the decision of the court, and

11  upon filing of the statement of decision with the clerk of the court, judgment may be entered

12  thereon in the same manner as if the action had been tried by the court."

13

14      *Tentative Statement of Decision Now Final*

15      The Referee issued a tentative decision on November 9, 2020 and indicated that it would

16  be the statement of decision unless within ten days a party specified one or more controverted

17  issues or made proposals not covered in the tentative decision. The lawyers were directed to CCP

18  § 632 and California Rules of Court 3.1590 and 3.1591. "The request for a statement of decision

19  shall specify those controverted issues as to which the party is requesting a statement of decision.

20  After a party has requested the statement, any party may make proposals as to the content of the

21  statement of decision." CCP § 632. The Court is not required to respond to requests for findings

22  with regard to evidentiary facts or individual items of evidence.

23      The parties were reminded that a statement of decision need not discuss each point listed

24  in a party's request; it need only set forth "ultimate facts" (as opposed to "evidentiary facts") on

25  the principal controverted issues requested.  There is no authority for the idea that a statement of

26  decision is prejudicially deficient because it does not include the evidentiary basis for a finding.

27  A statement of decision does not deal with evidence, but rather with ultimate facts. See *In re*

28  *Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736, fn. 15; *In re Marriage of Garrity &*

29

2

**EXHIBIT A**

1  *Bishton* (1986) 181 Cal.App.3d 675, 686-687, superseded by statute on other grounds; *Estate of*
2  *Hudspeth* (1964) 225 Cal.App.2d 759, 765; CCP § 634.

3      "A statement of decision need not address all the legal and factual issues raised by the
4  parties. Instead, it need do no more than state the grounds upon which the judgment rests,
5  without necessarily specifying the particular evidence considered by the trial court in reaching its
6  decision." *Muzquiz v. City of Emeryville* 79 Cal. App. 4th 1106 (2000). Further, "[I]n rendering a
7  statement of decision a trial court is required only to state ultimate rather than evidentiary
8  facts..." *Sperber v. Robinson,* 26 Cal. App. 4th 736, 745 (1994).

9      Having received no proposals or objections to the content of the Tentative Statement of
10  Decision within the statutory time, the Referee now issues this final Statement of Decision.

11

12      *Controverted Issues/Ruling on the Complaint and Cross-Complaint*
13      The controverted *issues* are the elements of each cause of action. For example, was there
14  a breach of duty? If so, did it cause damage? Was there a breach of contract? And so forth.

15      The complaint states three causes of action: professional negligence, breach of fiduciary
16  duty, and breach of contract. As discussed further herein, the gravamen of the complaint was
17  professional negligence. The cross-complaint states a single cause of action for breach of
18  contract, based on failure to pay the remainder of legal fees owing.

19      Having considered and weighed all of the evidence, documentary and testamentary, and
20  assessed the credibility of the witnesses (credibility of witnesses was an unusually big problem in
21  this trial, as discussed herein), *I find for defendants Hollie Lemkin ("Lemkin") and Bohm Wildish*
22  *on all three causes of action. I also find for Lemkin and against Susan White ("White") on the*
23  *cross-complaint, and award her damages in the sum of $306,347.04. Lemkin's representation of*
24  *the plaintiff Susan White complied with the standard of care, she did not breach any of her*
25  *fiduciary duties, and the fees and costs she billed to White were reasonably and necessarily*
26  *incurred.*

27      *Rulings on Bench Briefs Submitted on Behalf of Lemkin*
28  *1. The In Pari Delicto and Unclean Hands Doctrine Bar to Plaintiff's Claims*

29      A ruling on these defenses is moot, since plaintiff has not prevailed on any of her causes

3

**EXHIBIT A**

1  of action. However, in order to provide a complete record, I will rule, having read and
2  considered the moving and opposing briefs.   Citations are provided in Lemkin's brief and not
3  repeated herein. The evidence was overwhelming that in the underlying case White *knowingly*
4  *provided false testimony under oath.* This simply cannot be tolerated or rewarded. The
5  opposition is not persuasive.

6      *Even if White had established any of her causes of action by a preponderance of the*
7  *evidence, I find that the doctrines of unclean hands and in pari delicto bar White's claims.*

8

9  *2. Admissibility of Court Rulings*

10     White claimed that Lemkin negligently handled the underlying dissolution proceedings,
11 billed for unnecessary services, and failed to introduce sufficient evidence of various issues
12 during the five-day trial, which was conducted over the course of several month. It is entirely
13 appropriate, and within the Court's discretion, to take judicial notice of underlying Minute
14 Orders as to the fact that the order was issued and the fact that conclusions of law and/or findings
15 on litigated issues were reached by the underlying court though not as to the truth, accuracy, or
16 propriety of any such conclusions or findings. *Evidence Code §452.* The record already reflects
17 those orders for which judicial notice was taken, so they are not repeated herein.

18

19 *3. Admissibility of Underlying Transcripts*

20     Lemkin offered the trial transcripts for the non-hearsay purpose of showing that the
21 following evidence was presented at the underlying trial: Susan White's IRA; Ross White's
22 IRA; contract for deed and North Dakota Litigation; TP Motel income and K-1's; TP Motel
23 value; Ross White's breaches of fiduciary duty; community debts, credits, and charges;
24 withdrawals from community accounts; medical and childcare expenses; support; fees and
25 sanctions; personal property; Ross White stalking; domestic violence; mental health issues;
26 substance abuse issues; paternity issues; custody and visitation recommendations and issues.
27     There was a stipulation as to foundation of the transcripts, but not as to their
28 admissibility.   Ms. White's lawyer filed an opposing brief, which I also read and considered.
29      *I grant the request, set forth at page 8 of the Lemkin brief, to take judicial notice of the*

4

**EXHIBIT A**

1   *underlying trial transcripts (Exhibits 1006-1010) identified in Section II(A) of her brief, for the*

2   *non-hearsay purpose of proving the fact that certain evidence was offered at the time of trial.*

3       *I also grant the request that the excerpts of the September 23, 2014 underlying hearing*

4   *transcript (Exhibit 525) and the underlying trial transcripts (Exhibits 1008-1009) identified in*

5   *Section II(B) of the Lemkin brief, are admitted as party admissions.   Since it is claimed that*

6   *White lied at the underlying trial, I will not assume the truth of any lies.  Her statements at the*

7   *underlying trial are taken as admissions, and as prior inconsistent statements.  The excerpts*

8   *prove White's prior statements contrary to claims in this action relating to various issues, as*

9   *outlined at pages 7 and 8 of the Lemkin brief.*

11   ***Brief Factual Background***

12       The trial of this matter took close to seven days, with six witnesses being called: the

13   parties: Susan White and Hollie Lemkin; and two experts for each side: John Gilligan Esq. and

14   Tim Maher CPA (plaintiff); Michelle Mangan and Jeff Mangum Esq. (defendants).  While all

15   four experts had good credentials, I found the defense experts to be the more persuasive.  It

16   cannot be overstated that credibility of the parties was a critical element of this trial, and Lemkin

17   prevailed in that category, hands down.

18       Plaintiff White retained Defendant Lemkin, a California State Bar certified Family Law

19   specialist - to represent her in a complex marriage dissolution action in California involving parties,

20   property, and related litigation in North Dakota, which ultimately spanned four years before

21   judgment was entered. The dissolution addressed a range of contentious issues, including alleged

22   domestic violence, alcoholism, and mental illness; concerns regarding stalking, harassment, and

23   statements disputing paternity of the minor children; child custody and visitation; child and spousal

24   support; accounts and assets located in two states; and claims of breaches of fiduciary duty,

25   unilateral liquidation of community assets, and misrepresented financial information.

26       In 2013, White decided she wanted to end her 14-year marriage. From the beginning, it

27   was not an acrimonious split.  After alleged instances of domestic violence perpetrated by her

28   husband Ross White ("Ross") she filed for divorce after moving from North Dakota to

29   California, taking with her the couple's two children. Ross filed for divorce in North Dakota and

**EXHIBIT A**

a jurisdictional battle ensued.

Early in the case, Lemkin obtained a temporary domestic violence restraining order ("DVRO"), but Ross evaded service, increasing costs to issue the order that his estranged wife ultimately decided to abandon. The parties then began an intense fight over a motel in North Dakota too, where White had hired a separate lawyer to protect an alleged community property asset. The couple had defaulted on loan payments and Ross' parents were seeking to recover the property. Early on, a bitter tone was set for these divorce proceedings.

In the 43 months while Lemkin represented White, there were more than 30 hearings, multiple court conferences, five days of trial, and numerous court filings. Most of Lemkin's filings were to force Ross to comply with discovery and court orders, when he demonstrated no willingness to do so voluntarily. Aside from the contentious tone, and despite the opinion of White's standard of care expert, this was not a straightforward divorce action. The parties dealt with a myriad of issues: custody and visitation, the ex-husband's mental illness, alcoholism, stalking, harassment, and paternity disputes, and financial issues with an out-of-state property.

Trial took place over five days: February 22, 2016; March 29-30, 2016; and April 25-26, 2016. Dr. Sheffner, Dr. Johnson, Ken Rugeti, Susan White, and Ross White testified at the time of trial as to the remaining issues between the parties. At the conclusion of trial, the trial judge, the Honorable Mark Millard, directed the parties to submit a written closing argument, citing to the trial transcript and court record in support of their claims. On June 9, 2016, Lemkin filed a written closing argument with page and line citations to trial testimony transcripts and the court record supporting each of Susan's requests. (**Exhibit 995**)

On July 28, 2016, the Court issued its Intended Statement of Decision. (**Exhibit 541**) After numerous discussions about the order, White instructed Lemkin to prepare a document called Request for Order ("RFO"), to address various issues. On September 9, 2016, Lemkin filed Susan's RFO which was set for hearing on November 30, 2016, and which identified certain errors and omissions as to each issue, with page and line citations to the evidence offered at trial. (Exhibit **542**) Before this request was heard, White fired Lemkin, hired a new lawyer, and reached a settlement with Ross that resolved all the issues.

**EXHIBIT A**

1  Evidence of Ross' repeated violations of court orders had been introduced at the underlying
2  family law trial. While Ross was charged with the funds improperly liquidated or withheld, the trial
3  court declined to find that Ross breached his fiduciary duties to the community, finding his conduct
4  was not intended to harm the community but instead was necessitated by insufficient financial
5  resources.

6  At the trial over which I presided, the malpractice matter, White claimed that in the
7  underlying dissolution action, Lemkin repeatedly advised her to engage in deceitful, and
8  downright perjurious conduct, such as executing numerous declarations with false information,
9  creating an LLC as a mechanism for hiding her income, providing false testimony under oath at
10  deposition, hearings and trial. She testified that she relied on Lemkin's advice, and this
11  increased the cost of litigation, negatively impacting the allocation of assets and debts after trial,
12  requiring her to retain subsequent counsel Christi Rios.

13

14  ***Trial Exhibits***

15  I received, considered, and weighed the importance of the numerous and voluminous trial
16  exhibits listed on the attached (**"Attachment A"**) *Brief Regarding Admitted Trial Exhibits as of*
17  *September 30, 2020*, which was submitted at my request by counsel for Lemkin. I have
18  handwritten, and initialed, on the chart those Exhibits admitted on the last day of trial, October
19  20, 2020, as well as matters for which I took judicial notice. If I have inadvertently failed to note
20  any Exhibits that were admitted, I welcome input from counsel in that regard.

21

22  ***The Witnesses***

23  The following comments and observations on the testimony are not meant to be an
24  exhaustive summary of the contents of the testimony, but rather my impressions of each witness,
25  and some key points, to me, of their testimony. Counsel and their clients should rest assured that
26  I took copious notes, carefully reviewing all the testimony and the exhibits that were received
27  into evidence. Everyone agreed that credibility of the witnesses, particularly that of the parties,
28  was of paramount importance.

29

7

## EXHIBIT A

*~Hollie Lemkin*

Lemkin testified on September 14, 15, 30, and on October 20, first under Evidence Code §776 examination, and then on her own case in chief. Her testimony was interrupted more than once in order to accommodate various expert witnesses. (This also was true for the taking of White's testimony.) With the testimony being taken via Zoom, I had a much closer look at witnesses than might occur in a traditional trial where I would sit off to the side of a witness, who was facing forward, in the direction of the lawyers. Lemkin, a certified family law lawyer, was well prepared and did not appear at all "rehearsed" in her testimony. I found her to be an excellent witness who was credible and believable. The allegations and complaints lodged against her were many, and she met them with poise. She admittedly was defensive at times in her testimony, but that was understandable, given the allegations. She testified in detail as to the work she did on behalf of White, including the five-day trial in the underlying matter. Many issues were covered at that trial (borne out in the detailed 21 page Minute Order of Judge Millard, as well as in the trial transcripts): custody, visitation, child support, spousal support, medical reimbursements, and division of assets, domestic violence.

Lemkin prevailed in every discovery motion that she filed. Her client never complained about her lawyer's work or her bills until after she received Judge Millard's intended statement of decision. Lemkin adamantly denied ever telling her client to lie. She denied making up the contents of declarations for her to sign, or telling her to falsify Income and Expense Declarations. I believed her. According to Lemkin, Susan White was a very involved client who called her multiple times a day. (White also testified to numerous daily telephone calls.)

White hired Lemkin after she became unhappy with her last attorney. At their initial meeting, White and Lemkin discussed issues of custody, visitation, White's fear of Ross, asset division, and support. Lemkin described White as anxious, upset, concerned, and afraid of her husband who had been stalking and harassing her. White described Ross to Lemkin as alcoholic with psychological problems. White was also concerned that her estranged husband wanted to take the children away from her.

Lemkin testified that any issue in a dissolution proceeding can become expensive. (Any judge, including the undersigned, who's sat in a family law department, certainly knows this to

**EXHIBIT A**

1  be the case.) She denied ever telling her client that it was her "goal" to go to trial. She told her

2  client that was the most expensive route to go. She testified in detail about efforts to resolve the

3  matter short of trial; settlement demands and counter demands were received into evidence in

4  this trial. She discussed all settlement offers and terms with her client.

5      Lemkin denied ever telling her client not to settle or that she could obtain a termination of

6  Ross's parental rights. She said her client wanted an "all or nothing offer". She described Ross'

7  compliance with court orders as "half-baked."

8      It was clear from Lemkin's testimony that her client was extremely hands on in this

9  dissolution proceeding. Her client never instructed her to accept any settlement proposals;

10  indeed, she told her not to accept any of them. Lemkin discussed every motion and every

11  declaration with White. She said her client was "100% the decision maker." Sometimes they

12  spoke two to three times a day, with White stating her goals.   White never told her she did not

13  understand anything.  Lemkin described her former client as "extremely educated and

14  knowledgeable" and capable of understanding sophisticated analyses. White never told her that

15  any information on declarations filed with the court was incorrect. **Exhibits 796 and 831** are two

16  of many examples of White's active involvement in her case.

17      Lemkin testified that she had periodic conferences with her client regarding costs and the

18  size of her bill.  She was never told to stop work or cut back on it.

19      Lemkin described White as screaming at her as they were going over Judge Millard's

20  July 28, 2016 Minute Order.

21

22  *~Susan White*

23      Susan White is an educated and bright woman who went through an extremely

24  contentious and no doubt highly stressful divorce. She testified that she moved from North

25  Dakota with her two children in 2012 due to her then husband Ross's "mental break", domestic

26  violence, and drinking (all the ingredients for a protracted stay in the family law court).  She had

27  been working at Verizon when they moved.  She came to California with no job, and no income,

28  except for unemployment benefits.  She described herself as "stressed and in fear" as well as

29  "distraught, upset, concerned for the well-being" of her children.  She was seeing a Denise

9

**EXHIBIT A**

1   Bonner for psychological help. Dr. Bonner referred her to Lemkin. White was not happy with

2   prior counsel and testified that she wanted to get a restraining order and a divorce so she could be

3   "done with" Ross. She testified frequently throughout this trial that she relied on Lemkin's

4   expertise. She also testified repeatedly as to her fragile emotional state during the course of her

5   representation by Lemkin, yet never introduced testimony by Dr. Bonner, for example, to

6   substantiate this claim. The examination quickly got to a point where the witness could not

7   answer a question responsively, especially under Mr. Grebing's examination; instead she

8   repeated that she relied on Lemkin. Her continued non-responsiveness to even the simplest of

9   questions severely damaged her credibility, as did the written record of emails between her and

10   Lemkin wherein she very clearly had an active role in the litigation.

11        White told Lemkin she wanted full legal and physical custody of her children. Yet she

12   denied any clue as to what the costs of a custody battle might be. She talked with Lemkin by

13   phone "on a regular basis." It was clear from her testimony and that of Lemkin, that Ross was

14   evading service, which never keeps costs of litigation down.

15        It absolutely strained credibility that the witness actually testified at this trial that her

16   attorney never told her that lying was wrong or a fraud on the court. Who needs to be told such a

17   thing? It further strained credibility when the plaintiff repeatedly testified that she "relied" on

18   advice of her attorney to sign *under penalty of perjury* statements she believed contained

19   inaccurate or false statements. No doubt it was true that Lemkin drafted the declarations for her

20   to sign, but as Lemkin testified, the contents were taken from information provided by White.

21   She testified that she did not review for accuracy the documents presented to her for her

22   signature. Unfortunately for her, there is a presumption that someone has read something she

23   has signed. Her denial of having any input whatsoever into the declarations she signed was not

24   believable, and was directly contradicted by the exhibits admitted into evidence. She admitted

25   time and again during this trial that she was not truthful in her testimony in the underlying case.

26   (See CACI 107 as to the credibility of a witness who has been untruthful in important matters.)

27        White testified that she paid Lemkin $253,000 and wanted it all back. She described her

28   emotions upon receiving Judge Millard's order, as "beyond angry", and said that she "could not

29   see straight". That is the driving force of this legal malpractice suit, in this trier of fact's opinion

**EXHIBIT A**

and it was confirmed in her testimony on the final trial day. She was angry that only one exhibit was introduced at trial. But any experienced trial lawyer or judge knows that oral testimony, if believed, does not have to be supported by reams or exhibits, or by any exhibits for that matter.

Mr. Grebing's cross-examination of the plaintiff further seriously damaged the plaintiff's credibility. His cross was as cross examination should be: leading and not open-ended. Yet the plaintiff struggled to be responsive and instead was extremely evasive. Her mantra was "I relied on Hollie." Despite her claim that Lemkin made up the information on trial charts, **Exhibits 971, 977, and 979** show that Lemkin emailed them to her and sought her input. These exhibits seriously damaged White's credibility and impeached her testimony that suggested she had not seen any of the charts prepared by Lemkin for the trial. While she claimed that Lemkin made up the information on the Income and Expense Declarations, **Exhibit 898** for example clearly belies that testimony (her email to Lemkin with annotations on the declaration). She testified that Lemkin told her to make up the numbers "so it didn't appear to the judge that I was lying." She was also impeached with portions of deposition testimony read into the record. She admitted being untruthful at the underlying trial. **Exhibits 815-818** show how very involved she was in actively participating in the litigation with Lemkin.

Ms. White did not complain about Ms. Lemkin's fees until August of 2016. When asked what prompted her, she responded that it was the outcome of the court's rulings. Despite the clear language in the retainer agreements, which she signed, she claimed she was not aware of any deadline to challenge the fees. Ms. White also testified that she spoke with Lemkin "almost every day".

### ~*John Gilligan, Esq.*

John Gilligan, plaintiff's expert, has a very good reputation and good credentials. He is a family law specialist who's been practicing for about 40 years. He testified that there were various breaches of the standard of care, and that the plaintiff's damages were the increased fees. However, he also conceded that Ross White's own conduct/actions caused more litigation and higher bills, or as he put it, "a great deal of un-necessary hours." Indeed, he said Ross's stalking of Ms. White was jeopardizing her employment and her safety, and causing stress on the family.

11

**EXHIBIT A**

1  (This is confirmed in testimony of White and Lemkin, because of course this is not something
2  for an expert to opine about.) Mr. Gilligan testified to a number of areas of criticism. They
3  include, but are not limited to: the discovery motions, conduct of the underlying trial, and what
4  he called overcharges. In his opinion, this was a $30,000 case, "tops." He testified that "false
5  declarations" had a "devastating impact" on the family law case. He went so far as accusing
6  Lemkin of suborning perjury (which is to say, White committed perjury in the underlying matter;
7  a person doesn't accidentally commit perjury). With no objections asserted, Mr. Gilligan also
8  testified as to how he'd have handled the case. How an expert personally would have handled a
9  matter of course is not the standard.

10  Mr. Gilligan conceded that most of the issues that remained between Ross and Susan
11  White after the trial were resolved by a stipulated judgment. On cross-examination, he admitted
12  that much of the testimony at the underlying trial covered what was in the exhibits that were not
13  received into evidence (in other words, the exhibits would have been cumulative).

14  I did not find his opinion that this was a "garden variety case" that was "not that
15  complicated", with "a little custody issue" and "a couple of assets" to be persuasive. With all
16  due respect to Mr. Gilligan, the evidence at this trial disclosed that it is not true that "there was
17  nothing to this case." Ross even disputed paternity of one of the children during the pendency of
18  the case. That is hardly a "nothing."

19

20  *~Jeffery Mangum, Esq.*

21  Jeffrey Mangum, Lemkin and Bohm Wildish's expert, is also a highly qualified family
22  law practitioner, and a certified specialist. He handles complex and high asset cases. He
23  reviewed over 60,000 pages of materials. The quality of his testimony was outstanding. It was
24  careful and well reasoned. It was professional and did not come off as advocacy, which too
25  often is the case with experts. His numerous opinions were well reasoned and buttressed by
26  solid foundation. He said that there was a "high level of contention" between the parties,
27  something White herself did not deny. He had no criticisms of the work Lemkin did.    Based on
28  his review of the voluminous materials, he concluded (which I saw myself from the exhibits) that
29  Lemkin and White had extensive strategy discussion, and that drafts of every declaration went to

12
**EXHIBIT A**

1  White. He testified that standard of care is not a guarantee that no "mistakes" will be made; it

2  also is not defined by "best practices." Standard of care is broad enough to cover strategic

3  decisions. Success is not required. See CACI 600-603.

4        Discussing a number of areas at issue in the underlying matter, including but not limited

5  to the handling of the DVRO, the discovery, employer confidentiality, the North Dakota hotel,

6  and settlement efforts, Mr. Mangum felt that the plaintiff was actively involved in every

7  decision. He described her as "very much a hands on client" and the one who was "driving the

8  bus." Mr. Mangum described Lemkin's trial efforts as "well presented." He opined that the fees

9  were all reasonable and necessary. Given the issues, he would expect them to be on the "higher"

10  side. He did not fault Lemkin for not sending her client to DCSS to enforce support. Custody

11  and visitation were the "center of gravity of the case". Indeed, in her own testimony on the last

12  trial day, White was shown a communication she'd sent to Lemkin saying "custody is not an

13  option." Mr. Mangum concluded, as did I, that White was upset with the result, but that does not

14  lead to a conclusion that Lemkin committed malpractice or breached any fiduciary duties. The

15  time he spent reviewing this matter as an expert generated $52,650 in fees, which tells me the

16  underlying case simply was not the stroll in the garden Mr. Gilligan suggested it should have

17  been.

18

19  *~Damages Experts*

20        There were two damages experts, one for each side, Timothy Maher (plaintiff's expert)

21  and Michelle Mangan (defendant's expert). There's no need to discuss their testimony since I

22  have found no liability, except to say that I found Ms. Mangan's to be more persuasive.

23

24  ***The Complaint***

25        The complaint states three causes of action each of which arise from the same facts and

26  essentially seek the same relief. Thus, the gravamen of this case is for legal malpractice. *Kracht*

27  *v. Perrin, Gartland & Doyle* (1990) 219 Cal.App.3d 1019, 1022 "[w]here the injury is suffered

28  by reason of an attorney's professional negligence, the gravamen of the claim

29  is legal malpractice, *regardless of whether it is pled in tort or contract*." (Emphasis is mine). A

13

**EXHIBIT A**

1 professional negligence cause of action is considered to be in tort even if pleaded in breach of

2 contract. *DeMirjian v Ideal Heating Corp.* (1949) 91 Cal. App. 2nd 905, 909; *Automobile Ins. Co.*

3 *v Union Oil Co.* (1948) 85 Cal.App. 2nd 302, 307.

4 **First Cause of Action: Legal Malpractice**

5 In her prayer for relief, item 1. Plaintiff asks for what she would have recovered at the

6 trial, "if the Defendants had acted as…reasonably careful attorneys…" Thus it at least started

7 out as a "settle and sue" case, though she actually did just as well, or better, with the ultimate

8 settlement. The law pertaining to these types of cases is well briefed by the defense lawyers,

9 and not repeated herein. The damages claimed are the fees paid to Lemkin, which are not

10 recoverable in a legal malpractice cause of action.

11 During closing argument, Mr. Mulvana conceded that defendants prevailed on this claim.

12 As he put it, this "essentially is a fee dispute." He argued that Lemkin "should not have taken

13 the case." This too sounds like a malpractice claim. The breach of contract claims and breach of

14 fiduciary claims are based on the alleged negligence of Lemkin. In closing argument, Mr.

15 Mulvana also spoke of what he called a "significant failure" to advise his client of the "potential

16 costs.

17 **Second Cause of Action: Breach of Fiduciary Duty**

18 CACI 4106 sets forth the essential factual elements breach of fiduciary duty by attorney:

19 1. *That defendant breached the duty of an attorney 2. That plaintiff was harmed; and 3. That*

20 *defendant's conduct was a substantial factor in causing plaintiff's harm.* This cause of action

21 alleges that Lemkin breached her twofold fiduciary duties to her clients: undivided loyalty and

22 confidentiality. (Para. 28) The only case cited in support of pleading this as a species of tort

23 distinct from the cause of action for professional negligence, *Stanley v Richmonds* (1995) 35 Cal.

24 App. 4th 1070, is not applicable. *Stanley* involved an issue of ethics where the attorney had a

25 conflict of interest where that attorney was considering a partnership with the opposing counsel's

26 attorney. In this cause of action, plaintiff alleges inflated, padded billings and overcharging.

27 **Third Cause of Action: Breach of Contract**

28 This cause of action is grounded in the retainer agreements (**Exhibits 706 and 1021**).

29 White was unable, either in the complaint, or at the trial, to identify any particular sections of the

14
**EXHIBIT A**

1  retainer agreements that were allegedly breached. In fact, in closing argument, her lawyer

2  argued that there was a "failure of consideration." He said Ms. White paid for a trial that "did

3  not happen." If there is a failure of consideration, there's no contract to breach. This is more in

4  the nature of an affirmative defense to the cross-complaint. He also argued that damages "may

5  have to be under the contract." The contract cause of action really is subsumed in the other

6  two, as seen in paragraph 43 which alleges "overbilling and overcharging for unnecessary and

7  unreasonable purported legal services and ...concealment..." Mr. Mulvana argued that the

8  burden of proof was on Ms. Lemkin to prove the reasonableness of her fee. This is true as to the

9  cross-complaint (discussed below) and she has met that burden of proof.

10  White contends that the recoverable damages caused by the conduct of the defendants are

11  the fees charged. Fees paid to an allegedly negligent attorney are not cognizable tort damages.

12  *Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1058-1060;

13  *Jalali v. Root* (2003) 109 Cal.App.4th 1768, 1781-1783. Were the law to be otherwise,

14  exposure to tort damages would exist in every instance where an attorney attempts to collect her

15  fee.

16  *The Cross-Complaint*

17  By her cross-complaint, Lemkin seeks recovery of fees, costs and expenses incurred in the

18  defense of the complaint of Susan White and in the prosecution of the cross-complaint of the

19  Law Offices of Hollie Lemkin. Lemkin claims fees and costs under the contract, as an item of

20  her cross-complaint damages. There were two written retainer agreements allowing for her to

21  obtain "costs of collection, including reasonable Attorney's fees, should it become necessary to

22  institute legal proceedings." They are February 12, 2013 Fee Agreement, paragraph 18,

23  **Exhibit 706.3,** and July 20, 2016 Fee Agreement paragraph 20, **Exhibit 1021.29-30.**

24  On October 6, 2020, on behalf of Lemkin, Mr. Grebing submitted an *Amended*

25  *Declaration in Support of Fees, Costs and Expenses Incurred in the Defense of the Complaint of*

26  *Susan White and in the Prosecution of the Cross-Complaint of the Law Offices of Hollie*

27  *Lemkin.* But for two of the Affirmative Defenses to the cross-complaint, these fees, while

28  reasonable, might not be considered as strictly incurred in collecting the fees claimed in the

29  cross-complaint. Rather, they'd likely be considered as incurred in defending the legal

15
**EXHIBIT A**

1   malpractice action. However, the brief submitted by Mr. Grebing points out that the Seventh

2   Affirmative Defense to the cross-complaint raises the issues of Lemkin's alleged malpractice as

3   either a complete bar, or as a reduction to recovery. The Fourteenth Affirmative Defense

4   alleges that recovery on the cross-complaint "must be reduced and offset by those monies

5   owed" by Lemkin to White. Thus, to counter and defeat these affirmative defenses, it was

6   necessary to counter and defeat the complaint for damages. Attachment 1 to the Declaration

7   contains 123 pages of supporting documentation, with redactions as to financial privacy and/or

8   payment information. There was no evidence to counter Mr. Grebing's Declaration.

9        The costs of collection are not limited to the costs listed in CCP §1033.5, which relates to

10  costs that can be included in a Memorandum of Costs After Judgment. Costs not listed in

11  §1033.5 are recoverable as damages. As prevailing party, Lemkin presumably will be

12  submitting a Memorandum of Costs that does not duplicate that which is listed in Mr. Grebing's

13  Declaration. The claim submitted by Mr. Grebing is for $186,080.36. It includes defendants'

14  experts' fees, trial transcript costs, exhibit preparation fees, investigation expenses, ADR

15  Services Inc.'s Fees, and "additional costs." Additionally, at trial, Mr. Teal, representing

16  Lemkin on the cross-complaint, offered the following summary, which was supported by

17  Lemkin's testimony and the exhibits:

18                        Law Offices of Hollie A. Lemkin APC

19                      January 2013 Through September 2015

20

| Exhibit Number | Fees | Expenses | Payments Received | Balance Due |
|---|---|---|---|---|
| 1011.65 | $247,042.57 | | | |
| 1011.74 | | $7,372.53 | | |
| 1011.74–1011.76 | | | $218,500.00 | |
| Totals | $247,042.57 | $7,372.53 | ($218,500.00) | $35,915.10 |

28

29

16
**EXHIBIT A**

**Bohm Wildish October 2015 Through June 2016**

| Exhibit Number | Fees | Expenses, Advances and Finance Charge | Payments Received | Balance Due |
|---|---|---|---|---|
| 1013 | $48,350.00 | | | |
| 1013 | | $1,667.34 | | |
| 1012.16 and 1013 | | | $15,000.00 | |
| Totals | $48,350.00 | $1,667.34 | ($15,000.00) | $34,902.34 |

**Law Offices of Hollie A. Lemkin APC**

**July 2016 Through September 2016**

| Exhibit Number | Fees | Expenses | Payments Received | Balance Due |
|---|---|---|---|---|
| 1011.78 | $15,030.00 | | | |
| 1011.78– 1011.79 | | $257.33 | | |
| 1011.78 | | $34,902.34 Balance Transfer re Money Due for Fees and Expenses while Lemkin was contract attorney with Bohm Wildish | | |
| 1011.79 | | | $200.00 | |

17

**EXHIBIT A**

| Totals | $15,030.00 | $35,159.67 | ($200.00) | $49,989.67 |

## Global Summary

Total Due to Law Offices of Hollie A. Lemkin APC for

January 2013 through September 2015                     **$35,915.10**

Total Due to Bohm Wildish/Law Offices of Hollie

A. Lemkin APC for October 2015 through September 2016     **$49,989,67**

                                                    _____

**Total**                                            **$85,904.77**

**Interest Due** ($85,904.77 x 10% = $8,590.48 x 4 years)     **+$34,361.91**

                                                    _____

**Requested Award for Unpaid Fees, Expenses**

**and Interest**                                       **=$120,266.68**

**Requested Award for Costs Not Enumerated**

**in CCP § 1033.5 per Amended Declaration of Charles Grebing**     **+$186,080.36**

                                                    **=Total of $306,347.04**

DATED: ___12/3/2020___          _mary schulte_
                                Hon. Mary Fingal Schulte (Ret.)

See also, ATTACHMENT "A"

18
**EXHIBIT A**

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION


In re:                          )
                                )Bk No. 8:24-bk-10187-SC
SUSAN JO WHITE,                 )
                                )
          Debtor.              )
_____)




JUDGEMENT DEBTOR EXAMINATION OF:

SUSAN JO WHITE

Taken on Monday, May 13, 2024, at 10:05 A.M.

1

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   SANTA ANA DIVISION

4

5     In re:                    )
                                )Bk No. 8:24-bk-10187-SC
6     SUSAN JO WHITE,           )
                                )
7              Debtor.          )
      _____)

8

9

10

11

12

13

14

15

16

17

18

19        Judgement Debtor Examination of SUSAN JO WHITE,

20    taken on behalf of the Judgement Creditors via Zoom

21    commencing at 10:05 A.M., Monday, May 13, 2024,

22    before Amy M. Browner, C.S.R. #13425.

23

24

25

```
 1   APPEARANCES

 2   FOR THE JUDGEMENT CREDITOR Hollie A. Lemkin:

 3        HESTON & HESTON
          BY:  Ben Heston
 4        19700 Fairchild Road, Suite 280
          Irvine, California 92612-2827
 5        (951) 290-2827
          ben@nexusbk.com
 6
     FOR THE JUDGEMENT DEBTOR:
 7
          LAKE FOREST BANKRUPTCY
 8        BY:  Anerio Altman
          26632 Towne Center Drive, Suite 300
 9        Foothill Ranch, California 92610
          (949) 218-2002
10        avaesq@lakeforestbkoffice.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                          INDEX

 2     Examination                              Page

 3     Mr. Heston                                 5

 4

 5

 6                        EXHIBITS

 7     Number              Description          Page

 8                      (None offered.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

1              Monday, May 13, 2024,  10:05 A.M.

2                         oo0oo

3                  SUSAN JO WHITE,

4          having been previously duly sworn,

5          was examined and testified as follows:

6

7                      EXAMINATION

8

9   BY MR. HESTON:

10      Q    All right.  Ms. White, I'm Ben Heston.

11  We've never met before.  As you might imagine, I'm

12  related to Richard.  I'm his son.  But I'm going to

13  be handling the questioning today.  So first I'm

14  going to go over some preliminary information.

15          You've been -- you've had your deposition

16  taken a few times; isn't that correct?

17      A    Yes.

18      Q    How many?

19      A    I -- I don't recall.  It's been more than

20  once.  It's probably been four or five maybe.

21      Q    Okay.  So you understand no uh-uhs, uh-huhs,

22  or shaking your head, body language -- that doesn't

23  get picked up in the transcript.  And do you

24  understand that the oath that you were just

25  administered is the same oath as if you were in court

1   and is punishable as perjury if you were to make any

2   misstatements.

3          Do you understand that?

4   A    Yes.

5   Q    Sorry.  I don't know why my video just cut

6   off.

7   A    Some reason my connection is not very good

8   today.

9   Q    Yeah.  Okay.  So --

10  A    Is there a dial in?

11       (Off-the-record discussion.)

12       MR. HESTON:  Back on record.

13  BY MR. HESTON:

14  Q    So the purpose of this examination is to

15  obtain information I'm not going to try and trick

16  you.  Ideally responses that you give today are

17  accurate and complete.  However, once we're done

18  within -- you'll be given a transcript of these -- of

19  your testimony and you can make changes.  However,

20  that doesn't make the testimony you give today go

21  away, and we can take note that you made changes to

22  the -- to your transcript after the fact.

23          So ideally, again, the information you give

24  today is complete and accurate.  If you don't

25  understand my question or need any type of

1  clarification just let me know.

2         And I do not want you to guess.  So the

3  example that everyone uses the conference table.  If

4  I were to ask you how big his conference table is

5  yesterday you would have to -- that would be a guess.

6  But now that you can see it behind me you would be

7  able to make an estimate.

8         Does that make sense?

9     A    Yes.

10    Q    Okay.  We can take breaks, but if I'm in the

11 middle of an area of questioning then I would like to

12 complete that questioning before we take the break.

13 So just keep that in mind that if you need to take a

14 break restroom just let me well ahead of time.

15    A    Okay.

16    Q    Is there any reason why you would not be

17 able to give your best testimony, such as taking

18 medication or any other substances?

19    A    No.

20    Q    Where are you -- are you doing this from?

21    A    My house.

22    Q    Okay.  Is there anyone else there?

23    A    No.  unless you count the dogs.

24    Q    No.  I think that's fine.  Okay.  So first

25 I'm to go through some of these bank statements.

7

1    Just looking at the larger transactions from your

2    Comerica checking account there was a deposit that

3    was made on May 2nd, 2022, in the amount of $11,771.

4            Do you have any idea what that might be?

5        A    Severance maybe, I think.  Can you show me

6    the statement and I'll tell you for sure.  Sorry.

7    I'm moving around to try to get a better internet

8    connection because it keep dumping me.

9        Q    Yeah.  Let me try and share.  Can you see

10   that?

11           MR. ALTMAN:  I can see it fine on the

12   screen.  Susan, can you see --

13           THE WITNESS:  I can too.  So that was in

14   2022?

15   BY MR. HESTON:

16       Q    Yeah.

17       A    That would have been my severance pay from

18   Riverbed.

19       Q    Okay.  And this is a few more -- these

20   are -- looks like checks that you wrote.

21       A    Hang -- so 2020 -- just hang on one second.

22   May of 2022.  So we're --

23       Q    This is -- the transactions I'm looking

24   at --

25       A    You know what -- so May of 2022.  It could

8

1   have been a commission check possibly.  I don't know.

2   I don't recall.

3       **Q    Okay.**

4       A    Because I got let go from Riverbed -- sorry.

5            (Off-the-record discussion.)

6   BY MR. HESTON:

7       **Q    What I was saying is that these are actually**

8   **checks that you wrote, not deposits.**

9       A    Oh, checks that I wrote?

10           MR. ALTMAN:  This the first thing he asked

11  about was a deposit and then the second thing he's

12  asking about on the screen are the checks that are

13  deposits into your account.  So those are two

14  different things.

15           THE WITNESS:  Okay.  So which one do you --

16  why don't we start again so then I can actually see

17  it and you can go back through it.

18  BY MR. HESTON:

19      **Q    Okay.**

20      A    It's self-explanatory on the deposits it

21  looks like.

22      **Q    Right.  So I'm just looking at the checks**

23  **that were issued, or, I guess, cashed on June 2nd,**

24  **2022, and the amounts are $6,035 and $1,800.**

25           **Do you have any recollection of what those**

1    checks were for?

2        A    I -- I don't.  The best estimate I would

3    have is something for rent probably or I possibly

4    would have -- probably rent.  I don't know.  I don't

5    recall.  That's three years -- two years ago.

6        Q    Right.  And then now looking at this check

7    from May 13th, 2022, in the amount of $7,900.

8        A    I really -- I don't know unless I go back

9    and pull the actual check.

10       Q    Now, looking at this deposit, which was on

11   September 6th, 2022, in the amount of $5,669.51.

12           Do you have any recollection of that what's

13   for?

14       A    So September -- it probably would be

15   something to with my payroll from Riverbed.  Because

16   I had hard copy checks.

17       Q    Got it.  So would you sometimes receive

18   direct deposit but then sometimes physical checks?

19       A    I would direct deposit until probably --

20   yes.  I was direct deposit for quite a while and then

21   I went to hard copy checks.

22       Q    I see a few of these withdrawals in the

23   amount of $5,400.

24           What are those for?

25       A    Rent.

1      Q    Now I'm looking at the statement for

2  December of 2022.  There's this deposit that's

3  labeled TD America Trade in, ACH out in the amount of

4  $10,750.

5          Can you explain what that was for?

6      A    For attorney's fees.

7      Q    And what is this TD America Trade?  Is that

8  a separate account?

9      A    My retirement account.

10     Q    And then -- and then there was a withdraw.

11 I think it was -- yeah, the same -- the same day in

12 the amount of 10,750.

13         Was that a payment for attorney's fees?

14     A    Yes.

15     Q    And which attorney?

16     A    Anerio.

17     Q    Now I'm looking at the January statement

18 from 2023 and on January 19th there was a deposit in

19 the amount of $33,000.

20         Can you explain what that was for?

21     A    What -- oh, the January 19th, 33- -- that

22 would be another -- 2023.  That would have been

23 probably for attorney's fees as well.  So I would

24 have --

25     Q    This is a deposit.

1      A      Yes.

2      **Q      So do you know whether this -- what was the**

3   **source of the $33,000?**

4      A      That would have been -- I am assuming best

5   estimate is that it came from my -- again, my

6   retirement account to pay attorney's fees.  But,

7   again, the corresponding statements, if we look at

8   those that's what I have to go do.

9      **Q      Okay.  So in order to check if this was from**

10  **the retirement account that would show up on your**

11  **retirement account statements?**

12     A      Correct.

13     **Q      And then so this withdrawal that was a few**

14  **days later, was that for attorney's fees?**

15     A      Yes.

16     **Q      For your current attorney Mr. Altman?**

17     A      Correct.

18     **Q      I'm looking at another Comerica statement**

19  **from April of 2023.  There's a deposit in the amount**

20  **of $16,484.80.**

21         **Do you know what this is was for?**

22     A      So this would actually be -- do this is

23  2023; correct?

24     **Q      Yes.**

25     A      My best guess would be severance pay from

1   Riverbed.  But, again, I'd have to go back and look

2   at statements -- or the amount just to cross

3   reference it but that is what I would attribute that

4   to.

5       Q    Yeah.  If there's any of those deposits we

6   want more information on then we can deal with that

7   later.

8            Who is Monique Ruiz?

9       A    She is a -- she's somebody that bought some

10  furniture from Robert.

11      Q    So that was just -- was that, like, sold on

12  Craigslist or what was that?  Can you explain it?

13      A    It's somebody in the neighborhood that had

14  bought furniture from him.  So I -- I was the one

15  that actually had sold it to her.  So she paid it to

16  my Zelle account.

17      Q    Got it.

18      A    That was his stuff.

19      Q    And we have this one.  This is from your

20  June 2023 statement.  There's a withdrawal in the

21  amount of $5,200 on June -- June 8th, 2023.

22           Do you know what that was for?

23      A    It would be rent.  I paid the landlord in

24  cashier's check or I pay him in cashier's check.

25      Q    And now I'm looking at your February 2024

1   statement.  On March 7th there's this wire transfer

2   in the amount of $2,633.  And it looks like thi --

3   A    Oh.

4   Q    -- says that the original is the Bank of

5   America.

6        Do you know what this is?

7   A    So which one?  The wire transfer or which

8   one?

9   Q    Yeah, the wire transfer.

10  A    Payment to the landlord.

11  Q    Well, this is a deposit into your account.

12       Where did this money come from?

13  A    Oh.  It came back.  So when I paid -- there

14  should be a corresponding wire out.  It came back

15  because he gave bad wiring information.

16  Q    Is that this one, Jianfeng?

17  A    Yes.

18  Q    On your bankruptcy petition that was filed

19  in January, you listed a Bank of America bank account

20  and we did -- I don't think that we got any

21  statements for that.

22       Do you still have that account?

23  A    It wasn't, like, a real bank account.  It

24  was for unemployment.  EDD.

25  Q    Got it.  Now I'm looking at your Wells Fargo

1   statements, and there's these periodic deposits that

2   look like they're all done in branch in various

3   amounts.  So right here we have July 5th, 2022, in

4   the amount of $1,430.23.  Another one on August 26th

5   in the amount of $1,600, and there's a few more of

6   these.

7           Do you know what these are for?

8      A    I'm assuming they would have been my payroll

9   checks but it depends upon the date.  Again, I --

10  one, I can't see them because I can't see anymore.

11     Q    Yeah.

12     A    Thank you.  I'm assuming they would have

13  been payroll checks.  Because, again, I got hard copy

14  checks and that's how I deposited them.  So it

15  depends upon the dates.  I've not seen a date so I

16  can't --

17     Q    This is --

18     A    What year are we in?  2022?  So it would be

19  a payroll check if it was any significant amount.

20     Q    Okay.  And I think that's it from -- yeah.

21  I don't think I had any questions.

22          What is the current status of the Bank of

23  America account?  Is that now closed?

24     A    So EDD has switched banks.  They're doing

25  something, which I don't know.  I'm not collecting

1   unemployment so I'm not 100 percent sure.  But they

2   no longer have that relationship with Bank of

3   America.  I was notified.

4        Q    Okay.  And that screen share, is that gone

5   now?

6        A    Yes.

7        Q    I don't know why my video keeps turning off.

8   So if I -- if that happens again and I don't notice

9   just let me know.

10       A    It turns off when you're screen sharing.

11       Q    Oh.  And also on the same bank statements I

12  saw that there was quite a few Zelle and a few Venmo

13  transfers that looked like they were to yourself.

14            Can you explain to me why you made those

15  transfers?

16       A    So I pay my bills out of the Wells Fargo

17  account.  So I would Zelle money from Comerica to my

18  Wells account so I could pay my, like, utilities,

19  groceries.  Whatever.

20       Q    And so why do you use multiple banks?  I

21  think it was Comerica, Wescom, Wells Fargo.  I think

22  that was it.

23       A    So I've had Wescom since I was a telecom

24  employee for a long time ago.  So I just kept that,

25  and that's what I use to pay my car payment out of

16

1  because I had bought cars.  And the other two -- I've

2  always had two accounts.

3      Q    Okay.  And I saw that on your bankruptcy

4  documents you listed that you had three Wells Fargo

5  accounts that were closed in February of 2021.

6          Can you explain what that situation was?

7      A    I had fraud on my account.  Somebody had

8  tried to access it, and so Wells Fargo shut them down

9  and opened up new accounts.

10     Q    Okay.  Another one I saw from your bank

11  statements that you receive child support; is that

12  correct?

13     A    Yes.

14     Q    And is there any restrictions on how you can

15  use that money?  For instance, is there a court order

16  it has to go toward school expenses or anything like

17  that?

18         MR. ALTMAN:  Objection.  Calls for a legal

19  conclusion.

20         Susan, you can answer to the best of your

21  knowledge.

22         THE WITNESS:  Not to my knowledge.  I don't

23  know if there is or not.  I've never heard of that.

24  So I'm assuming no.

25  ///

17

1    BY MR. HESTON:

2        Q    Okay.  And your bankruptcy petition that was

3    filed in January you listed quite a few tax debts and

4    most of them seem to be secured against property; is

5    that right?

6            MR. ALTMAN:  Objection.  Calls for a legal

7    conclusion.

8            Susan, you can answer to the extent you

9    know.

10           THE WITNESS:  I don't understand the

11   question.  Against property?

12   BY MR. HESTON:

13       Q    Correct.  In your bankruptcy petition it

14   lists that you have debts owed to the IRS and the

15   Franchise Tax Board, and they are listed as being

16   secured against retirement accounts.

17           Can you explain why that would be?

18       A    I don't know how that works.  So I'm not

19   even going to attempt to answer that.

20       Q    Okay.  Well in -- did you receive a notice

21   of levy from the taxing agencies or did you get this

22   information from a transcript?

23       A    I definitely have had multiple notices of

24   levy.  I don't know what they -- again, I have

25   notices of levy from other the IRS and the State

1   Franchise Board.  You disappeared again.

2          MR. ALTMAN:  We can hear you fine.

3          MR. HESTON:  I know but -- yeah.  Okay.

4   I'll try and pay attention to that.

5   BY MR. HESTON:

6       Q    **For these tax debts which seem to span 2013**

7   **to 2021, do you know if your tax returns were filed**

8   **on time?**

9       A    Yes.  They all have been filed on time with

10  the exception of this 2023.  I got my -- let me take

11  that back.  They had been filed and there may have

12  been an extension filed along with it or -- and then

13  filed later or this year my tax guy I thought they

14  filed it but they hadn't.  So I needed them to update

15  one thing on, like, health care.  So that's still

16  pending, but everything else has been filed in a

17  timely manner.

18      Q    **Okay.  And do you have an estimate of when**

19  **you're going to have your 2023 taxes filed?**

20      A    I just need to connect with him and get it

21  done.

22      Q    **Okay.**

23      A    I got to get it done.

24      Q    **And are you anticipating a refund?**

25      A    Well, yes, but my friends at the IRS I'm

19

1  sure will keep that, so...

2      Q    What -- what is the amount of refund you're

3  expecting?

4      A    It was around 2500.

5      Q    Is that just to the IRS?

6      A    Are you talking versus State Franchise Board

7  of?  I don't know what -- so for the IRS it is around

8  3500 is, like, the ballpark.

9      Q    Okay.  And do you have an estimate of what,

10 if anything, you'll be receiving from the Franchise

11 Tax Board?

12     A    I don't recall.  I believe there was a

13 refund.  I don't recall the amount.

14     Q    So you filed your current bankruptcy case on

15 January 25th, 2022.

16          Do you recall doing that?

17     A    I -- yes.

18     Q    And why was it that you filed then?

19     A    I don't know.

20     Q    Well, you had a judgment debtor exam

21 scheduled for the next day.  Was it your intent that

22 by filing the bankruptcy petition you would not be

23 required to attend that judgment debtor exam?

24          MR. ALTMAN:  Objection, leading.  Objection,

25 argumentative.  Objection, calls for a legal

1    conclusion.

2            Susan, you can answer to the extent you're

3    able to do so.

4            THE WITNESS:  There was -- it just happened

5    to be the date.  There was no specific reasoning that

6    I even recall that it was filed because it needed to

7    get done.

8    BY MR. HESTON:

9        Q    Were you prepared to attend the judgment

10   debtor exam?

11       A    I didn't even though there was one the next

12   day.  So I don't recall there being one.

13       Q    On your bankruptcy petition it lists that

14   there's three debts that are secured against the 2020

15   Hyundai Palisade.  There's one from Hyundai Motor

16   Finance, another one from Robert Stidham [ph.], and

17   then another one for Executive Decisions Group, I

18   think this is the name.

19           Can you explain how these liens came to be?

20       A    I think it's only two.  So I don't know what

21   you're looking at, but Robert loaned me the money for

22   the down payment of the car, and then Hyundai Motor

23   the financial company that I make the payments to.

24       Q    I'm just going to open your bankruptcy

25   petition.  Give me one second.

1          Can you see what I'm looking at here?

2     A     I see Charles Schwab.

3     Q     Okay.  Yeah.  I'm getting to it.  So here we

4  have Executive Decisions Group and it describes the

5  property that secures this claim and it says 2020

6  Hyundai Palisade.

7     A     Okay.

8     Q     In the amount of $10,000.

9          How did this lien come to be?

10    A     Robert put down the down payment or the

11 company put down the down payment on my car.

12    Q     And what are the terms of the repayment of

13 this then $10,000?

14    A     I don't know.  It's been almost five years.

15 I don't recall.  I'd have to go back and look at

16 paperwork.

17    Q     And then we got this one right here, Robert

18 Stidham as secured against the 2020 Hyundai Palisade

19 in the amount of $24,720.

20         Can you explain that one?

21    A     That was for rents that I owed him to help

22 me out.  So that was -- I guess the Palisade was part

23 of the claim against.  So -- but that was -- the

24 money, the 24,00, that was to cover, like, my rent

25 when I hadn't been able to make full rent payment.

1     Q    And I'm guessing this collection agency,
2   that's just a typo?
3     A    I -- it's not checked.  So I'm assuming
4   because there's no check in the box.
5     Q    Huh.  And then you also checked the box for
6   disputed.
7          Can you explain that?
8     A    As far as what?
9     Q    Well, this is -- this box is what you would
10  check if you don't agree with the -- what the
11  creditor is saying the amount of the debt is or
12  whether you owe it at all.  I'm assuming that's just
13  a typo and I'm just trying to clarify that that's the
14  case.
15    A    Anerio, I don't know.
16         MR. ALTMAN:  Susan, this is your deposition.
17  If you don't know the answer you can say I don't know
18  the answer.  It's okay.
19         MR. HESTON:  Yeah.  That's fine.
20         THE WITNESS:  I don't know.
21  BY MR. HESTON:
22    Q    Okay.  So was there a contract or some kind
23  of agreement regarding this $20,720?  Something in
24  writing?
25    A    I don't think we had an agreement.  I think

23

1    it was more of a hand shake on it.  But I -- again, I

2    would have to ask Robert.  This is from two years

3    ago.  So I don't know.  Yeah.  Over.  Three years

4    ago.  So I don't recall.

5        Q    Yeah.  Do you know if this debt to Robert

6    Stidham or the one to Executive Decisions Group, were

7    there any documents submitted to the DMV so that they

8    would be listed as lien holders?

9        A    I don't believe so.

10       Q    Let's stop the screen share.

11            Have you ever made any payments towards that

12   list, the -- to Robert Stidham that we just went

13   over, $24,720?

14       A    As in when?

15       Q    Have you made any payments on it ever?

16       A    I don't remember.  Again, that's, like,

17   three-plus years old.  So I don't know.

18       Q    So Robert has given you contributions on and

19   off for the past couple years; isn't that right?

20       A    Yes.

21       Q    And looks like some of these are

22   contributions, but then some of them you've treated

23   as if they are personal loans.  Can you explain why

24   that would be?  Why some are just contributions and

25   the others seem to be subject to repayment?

```
 1            MR. ALTMAN:  Objection, argumentative.
 2    Objection, lacks foundation.  Objection, assumes
 3    facts not in evidence.
 4            Susan, you can answer to the extent you're
 5    able to answer.
 6            THE WITNESS:  Well, when I had a job the
 7    plan was I was going to pay him back.  Seeing that I
 8    still don't have a job now he's kind of like in
 9    this -- he's been kind enough to help so I'm not
10    homeless.
11    BY MR. HESTON:
12        Q    So you left your job at -- was it Riverbed
13    Technologies was your prior employer?
14            MR. ALTMAN:  Objection, assumes -- Susan,
15    hold on.
16            Objection, assumes facts not in evidence.
17    Lack of foundation.
18            Susan, you can answer to the extent you're
19    able to do so.
20            MR. HESTON:  I'll reask the question just so
21    it's all there.
22    BY MR. HESTON:
23        Q    Where were you working at the beginning of
24    2022?
25        A    2022?
```

25

1     Q     Right.

2     A     I was at Riverbed.

3     Q     When did you stop working there?

4     A     I was given a severance package in April of

5     2023.

6     Q     And so were you laid off?

7     A     Yes.  It was a reduction in force.

8     Q     And I'm sorry.  What was the date that you

9     ended your job there?

10    A     I don't have the exact date but it was in

11    April of 2023.

12    Q     And when did you find your next employer?

13    When did you start working again?

14    A     December 29th of 2023.

15    Q     And so what was your income between the two

16    jobs?  What sources of income did you have?

17    A     Child support, unemployment, and I had

18    gotten a severance package from Riverbed.  And

19    then -- wait.  And then Robert helped contribute when

20    I was short money.  So I guess four sources.

21    Q     Do you have an estimate of how much he

22    contributed during July through December?

23    A     No idea.

24    Q     On your means test that was submitted with

25    your Chapter 7 petition it lists an average of

```
 1    $6,972.33, which would mean that the actual amount
 2    would be six times that.  So that would be $41,834.
 3            Does that sound like it is correct as the
 4    amount he --
 5            MR. ALTMAN:  Objection.  Go ahead.  Finish.
 6    Sorry.
 7    BY MR. HESTON:
 8        Q    -- as the amount that he contributed during
 9    that period?
10            MR. ALTMAN:  Objection, calls for a legal
11    conclusion.  Objection, assumes facts not in
12    evidence.  Objection, best evidence rule.  Objection,
13    hearsay.
14            Susan, you can answer it if you know.
15            THE WITNESS:  I don't -- I don't know the
16    exact amount.  Again, I don't know because it varies.
17    There's never been a set amount.
18    BY MR. HESTON:
19        Q    Can you see my screen?
20        A    Yes.
21            MR. ALTMAN:  Yes.
22    BY MR. HESTON:
23        Q    Okay.  Do you recognize this document?
24        A    Yes.
25        Q    Okay.  So this is the statement of your
```

27

1   current monthly income that was submitted with your

2   current case.  As you can see here under line 4 for

3   all amounts from any source which are regularly paid

4   for household expenses of you or your dependents,

5   including child support it lists $6,972.33.

6         How did you arrive at that number?

7      A    It's an average.

8         MR. ALTMAN:  Objection, calls for a legal

9   conclusion.

10         THE WITNESS:  Oh.

11         MR. ALTMAN:  Susan, you can answer if you

12   know.

13         THE WITNESS:  It would be an average.  So we

14   looked at the six months prior and it was an average.

15   BY MR. HESTON:

16      Q    So when -- these -- is this all

17   contributions is part of that child support?

18      A    It says "including child support."  So the

19   child support would have been included in that

20   number.

21      Q    And so when Robert was making these

22   contributions during that period, how would he do

23   that?  Would he give you money or would he pay

24   expenses directly?

25      A    It just -- it depend upon what was needed.

28

1    There's never been -- it's never been a set amount.

2    It's never been said this is like, oh, hey, I need

3    help with this or groceries or gas or whatever and he

4    may take me to the gas station or take me grocery

5    shopping, or he may even give me some cash if I

6    needed it.  I mean, it just depended.  There's never

7    been a set way.  It's all just whatever.

8         **Q    And you mentioned that when you weren't**

9    **working the money that he would give you or the**

10   **expenses that he would cover those were**

11   **contributions, whereas while you were working you**

12   **treated them as loans.  Is that -- is that correct?**

13        A    So not in all cases, but, yeah, my intent

14   has always been to pay back.  I never expected to not

15   be working.  So that was the original intent.

16        **Q    Is there any expectation that you repay any**

17   **of this $6,972 or I guess total would $41,834.**

18        **Is there any expectation that you have to**

19   **repay that?**

20        A    Well, so you're bundling in what Robert

21   gives me, my child support due, my unemployment.  So

22   you're not -- you got to piece it out.  Because this

23   probably wasn't that complete amount.  So if you're

24   asking me am I intending -- so what are you asking?

25   So knowing that it's not -- you're trying to lump it

1  together and it's not lumped together.

2      Q    Right.

3      A    So you have to look at it more

4  individually.

5      Q    Okay.  We can just ignore the numbers.

6          If -- are you expecting to repay any of the

7  contributions that Robert gave to you during the time

8  in which you were unemployed?

9      A    We have not sat down and talked about it.

10     Q    I'm just turning off screen share.

11         During the time in which you were

12  unemployed, were there any expenses that you had to

13  cut back on or did you maintain essentially the same

14  standard of living?

15     A    Definitely cut back.  I mean, we rarely go

16  out to eat, I guess.  What expenses?

17     Q    I'm just asking across the board were there

18  any expenses that you can recall having to cut back

19  on during that period?

20     A    Trying to be more thoughtful with, you know,

21  water use and not eating out.  I don't live an

22  extravagant life in the first place.  I've got

23  teenagers.

24     Q    And you said you started working at a new

25  job in December of 2023.

1            What was the name of that employer?

2      A    Proficient.

3      Q    And do you still work for Proficient?

4      A    No.

5      Q    Can you explain what happened?

6      A    I was let go.

7      Q    Were you told why?

8      A    I did not learn fast enough and I had not

9  done enough outreach.

10     Q    On your Schedule J, which is the budget that

11 was submitted with your Chapter 7 petition, you

12 listed an expense of -- I believe it was 30- -- $36

13 per month for license.

14          Can you specify what license this is?

15     A    You can repeat the question or show me the

16 document you're looking at?  Because if I can see

17 what you're looking at -- I don't know -- license for

18 what?

19     Q    So this is your Schedule J, which lists your

20 expenses.  And on this attachment here there is this

21 expense.

22     A    Huh.  Probably -- I -- I would think, like,

23 DMV but I don't recall.  I'd have to look.

24     Q    Other than a driver's license, do you have

25 hold any licenses?

1      A     No.

2          Q     On the same budget you listed your rent as

3   being $2,700 but you had just testified a few minutes

4   ago that your rent was $5,400.

5               Can you explain why it says 2,700 here?

6      A     Yes.  The rent is 5,400.  Executive Decision

7   pays 2700 of it.  They're on the lease.  And then I

8   pay 2700 of it.  Or I'm on the -- supposed to pay

9   2700 of it.

10         Q     So the lease agreement says that you pay

11  2700 and Executive Decision Group pays 2700?

12     A     Well, it just -- it's -- that's how we split

13  it, 50/50.

14         Q     So does the lease agreement say that you are

15  both liable for the 5,400 and that the 2,700 that's

16  just the split that you've worked out?

17     A     I don't recall what the lease states but

18  it's -- the lease would state 5,400.  I don't think

19  the lease care who pays what.  It's not that

20  specific.  It just says rent is 5,400, and my portion

21  has been the 2700 and Executive Decision's is the

22  2700.

23         Q     How long have you lived at Snowberry?  I

24  think it was Ten Snowberry?

25     A     Since April or May of 2018.

1      Q     And was Executive Decision Group listed on
2  the lease in 2018?
3      A     No.
4      Q     When were they added?
5      A     Last year.
6      Q     And what was the purpose of that?
7      A     So Robert is an Arizona resident and when
8  he's in Orange County he has customers here.  So it's
9  easier for him to have a place to stay so he's not
10 paying for hotel fee.  So we've just put him on the
11 lease for the corporation.
12     Q     What is Robert's connection with Arizona?
13     A     That's where his company is headquartered.
14     Q     How often is he there?
15     A     Whenever -- I don't know.  The guy travels
16 all the time.  So maybe one or two days a month.  I
17 don't know.  Maybe a week a month.  I mean, it's
18 never -- there's no -- again, he's on the road all
19 the time.
20     Q     Is he primarily staying with you at your
21 home?
22     A     No.  He's literally on the road three weeks
23 out of every month.
24     Q     And so if he's not in Arizona and he's not
25 with you he's just on the road traveling for

1    business?

2        A    Yes.

3        Q    Would you be able to give me an estimate,

4    maybe break it down by year or month or whatever's

5    easiest for you to give me just an estimate of

6    what -- maybe what percentage or what portion of the

7    year he's spending with you?

8        A    I would have -- it -- again, he -- his work

9    is, like, on the road.  His customers.  So there is

10   no set schedule.  I could not -- I couldn't even

11   guess.  Like, I literally barely see the guy half the

12   time.  He's here.  He's on the road.  He's -- like,

13   he's been in -- he's on his way to Sydney, Australia,

14   today or last night.  He's gone all the time, and

15   when he's gone he's gone for, like, ten days.  Then

16   he goes back to Scottsdale for a couple days or he'll

17   come here and spend a weekend with the kids and I.  I

18   mean, it's on the road all the time.

19       Q    Does he still have the rental in Scottsdale,

20   Arizona?

21       A    As far as I know, yes.  He maintains a

22   property or a residency there.

23       Q    At your previous deposition you testified

24   that you had two spare bedrooms, one of which you

25   were using as a home office and the other was a guest

1  room.

2        Is that still the case?

3     A    Yes.

4     Q    How often do you have guests staying with

5  you?

6     A    I mean, it just depends upon if family comes

7  out to visit or if I have friends that come visit.

8     Q    Does Robert have any children from his

9  previous relationship?

10    A    Yes.

11    Q    And how old are they?

12    A    I think he's like 34 or 35.

13    Q    He just has one child?

14    A    Correct.

15    Q    And you have two kids; is that correct?

16    A    Yes.

17    Q    And how do you see Robert?  Do they consider

18 him to be your boyfriend or do they treat him like

19 he's their stepfather?  Does that make sense?

20    A    How do the kids see Robert or how do I see

21 Robert?

22    Q    How do the kids see him.  Do the kids have a

23 direct relationship with Robert or do they just kind

24 of see him as mom's boyfriend?

25    A    You'd have to ask them, I guess.  I don't

```
 1   know.  I mean we're --
 2        Q    Does Robert ever take them out?
 3        A    To do what?
 4        Q    Just take them out for activities.  My kids
 5   are pretty young and I take them out for ice cream.
 6   That's kind of thing we do.
 7             Is there any kind of similar thing where
 8   Robert spends quality time with your kids?
 9        A    He -- yeah.  I mean, he will take them --
10   yeah.  I mean, I don't know if they're going out for
11   ice cream anymore.  Maybe.  But -- yeah.  I mean,
12   he's taken them out.  I -- we've been together for --
13   my God -- seven years.  So yeah.  I mean, obviously,
14   he's -- I'm sure they consider him family but I don't
15   really go, oh, we're not married.
16        Q    Do you have any plans to get married?
17        A    Never.
18        Q    Why is that?
19        A    I tried that and it took four years to
20   unravel.  No thank you.
21        Q    That makes sense.
22        A    Don't laugh, Anerio.
23        Q    I'm going through a divorce right now.  So I
24   can definitely -- I understand.
25        A    Here's some advice.  Find a good divorce
```

36

1    attorney.

2        Q    Yeah.  Okay.  I'm going back to your

3    bankruptcy petition that was filed in January of this

4    year.  You listed on your Schedule D, which is a list

5    of secured debts -- you listed a debt owed to Charles

6    Schwab and you indicated that that debt is secured

7    against a retirement account.

8            So is that just a 401(k) loan?

9        A    Again, I'd have to see it and I don't know.

10   You didn't say the amount.

11       Q    Okay.  This is what I'm looking at.  This is

12   your bankruptcy petition, Schedule D.  It says the

13   creditor's name is Charles Schwab, secured against

14   the 401 action, and the amount of the claim is

15   $14,669.12.

16       A    Ask your question again then.  Sorry.  Yeah.

17   So it's a 401(k) loan, correct.

18       Q    Okay.  Do you have to pay Charles Schwab or

19   are you just paying back money into your own

20   retirement account?

21       A    At this point I think they -- I was paying

22   Charles Schwab for the loan and then it -- it

23   converted.  It just -- I don't know even know when it

24   converted, but, yeah, I was paying Charles Schwab.

25   It was a loan against my 401(k).

37

1     Q     And what do you mean that it converted?

2     A     I think what they do after not doing

3 anything with it after a year then they ding you with

4 it or like you took out an early withdrawal.  So it

5 originally was a loan that I had to pay and then it

6 converts eventually.

7     Q     So are you still making payments on this?

8     A     No.  I can't because I have no money, but I

9 was making payments on it.

10    Q     And those payments were in the form of

11 payroll deductions?

12    A     Yes.

13    Q     Okay.  Now I'm looking at the statement of

14 financial affairs that was filed along with your

15 Chapter 7 petition.  Right here under Item No. 4 this

16 is where you would list income from employment or

17 operation of a business.  You indicated that in 2022

18 you earned wages of $211,530.

19          Can you explain to me how you arrived at

20 that figure?

21    A     For -- it would have been coming off of my

22 W-2 I'm sure.

23    Q     Does it pop up for you?  Can you see that

24 paycheck?

25    A     Uh-huh.

38

1      Q    This is your December 15, 2022, paycheck.

2  And see here that it says your gross pay year to date

3  is $239,707.85.  I do see that part of that is

4  imputed income.  But still --

5      A    They -- sorry.

6      Q    But I don't see how these numbers -- and I'm

7  assuming you had one more paycheck after this because

8  it looks like -- or did you have another paycheck

9  after this?

10      A    Well, scroll over.  So behind there you are

11  missing the 401(k) pretax.  So there's a gross wage.

12  If you know how to read a paystub there's a gross

13  age.  Scroll down.  And then you see there's a

14  pre-tax and a post-tax for 401(k).  But you're

15  missing to the right it says "Other 401(k) pre-tax."

16      Q    Oh.

17      A    I can't see because of how my layout is, but

18  that's how much went into the 401(k).

19      Q    Got it.  Okay.

20      A    So you got to deduct that and then that's

21  your net income or gross income.  I guess it's gross

22  income because it comes off of the top.

23      Q    Okay.

24      A    So, again, it comes -- that number on the --

25  whatever you had pulled up on my payment, it came off

1   of my W-2.  So that is correct.

2        Q    Yeah.  Okay.  I understand.

3             MR. ALTMAN:  Ben, can we take a five?

4             MR. HESTON:  Sure.

5             MR. ALTMAN:  Okay.

6             MR. HESTON:  Okay.  Off record.

7             (Pause in the proceedings.)

8             MR. HESTON:  Back on record.

9   BY MR. HESTON:

10       Q    Okay.  Are you currently unemployed?

11       A    Yes.

12       Q    Are you looking for work?

13       A    Yes.

14       Q    And what job or what field are you looking

15  at?

16       A    Tech.  Tech sales.

17       Q    This is what you were doing previously;

18  right?

19       A    Correct.

20       Q    Are you receiving unemployment?

21       A    No.

22       Q    Why is that?

23       A    The -- I wasn't able to file because it

24  hadn't been a year prior to my last filing of

25  unemployment, and I don't even think I have enough

40

1  credit to collect.  I'm trying to see what my options

2  are.

3      Q    How are you making ends meet right now?

4      A    As far as -- well, I have child support

5  coming in and I'm relying on friends and family.

6      Q    So are you receiving -- you're receiving

7  contributions from friends and family right now?

8      A    Yes.

9      Q    From who?

10      A    My mom helps me out and Robert has helped me

11  out.

12      Q    How much approximately has your mom given

13  you since you became unemployed?

14      A    Again, no set amount.  She's -- she hasn't

15  been like, oh, let me give you a set amount.  That

16  hasn't been the case.

17      Q    Right.  No.  I understand.  I'm just

18  wondering how much total?

19      A    Maybe $1,000.

20      Q    And what period has this been over?

21      A    Let's see.  I lost my job in February.  So

22  since February she's given me $1,000.

23      Q    And did you say that Robert has been helping

24  as well?

25      A    Yes.

1    Q    Do you have an estimate of how much he's

2    contributed?

3    A    Again, I -- there has been no set amount.

4    It just depends upon what has been needed.

5    Q    Do you have an estimate?

6    A    I couldn't even estimate because the bills

7    just -- they vary from month to month.

8    Q    And so has he been paying these bills

9    directly or giving you money or both?

10   A    He will pay the bills directly.

11   Q    Has he been making the full rent payment of

12   $5,400?

13   A    Yes.  He's had to do that.

14   Q    And are -- is there any expectation that the

15   money that he's given you over the past I guess --

16   what? -- three months is there any expectation that

17   you are going to repay that?

18   A    We have not sat down and talked about it.  I

19   hope not but we haven't talked about it.

20   Q    Have you incurred any new debt since your --

21   since January of this year?

22   A    As far as what?

23   Q    Just any type of debt.  Credit card,

24   personal loans.

25   A    No.

1    Q    So your prior attorney was Bill Parks; is
2    that correct?
3    A    Yes.
4    Q    How did you meet him?
5    A    He was referred over to me.
6    Q    By who?
7    A    A friend of Robert's.
8    Q    Did meet with any other bankruptcy attorneys
9    prior to filing that first case?
10   A    No.  I should have but no.  I should have
11   met Anerio.
12   Q    Okay.  That gets to my next question.
13        How did you come to know Anerio?
14   A    He was referred to me.
15   Q    By who?
16   A    I think through, like, a couple of other --
17   I think some other attorney had referred him to me.
18   I don't recall the guy's name but he said Anerio's
19   amazing.  He'll get a big head now.
20   Q    So in your first Chapter 7 bankruptcy, the
21   one that was filed in San Diego, what was the initial
22   amount that you agreed to pay Bill Parks as a
23   retainer?
24   A    I don't recall what it was.  I don't know.
25   Maybe 5,000, 7,000.  I don't know.  I couldn't tell

43

1    you.  I'm guessing.  I don't even want to guess.

2         Q    Do you know if you paid the full amount in

3    advance?

4         A    For bill?

5         Q    Correct.

6         A    I think I gave him, like, an original $5,000

7    payment and I think I had to pay him more, but I

8    don't recall the exact amount.

9         Q    If you had to give an estimate of additional

10   charges, what would you say?

11        A    No idea.  I'm -- it's pure guess.  That

12   was -- what? -- four years ago?  Three years ago.

13   That's a long time.  That's a lot.

14        Q    Yeah.  Do you know what his hourly rate

15   was?

16        A    No idea.

17        Q    There was a few motions, including a motion

18   to dismiss that he filed an opposition to.

19             Did you pay for this separately or was that

20   included in the initial retainer?

21        A    Again, I don't recall.  I don't know.

22        Q    And Mr. Parks, he filed your second

23   bankruptcy case; is that correct?

24        A    Yes.

25        Q    And do you know how much he charged for the

1   initial retainer fee?

2       A    I -- I don't recall what it was exactly.

3       Q    Do you know if you -- if you owed Mr. Parks

4   any money prior to when your second case was filed

5   other than the retainer for the second case?

6       A    I do not believe so, but I would have had to

7   square that up beforehand.

8       Q    And what did you -- did you ask Mr. Parks to

9   substitute out of the case?  Did you tell him that

10  you wanted to replace him?

11          MR. ALTMAN:  Objection and instruct my

12  client not to discuss conversations she had with her

13  counsel.  Obviously, objecting on attorney-client

14  privilege.

15          MR. HESTON:  Right.  I'm trying to figure

16  out to how to rephrase it.

17          MR. ALTMAN:  Yeah.

18  BY MR. HESTON:

19      Q    We can skip that one I suppose.

20          What was -- what was the initial retainer

21  fee amount for -- that Mr. Altman charged for taking

22  over your second case?

23      A    I don't recall that.

24      Q    Do you know what the approximate amount

25  was?

1    A    Again, I'd have to trying to dig through

2   records.  I have no idea what I have paid him to date

3   even.

4    **Q    In the second bankruptcy case, were there**

5   **charges that occurred other than the initial**

6   **retainer -- or sorry.  Strike that.**

7         **Was the -- was the retainer exhausted in the**

8   **second bankruptcy case, the retainer with**

9   **Mr. Altman?**

10        MR. ALTMAN:  Objection.  Vague as to "second

11   bankruptcy case."  And if we can do this on the

12   record, a brief meet and confer.  So there's a San

13   Diego case that got moved to Orange County, which is

14   technically the first bankruptcy case but it has a

15   different case number, and then there's a second

16   bankruptcy case filed immediately thereafter, and

17   then this would be the third one.  So of these three

18   cases, which one are you referring to?

19        MR. HESTON:  I'm referring to the one that

20   was filed in 2022 on April 18th, 2022, Case number is

21   8:22-BK-10652-ES.

22        MR. ALTMAN:  Susan, if you can recall don't

23   discuss conversations you had with me but you can --

24   you can answer it if you can.

25        THE WITNESS:  I don't know the amounts that

1   have been paid.  Again, you're talking two years ago.

2   Like, I don't recall the amount.  It's been a long

3   time.

4   BY MR. HESTON:

5       **Q    Is it you -- has it been you that has paid**

6   **the fees or is someone else helping?**

7       A    I just -- I have paid them.  I guess I take

8   that back.  My mom helped me with one, I believe, and

9   Robert probably has given me a little bit as well on

10  the first one and I have paid the rest.

11      **Q    Have all of the payments for attorney's fees**

12  **come from -- well, other than what you just said,**

13  **have they come from your bank accounts?**

14      A    They were -- remember, we went through

15  the -- okay.  So the 401(k) loan and stuff, so that's

16  where they've come from.  So I've had to take it out

17  of the 401(k) and then they go into my -- because

18  they won't send a check directly to Anerio.  Then it

19  comes to me and I'd have to pay Anerio myself.

20      **Q    The amount that was paid -- I'm looking at**

21  **the -- well, actually, No.  Sorry.  Hang on one**

22  **second.**

23          **So on your statement of financial affairs**

24  **that was filed along with the Chapter 7 petition it**

25  **states that $19,008 was paid to Lake Forest**

1   **Bankruptcy on January 25th, 2024, which is the same**

2   **date a case was filed; is that correct?**

3       A    Yes.

4       **Q    What was the source of that payment?**

5       A    That would have came from my -- my loan.

6       **Q    So you received a check from your**

7   **retirement?**

8       A    No.  I had already taken the money out of

9   retirement.  Remember?  We went through the --

10      **Q    Right.**

11      A    -- amount.

12      **Q    I didn't see -- sorry.  I didn't see the**

13  **payment on any of the bank statements that you**

14  **provided.  So maybe you can direct me to that.**

15      A    You had already pulled it up on one of them.

16      **Q    Do you know which bank account?**

17      A    You had already pulled it up on -- I don't

18  know.  I think it was a Comerica.  We already looked

19  at it.  We already looked at the...

20          MR. HESTON:  Okay.  Can we go off record for

21  just a second while I look through these bank

22  statements?

23          MR. ALTMAN:  Sure.

24          (Pause in the proceedings.)

25          MR. HESTON:  Back on record.

1   BY MR. HESTON:

2       Q     Okay.  I'm looking at the Comerica statement

3   from January of 2023, and I see a deposit for 33,000.

4   And I know that we went over this earlier but could

5   you refresh my recollection as to where -- what the

6   source of that payment was?

7       A     That came in?

8       Q     Correct.  This is a deposit into the

9   account.

10      A     It -- it was that TD Ameritrade, remember?

11  We talked about that already.

12      Q     Well, on December 19th is the TD Ameritrade,

13  and that was in the amount of $10,750.  So it appears

14  that that's a different transaction.

15      A     Correct.  You understand Schwab has now

16  bought TD Ameritrade.  So it's all one big -- so I

17  guess I should be saying -- I don't even know who

18  owned them at that time, but it came in from my 401

19  (k).  One would have come in from my IRA; one would

20  have come in from my 401 (k).

21      Q     Got it.  And then so this $30,000 that

22  withdrew, where did that go?  It went from your bank

23  account to where?

24      A     To my attorney.

25      Q     The entire 30,000?

```
 1       A    Yes.

 2       Q    So on your statement of financial affairs it

 3   says that it's $19,008 received on January 25th,

 4   2024.  Is that a typo?  Does that need to be

 5   corrected?

 6       A    Again, so the 30,000 went -- there was

 7   another case prior to this filing.  So your -- you're

 8   mixing the two together and it shouldn't be mixed

 9   together.  They -- so there was still money that was

10   paid to him for the -- I'm assuming it was held in,

11   like, an escrow or something.  But -- yeah.  So the

12   30,000 went -- go back to the dates.  You got to look

13   at the dates.

14       Q    Yeah.  No.  I -- I think I'm following.

15       A    You're mixing it together and trying to say

16   there's two different payments and there wasn't.

17   There was one payment but it was part of -- we had

18   spent whatever amount for the second filing, and then

19   the 19,000 was for the new filing that was there.

20   That was a payment to him.

21       Q    Got it.

22            Did you owe Mr. Altman any money before

23   filing the present case?

24       A    I do not believe so.

25       Q    And is it your testimony that if anyone else
```

50

```
 1    paid any of your legal fees it would have been a
 2    relatively nominal amount?
 3         A    Yes.  Given what this is costing me, yes.
 4         Q    Sorry.  We might be getting close to the end
 5    of this, and I'm just skimming through my questions
 6    so I'll just be one minute.
 7              MR. ALTMAN:  That's right.
 8              THE WITNESS:  No worries.  Thank you.
 9              MR. HESTON:  Would you guys mind if we took
10    a break, go off the record?
11              MR. ALTMAN:  Go ahead.
12              MR. HESTON:  Five minutes.
13              MR. ALTMAN:  Uh-huh.
14              (Pause in the proceedings.)
15              MR. HESTON:  We can go back on record.
16    BY MR. HESTON:
17         Q    Susan, can you hear me?
18         A    Yes.
19         Q    Okay.  There was some litigation that
20    happened in state court in between your second
21    bankruptcy case and the current one; is that
22    correct?
23         A    What kind of litigation?
24         Q    Well, there was -- was it -- it was a claim
25    of exemption; right?  And you had -- I believe you
```

51

1  hired Mr. Altman to represent you in that.

2      A   Okay.

3      Q   At the conclusion of the claim of exemption

4  proceeding, did you owe Mr. Altman any money?

5      A   I -- I guess I don't know.  I don't think

6  so.

7      Q   Did you receive any bill?

8      A   Yes.  I have bunch of invoices.  I have not

9  looked at all of them, but it would have already been

10  paid for I'm assuming.

11     Q   Can you explain what you just said?

12     A   So I had hired him for the bankruptcy and

13  that was for I think -- she had -- Hollie had filed a

14  wage assignment; right?  That's what you referring

15  to?

16     Q   Yes.

17     A   Right.  It would have been paid.  He

18  wouldn't have taken this filing if it wouldn't have

19  been paid.

20     Q   Well, when was it paid is my question?

21     A   Oh.  I don't know the exact date.  I don't

22  recall.

23     Q   Was it before or after the conclusion of the

24  state court proceeding?

25     A   I had him on retainer.  So it would have

1   come out of existing funds that were there from the

2   retainer.

3        **Q     So are you saying that the $30,000 that was**

4   **paid around January of last year at least a portion**

5   **of that money went to cover the attorney's fees for**

6   **the claim of exemption?**

7        A    I don't -- I don't know the exact date of

8   when was paid.  So -- yeah.  I mean, the monies would

9   have already been there.  Sorry.  My -- sorry.

10           MR. HESTON:  Well, I think that concludes my

11   questions.  We can go off record.

12           (The deposition concluded at 11:32 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              * * * *

2

3        I do solemnly declare under penalty of perjury

4    that the foregoing is my Examination Under Oath; are

5    the questions asked of me and my answers thereto;

6    that I have read same and have made the necessary

7    corrections, additions or changes to my answers that

8    I deem necessary.

9

10          I witness thereof, I hereby subscribe my

11   name this _____ day of _____.

12

13

14

15                    _____

16                    SUSAN JO WHITE

17

18

19

20

21

22

23

24

25

54

1                          CERTIFICATION

2                               OF

3              CERTIFIED SHORTHAND REPORTER

4

5      The undersigned certified shorthand reporter of

6   the state of California does hereby certify;

7            That the foregoing Examination Under Oath

8   was taken before me at the time and place therein set

9   forth, at which time the witness was duly sworn by

10   me;

11            That the testimony of the witness and all

12   objections made at the time of the deposition were

13   recorded stenographically by me and thereafter

14   transcribed, said transcript being a true copy of my

15   shorthand notes thereof.

16            In witness whereof, I have subscribed my

17   name this date May 29, 2024.

18

19

20   _____

    Amy M. Lemacks
21   Certificate No. 13425

22

23

24

25

55

**JDE of Susan Jo White**
**In re: Susan Jo White**

1    CASE NAME: _____

2    WITNESS NAME:_____

3    DATE TAKEN:_____

4                   TRANSCRIPT ERRATA SHEET

5    The reasons for making changes are as follows:

6    1. To clarify the record;

7    2. To conform to the facts;

8    3. To correct major transcription errors

9    PAGE     LINE       CORRECTION & REASON

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   Signature of Deponent                    Date

**JILIO-RYAN Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**19700 Fairchild Road, Suite 280
Irvine, CA 92612**

A true and correct copy of the foregoing document entitled (*specify*): **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS CHAPTER 7 CASE PURSUANT TO SECTION 707(b)(2) & (3)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 7/10/2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Anerio V Altman     LakeForestBankruptcy@jubileebk.net, lakeforestpacer@gmail.com;ecf@casedriver.com
Karen S Naylor (TR)     alane@ringstadlaw.com, knaylor@IQ7technology.com;ecf.alert+Naylor@titlexi.com
United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 7/10/2024 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Judge Scott C. Clarkson
411 West Fourth Street
Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed (state method for each person or entity served):

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 7/10/2024 | Benjamin Heston | /s/Benjamin Heston |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**